MABGDEN1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4                 v.                        20 Cr. 623 (JSR)

 5    WILLIE DENNIS,

 6                                           Trial
                      Defendant.
 7    ------------------------------x

 8                                           New York, N.Y.
 9                                           October 11, 2022
                                             11:30 a.m.
10

11    Before:

12                        HON. JED S. RAKOFF,

13                                           District Judge
                                              and a Jury
14
                            APPEARANCES
15
      DAMIAN WILLIAMS
16         United States Attorney for the
           Southern District of New York
17    SARAH KUSHNER
      STEPHANIE SIMON
18    KIMBERLY RAVENER
           Assistant United States Attorney
19
      WILLIE DENNIS, Pro Se
20
      Also Present:
21
      Colleen Geier, Paralegal
22    Elisabeth Wheeler, FBI
      Elizabeth Caruso, Interpreter (Spanish)
23    Elizabeth Ilaakostos, Interpreter (Spanish)

24

25
```

MABGDEN1

```
 1                 (In open court; jury not present)
 2                 THE COURT:  This is United States v. Dennis.
 3                 Counsel for the government please identify themselves.
 4                 MS. KUSHNER:  Good morning, your Honor.  Sarah
 5       Kushner, Stephanie Simon and Kimberly Ravener on behalf of the
 6       government.  And also at counsel table is also FBI Special
 7       Agent Elisabeth Wheeler.
 8                 THE COURT:  Good morning.  So it is now 11:25.
 9       Mr. Dennis was informed in our last conference on the record
10       that this matter would begin promptly at 11:15.  He is not yet
11       here.  We will wait a reasonable amount of time.  But if he
12       doesn't show, of course, we'll need to take appropriate action,
13       but let's see what happens.
14                 What was the last contact that anyone at government
15       table had with Mr. Dennis?
16                 MR. DENNIS:  He emailed the government this morning
17       asking for the courtroom address.
18                 THE COURT:  When was that, approximately?
19                 MR. DENNIS:  It was approximately an hour ago.  And we
20       responded right away.
21                 THE COURT:  All right.
22                 THE DEPUTY CLERK:  Does he have the courtroom number?
23                 MR. DENNIS:  It was an hour and a half ago, closer to
24       two hours.  And we and your law clerk provided the address.
25                 THE COURT:  I hope it won't be necessary, but has the
```

MABGDEN1

1    government now prepared a bench warrant?

2            MS. SIMON:  We're working on it, your Honor.

3            (Pause)

4            LAW CLERK:  We just got an email from Mr. Dennis.  It

5    says, I'm a little delayed.  I expect to be at the courthouse

6    in the next 15 minutes.

7            So that would be by 11:45 a.m.

8            (Pause)

9            THE COURT:  Where do we stand on that bench warrant?

10            MS. SIMON:  It's being prepared by our office now.

11    And with the Court's permission, we would submit it by email.

12    Would that be possible?

13            THE COURT:  Yes, that's possible.  But this normally

14    would take, on a slow day, about two minutes to prepare.

15            MS. SIMON:  We're having some connectivity issues here

16    in the courtroom, your Honor.  And that's why someone back in

17    our office is preparing it.

18            THE COURT:  Have you ever heard of the telephone?  Who

19    is it you want to reach?

20            MS. SIMON:  They are already preparing it.

21            THE COURT:  You just tell them that I want it here in

22    five minutes or less.

23            MS. SIMON:  Yes, your Honor.

24            Would your Honor like us to send it to the chambers

25    address or to Mr. Kern?

MABGDEN1

1          THE COURT:  Send it to Mr. Kern.

2          MS. SIMON:  We just sent it to you.

3          THE COURT:  So I will give the signed arrest warrant

4     to the government.  It is now 11:45, so it's a half hour since

5     Mr. Dennis was supposed to appear.  My law clerk said he sent

6     an email saying he would be here at approximately 11:45.  We

7     will wait no more than 15 additional minutes.

8          (Pause)

9          MS. SIMON:  Pretrial just provided an address to us.

10    It's the west side Y M C A at --

11         THE COURT:  Here is the defendant.

12         Take a seat at the second table, Mr. Dennis.

13         MR. DENNIS:  Apologies, your Honor.  I was delayed

14    downstairs, your Honor, because they took my cell phone and my

15    iPad.

16         THE COURT:  Yes, as they will with every single human

17    being who goes through this court, except upon order of the

18    court.  But we'll take that up later, because it is now almost

19    12:00 o'clock.  This matter was called for 11:15, and we're

20    going to bring up the jury panel right now.

21         MR. DENNIS:  My apologies, your Honor.  My parents had

22    an issue with their medication this morning.  As you know, I am

23    their primary caretaker.  So I had to get on the phone with

24    them.  The person who was stepping in for me did not come.  So

25    I had to make sure they got their medication.  This is their

MABGDEN1

1    first day without me helping them with that process, so it got

2    a little confused.  So I apologize.

3              Your Honor, during the jury portion, jury selection,

4    does the government have their devices?

5              THE COURT:  They have previously obtained permission.

6    If you would like permission, I will consider that.

7              MR. DENNIS:  I think I'm at a severe disadvantage,

8    your Honor.

9              THE COURT:  No, you're not at a severe disadvantage

10   because you have paid no attention to the rules of this court.

11   If you had done even the most basic research, you would have

12   known you needed the court's permission because it has been the

13   rule of this court for at least the last dozen years that, for

14   security reasons, no person entering this court can keep their

15   electronic equipment, except upon prior express order of the

16   court.  But I am happy, if you wish, to execute such an order

17   in your case.  But don't tell me about unfairness when you have

18   created the situation.

19             MR. DENNIS:  Your Honor, I object and disagree.

20   Because once again, as we have discussed before, I am

21   representing myself pro se.  So there are three government

22   attorneys sitting here, and I am -- the only reason why I raise

23   this issue is because you are saying if I do this and if I do

24   that.  I'm doing a lot.  They have three attorneys, they have

25   paralegals, they have secretaries.  And in my instance, it's

MABGDEN1

1  just me, my mother and father and my iPad.

2          THE COURT:  So the point is that, during this trial,

3  the rule of law, including the rules of this court, will be in

4  full stead.  Now, Mr. Dennis, to be frank, you have a long

5  history of violating my rules.  The most recent one being just

6  this past weekend.  I have told you at least a dozen times --

7  and of course, it's in my individual rules as well -- not to

8  send emails to the Court.  But rather, if you have an

9  application, to make it through a joint telephone call with the

10 government.  And that seems to have not made any difference to

11 you.

12         MR. DENNIS:  I object, your Honor, again.  As is in

13 the prior record, I was being -- I was -- Judge Schofield was

14 presiding over this.  I am a pro se representative --

15         THE COURT:  Mr. -- go ahead, finish.

16         MR. DENNIS:  Your Honor, 60 days before trial, I've

17 had a new judge come in, who is now insisting that any

18 violation of all of his rules -- that I have to learn all of

19 his new rules, and he knows that I'm representing myself pro

20 se.

21         THE COURT:  Now, there is one rule -- stop faking.

22         MR. DENNIS:  Excuse me, your Honor.  I object.

23         THE COURT:  Well, I'm going to tell you.

24         MR. DENNIS:  I object.

25         THE COURT:  There is only one rule that I've told you

MABGDEN1

1    to abide by.  And I told it to you the very first day we had

2    our first conference.  And I have told it to you again and

3    again and again, which is not to send emails, but to convene --

4    if you have an application -- convene a joint conference with

5    the government and the Court, which has been my universal rule

6    for 26 years.  And it makes a lot of sense, for reasons I'll

7    get to in a minute.  But that's one rule.  It's one very simple

8    rule.  So what is this stuff about, oh, the case was

9    transferred and I had to learn all sorts of new rules?  It was

10   one rule, and you seem incapable of abiding by it.

11          MR. DENNIS:  Your Honor, it's so that it's on the

12   record, when I emailed the Court was yesterday, Monday, as I

13   was traveling and could not get on a phone, was having problems

14   with my -- with my cell phone, as I informed pretrial

15   repeatedly, and the only request that I made was that my

16   parents be able to participate, who I have been -- I'm the

17   primary caretaker for, have been for the entire time.  And your

18   Honor has that in his record, that I take care of their

19   medicine.  Your Honor has it in the record that my mother

20   almost died twice during this period.  So the only thing

21   that -- going outside of your rules was yesterday asking if you

22   would give them permission to be able to participate via audio,

23   in the event of my conviction, being that they're 87 and 81

24   years of age, they may never see me again.  So I'm sorry that I

25   offended your Honor by making that request given the

MABGDEN1

circumstances I was under yesterday.

            THE COURT:  So let's, again, get the record straight.

            As you yourself pointed out in your email, this was
something that you should have brought up at the conference we
held on Friday where, to accommodate you and your parents and
your care for your parents, I allowed you to appear
telephonically over the government's objection.  And then you
waited until late yesterday.  And out of respect for your
parents and only out of respect for your parents, I once again,
as I have so often, did not enforce my rule, but rather
responded to your request saying that I was sympathetic to your
request, but that I needed to hear from the government, which
we will hear from in a minute.

            So the rules are not to be made by you.  They are not
to be made, oh, well, I'm traveling so I don't have to abide by
your rules with respect to a request that I could have made the
previous Friday, but Judge, now I'm traveling.  So I'm going to
ignore your rule.  That will not do in my court.  So let me
just make it clear and then we'll move on to the substance.

            If I receive from any party in this case any email
between now and the end of the case, I will consider holding
that person in contempt of court, which could mean, among other
things, revocation of bail.

            Now --

            MR. DENNIS:  Just so I'm clear, your Honor, so right

1    now, I'm on trial and basically facing five years in prison

2    because I sent emails that the government is claiming injured

3    and harassed them.  And now you are saying, basically, that if

4    I violate one of your rules, even if it's -- particularly, if

5    it's relating to my parents and their health, that you will

6    possibly revoke my bail and send me to jail for that?

7             THE COURT:  I'm telling you that because you are a

8    serial violator of the one and only rule that I have stressed,

9    that if you do it again, you may pay the consequences.

10            Now, why do I have that rule?

11            MR. DENNIS:  I object.  I'm not a serial violator.

12            THE COURT:  Your objection is duly noted, but you

13   better not send another email.

14            MR. DENNIS:  Understood, your Honor.

15            THE COURT:  So the reason I have this rule is really

16   for your benefit as much as anyone's.  Because had you convened

17   a telephone call at any time between Friday and yesterday, I

18   could have gotten the government's position, and then I could

19   have ruled.  And if I had ruled in your favor, we could have

20   set up the equipment.  But that's the reason I have the rule,

21   so I can deal expeditiously with any application made by any

22   party.  And every party, including pro se parties, have had no

23   difficulty abiding by that rule for the last 26 years until

24   you, Mr. Dennis.

25            Now, let's turn to the merits.

MABGDEN1

1          MR. DENNIS:  Your Honor, before -- I'm sitting back

2     here.  Is there a reason why I'm not sitting closer to --

3          THE COURT:  Yes.  Because defendants always sit at the

4     second table.

5          MR. DENNIS:  Okay.  Thank you.

6          THE COURT:  Now, what is the government's position

7     with respect to the request that Mr. Dennis' parents be plugged

8     in by video to these proceedings?

9          MR. DENNIS:  Your Honor, the government objects.  It's

10     a fairly extraordinary application to ask that a jury trial be

11     video streamed.  Of course, even when a witness, under extreme

12     circumstances, has to testify remotely, there are procedures

13     and standards in place.  And here, we do not think that this is

14     an extraordinary reason justifying the video broadcast of a

15     jury trial involving sensitive issues.

16          THE COURT:  Let me ask you this, Mr. Dennis, the one

17     concern I have about video -- in addition to that it's very

18     unusual in these circumstances -- but one concern I have about

19     video is it would be totally improper for the jury to be seeing

20     your parents 24/7 or whatever the time was of the trial,

21     because that would introduce an element to the case that was

22     not there.

23          So what about the telephone connection so they can

24     hear everything that's going on?

25          MR. DENNIS:  That would be fine, your Honor.

MABGDEN1

1           THE COURT:  That would be fine?

2           MR. DENNIS:  Yes.

3           THE COURT:  All right.  I will see -- because we're

4    running late, I had wanted to try to contact audiovisual people

5    earlier -- but I'll see what I can do to set up -- they

6    understand that they won't be able to talk, they'll just be

7    able to listen; you understand that?

8           MR. DENNIS:  Yes.

9           THE COURT:  I think my feeling on this is that -- as I

10   have tried to do throughout the case since it was assigned to

11   me -- we have to give accommodation to Mr. Dennis' parents and

12   the unhappy situation that they are in, both health-wise and

13   otherwise.  And so I think it would not be inappropriate to set

14   up a telephone link so they could listen to the trial.  So I

15   will do my best to arrange that during the lunch break today.

16          MR. DENNIS:  Your Honor, I was going to take notes on

17   my iPad, but I don't have it right now.

18          THE COURT:  I'm sorry, do you need a pen?

19          MR. DENNIS:  Yes.

20          THE COURT:  If someone would give him a pen, please.

21          MR. DENNIS:  Thank you.

22          THE COURT:  Now, in terms of your equipment, you have

23   a cell phone and an iPad; is that what was taken from you?

24          MR. DENNIS:  Yes, your Honor.

25          THE COURT:  Any objection from the government to the

MABGDEN1

1    Court issuing the order allowing him to keep those during the

2    course of this trial?

3            MR. DENNIS:  No, your Honor.

4            THE COURT:  So I'll ask my law clerk to prepare such

5    an order during the lunch break, and you'll be able during the

6    lunch break then to retrieve them, Mr. Dennis.

7            Now, I think the only other pending matter we have was

8    there was one outstanding issue regarding a subpoena.  Namely,

9    this was the subpoena that Mr. Dennis had propounded to

10   Bradford Smith, the chairman of Microsoft.  His process server

11   was unable to serve Mr. Smith, so he asked, Mr. Dennis asked if

12   he could serve him by mail.  This was an application made on

13   Friday when I didn't have a copy of the subpoena in front of

14   me.

15           I had previously approved, as I had approved every

16   last one of Mr. Dennis' subpoenas for service --

17           MR. DENNIS:  Sorry, your Honor, one issue.  What we

18   talked about at the last hearing was that I was going to be

19   able to respond as to why I needed Mr. Smith.

20           THE COURT:  Yes.  You told me that your process server

21   had tried to get in there and had not been successful.

22           MR. DENNIS:  Right.  So all my notes relating to that

23   manner and the conversation we're about to have is on my iPad.

24           THE COURT:  Well, do you want to hold off until we get

25   your iPad?

MABGDEN1

1            MR. DENNIS:  Yes, please.

2            THE COURT:  We'll do that.

3            Now, one of the most unfortunate things about the

4    defendant's delay was we were originally going to have the jury

5    panel at 11:30 and we had to excuse them because we didn't know

6    when you were going to appear, so my courtroom deputy is, I

7    think, checking on that.  But let me ask my law clerk to go

8    check with her and see what the story is.

9            There they are.

10           (Recess)

MabWden2

1        THE COURT:  All right.  Ladies and gentlemen, you are

2   our jury to try this case.  In a few minutes, we're going to

3   swear you in and then excuse you for lunch, and then when you

4   come back we'll start with the opening statements of counsel

5   and the first witness.  But let me give you a few sort of

6   housekeeping details.

7        First, you should not discuss this case with anyone

8   outside.  You may have to tell an employer or a spouse or

9   someone like that you're going to be on jury service for about

10  a week, but when they inevitably say, oh, tell us about the

11  case, you have to say no, I'm sorry; I can't discuss the case.

12  And the reason for that is we want you to decide this case

13  based solely and wholly on the evidence that you hear here in

14  the courtroom.  The evidence will consist of testimony.  It

15  will consist of exhibits.  Once in a while there's also

16  something called a stipulation, where the parties agree to a

17  fact.  Those are the only sources of evidence, and it will help

18  you to focus just on that, not to discuss with someone who

19  hasn't been here and doesn't know any of the evidence in the

20  case.

21        The second rule, which is a little less obvious, is

22  that you should not discuss the case even among yourselves

23  until it's given to you for your deliberations at the close of

24  all the evidence.  And the reason for that rule is that the

25  evidence will come in one witness at a time, one document at a

MabWden2

time, and it will a while until you have the whole picture, and

we don't want you to start making up your mind until you have

heard all of the evidence.  So don't even discuss the case

among yourselves until it's given to you for your

deliberations.

A third rule, which, again, is probably quite obvious,

don't try to do your own research.  Don't Google anything about

the case or cyberstalking or anything like that.  We'll give

you everything you need to know here in the courtroom, and

that's what you need to decide the case on.

And finally, really a rule for the parties and the

lawyers, but I want you to be aware of it, is they are under

very strict orders to have no contact with you.  So if you're

in the elevator and there's one of the lawyers or parties and

they don't even smile and say hello, it's not that they're

being rude.  It's because they're under very strict orders to

have no contact with you whatsoever.

Now, we're going to excuse you.  You'll initially go

into the jury room.  My courtroom deputy will take some contact

information, and then you'll be excused for lunch.  We'll give

you a full hour for lunch, and then we'll resume about 2:15 and

hear the opening statements of counsel.

MR. DENNIS:  Your Honor, because I have to retrieve my

iPad and --

THE COURT:  Yes, we'll take care of that.

MabWden2

1          MR. DENNIS:  -- can we have a little more time?

2          THE COURT:  OK.  We'll give you an hour and a quarter

3     for lunch.  I'm sure we can do that for you quite swiftly.

4          MR. DENNIS:  OK.

5          THE COURT:  So we'll start again at 2:30, in which

6     case we won't take a midafternoon break.  We'll just go from

7     2:30 to 4:30 this afternoon.  But now we need to swear you in.

8          (A jury of twelve and three alternates was impaneled

9     and sworn)

10         THE DEPUTY CLERK:  Please follow me into the jury

11    room.

12         (Jury not present)

13         THE COURT:  Mr. Dennis, if you want to wait here,

14    we'll get you that order right away and have someone escort you

15    down to security so you can get your electronic equipment right

16    away.

17         We will convene promptly at 2:30.

18         MS. KUSHNER:  Your Honor, can we raise four brief

19    issues?

20         THE COURT:  Yes.

21         MS. KUSHNER:  Just to be clear -- all the proposed

22    instructions reflect this -- the government is not proceeding

23    on Count Three of the indictment, and we would move to dismiss

24    that count.

25         THE COURT:  I'm sorry.  Say this again.

MabWden2

1           MS. KUSHNER:  It's a four-count indictment.

2           THE COURT:  Yes.

3           MS. KUSHNER:  The government is not proceeding on

4    Count Three.

5           THE COURT:  Oh, I wondered that from your proposed

6    jury instructions.  So Count Three is dismissed.

7           MS. KUSHNER:  Thank you.

8           We just want to clarify that while the defendant will

9    have his iPad and phone here there won't be any recording

10   through any of those devices during the course of the trial.

11          THE COURT:  Yes.  He's nodding affirmatively.

12          MR. DENNIS:  Affirmative.

13          THE COURT:  Yes.

14          MS. KUSHNER:  Third, while no plea offer was ever

15   extended, because the defendant expressed absolutely no

16   interest in it, a *Pimentel* letter was provided to the

17   defendant.

18          THE COURT:  I'm sorry.  For some reason I'm having a

19   little trouble hearing you.

20          MS. KUSHNER:  I'm sorry.  I pushed the microphone

21   away.

22          While no plea offer was ever extended to the

23   defendant, because he expressed no interest in that, a *Pimentel*

24   letter was provided, and even before that, since December of

25   2021, the defendant has been informed that the government would

MabWden2

1    oppose a one-point reduction at sentencing if defendant were to

2    proceed to trial.

3         THE COURT:  Yes, but I might as well tell Mr. Dennis

4    what the government already knows, I don't pay any attention to

5    the guidelines.  I think the guidelines are totally irrational,

6    so you may have a guideline range that's up to the wazoo, it

7    won't affect my sentence one way or the other.  Of course, you

8    may be acquitted, but if you're convicted, what I will look at

9    is, first and foremost, the human being that I'm about to

10   sentence -- that's always the most important thing to me; and

11   secondly, the victims and how they were affected.  Those two

12   factors weigh far more with me than any of this arithmetic

13   mumbo-jumbo that the sentencing commission engages in.  But

14   nevertheless, I'm glad to know that it's on the record that a

15   *Pimentel* letter has been provided.

16        OK.  Yes.

17        MS. KUSHNER:  And the fourth matter is we just want to

18   alert the Court that one of the pending motions *in limine* the

19   issue is going to become relevant with the second witness, and

20   the first witness is going to be relatively short.  So if the

21   Court wants to put aside time to address it, we're ready.

22        THE COURT:  OK.  Go ahead.

23        MR. DENNIS:  Your Honor, I still have to get my --

24        THE COURT:  I'll tell you what.  Why don't you all

25   come back at 2:20 instead of 2:30.

MabWden2

1          It's going to take you five minutes.  Were you

2     planning on more than an hour for lunch?

3          MR. DENNIS:  No.  I was planning on, actually, I

4     didn't have my notes to sort of incorporate what I've got into

5     my notes.

6          THE COURT:  OK.  Come back at 2:25 then.  I think we

7     can deal with this in five minutes.  I don't want to ever

8     detain the jury.  The jury are the most important people in

9     this courtroom, and they were told to come back at 2:30.

10          I did want to state on the record Mr. Dennis handed up

11     three proposed questions.  The first one was:  "Every person

12     looks at the world through a lens colored by their life

13     experiences.  My question is if you have had any experience in

14     your life that will make it hard for you to be fair when you

15     hear and see the evidence through the lens of your life's

16     experience."

17          I did not give that first request because I thought it

18     was too rhetorical and vague, but I did, of course, the ask the

19     jurors at the end whether there was anything that I hadn't

20     covered that made them think they couldn't serve as a fair and

21     impartial juror, so I think the substance of it was, in effect,

22     given.

23          The second question was:  "You have not heard any

24     evidence.  Do you have feelings already about how business is

25     done in the large international law firms that would make it

MabWden2

1    hard for you to hear the evidence fairly to me?"

2            I think that is nothing but an argument disguised as a

3    question, and so I rejected that.

4            The third one was:  "I want you to think for a moment

5    about the meaning of the expression 'beyond a reasonable

6    doubt.'  Do you think you can listen to the evidence and then

7    determine guilt beyond a reasonable doubt?"

8            Actually, I gave a stronger version of that at the

9    very outset.  As you may recall, the very first thing I said to

10   the jury was that the bedrock principle of our law is that a

11   defendant is presumed innocent until and unless the government

12   proves his guilt beyond a reasonable doubt.  And of course, I

13   will give them instructions at the end about what we mean by

14   reasonable doubt.  So I think as to No. 3, that was more than

15   covered.

16           I'll have my law clerk hand this back to Mr. Dennis,

17   because there were also some handwritten notes that I don't

18   want to keep.  Those are yours.

19           OK.  Very good.  We'll see you at 2:25.

20           MR. DENNIS:  Your Honor, will you send, will someone

21   be able to send --

22           THE COURT:  Yes.  We're going to work on that right

23   now.

24           (Luncheon recess)

25

MABGden3

```
 1                        AFTERNOON SESSION

 2                           2:25 p.m.

 3           (In open court; jury not present)

 4           THE COURT:  Does the government want to be heard?

 5           MS. SIMON:  The government wanted to preview an issue

 6   for the court that was raised in the motion in limine,

 7   specifically, the government expects to elicit from its second

 8   witness testimony regarding two in-person interactions that the

 9   witness had with the defendant.  And I expect the witness will

10   testify regarding an incident where the defendant approached

11   him at a professional conference, and then the defendant sent

12   him over 20 text messages over the course of one night.  That

13   included the text message, I will find you.  And then the next

14   day shows up and in fact found the witness.

15           In addition, I expect that the witness will testify,

16   after that incident, he blocked the defendant's phone number.

17   But the evidence I expect will show that the defendant

18   attempted to get in touch with this witness after that point

19   and that several months after, there was another in-person

20   interaction where the defendant approached the witness at

21   another professional conference.

22           The government thinks this is direct evidence of the

23   charged crimes.  It puts the messages that the defendant sent

24   to the victim in context.  And it contextualizes both the

25   victim's own understanding of the messages when he received
```

MABGden3

| 1 | them and the reasonableness of his belief that the messages |

1      them and the reasonableness of his belief that the messages

2      were annoying, harassing and threatening and also speaks to the

3      defendant's intent.

4                  THE COURT:  Now, for the reasons I already sort of

5      expressed in connection with the motions *in limine*, I really

6      don't think I can rule on that until I hear what leads up to

7      it.  So when you get to the questions that raise this, say,

8      Judge, we're about to get to it and we'll have a sidebar and

9      I'll hear from the defendant as well, and then I'll rule.

10                 MS. SIMON:  Of course, that's fine, your Honor.  The

11     government is happy to proceed that way if your Honor prefers.

12     I just wanted to make clear that it's going to come fairly

13     early in the witness' testimony, and the lead in will be

14     something to the effect of, after the defendant stopped working

15     at the law firm, did you see the defendant again.

16                 THE COURT:  The answer to that is yes.

17                 MS. SIMON:  Yes.

18                 THE COURT:  That's not the end of the testimony.

19                 MS. SIMON:  Certainly not, your Honor, but the context

20     will be --

21                 THE COURT:  If you want to, let's take that as an

22     example.  So the answer the witness gives is yes, what's your

23     next question?

24                 MS. SIMON:  Where was that.

25                 THE COURT:  And the answer is?

MABGden3

1          MS. KUSHNER:  At a professional conference.

2          THE COURT:  What's your next question?

3          MS. SIMON:  And what happened.

4          And he will explain the nature of the interaction with

5     the defendant, and then the in-person interaction with the

6     defendant.  And then he'll explain that, after that

7     interaction, that in-person interaction, he received several

8     text messages from the defendant that night and then very early

9     the next morning.

10         THE COURT:  The interaction was of an antagonistic

11    sort?

12         MS. SIMON:  Yes, your Honor.

13         THE COURT:  So what's he going to say in that regard?

14    That's what I need to know.

15         MS. SIMON:  I apologize, your Honor.  I expect the

16    witness will testify that the defendant approached him at this

17    professional conference and started yelling at him and was

18    raising several of his grievances about the firm and with the

19    witness in particular in a way that the witness found to be

20    intimidating.

21         THE COURT:  I think that sounds like appropriate

22    background, so I will allow it.

23         MS. SIMON:  Thank you, your Honor.

24         MR. DENNIS:  Your Honor, there's one thing I would

25    like to ask of the Court.  Given that I'm representing myself

MABGden3

1    pro se and that minutes before one of the witnesses -- one of

2    the government's witnesses is going to testify, I'm hearing new

3    information, I'm requesting in advance now the opportunity to

4    go home and to prepare my cross-examination questions of this

5    witness.

6            THE COURT:  Denied.

7            Let's bring in the jury, and we'll hear opening

8    statements.

9            THE DEPUTY CLERK:  I'm missing one, Judge.  I have her

10   cell phone, so I can call her right this second and see where

11   she is.

12           THE COURT:  I know that right after we broke last, the

13   defendant was able to recover his electronic equipment.

14           And let me ask my law clerk, where do we stand on the

15   telephone connection to the parents?

16           LAW CLERK:  They are hearing us.

17           THE COURT:  So that's been done.  Great.

18           So I think the only other open matter is the subpoena

19   that, Mr. Dennis, you wanted a chance to look at your laptop

20   before we discuss that.  Are you ready to discuss that now?

21           MR. DENNIS:  Yes, I am, your Honor.

22           THE COURT:  So through no fault of his own, Mr. Dennis

23   and his process server were not able to serve the head of

24   Microsoft.  And so he has applied to have that service made by

25   mail.

MABGden3

1          The problem that we confront here is that the request,

2    at least for documents, are similar to requests that I have

3    already held not to be the proper subject of a subpoena because

4    they're not likely to lead to admissible evidence.  For

5    example, we have a whole bunch of requests about the no contact

6    list -- and I won't belabor the record by going through why

7    that is -- while it's part of this case, it's not part of this

8    trial.  But this is also a request for Mr. Bradford Smith's

9    personal appearance.

10          What is it you would suggest he would testify to?

11          MR. DENNIS:  Your Honor, with respect to Mr. Smith,

12    he's different from any of the other Microsoft executives.

13          THE COURT:  Can you bring the microphone just a little

14    bit closer to you.

15          MR. DENNIS:  Yes, sorry.

16          THE COURT:  You can sit down, but just bring it closer

17    to you.

18          MR. DENNIS:  He's different from any of the other

19    Microsoft executives because I've known Brad for over 20 years.

20    And so I've known him both professionally and personally.  So

21    by him being placed on the no -- and he was on my witness list

22    in the arbitration, because I expected him to be a witness to

23    testify on my behalf -- by putting him on the no contact list,

24    the government precluded me from having conversations with

25    someone who would have been a witness on my behalf.

MABGden3

```
 1              THE COURT:  But my question is -- we've been through
 2     that, and as you will recall, when you finally raised on
 3     Friday, after many invitations from me to do so, the no contact
 4     list, and I gave you permission then to contact the counsel for
 5     the witnesses on the no contact list who were represented by
 6     counsel and see if their clients wanted to talk to you.  But
 7     what is it you think -- to be continued.
 8              (Continued on next page)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

MABGden3

1          (Jury present)

2          THE COURT:  Ladies and gentlemen, we're about to hear

3    opening statements from counsel.  I want to caution you at the

4    beginning that nothing that the lawyers or the parties say in

5    opening statements is evidence.  As I mentioned before, the

6    evidence comes from testimony, from exhibits, and there may be

7    something called stipulations.  Those are the only sources of

8    evidence.

9          So you may ask, why do we even have opening

10   statements.  Well, the answer, again, is the evidence is going

11   to come in a little bit at a time.  And so counsel are going to

12   give you their overview -- by "counsel," I'm including

13   Mr. Dennis in his role as counsel, in that he's representing

14   himself -- they're going to give you an overview of what they

15   think the evidence may prove or may fail to prove.  So this is

16   a chance to give you a kind of roadmap as to where they think

17   the evidence is going.  And they will, doubtless, have

18   different views of that, but by hearing their respective

19   positions, it will give you a little bit of context to evaluate

20   the evidence as it begins to come in.

21         I want to remind you that the government bears the

22   burden to prove guilt beyond a reasonable doubt, and so they

23   will go first.  And I also want to remind you that the basic

24   charges in this case relate to the alleged use of emails and

25   text messages for purposes of conveying threats or intimidation

MABGden3                    Opening – Ms. Simon

or other material likely to cause substantial emotional harm
and that the standard has to be not only that that occurred,
but also that the defendant intended that that would occur.

          So against that background, let's hear first from the
government.

          MS. SIMON:  Thank you, your Honor.

          Sleep with one eye open.  We are coming for you.  I
will find you.  These are just a small fraction of the
thousands of messages that the defendant sent to his former
coworkers over the course of two years.  He harassed them in
the middle of the night, bombarded them with messages back to
back to back.

          When the victims got the defendant's messages, they
were anxious.  They were distressed.  They were even scared.
They didn't know what the defendant might do.  They thought the
defendant might come to their home or office and that he might
even hurt them.

          The defendant's messages upended the victims' lives.
That is why we are here today, because that man, the defendant,
Willie Dennis, engaged in a year's long campaign to harass,
intimidate and threaten his former colleagues at the law firm
where he used to work.  For that, he's charged with
cyberstalking.  It's time to hold him accountable for what he
did.

          This opening statement is the government's opportunity

MABGden3                    Opening - Ms. Simon

1   to give you a preview of what I expect you are going to hear

2   and see over the coming days.  First, I will address what I

3   expect the evidence will show.  Second, I will address how the

4   government will prove beyond a reasonable doubt that the

5   defendant is guilty.

6           So what will the evidence show?

7           The evidence will show that the defendant was a

8   partner at a big law firm.  At some point, he became upset with

9   the firm and he started to send hostile repetitive emails to

10  his coworkers.  The sheer number of those messages was

11  disruptive to the workplace.  The defendant was asked to stop

12  multiple times, but he refused.

13          After the defendant stopped working at the law firm,

14  you'll learn, his conduct escalated.  He began to flood his

15  former coworkers, including the three victims in this case,

16  with thousands of disturbing text messages and emails.  In

17  those messages, the defendant called the victims degrading

18  names; rat, gutter rat, piece of shit, cotton head.  He falsely

19  accused them of illicit sexual conduct.  He threatened their

20  families.  He threatened their careers.  He claimed to invoke

21  the wrath of god against his victims.  He said that in the

22  Bible's words, his victims would be cut down and destroyed.  He

23  even invoked the horrors of mass shootings, implying that his

24  victims might suffer the same fate.

25          Sometimes his messages contained explicit threats like

the ones I mentioned earlier; sleep with one eye open, I will

find you.  Other times, the defendant's messages were more

cryptic.  The defendant did not always spell out exactly what

he meant.  But that was part of the point, to keep the victims

guessing, unsettled, uncomfortable.

You will learn that the defendant sent his victims

multiple disturbing messages, often in rapid succession.

You'll learn that one victim received over 20 messages in the

course of a single evening.  Other victims, you'll learn,

received thousands of messages from the defendant over the

course of two years; sometimes over a hundred in a day.  The

victims did not respond to the defendant's messages, but the

defendant continued to pummel them with unwanted messages

anyway, again and again and again.

You will see that the victims' lives were disrupted by

the defendant's endless barrage of messages.  Not only that,

they were also afraid; afraid that the defendant might do

something violent.  So they took steps to protect themselves.

One victim started wearing shoes with treads when he

was on the subway so he would be ready to run in case the

defendant snuck up on him.  Another victim started sleeping

with a loaded gun under his pillow after the defendant

threatened to come to his home.  Another victim moved to a

completely different state to get away from the defendant.

That's how scared they were.

MABGden3                         Opening - Ms. Simon

1          You will learn that the volume of the defendant's

2     messages were so overwhelming and their contents so disturbing

3     that one of the victims blocked the defendant's cell phone

4     number.  Others feared that if they blocked the defendant's

5     number and stopped seeing his messages, they wouldn't be ready

6     if the defendant actually acted on his threats, so they

7     continued to receive his messages day after day, despite the

8     fear and pain those messages caused.

9          Now, I expect you will also hear that the defendant

10    had various grievances with his former law firm.  I expect you

11    will learn that more than a year after he stopped working at

12    the firm, the defendant sued, and that lawsuit is still

13    ongoing.  But don't be distracted.  That's not what this case

14    is about.

15         This case is about what the defendant did to the

16    victims.  It's about the messages he sent them, how he

17    terrorized them.

18         As a result, the defendant is charged with three

19    counts of cyberstalking; one count for each targeted victim in

20    this case.

21         So how will the government prove its case beyond a

22    reasonable doubt?

23         You will see the defendant's own words for yourselves.

24    You will see many of the harassing, intimidating and even

25    threatening messages the defendant sent.  You will see how the

defendant inundated the victims with messages late into the
night, early in the morning, sometimes for days and even weeks
at a time.

You will also hear from the victims directly. They
will tell you about the awful, abusive messages they received
from the defendant, how those messages invaded and disrupted
their everyday lives, how they were forced to take steps to
protect themselves.

You will also hear from law enforcement officers,
including the officer who arrested the defendant and seized his
cell phone and the FBI technician who extracted the defendant's
harassing messages from that very same cell phone. You will
also see records connecting the defendant to that cell phone
and other email accounts that were used to send more harassing
messages.

What I have just described to you is just an overview
of what I expect the evidence will show. The actual evidence
will come in one piece at a time. No single witness or single
message can give you the full story of what the defendant did.
But as the trial goes on, you will watch as each piece of
evidence helps to build the full picture of the defendant's
crimes.

So as you hear and see the evidence throughout the
course of the trial, I'm going to ask you to do three things:
First, pay close attention to the evidence; second, follow

1   Judge Rakoff's instructions on the law; and third, use your

2   common sense, the same common sense you use every day to make

3   all sorts of decisions in your own lives.  If you do those

4   three things, you will reach the only verdict that is

5   consistent with the law, the evidence and your common sense,

6   that Willie Dennis is guilty.

7            THE COURT:  Thank you very much.

8            Now we will hear from Mr. Dennis.

9            MR. DENNIS:  Ladies and gentlemen, good afternoon.

10  And thank you for taking the time to serve as jurors as I try

11  to avoid being sent to prison.

12           MS. SIMON:  Objection, your Honor.

13           MR. DENNIS:  I have never done any of this before.

14           THE COURT:  I'm sorry, I didn't hear.

15           MR. DENNIS:  Excuse me.

16           MS. SIMON:  I'm sorry, there was an objection, your

17  Honor.

18           THE COURT:  I didn't hear what he said right before

19  that.  What are you objecting to?

20           MS. SIMON:  I avoid trying to be sent to prison, your

21  Honor.

22           THE COURT:  I see.

23           So ladies and gentlemen, the question of any

24  punishment if the defendant is convicted is purely a question

25  for the Court, not for you.  So don't be concerned about

1    punishment in any way, shape or form.  That will be something

2    that, if and only if the defendant is convicted, the judge gets

3    to decide.

4              Go ahead.

5              MR. DENNIS:  I've never done any of this before, so

6    you're probably going to hear more objections as I go through

7    this.  But more importantly, I'm going to ask you to excuse me

8    because I have made a lot of -- I've made notes.  And we'll

9    have to refer to them often to stay organized, as I make my

10   opening statements.

11             The evidence will show that I am the son of two

12   hardworking parents.  My father worked for the New York City

13   Sanitation Department behind the truck for 31 years, who

14   invested most of their hard-earned money to provide me, my

15   brother and my sister with food, shelter and a good education.

16             I graduated from Columbia College and then Columbia

17   Law School.  And I worked during college and law school to help

18   pay the way through.  Then I practiced for over 30 years in New

19   York City at some of the highly regarded firms, including a

20   firm where I started at, which was called Mudge Rose Guthrie

21   Alexander & Ferdon, where I was personally trained by a

22   gentleman by the name of Robert Ferdon, who, as your Honor can

23   confirm, was one of the most respected attorneys in America for

24   his legal skills and his ethical standards.  And I worked at

25   the law firms of Akin Gump and K&L Gates, which K&L Gates is

one of the top firms in the country, in the world.  It's the

fifth largest law firm in the United States.

        The evidence will show that during my 30-year career,

I developed strong relationships and brought to the firm many

millions of dollars in business with Fortune 500 companies

including Microsoft, Goldman Sachs, Dupont, MetLife, American

Express, Tyco, Toys "R" Us and Darden Restaurants, to name a

few.  If you don't know Darden, Darden is really more well

known for being a Red Lobster or Olive Garden, if any of you

know those chains.

        The prosecution has read its charges against me, and

these charges give the burden to the prosecution to prove

beyond a reasonable doubt that I sent emails to four of my

former partners at K&L Gates with the intent to intimidate or

cause fear in these four individuals.  The evidence will show

that I actually sent these emails to many, many more partners

at K&L Gates, not just the four that the prosecution is focused

on in this courtroom.  And that my intention in sending these

emails was not to intimidate or to strike fear in any of them.

The evidence will show my purpose was to act like a reasonable

partner of the firm of K&L Gates and put the partners on notice

of very specific misconduct some of them had been doing

individually against me and some being against the interest of

the firm.

        The evidence will show that I was concerned about two

MABGden3                        Opening - Mr. Dennis

1    things:  One was the firm's public reputation for tolerating

2    sexual harassment and gender discrimination; a second was that

3    a small group of leaders of the firm was violating the firm's

4    bylaws and taking my clients away from me, reducing my clients.

5        The evidence will show that the American Lawyer, one

6    of the most prestigious publications in the law, published an

7    article --

8        MS. SIMON:  Objection, your Honor.

9        MR. DENNIS:  -- stating, during a multiyear period,

10   every single sexual harassment case made by a woman attorney --

11       THE COURT:  Sustained.

12       Mr. Dennis, there's no way that's coming into

13   evidence.  That's hearsay.  I know you are not a trial lawyer,

14   but that's classic hearsay.  Please go on to something else.

15       MR. DENNIS:  Okay, your Honor.

16       The evidence will show that -- testimony from my

17   partners -- that I suggested reforming our process of reviewing

18   sexual harassment allegations before we were sued and hurt

19   financially.

20       MS. SIMON:  Objection, your Honor.

21       THE COURT:  Well, I want to really caution the jury

22   that, as I told you before, nothing that either side says at

23   this point is evidence.  Whether the evidence will show what is

24   being now stated or not, we'll see.  But I will let Mr. Dennis

25   continue.  But I do want to make sure that you understand that

MABGden3                    Opening – Mr. Dennis

1    none of this is evidence.  The question is what will come from

2    the witnesses and the documents.

3          Go ahead, Mr. Dennis.

4          MR. DENNIS:  So the evidence -- particularly, I know

5    the prosecution just sort of gave you different things that

6    they allegedly said I've done.  But I think what's most

7    important is if you put this in a timeline of what occurred.

8          So the evidence will show that on January 29th, I

9    emailed the chairman of K&L Gates basically telling him there

10   were $500 million in lawsuits attributable to Microsoft and

11   notifying them I intended to take this to the full partnership

12   the next morning at 11:00.  It will further show that on

13   January 30th at 1:44 a.m. -- and this will be one of the

14   witnesses who will be testifying -- informed me that the

15   firm -- this is less than eight hours later -- had suspended my

16   access to the offices, access to my emails, though the firm

17   continued to pay me, but there was nothing in the partnership

18   agreement that allowed them to do that.

19         To give you some context, I didn't know if any of

20   you -- it didn't come up during the questioning -- but if any

21   of you had any legal experiences, imagine that one day your

22   lawyer is representing you and then the next day he has no

23   resources; doesn't have a phone, doesn't have access to word

24   processing, but your case is still going on.  That day when

25   they did that, when they suspended all my resources, I lost all

1  my clients because I couldn't service them.  Clients called me,

2  said what am I doing.  I said, look, you have a matter going

3  on, keep going with the firm, don't stop because I'm not there.

4  This is between me and my partners.  That was the effect of

5  that.

6       Almost eight hours later, all of my emails, including

7  those on my message system were removed from all my mobile

8  devices.  Almost eight hours after that, I received an email

9  from one of the witnesses who will be testifying today or

10  tomorrow outlining a settlement component.

11       The evidence will show that 12 days later, on

12  February 11th, with all these other issues still resolved, my

13  wife's divorce attorney received documents from K&L Gates, my

14  partners, mostly about my finances, without my consent or

15  knowledge and without any subpoena being issued.  The evidence

16  will show that they sent a letter to my attorney asserting I

17  had harassed them, but stating there was no criminal action

18  being threatened.

19       The evidence will show on April 16th -- this is 2019

20  for the timeline, and I'm going in order -- I sent an email to

21  the leadership team and a hundred other partners talking about

22  how we could put in better me too policies, me too policies

23  that would, you know, be helpful for everyone.

24       The evidence will show that a few months -- a month

25  and a half after that, I was expelled from the firm.  The

MABGden3                         Opening - Mr. Dennis

1    evidence will show -- now we are getting to the point where --

2    what we discuss is that -- and it says in the indictment,

3    between September 4th, 2019 and September 27th, 2019, I sent at

4    least approximately 200 written communications to victims and

5    other members of the law firm.  What it will also show is that

6    on September 4th at 10:30 p.m. at night, two New York City

7    police officers --

8            MS. SIMON:  Objection, your Honor.

9            MR. DENNIS:  -- my home --

10           THE COURT:  You know that we discussed this before,

11   Mr. Dennis.  That has nothing to do with the issues in this

12   case.  Please confine yourself to the issues in this case.

13           MR. DENNIS:  Can we approach the bench for a second,

14   your Honor.

15           THE COURT:  No.  Please continue with other parts of

16   your opening.

17           MR. DENNIS:  Okay.

18           The evidence will show that three weeks later, on

19   September 24th, I was participating in a women's legal

20   conference and Chicago --

21           MS. SIMON:  Objection.

22           MR. DENNIS:  -- police officers were sent to surveil

23   me --

24           THE COURT:  So ladies and gentlemen, what you are

25   concerned with here is whether or not the government has shown

MABGden3                         Opening – Mr. Dennis

1    that Mr. Dennis did the things that they claim he did.  His

2    interactions with police, Chicago or wherever, have nothing to

3    do with what you have to decide.  Before a trial begins, all

4    these things get presented to me, and I work them out.  And I

5    have already ruled that this has nothing to do with your

6    determination in this case.

7            So please, Mr. Dennis, go on to something that was

8    permissible.

9            MR. DENNIS:  Objection, your Honor.  I would like to

10   have a conversation with the bench.

11           THE COURT:  All right.  Come to the bench.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

MABGden3                    Opening - Mr. Dennis

1          (At sidebar)

2          MR. DENNIS:  So these issues that I'm discussing are

3    issues that each of the witnesses that they're bringing to the

4    stand today are capable of talking about, and I should have the

5    right to cross-examine --

6          THE COURT:  No, this is a question of relevancy.  It's

7    not a question of knowledge.  It's a question of relevancy.

8    Whether or not police in New York or Chicago, wherever took

9    actions against you that you may feel were improper or

10   intimidating or whatever is an issue that was discussed

11   pretrial, and I ruled that it was irrelevant to the issues that

12   will go before the jury.

13         And more generally, I granted the motion *in limine*.

14   There was a specific motion *in limine* from the government

15   directed at this, which I granted.

16         Now, I understand you don't agree with all my rulings,

17   so be it.  But once I've ruled, I expect you to abide by my

18   rulings.  So I think you need to go on to something else.

19         Now, I allowed you -- actually, the government could

20   have objected to other things in your opening, but they didn't.

21   And I erred on the side of caution, allowed you to get very far

22   into stuff that was borderline.  But this is beyond the pale

23   because I have specifically ruled on it.  So let's go on.

24         MR. DENNIS:  Just for the record, my understanding was

25   the ruling was in quashing the subpoenas of those individuals

MABGden3                    Opening – Mr. Dennis

1    who I was calling to testify as to these matters.

2              (Continued on next page)

1          (In open court; jury present)

2          MR. DENNIS:  One of these things I say -- and I echo

3    what the Department of Justice said -- which is in deciding

4    justice, you need to understand the context.  Without the

5    context, just saying emails, not understanding what happened

6    before or after the emails makes it difficult to understand.

7    Because I can give you -- probably each one of you has an email

8    with one of your friends in one of your inboxes that says X, Y

9    and Z, I can say, wow, you were threatening that person.  But

10   give me the complete context of the relationship, prior, during

11   and after, and then I'll have a better idea of whether or not.

12         So to continue on with my timeline, the evidence will

13   show that on March 3rd, 2020, I filed a discrimination suit

14   against K&L Gates.  And the evidence will show that I received

15   a right to sue letter in August.  And then the evidence will

16   show that on October 28th of 2020, a sealed indictment --

17         MS. SIMON:  Objection.

18         MR. DENNIS:  -- this case, was against me without me

19   ever being interviewed.

20         THE COURT:  I'm sorry, I didn't hear the last thing

21   you said.

22         MR. DENNIS:  The last thing I said?

23         (Record read)

24         THE COURT:  I'll allow that.

25         Go ahead, Mr. Dennis.

1          MR. DENNIS:  So then on November 3rd, I filed a civil

2     suit against my partners at K&L Gates.  And then on

3     November 15th, you know, I filed a -- November 15th, a year

4     later, I filed a witness list with the American Arbitration

5     Association, a year later.  And on November 16th, a year and a

6     half later, I was arrested on the sealed indictment from 2020.

7     And the arrest record states that it was my intent to commit

8     homicide.  This is now changed to harassment.

9          So let's go on and talk a little bit -- that's a

10    little bit about the timeline that you're going to hear about.

11    Let's talk about, you know, intent.  So first and most

12    importantly, that was never my intent.  I was trying to show

13    the best interests of the ranks and file of K&L Gates and to

14    protect my own compensation by insisting on remedying what I

15    considered to be gender discrimination, race discrimination and

16    poor management.  The objective proof of my intent is the

17    business contacts, the multiple acts of management which

18    justified my emails.

19          The prosecution is mainly talked about the number of

20    emails.  And I expect, while presenting the case to you, you

21    will read a small portion of only pieces of the emails, not the

22    entire emails.  So they will ask you to convict me merely on

23    the content of a portion of a few number of emails without a

24    lot of the extra stuff going on.

25          As you begin to consider this case, I want you to

MABGden3                    Opening - Mr. Dennis

1   consider generally what's going on here.  I woke up this

2   morning, and I don't know if you guys saw this bombing that

3   went on in Ukraine --

4           THE COURT:  Would you please put that down.

5           MR. DENNIS:  Okay.  But you'll see where I'm going,

6   your Honor, real quickly.

7           So America is specifically surging in violent crime;

8   assault rifles being used against our children almost on a

9   monthly basis.  In our city, violent crimes are being

10  consummated against children, elderly on the subway systems,

11  buses, streets.  The perpetrators are without remorse and

12  assailants -- who knows.  With all this going on outside right

13  now, ask yourself why is the Department of Justice devoting all

14  of these resources --

15          MS. SIMON:  Objection, your Honor.

16          MR. DENNIS:  -- to convict a man who is 60 years old

17  of email harassment, with everything that's going on outside

18  around us right now.

19          THE COURT:  Let me instruct you, ladies and gentlemen.

20  First, of course, this is just one of thousands of criminal

21  cases that are brought every year, and they come with a whole

22  range.

23          Second and more importantly, the determination of

24  whether to indict someone is made by the grand jury.  It's not

25  made by anyone other than persons like yourselves who hear

1   evidence in what's called a grand jury and decide whether or

2   not to go ahead and charge someone with a crime.

3          Now, the charge is not proof of guilt beyond a

4   reasonable doubt.  That's your job, to determine whether the

5   government has proven guilt beyond a reasonable doubt.  But it

6   is the grand jury that decides whether or not to charge someone

7   with a crime.  And in this case, they charged this crime.

8          So the fact that other people may commit other crimes

9   is neither here nor there.  That will be a job for another jury

10   or many jurors if cases are brought there, but you're focusing

11   on the case before you.

12          Go ahead.

13          MR. DENNIS:  I would just remind the jury, which is

14   important, that this is a grand jury that I never got a chance

15   to speak to.  I was never interviewed.  This is the first time

16   publicly that I'm talking about all this.

17          But in any event, so the law partners that you are

18   going to see today, just to give you a sense, they're law

19   partners that come from the fifth largest law firm in the

20   world, over 2,000 lawyers across the globe, on the East Coast

21   from Boston to Miami, to Seattle, Chicago; internationally,

22   London, Paris, Beijing.  A law firm which has partners that are

23   able to communicate with some of the people in the highest

24   levels of government.

25          One of my partners is Rosemary Alito.  Her brother is

1    Samuel Alito, the Supreme Court justice.

2              MS. SIMON:  Objection, your Honor.

3              THE COURT:  Sustained.

4              I wish, Mr. Dennis, you would go back to -- you were

5    focusing on your intent and that which is relevant to this

6    case.  But who might be a sibling of one of your partners is

7    completely irrelevant.

8              MR. DENNIS:  Your Honor, I apologize.  What I was

9    trying to give the jury was an idea of the people who are about

10   to testify in front of you today, the victims.

11             THE COURT:  You'll have an opportunity to

12   cross-examine the people when they testify.

13             MR. DENNIS:  Okay.  All right.  So these partners --

14   and we're going to talk about them, but I want to -- this is my

15   overview, in terms of what I want you to look for, is this law

16   firm and the partners and myself, we're called in to handle the

17   toughest cases of the largest companies in the US and

18   internationally.  So we're accustomed to unleashing some of the

19   harshest attacks on the opponents of our clients; Microsoft,

20   AT&T, whoever they may be.  And we have war rooms where we

21   discuss all issues with no holds barred.  So this isn't your

22   normal -- when one of our largest clients like Microsoft comes

23   in and says, I've got a big problem, they want you to get the

24   army together and get the army marching.

25             So understanding that as the environment that we all

MABGden3                          Opening – Mr. Dennis

work in, including the people who are going to testify today

and tomorrow, it makes you -- one of the questions that you

have to consider is, what was it in an email that would

intimidate people like this.  So let me give you a little

background about some of the people who are going to be

testifying.

Eric Cottle, litigation partner for over 20 years,

okay.  He does toxic tort claims, including the representation

of companies in asbestos, silica and led pigmentation.  Let me

translate what that means to you because I was at the firm, we

represent companies like that.  You have asbestos that cause

you cancer.  We're the law firm that has to go to court and

say, you know what, this person did it on their own.  They

caused their problem, so don't blame my client just because

there was asbestos, it's this individual.  And we will do it

and he has done it, where he knows that the person who is

making the claim is only going to be testifying through

videotape because they're going to be dead by the time the case

comes to trial.

MS. SIMON:  Objection, your Honor.

MR. DENNIS:  That is the nature of his practice.  I

think that's relevant to know what does he talk about -- so

what would intimidate a man like that?  What would cause

problems for a man like that?

Most importantly, when you see Eric, Eric is a former

1  Olympic track and field athlete.  He's 6 feet 2, over

2  220 pounds, in excellent shape.

3            It's a fact that I am who I am.  I never owned a

4  weapon.  I'm scared of weapons.  And I'm a sane man.  So when

5  you look at his physical and understand what would it take,

6  what kind of email would it take to scare a man like this.

7            One of the other partners is going to be John Bicks.

8  He's a managing partner of the New York office.  John Bicks

9  basically represents -- he's a bankruptcy lawyer for the

10 company.  So a company is going out of business, they need a

11 lawyer, John Bicks is the one who is going to go to all the

12 creditors and say, you're not going to get paid or you're going

13 to get paid 10 cents on the dollar.

14           MS. SIMON:  Objection, your Honor.

15           THE COURT:  I'm going to allow this on the limited

16 basis that I understand the argument is being made that these

17 people are not easily intimidated, as shown by their

18 background.  I will -- that's one argument that I think can be

19 made.  We'll see whether it's borne out by the facts.

20           MR. DENNIS:  So I mean, I won't go through -- I talk

21 about the other partners who are coming in here.  These

22 aren't -- I was part of that -- these aren't your everyday

23 people who have nicey nice conversations most of the time.  In

24 fact, most of our conversations are pretty tough conversations

25 that we have with each other and that we have with our clients.

1    It's messages that we have to deliver that no one wants to

2    deliver, but we do.

3              So going back to –- I want you to look at the complete

4    context of everything that's happening here.  One of the things

5    I'll share with you, this is just –- as your Honor mentioned

6    earlier, the Southern District of New York is the most –- is

7    the most –- is the best, considered the foremost district in

8    the nation, in terms of where law is developed.  And all other

9    courts around the nation follow the Southern District of New

10   York.  It's that important in our nation's legal system.

11             So what you have is, in our Justice Department, you

12   have the best of the best lawyers.  So I mean, if you just look

13   at Ms. Kushner, University of Pennsylvania, NYU Law School –-

14             MS. SIMON:  Objection, your Honor.

15             THE COURT:  Mr. Dennis, although I applaud your

16   bringing forward that Ms. Kushner has a distinguished legal

17   background, it has nothing to do with the issues in this case.

18             MR. DENNIS:  I just wanted to draw the understanding,

19   given the context of the email harassment and the level of fire

20   power that's in this room, and I'll leave it.  I think I –- I

21   won't go through, but I can just tell you all of the other

22   are –- legal –- lawyers.

23             In any event –-

24             THE COURT:  No, I think you actually have gone the

25   half hour, but you did have some sidebars, so I'll give you a

1    couple more minutes if you need it.

2          MR. DENNIS:  As I stated, again, as you listen to the

3    witnesses and you hear the issue, I just want you to keep --

4    just keep the context in mind, context of this case and just

5    generally.  You guys didn't walk in here not reading the news

6    and not reading about what's going on in our legal system and

7    issues.  This isn't the first time you heard about emails being

8    used or not being used.  This is all -- so you don't -- that's

9    what you bring into the room as a jury, is understanding how

10   the world really works and making sure that the law is applied

11   properly.  That's what we want.  That's what it starts off

12   with; common law, common sense.  And then we built all these

13   things around it.  And it's this and that and the other thing,

14   and you've got guys like me, but it started off with common

15   law, meaning common sense.  You guys -- I want to thank you.

16   You guys are perfectly equipped and able to evaluate this case

17   and your determination will be a fair and just one.

18          Thank you.

19          THE COURT:  Thank you very much.

20          Please call your first witness.

21          MS. KUSHNER:  Your Honor, the government called Gladys

22   Frias Mora.

23   GLADY INIAS FRIAS MORA,

24        called as a witness by the Government,

25        having been duly sworn, testified as follows:

MABGden3                        Frias Mora – Direct

1    DIRECT EXAMINATION

2    BY MS. KUSHNER:

3    Q.  Good afternoon.  Could you please state your name for the

4    court reporter.

5    A.  Gladys Inias Frias Mora.

6    Q.  And where do you work?

7    A.  I work for the national police of the Dominican Republic.

8    Q.  What is your title there?

9    A.  I am a first lieutenant.

10   Q.  Lieutenant Frias, how long have you worked for the national

11   police in the Dominican Republic?

12   A.  Approximately 13 years.

13   Q.  And are you assigned to a particular division currently?

14   A.  Yes, ma'am.

15   Q.  What division?

16   A.  I work for the division for the FBI in the Dominican

17   Republic.

18   Q.  And how long have you been in that role for?

19   A.  Since 2015.

20   Q.  And what do you do in that role?

21   A.  I work as an investigative officer.

22   Q.  And as a member of the national police for the Dominican

23   Republic, is anyone within that office allowed to work with the

24   FBI?

25   A.  No, ma'am.

MABGden3                          Frias Mora - Direct

 1    Q.  And just to be clear, is the FBI also sometimes known as
 2    the federal bureau of investigation?
 3    A.  Yes, ma'am.
 4    Q.  What do you have to do as a police officer in the Dominican
 5    Republic to work with the FBI?
 6    A.  First of all, you have to be a police officer, and then you
 7    have to pass a polygraph exam so then you can become part of
 8    the team for the FBI.
 9    Q.  I want to direct your attention to November 16th of 2021.
10    Did you arrest anyone that day?
11    A.  Yes, ma'am.
12    Q.  Who did you arrest?
13    A.  Mr. Willie Dennis.
14    Q.  And sitting here today in the courtroom, do you see
15    Mr. Willie Dennis?
16    A.  Yes, ma'am.
17    Q.  Can you please describe an article of clothing that he's
18    wearing.
19    A.  He's wearing a blue jacket.
20    Q.  And where is he sitting exactly?
21    A.  Practically in front of me.
22             MS. KUSHNER:  Let the record reflect that the witness
23    has identified the defendant as Willie Dennis.
24             THE COURT:  Yes.
25    BY MS. KUSHNER:

1    Q.  Lieutenant Frias, what authority did you have to arrest the

2    defendant?

3    A.  We had an arrest warrant and a deportation order against

4    him.

5    Q.  Do you know what country issued the arrest warrant?

6    A.  Yes, ma'am.

7    Q.  Which country?

8    A.  The United States.

9    Q.  And where did you arrest the defendant?

10   A.  In the province of Puerto Plata in the Dominican Republic.

11   Q.  And where exactly was the defendant in Puerto Plata?

12   A.  He was lodged, he was staying in the penthouse of a hotel

13   named as the Magnifico Hotel in Puerto Plata in the Dominican

14   Republic.

15   Q.  Was anyone else in the penthouse?

16   A.  No, ma'am.

17   Q.  I'm showing you what's been marked for identification

18   purposes.  It will probably be on the screen in front of you as

19   Government Exhibit 610.

20       Do you recognize it?

21   A.  Yes, ma'am.

22   Q.  How do you recognize it?

23   A.  I recognize it because it was me who took that photograph.

24   Q.  And what is a photograph of?

25   A.  It is a photograph of the block where the penthouse was

MABGden3                    Frias Mora - Direct

1   located, the penthouse where Mr. Willie Dennis was staying.

2   Q.  Is it a true and accurate photo of the block?

3   A.  Yes, ma'am.

4           MS. KUSHNER:  The government offers Government

5   Exhibit 610 into evidence.

6           THE COURT:  Any objection?

7           MR. DENNIS:  I object, your Honor.

8           THE COURT:  Overruled.

9           Proceed.

10          MR. DENNIS:  Can I state why.

11          THE COURT:  No.

12          (Government Exhibit 610 received in evidence)

13          THE COURT:  Proceed.

14          MS. KUSHNER:  Can we please publish for the jury

15  Government Exhibit 610.

16  BY MS. KUSHNER:

17  Q.  Where exactly is the penthouse in this photograph,

18  Lieutenant Frias?

19  A.  In the upper left-hand corner.

20          MS. KUSHNER:  Thank you.

21          We can take Government Exhibit 610 down.

22  Q.  In addition to arresting the defendant at the penthouse,

23  did you do anything else at the penthouse?

24  A.  Yes, ma'am.

25  Q.  What did you do?

MABGden3                        Frias Mora – Direct

1   A.   We executed a search warrant in the room where he was

2   staying.

3   Q.   And did you find anything?

4   A.   Yes, ma'am.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MabWden4                          Frias - Mora

1    BY MS. KUSHNER:

2    Q.  What did you find?

3    A.  We found electronic devices, money, and documents.

4    Q.  I'm showing you what's been marked for identification

5    purposes as Government Exhibit 616.  Do you recognize it?

6    A.  Yes, ma'am.

7            MR. DENNIS:  Objection, your Honor.  The Court has not

8    established why the government is presenting this information

9    or why Mr. Dennis was in the Dominican Republic in the first

10   place.  There's no connection.

11           THE COURT:  That's your cross-examination.  I

12   understand that's what you want to get into, but that's for

13   cross-examination.

14           Go ahead.

15   BY MS. KUSHNER:

16   Q.  How do you recognize what's shown in front of you?

17   A.  Because I was the one who took the photo.

18   Q.  And in general, what is it a photo of?

19   A.  This photo is of the evidence, the items of evidence that

20   were recovered in the room that Willie Dennis was staying in.

21   Q.  Is it a true and accurate photo of that evidence?

22   A.  Yes, ma'am.

23   Q.  I'm now showing you what's been marked for identification

24   purposes as Government Exhibit 616A.  Do you recognize this?

25   A.  Yes, ma'am.

MabWden4                          Frias - Mora

1   Q.  What is it?

2   A.  Electronic devices.

3   Q.  Is it a zoomed-in version of Government Exhibit 616?

4   A.  Yes, ma'am.

5   Q.  And is it otherwise a true and accurate photo of the

6   electronic devices that were recovered from Willie Dennis's

7   room?

8   A.  Yes, ma'am.

9          MS. KUSHNER:  The government offers Government Exhibit

10  616A into evidence.

11         THE COURT:  I take it, Mr. Dennis, that your objection

12  is on grounds of relevance.

13         MR. DENNIS:  Yes.

14         THE COURT:  Let's have a sidebar.

15         (Continued on next page)

16

17

18

19

20

21

22

23

24

25

MabWden4                              Frias - Mora

1              (At sidebar)

2              THE COURT:  What's the relevance?

3              MS. KUSHNER:  I just want to establish that the cell

4     phone from which all the text messages came from was Willie

5     Dennis's phone, and it was recovered at the time of his arrest.

6              THE COURT:  The cell phone that you're later going to

7     introduce the contents of; is that it?

8              MS. KUSHNER:  Yes, and because we don't have the

9     physical phone, because we returned it, and there's no

10    stipulation, we want to make sure that the phone is tied

11    directly to him.

12             THE COURT:  That's right.  I granted the return of the

13    phone on the motion made by Mr. Dennis.  I think then this is

14    necessary for chain of custody.

15             MR. DENNIS:  OK.  I object because I don't understand

16    the relevance of showing photographs of money all around as if

17    giving the impression to the jury that there's something else

18    going on.  She wants to --

19             MS. KUSHNER:  The purpose is not to introduce that

20    larger photo.

21             THE COURT:  No, no, no.  I assume, and this is why I

22    overruled your earlier objection, I assume you're going to

23    cross-examine about you were just there, and I don't know

24    whether it was a business trip or a vacation or whatever, but I

25    doubt very much that this officer will have any independent

MabWden4                        Frias - Mora

1    knowledge of why you were there.  So that's fair to bring out.

2    But what they're getting into right now is chain of custody.

3    That, I think, is relevant.

4            MR. DENNIS:  I'm not denying chain of custody.  I mean

5    they're putting on -- is there a way to short circuit this?

6            THE COURT:  Well, you could have stipulated, but you

7    declined to stipulate.  That is the point.

8            MR. DENNIS:  Maybe Mr. Kelly didn't explain it right.

9            THE COURT:  No, no, no.  This was --

10           MR. DENNIS:  This was recently?

11           THE COURT:  Well, the --

12           MR. DENNIS:  I mean I don't know.

13           THE COURT:  Do you want to stipulate that the phone

14   records they're going to put in later, the phone messages, all

15   came from the phone that was seized from you?

16           MR. DENNIS:  Take that under consideration; I don't

17   remember seeing all the phone records.  But you're saying these

18   are all the phone records that came from my 646-418-3229

19   number?

20           MS. KUSHNER:  Yeah, exactly.

21           MR. DENNIS:  Yeah.  What's wrong with that?

22           THE COURT:  All right.

23           MS. KUSHNER:  I just want to be clear on what is being

24   stipulated to.

25           THE COURT:  What I'm going to tell the jury right now,

MabWden4                        Frias - Mora

1    to move this along, is that the parties have stipulated that

2    certain records that will be introduced later from a particular

3    phone -- you'll give me the number --

4             MR. DENNIS:  Actually, your Honor, before you -- will

5    I still get a chance to cross-examine?

6             THE COURT:  Yes.

7             MR. DENNIS:  I don't want to stipulate.  I still want

8    to have a chance to cross-examine.

9             THE COURT:  OK.

10            MR. DENNIS:  OK.

11            THE COURT:  So let's just go forward.

12            MR. DENNIS:  Yeah, let's go.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

MabWden4                          Frias - Mora

1                  (In open court)

2                  MS. KUSHNER:  Just so the record's clear, the

3       government is offering Government Exhibit 616A into evidence.

4                  THE COURT:  Received.

5                  (Government Exhibit 616A received in evidence)

6       BY MS. KUSHNER:

7       Q.  Lt. Frias, what is on the top right-hand side of this

8       photograph?

9                  MS. KUSHNER:  If we could please publish it for the

10      jury.  Thank you.

11      A.  An Apple brand computer and cell phone, iPhones.

12      Q.  And are those the two phones right next to the Apple

13      computer?

14      A.  Yes, ma'am.

15      Q.  Showing you what's been marked as Government Exhibit 618,

16      do you recognize this?

17      A.  Yes, ma'am.

18      Q.  How do you recognize it?

19      A.  I was the person who took that photograph.

20      Q.  And what is it a photograph of?

21      A.  The photograph is of a gray Apple brand computer and of a

22      black iPhone.

23      Q.  And are these two of the items recovered from the

24      defendant's room?

25      A.  Yes, ma'am.

MabWden4                          Frias - Mora

1    Q.  And is it a true and accurate photograph of those two

2    items?

3    A.  Yes, ma'am.

4          MS. KUSHNER:  The government offers Government Exhibit

5    618 into evidence.

6          THE COURT:  Any objection?

7          MR. DENNIS:  No.

8          THE COURT:  Received.

9          (Government Exhibit 618 received in evidence)

10   BY MS. KUSHNER:

11   Q.  Lt. Frias, where were you when you took this photo?

12   A.  To be exact, in the penthouse where Willie Dennis was

13   staying.

14   Q.  And do you see the white sticker on the back of the phone?

15   A.  Yes, ma'am.

16   Q.  Was that sticker already on the phone when you took this

17   photo?

18   A.  Yes, ma'am.

19         MS. KUSHNER:  You can take it down.

20   Q.  And turning your attention to Government Exhibit 604, do

21   you recognize what's shown here?

22   A.  Yes, ma'am.

23   Q.  How do you recognize it?

24   A.  I was the person who took that photograph.

25   Q.  And what is it a photograph of?

MabWden4                          Frias - Mora

1    A.   It's the photograph of an iPhone cell phone that is black.

2    Q.   And is it a true and accurate photo of that phone?

3    A.   Yes, ma'am.

4         MS. KUSHNER:   The government offers Government Exhibit

5    604 into evidence.

6         THE COURT:   Any objection?   Mr. Dennis, any objection?

7         MR. DENNIS:   No objection.

8         THE COURT:   Received.

9         (Government Exhibit 604 received in evidence)

10   BY MS. KUSHNER:

11   Q.   And is this phone the same phone that was photographed in

12   Government Exhibit 618?

13   A.   Yes, ma'am.

14   Q.   And turning your attention to Government Exhibit 619, do

15   you recognize this?

16   A.   Yes, ma'am.

17   Q.   How do you recognize it?

18   A.   I was the one who took that photograph.

19   Q.   And what is it a photograph of?

20   A.   The photograph is of a gray Apple computer and of a black

21   iPhone cell phone.

22   Q.   And is it a true and accurate photograph of those two

23   items?

24   A.   Yes, ma'am.

25        MS. KUSHNER:   The government offers Government Exhibit

MabWden4                              Frias - Mora

1   619 into evidence.

2            THE COURT:  Any objection?

3            MR. DENNIS:  No objection, your Honor.

4            THE COURT:  Received.

5            (Government Exhibit 619 received in evidence)

6   BY MS. KUSHNER:

7   Q.  Is this another photograph of the same phone discussed

8   in --

9            THE COURT:  Counsel, I really think we need to move

10  this along.

11  BY MS. KUSHNER:

12  Q.  Where were you when you took the photo?

13  A.  To be exact, in the room where Willie Dennis was staying.

14  Q.  Did the search team do anything to keep track of evidence

15  items it recovered from the defendant's room?

16  A.  No, ma'am.

17  Q.  Did anyone take an inventory of the items that were

18  recovered from the defendant's room?

19  A.  Yes, ma'am.

20  Q.  And when was that done?

21  A.  While we were carrying out the search warrant.

22  Q.  And was that inventory of items memorialized anywhere?

23  A.  Yes, ma'am.

24  Q.  And where were you when the inventory was being written

25  down?

MabWden4                          Frias - Mora

1  A.  Notes were taken while the search warrant was being carried

2  out, and then we went to the office of the attorney general,

3  the Dominican Republic attorney general.

4  Q.  While the inventory was being written down, do you recall

5  whether any identifiers were written down for the cell phones

6  we've been discussing?

7  A.  Yes, ma'am.

8  Q.  Do you recall identifiers were written down for that cell

9  phone?

10  A.  Yes, ma'am.

11  Q.  What kind of identifiers?

12  A.  The phone's IMEI number and the serial number.

13  Q.  And did you know the serial number at the time it was

14  written down?

15  A.  Yes, ma'am.

16  Q.  And were you present when the serial number was written

17  down?

18  A.  Yes, ma'am.

19  Q.  Was it accurately recorded at the time?

20  A.  Yes, ma'am.

21  Q.  And did you review -- and do you recall the serial number

22  of the phone that was written down?

23  A.  No, ma'am.

24  Q.  I'm showing you what's been marked for identification

25  purposes as 3531-04.  Is this a reflection of the inventory

MabWden4                         Frias - Mora

1   that was written down at the time of the defendant's arrest?

2   A.  Yes, ma'am.

3   Q.  Directing your attention to item No. 2, can you please just

4   read that to yourself and then look up.

5       Does that refresh your recollection as to what serial

6   number was written down for the phone at the time?

7   A.  Yes, ma'am.

8   Q.  Can you tell the jury right now, without looking at that

9   document -- without looking at that document -- what the serial

10  number is?

11  A.  No, ma'am.

12  Q.  And why not?

13  A.  It's a very long number.

14  Q.  Can you please read the number from the document you're

15  looking at for the jury?

16  A.  Yes, ma'am.

17  Q.  Go ahead.

18  A.  89014104270935535434.

19  Q.  And was that the serial number that was written down?

20  A.  Yes, ma'am.

21  Q.  Where did you ultimately bring the defendant?

22  A.  He was brought to the United States.

23  Q.  And how do you know that?

24  A.  Because I was part of the custodial chain for the

25  defendant.

MabWden4                          Frias - Mora

1   Q.  Did you travel with the defendant to the United States?

2   A.  Yes, ma'am.

3   Q.  Did you bring anything else with you?

4   A.  Yes, ma'am.

5   Q.  What did you bring?

6   A.  The evidence that was collected at Mr. Willie Dennis's

7   penthouse.

8   Q.  And how did you get to the United States?

9   A.  On a commercial flight.

10  Q.  Where did you fly in to?

11  A.  To the United States.

12  Q.  Did you fly in to a particular airport?

13  A.  Yes, ma'am.

14  Q.  Where?

15  A.  Newark.

16  Q.  And what day was that?

17  A.  November 18, 2021.

18  Q.  What happened when you arrived at Newark?

19  A.  We turned the defendant over to FBI agents together with

20  all the evidence that was secured at the penthouse.

21  Q.  Including the phone we've been discussing today?

22  A.  Yes, ma'am.

23  Q.  After that, did you have any other involvement in this

24  case?

25  A.  No, ma'am.

1        MS. KUSHNER:  One moment.

2   Q.  Lt. Frias, can you just clarify what you did with the cell

3   phone when you arrived in the United States?

4   A.  It was given over as evidence to an FBI agent.

5        MS. KUSHNER:  Thank you.  No further questions.

6        THE COURT:  Cross-examination.

7   CROSS-EXAMINATION

8   BY MR. DENNIS:

9   Q.  Lt. Frias*, mucho tiempo.*

10      I guess the first question I want to ask is I want to

11  confirm that the witness was at my apartment the day of the

12  arrest.

13       THE INTERPRETER:  Is that a question, counselor?

14       MR. DENNIS:  Yes.

15  A.  Yes, sir.

16  Q.  OK.  I would like to ask the witness, what does the

17  following phrase mean, "*intento de homicidio*"?

18       THE INTERPRETER:  As per the interpreter, attempted

19  homicide.

20  A.  When a person tries to kill another.

21  Q.  OK.  And so -- try to phrase this the right way.

22      I assume -- well, I will ask.  Was the witness aware that

23  this was in the -- this was in the papers that were served in

24  me, served to me the day that I was arrested?

25  A.  I don't understand.

```
 1              MR. DENNIS:  Before she answers, here's a document
 2    right here that was served on November 16.
 3              THE COURT:  Wait a minute.  Wait a minute.  Wait a
 4    minute.  If you want to show a document to the witness --
 5              MR. DENNIS:  OK.
 6              THE COURT:  -- then just bring it to her.  Don't show
 7    it to anyone else.
 8              MR. DENNIS:  OK.
 9              Right here.
10              THE COURT:  Do you recognize this document at all?
11              THE WITNESS:  Yes, sir.
12              THE COURT:  OK.  What is it?
13              THE WITNESS:  It was an informational notes,
14    informational notes that were prepared at the office.
15              THE COURT:  OK.  Go ahead.
16              MR. DENNIS:  Let me ask her why it was, why I was
17    given a.
18              THE INTERPRETER:  Counsel, I do not ask questions.
19    I'm the interpreter.  You ask her.
20              MR. DENNIS:  Oh, I'm sorry.
21    Q.  Why was that document given to me?
22              MR. DENNIS:  That's fine.
23    Q.  The day that I was arrested, do you recall me asking -- do
24    you recall me asking to be able to see an attorney?
25    A.  I don't remember that.
```

MabWden4                          Frias Mora - Cross

1   Q.   During the ride to Santo Domingo, do you recall me asking

2   to see an attorney?

3   A.   No, sir.

4   Q.   Were you under the impression, based on the language in

5   this document, that I was being arrested because I had

6   attempted to murder someone?

7   A.   No, sir.

8   Q.   What did you interpret my crime to be?

9   A.   We only had, sir, an arrest warrant against you.

10  Q.   OK.  How many law enforcement officials were with you that

11  day at the apartment?

12  A.   The entire division.

13  Q.   (Laughter) More than ten?  Was it more than ten?

14  A.   Yes, sir.

15  Q.   And were they all armed?

16  A.   Yes, sir.

17          MR. DENNIS:  Uh-huh.

18          Your Honor, I don't have -- can I pass this to the

19  jury to see so that they saw just the language?

20          THE COURT:  No, but I thought you were, forgive me if

21  you don't want me to put this question.  But the question, I

22  thought, based on the sidebar, you were going to put to the

23  witness was -- and I'll put it -- did you have any idea why

24  Mr. Dennis was present in your country at that time?

25          THE WITNESS:  Yes, sir.

MabWden4                          Frias Mora - Cross

| | |
|---|---|
| 1 | THE COURT:  And don't tell me what it was, but tell me |
| 2 | what it was based on. |
| 3 | THE WITNESS:  Fine.  The arrest warrant was an -- |
| 4 | THE INTERPRETER:  The investigation was based on -- |
| 5 | interpreter's correction. |
| 6 | THE WITNESS:  The investigation was based on a search |
| 7 | warrant and an order of deportation against Mr. Willie Dennis. |
| 8 | THE COURT:  Deportation from where? |
| 9 | THE WITNESS:  From the Dominican Republic to the |
| 10 | United States. |
| 11 | THE COURT:  I guess maybe I didn't make my question |
| 12 | very clear.  Did you know whether Mr. Dennis was there in the |
| 13 | Dominican Republic because he was there on business or because |
| 14 | he was there on vacation or whether he was there for some other |
| 15 | reason?  Did you have any knowledge bearing on that? |
| 16 | THE WITNESS:  Well, I did not know his reasoning or |
| 17 | his -- for being there.  However, part of the investigation was |
| 18 | that Mr. Dennis was a fugitive from the law. |
| 19 | THE COURT:  Well, I'm going to strike that last part |
| 20 | of the answer as not responsive, but we'll keep the first part. |
| 21 | I take it, Mr. Dennis, that's the question you were |
| 22 | trying to raise at the sidebar. |
| 23 | MR. DENNIS:  Yes.  I would like to ask the witness -- |
| 24 | THE COURT:  OK.  If you want to go further -- |
| 25 | MR. DENNIS:  Yeah. |

MabWden4

1          THE COURT:  If you don't want it stricken, that's

2     fine.

3     BY MR. DENNIS:

4     Q.  Does she know, do you know when I entered the country?

5          THE INTERPRETER:  Sir, please do not use the third

6     person.  Speak to the witness directly.

7          MR. DENNIS:  Oh.

8          THE INTERPRETER:  Thank you.

9          THE COURT:  So the question is --

10    BY MR. DENNIS:

11    Q.  When did I enter?  When did I enter the Dominican Republic?

12    A.  I don't remember that information.

13    Q.  Do you know if I entered the Dominican Republic in the fall

14    of 2019?

15    A.  I don't remember that information.

16    Q.  How many arrests have you made for email harassment in the

17    Dominican Republic?

18         THE COURT:  Sustained.  Put another question.

19         MR. DENNIS:  I don't think I have any further

20    questions, your Honor.

21         THE COURT:  All right.

22         MR. DENNIS:  Would I be able to, if I came back with

23    more, talk to the witness?  This is all getting used to -- I

24    really didn't expect --

25         THE COURT:  Well, no.  This is your chance to put any

MabWden4

1    questions you wanted to.  If you don't have any other

2    questions, we'll hear from the government, and then if they

3    have nothing, we'll excuse the witness.

4            MR. DENNIS:  OK.

5            THE COURT:  Anything from the government?

6            MS. KUSHNER:  No, your Honor.

7            THE COURT:  Thank you so much.  You may step down.

8            (Witness excused)

9            MR. DENNIS:  Your Honor, is it all right if I take a

10   restroom break?

11           THE COURT:  I understand the need for a break, but I

12   was hoping, because we started so late this afternoon --

13           I'll tell you what, ladies and gentlemen.  In a moment

14   of weakness, we're going to let you go now for the day.  Don't

15   take it as a precedent, but we will end at 4 o'clock today.

16           Now, tomorrow, we're going to start promptly at 9:30,

17   so my suggestion is be in the jury room by at least ten minutes

18   before 9:30 so we can start right away.

19           Have a very good evening.  We'll see you soon.

20           Let me, once again, remind you not to discuss the case

21   with anyone.  By the way, I don't think this case is being

22   covered in the papers, but if for any reason you see anything

23   in the media about it, turn away immediately.  Don't pay any

24   attention to it, please.

25           (Continued on next page)

MabWden4

```
 1                    (Jury not present)

 2                    THE COURT:  Please be seated.

 3                    MR. DENNIS:  Your Honor, literally, can I just go to

 4          the men's room for one second?

 5                    THE COURT:  Oh, yes.  Go ahead.  I'm sorry.  We'll

 6          take a five-minute break, and then we'll resume.

 7                    (Recess)

 8                    THE COURT:  Mr. Dennis, come on up.

 9                    I think the only remaining item was we were in the

10          midst of discussing the subpoena to Mr. Bradford Smith of

11          Microsoft, and the jury was ready, so we interrupted.

12                    As I had pointed out, the document portion of the

13          subpoena deals with a lot of things that the Court has already

14          ruled irrelevant in other contexts, in other subpoenas.  But I

15          was asking Mr. Dennis if Mr. Smith were called by him as a

16          witness, what is it that you believe Mr. Smith could say that

17          would be helpful to your case.

18                    MR. DENNIS:  Your Honor, my -- I'm sorry.

19                    In the subpoena, as the judge recognized in any --

20          certainly I don't need the documents.  It was really the

21          witness testimony.  As I said in the subpoena application, it

22          was 12 days after notifying Mr. Smith that, among other

23          things -- so I just don't want it to be one thing, but I'm

24          going to give you three or four things.  It was 12 days after I

25          notified Mr. Smith, which was on November 16 of 2020, that
```

MabWden4

there was strong information, based upon my 14 years of partner

at KL Gates and understanding IT and being a technology lawyer

and knowing the CTO at the time is now the former CTO, that the

servers in -- KL Gates's servers in Beijing, Shanghai, and

Taipei had been penetrated by Chinese agents acting for the

Chinese Communist Party, and provided him with certain

information, which showed that this was based on the

information of someone who had been a partner 14 years at the

firm, who was very familiar with technology issues, very

familiar with spyware, very familiar with -- this wasn't from a

labor employment attorney.  This was my bread and butter and

had been since, since 19 -- 1995, when I basically represented

a lot of companies that are now -- or 1996, after Mudge closed,

when I started representing a lot of companies that now form,

are considered part of Silicon Valley.  And 12 days after

sending Mr. Smith that email, the indictment was filed against

me on October 28, 2020.

     And so as we've discussed before, your Honor, I

certainly feel, and the more -- the more I see is that former

U.S. Attorney Berman talked about political influence between

June and December of 2020, and certainly I agree with your

Honor that he did everything he could to attempt to, you know,

not let that happen, but of course, he was out of office.  He

was not there, and so Senator Durbin decided to look further

and decided that it's important, to maintain the public

MabWden4

confidence in the rule of law, to look further into the
comments and into, you know, basically some of the things that
Mr. Berman said had occurred.

And I, based on all the -- I don't consider them
coincidental anymore, the fact that, that the indictment was
handed down to me October 28, 2020, and as I was discussing
earlier, I understand the influence and power of my partners,
because I was there for 14 years.  So I believe, and I believe
there was, I believe there was influence in this case.  I
don't -- I mean it was obviously before all of the current
attorneys were there.  So I mean, you know, with different
leadership, but I believe there was influence in getting the
indictment --

THE DEPUTY CLERK:  We just lost everything.

THE COURT:  No, we didn't.

THE DEPUTY CLERK:  All the computers just went out.

THE COURT:  No, they're not.  I'm getting it on mine.
You may have lost it, but I didn't.

Go ahead.

(Discussion off the record)

THE COURT:  I will speak louder.

What I said was that everything that Mr. Dennis just
said was dutifully recorded by the reporter, and I can see it
on my screen as well.

MR. DENNIS:  OK.  I think we have a --

MabWden4

1          THE COURT:  All right.  The point is -- this is

2     familiar territory, Mr. Dennis -- you have an elaborate

3     conspiratorial theory that K&L Gates, using their alleged

4     influence, were the ones who orchestrated the indictment

5     against you.  It's an interesting theory, but it's one for

6     which there is no nonspeculative information.  There's nothing

7     that would be admissible under the rules of evidence to support

8     that theory, even assuming, which I doubt, that that would be

9     in any way, shape, or form relevant to this jury.

10          If, in fact, the indictment was orchestrated by K&L

11     Gates through their influence, of which I think there is no

12     meaningful evidence whatsoever, but even assuming for the sake

13     of argument that that were true, that has nothing to do with

14     any issue this jury is concerned with.  They're concerned with

15     whether there is evidence of whether the charges brought by the

16     grand jury against you are true or false or, more precisely,

17     whether the government has proven the charges beyond a

18     reasonable doubt or failed to do so.  So even if your theory

19     were less speculative than it is, your remedy would not be with

20     this jury or with evidence before this jury.  You might bring a

21     motion before this Court.  You've certainly discussed it before

22     this Court, and I've indicated I don't see any hard evidence of

23     it, but it has nothing to do with this jury, and that's why I'm

24     going to --

25          MR. DENNIS:  Well, just --

MabWden4

1          THE COURT:  Yes.

2          MR. DENNIS:  The one area that your Honor and I, and

3    obviously the Court's ruling is going -- that we, that one

4    factual area is that, and I said, made this argument

5    repeatedly, is that I'm entitled to my right to confront my

6    accuser.  Now, how we define my accusers --

7          THE COURT:  Well, I already told you so far as this

8    trial is concerned, those consist of the people who are taking

9    the stand.

10          MR. DENNIS:  And so that where I think we see it is

11    that those partners, and I, from being a partner at that firm,

12    did not and were unable to come in and produce this testimony

13    without first going to the executive management team of the

14    firm and getting their approval.  Firms like that do not

15    operate with parties acting unilaterally.

16          THE COURT:  First of all, I'm not going to get into a

17    discussion, although I was a partner at two major firms, but in

18    my recollection, for what it's worth, particularly at Fried

19    Frank, the firm I had the privilege of being with before coming

20    on the bench, was the partners mostly did what they wanted to

21    do.

22          But more to the point, if you want to cross-examine a

23    witness on the stand, "Before you agreed to testify in this

24    case, did you seek clearance from the executive committee," or

25    something like that, that might be a fair question.  That's

MabWden4

1    very different from what we were just discussing.

2                I thought, by the way, and this I offer for clarity to

3    the government, even though Mr. Dennis said a lot of irrelevant

4    stuff in his opening statement, one thing he said that I

5    thought was pertinent -- and I hadn't thought about before --

6    is I think he is entitled to bring out the, if you will, tough

7    mental state of the alleged victims to show that they would not

8    easily be intimidated and that, furthermore, he knew they

9    wouldn't be easily intimidated, and therefore, he didn't intend

10   to intimidate them; he was just talking in language that they

11   understood, or something like that.  So Mr. Dennis, I am going

12   to allow questions along those lines.

13               MR. DENNIS:  Thank you, your Honor.

14               THE COURT:  All right.  I think we've covered

15   everything I wanted to cover.  Anything else we need to take

16   up?

17               I am quashing the subpoena.

18               MS. KUSHNER:  Thank you, your Honor.

19               The government obviously has no objection to the

20   defendant cross-examining witnesses about the tough mental

21   man's club environment, but we just want to make sure --

22               THE COURT:  I should also note for the record that, of

23   course, the partners at Fried Frank were shy, quiet pussycats,

24   but we'll leave that for another time.

25               MS. KUSHNER:  But in terms of its prejudicial,

MabWden4

inflammatory effect, we would, and the defendant brought this

up in his opening, ask that he be precluded from asserting or

implying that these lawyers were taking on cases where they

just expected the witness to die or where they --

THE COURT:  Where they just?

MS. KUSHNER:  Expected the witness to die and for

asserting that the lawyers were knowingly representing a

company that knew what they had done -- that knew that they had

done what the plaintiff was alleging they had done to them.

THE COURT:  I'm not going to preclude across the

board, but I do think a question like that, a specific

question, that sounds like improper questioning, but we'll take

it one question at a time.

MS. KUSHNER:  OK.  The other issue raised by the

defendant's opening, the Court, of course, had previously ruled

that the government could not introduce the fact that he was --

THE COURT:  Oh, yes.  The door has been opened wide on

that.  Mr. Dennis, and I can well understand his strategy in

that regard, decided to bring out that he had been fired, but

now it's fair game for the government to get into that too if

you wish.

MS. KUSHNER:  Thank you, your Honor.

THE COURT:  All right.

MR. DENNIS:  Your Honor, one other question.  Can the,

because I'm representing myself *pro se*, and I need to prepare

MabWden4

```
 1    this evening, can the government tell me who their first
 2    witness is going to be tomorrow?
 3            THE COURT:  Yes, of course.  I was just going to ask
 4    them that.  Thank you for raising that.
 5            Who is your first witness tomorrow?
 6            MS. KUSHNER:  Your Honor, we're calling Eric Cottle.
 7            THE COURT:  OK.  There you are.
 8            MR. DENNIS:  Any other witnesses, as I'll be preparing
 9    tonight?  Eric Cottle --
10            THE COURT:  Who do you expect --
11            MR. DENNIS:  Who are you calling tomorrow?
12            MS. KUSHNER:  We anticipate calling Eric Cottle, Jeff
13    Maletta, an AT&T custodian.  Those are the next three
14    witnesses.  And then Stephen Flatley from the FBI.  Prior to
15    that it would be Christian Isolda, also from the FBI.  And
16    after that it would be John Bicks and then Calvina Bostick and
17    then a summary witness.
18            THE COURT:  OK.  So there you are.
19            I have another matter on the bench here at 4:30, so I
20    think this brings us to a conclusion.  We'll see you tomorrow
21    promptly at 9:30.
22            (Adjourned to October 12, 2022, at 9:30 a.m.)
23
24
25
```

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                              Page

 3   GLADY INIAS FRIAS MORA

 4   Direct By Ms. Kushner  . . . . . . . . . . .52

 5   Cross By Mr. Dennis  . . . . . . . . . . . .69

 6                     GOVERNMENT EXHIBITS

 7   Exhibit No.                              Received

 8    610     . . . . . . . . . . . . . . . . .55

 9    616A    . . . . . . . . . . . . . . . . .62

10    618     . . . . . . . . . . . . . . . . .63

11    604     . . . . . . . . . . . . . . . . .64

12    619     . . . . . . . . . . . . . . . . .65
```