MACGDEN1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                       20 Cr. 623 (JSR)

WILLIE DENNIS,

                                 Trial

        Defendant.

------------------------------x

                              New York, N.Y.
                              October 12, 2022
                              9:30 a.m.

Before:

                 HON. JED S. RAKOFF,

                              District Judge
                               and a Jury

                   APPEARANCES

DAMIAN WILLIAMS
    United States Attorney for the
    Southern District of New York
SARAH KUSHNER
STEPHANIE SIMON
KIMBERLY RAVENER
    Assistant United States Attorney

WILLIE DENNIS, Pro Se

Also Present:

Colleen Geier, Paralegal
Elisabeth Wheeler, FBI

MACGDEN1

```
1                    (In open court; jury not present)

2                    THE DEPUTY CLERK:  This is October 12th, 2022, the

3       continuation of the United States v. Willie Dennis.

4                    THE COURT:  Good morning.  Please bring in the jury

5       and please get the next witness on the stand.

6                    MS. SIMON:  Your Honor, we've left in a folder one

7       document that we intend to show the witness on the witness'

8       table.

9                    THE COURT:  Okay.

10                   MS. SIMON:  Thank you.

11                   (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Jury present)

2          THE COURT:  Good morning, ladies and gentlemen.  I

3    thank you very much for your promptness.  I have to reveal to

4    you that I am a devout Yankees fan, so I'm in a very good mood.

5    If any of you are Cleveland fans, you have my deep condolences.

6          Please call your next witness.

7          MS. SIMON:  The government calls Eric Cottle.

8    ERIC COTTLE,

9         called as a witness by the Government,

10        having been duly sworn, testified as follows:

11         THE DEPUTY CLERK:  State your name and spell is slowly

12   for the record.

13         THE WITNESS:  My name is Eric with a C, last name

14   Cottle, C-O-T-T-L-E.

15         THE COURT:  Counsel.

16   DIRECT EXAMINATION

17   BY MS. SIMON:

18   Q.  Good morning, Mr. Cottle.

19   A.  Good morning.

20   Q.  What do you do for a living?

21   A.  I'm an attorney.  Specifically, I'm a partner at the law

22   firm of K&L Gates.

23   Q.  What is K&L Gates?

24   A.  K&L Gates is a global law firm with about 2,000 lawyers,

25   about 44 offices across the globe.

MACGden1                      Cottle – Direct

1    Q.   How long have you worked at K&L Gates?

2    A.   I've worked at K&L Gates for 18 years.

3    Q.   What is your current position at K&L Gates?

4    A.   I'm a partner at K&L Gates.

5    Q.   Can you explain to the jury what a partner is?

6    A.   Sure.  Well, when I started K&L Gates, you're an associate,

7    just kind of coming out of law school and kind of got to work

8    your way through.  And eventually, I was elevated to a partner

9    in 2008.  And partners are responsible for a number of things.

10   Briefly, we're responsible for bringing in revenue for the

11   firm, expanding our firm's business, are responsible for

12   training other junior lawyers on our matters.  There are

13   different committees that partners work for in the firm, kind

14   of firm governance as well.

15   Q.   You mentioned that K&L Gates has multiple offices.  Are you

16   based in a particular office?

17   A.   I'm based out of our office in New York City.

18   Q.   And where is the New York office of K&L Gates located?

19   A.   The New York office of K&L Gates is on Lexington and

20   53rd Street in New York City.

21   Q.   What kind of law do you practice, Mr. Cottle?

22   A.   I'm a trial attorney, a litigator.  I represent companies

23   in the courtroom, and I've been doing that ever since I was at

24   the firm.

25   Q.   Do you know an individual by the name of Willie Dennis?

1  A.  I do, yes.

2  Q.  Do you see Mr. Dennis in the courtroom today?

3  A.  I do.

4  Q.  Can you please describe for us where he is seated and an

5  article of clothing --

6          THE COURT:  We have been through all that rigmarole.

7  Why don't you just point him out.

8          THE WITNESS:  Mr. Dennis is to your right sitting

9  at --

10          THE COURT:  Record will reflect the identification of

11  the defendant.

12          MS. SIMON:  Thank you, your Honor.

13  BY MS. SIMON:

14  Q.  Mr. Cottle, how do you know Mr. Dennis?

15  A.  Mr. Dennis was a partner at my law firm; my law firm, K&L

16  Gates.

17  Q.  During what time period did the defendant serve as your

18  partner at K&L Gates?

19  A.  Well, I became a partner -- okay, so 2008, I believe

20  Mr. Dennis was already a partner there.  So I guess we were

21  partners together in 2008.

22  Q.  Was there a time when the defendant stopped working at K&L

23  Gates?

24  A.  Yes.  That was in May of 2019.

25  Q.  What happened in May of 2019?

MACGden1                     Cottle - Direct

1   A.  Mr. Dennis was expelled from the firm then.

2   Q.  When Mr. Dennis worked at K&L Gates, was he based at a

3   particular office?

4   A.  Yeah.  He worked in the New York office, yes.

5   Q.  Prior to 2019, what was the nature of your relationship

6   with the defendant?

7   A.  I thought it was good, had a good relationship, cordial,

8   worked together on matters, worked together on business

9   development.  So I would say it was a good, healthy

10  relationship.

11  Q.  How, if at all, did that relationship change over time?

12  A.  Well, it eventually changed over time right around the 2019

13  period, just before he was expelled from the law firm.  It

14  changed right around that time.  And I guess Mr. Dennis, you

15  know, had issues with the law firm at the time and -- regarding

16  compensation and other matters -- and it just -- our

17  relationship just ceased to becoming a professional

18  relationship.  And it just kind of didn't -- it wasn't in the

19  same place it was before.

20  Q.  You testified earlier that the defendant was terminated

21  from K&L Gates in May of 2019.  Did you see the defendant after

22  he stopped working at the firm?

23  A.  Yes, I did.

24  Q.  Where did you see him?

25  A.  I saw Mr. Dennis in Washington, DC at a conference in June,

MACGden1                        Cottle - Direct

1    early June of 2019.

2    Q.  What conference was that?

3    A.  It was the Corporate Counsel Men of Color conference.

4    Q.  What is the Corporate Counsel Men of Color conference?

5    A.  Lawyers go to conferences all the time.  So this was a

6    conference with professional black lawyers or other black

7    professionals, where we meet every year to network, exchange

8    ideas.  It's an opportunity for me to introduce myself and my

9    law firm to other lawyers there and for me to meet other

10   individuals.  It's a good opportunity to network.  There's

11   other things associated to that conference with men's health,

12   black men's health, et cetera, et cetera.  It was a one-day

13   conference.

14   Q.  As part of your duties as a partner at K&L Gates, do you

15   regularly attend professional conferences?

16   A.  Yes, I do.

17   Q.  You touched on this a bit already, but why do you attend

18   such events?

19   A.  Well, as I said before, partners are -- one of our

20   responsibilities are generating business.  So a lot of these

21   conferences, they have other lawyers, decision-makers that work

22   for companies.  So I would attend these conferences to meet

23   other lawyers.  They're professional development conferences as

24   well, so there's a good opportunity to network, introduce

25   myself to other lawyers.  Sometimes we get to speak at these

1    conferences.  I wrote a chapter of a book, and sometimes we
2    talk about that there at the particular conference.  It's a
3    good opportunity for me to get to know other lawyers, for other
4    lawyers to get to know me and my law firm, ways to build
5    relationships.  So later on, down the road, we follow up on the
6    conferences, so later we will have further meetings.  Maybe one
7    day they'll be my clients eventually or other opportunities.
8    So we go to -- I go to those conferences for those reasons,
9    amongst others, as well.
10   Q.  What happened when you saw the defendant at the conference?
11   A.  So this was -- back to the CCWC conference -- so the
12   night -- the evening before the actual conference started,
13   there was a networking event at the hotel.  And I saw
14   Mr. Dennis while I was with other lawyers.  I think I was at
15   the bar just having a drink and eating hors d'oeuvres.  And I
16   think our eyes met at that networking event at the conference.
17   Q.  What happened next?
18   A.  Our eyes met, and I think we exchanged pleasantries.  I
19   think I said, hey, Willie -- I called him Willie at the time --
20   I might have said something like how are you doing, might have
21   asked him about his kids, something that I would continue to
22   do, how are your boys.
23       And then after that, Willie kind of just was pretty angry
24   at me.  And he mentioned that the firm took -- the law firm
25   took his healthcare away, he wasn't provided due process, he

MACGden1                          Cottle - Direct

1   doesn't have healthcare for his family, kind of things along

2   that line.

3   Q.  How would you describe the defendant's demeanor during this

4   conversation?

5   A.  Well, I was surprised.  It was pretty -- he was pretty

6   upset, passionate.  And it was -- I'm not going to say it was

7   loud, but it was -- I was uncomfortable with the conversation

8   because there was other people around.  So I might have said,

9   hey, calm down or something or the other.  But it was -- it was

10   aggressive, I would say.

11   Q.  Why were you uncomfortable?

12   A.  Well, number one, there were just other lawyers around.

13   This is a conference primarily for African-American men.  So

14   there were other just lawyers and I had a guest there.  And the

15   topics were just not appropriate, I thought, for just talking

16   about this in the open the way we were.  So I was

17   uncomfortable.  And it was unexpected to even see him or

18   discuss it at the moment.

19   Q.  Why was it unexpected to see the defendant?

20   A.  Well, I knew he was expelled from the firm, and I just

21   totally did not expect to see him at the conference.  I was

22   surprised to see him there.  It was in Washington, DC.  I

23   didn't expect to see him at the conference.

24   Q.  After the defendant approached you, what happened next?

25   A.  After we exchanged words, I think I left.  I looked around,

1    I said -- I was uncomfortable.  I said -- I left, went

2    somewhere else, and eventually went up to my room.

3    Q.  What happened when you went up to your room?

4    A.  Well, went up to the room, probably getting ready -- going

5    through my emails that I missed while I was downstairs.  One of

6    the first things I noticed, there was a few text messages from

7    Mr. Dennis on my cell phone.

8    Q.  After you saw those text messages, what happened?

9    A.  Well, there were more than one.  There were several.  They

10   kept kind of coming in.  So I think I just sat down and started

11   kind of reading the text messages.

12   Q.  Mr. Cottle, there's a document sitting in front of you

13   marked for identification as Government Exhibit 518-A.

14       Do you recognize it?

15   A.  I do.

16   Q.  What is it?

17   A.  So this appears to be -- well, this is the printed text

18   messages from Mr. Dennis that he sent to my cell phone

19   Thursday, June 6th, 2019.

20   Q.  How do you recognize it?

21   A.  Well, Mr. Dennis is in my cell phone, so it would be

22   Willie E. Dennis with his phone number underneath.  And I

23   remember these messages from receiving them.

24   Q.  Turning to the last page of that document.

25   A.  Yes.

1    Q.  Do you see a redaction there?

2    A.  I do.

3    Q.  Other than that single redaction, is this a true and

4    accurate copy of the text messages you received from the

5    defendant?

6    A.  Yes.

7              MS. SIMON:  The government offers Government

8    Exhibit 518-A.

9              THE COURT:  Any objection?

10             MR. DENNIS:  No objection, your Honor.

11             THE COURT:  Received.

12             (Government Exhibit 518-A received in evidence)

13             MS. SIMON:  Your Honor, may I have permission to

14   publish it to the jury.

15             THE COURT:  Yes.

16   BY MS. SIMON:

17   Q.  Mr. Cottle, drawing your attention to the very top left

18   corner, can you read the name and the phone number next to the

19   arrow.

20   A.  Sure.  It is Willie E. Dennis, phone number is

21   646-418-3329.

22   Q.  Whose telephone number is that?

23   A.  That would be Mr. Dennis' cell phone.

24   Q.  How do you know that?

25   A.  That's the contact that was in my phone and that's the

1  number we used to communicate on.

2  Q.  Without saying your full phone number, what are the last

3  four digits of the phone number that you received these

4  messages on?

5  A.  9316.

6  Q.  Is that still your phone number?

7  A.  Yes, it is.

8  Q.  What is the date of the fist message?

9  A.  The first message is Thursday, June 6th, 2019.

10  Q.  What was happening on June 6th, 2019?

11  A.  So this was the CC -- this was the evening of the CCMC

12  conference.  Like I said, this is the day before the actual

13  conference started on the 7th.

14  Q.  Is CCMC short for Corporate Counsel Men of Color?

15  A.  Yes, it is.

16  Q.  What time was the first message?

17  A.  The first message is 9:08 p.m.

18  Q.  Perhaps look a little closer.

19  A.  I'm sorry, 9:06 p.m.

20  Q.  Apologies, I know that is a little small.

21  A.  I don't have my glasses.

22  Q.  Mr. Cottle, what was the time of the last message you

23  received from the defendant?

24  A.  The last message is 7:05 a.m. on Friday, June 7th, 2019.

25  Q.  How many messages did you receive from the defendant

MACGden1                    Cottle - Direct

1    between 9:06 p.m. on June 6th and 7:05 a.m. on June 7th?

2    A.  23.

3    Q.  Did you respond to any of those messages?

4    A.  I did not respond to any.

5    Q.  Starting with the first message, can you please read aloud

6    the first three messages, reading both the time stamp and the

7    contents of the message.

8    A.  Okay.  The first message is June 6th, 2019.  The time stamp

9    is 9:06 p.m., and the message reads, keep on striving.  My kids

10   will appreciate it.  What is happening with Jack.

11       Btw, we should meet for breakfast.  So much to catch up

12   on...  brother.

13       Also glad I was able to introduce you to the folks at CCWC

14   and CMC.  Sure the brothers will appreciate someone with your

15   character.

16   Q.  Mr. Cottle, you can stop there.  Thank you.

17       Drawing your attention to the first message, who do you

18   understand Jack to be a reference to?

19   A.  Jack would be another attorney that we know.

20   Q.  Did you understand why Mr. Dennis was referencing him in

21   these messages to you?

22   A.  No.

23   Q.  And why not?

24   A.  First of all, I was stunned that I was getting any of these

25   messages, and Willie was no longer with the firm, so I -- I was

MACGden1                        Cottle - Direct

just surprised that I was receiving these messages in the first

place.  But no, I had no reason why he would say what is

happening with Jack.

Q.  Drawing your attention to the second message.  What does

btw mean?

A.  I understand it to be by the way.

Q.  What do you understand the rest of that message to mean?

A.  Well, then I was really confused too.  We should meet for

breakfast, so much to catch up on brother.  I didn't know what

it meant, honestly.  I don't know what we had to catch up on.

I was just getting a little worried.

Q.  What does the term brother mean to you?

A.  Brother is what sometimes black men call each other,

brother, term of endearment, could be, my brother.  Sometimes

we greet each other that way as well.

Q.  Drawing your attention to the third message, the one that

begins also glad.

A.  Mm-hmm.

Q.  What do you understand the letters CCWC to be a reference

to?

A.  Sure.  CCWC is Corporate Counssel Women of Color.

Q.  And what do you understand CMC to be a reference to?

A.  It could be corporate men's conference, maybe, I think.

But I know CCMC.  Could be corporate men's conference.

Q.  Drawing your attention to the second sentence in that

MACGden1                    Cottle - Direct

message, the one that reads, sure the brothers will appreciate

someone with your character.  What do you understand that

message to mean?

A.  Well, my character is coming in now, so here we are -- I

was really confused.  I don't know what he meant by that.  I

was reading it and I was getting concerned about it.

              (Continued on next page)

1    BY MS. SIMON:

2    Q.  Why were you concerned about it?

3    A.  Because I didn't want to deal with -- I didn't know what

4    was going on, honestly.  I didn't expect any of this to come

5    up.  I didn't expect to get text messages.  I didn't expect to

6    see Willie, didn't expect to see him the day before.  Didn't

7    expect to get 23 email messages the night before the

8    conference.  It was very puzzling and confusing.  I remember

9    being concerned a little bit about what my day might look like

10   tomorrow.

11   Q.  Can you start reading the messages again starting, with "my

12   kids"?

13   A.  Sure.  9:12 p.m.  "My kids, so what?  Right.  I am

14   concerned about you really.  Well, what about my kids?"

15        Sorry.  That was 9:13 p.m.

16        9:14 p.m., "they cut their health insurance immediately.

17   Is that what you are concerned about?"

18        9:15 -- that might be part of 9:14.  "I always knew, hoped

19   some goodwill and introductions would help.  Take, take, take."

20   And then 9:15, "striving."

21   Q.  You can go ahead and read the next two messages as well,

22   please.

23   A.  OK.  "And laughing about it, the big joke, as Joe mentioned

24   at dinner, and you said, let's no and then went home and

25   laughed about it (my kids) with your boy...right?"

MacWden2                    Cottle - Direct

1      This is 9:18.  "Did you give Joe your 5K?"

2  Q.  You can stop there, Mr. Cottle.  Thank you.

3      Did you understand these messages when you received them?

4  A.  I was actually very confused.  No, no.  Health care, no.  I

5  knew, there's a dinner that Willie -- Mr. Dennis -- and I

6  attended.  Joe, this $5,000 comes up once in a while, but as a

7  whole, I was just, you know, I wasn't expecting to get any of

8  these messages at this point.

9  Q.  Had Mr. Dennis referenced his children's health insurance

10  before?

11  A.  Only the night -- sorry.  Only earlier that evening he did.

12  Q.  Were you aware of any cutting of Mr. Dennis's children's

13  health insurance?

14  A.  I don't have any firsthand knowledge of any of that stuff.

15  Health insurance --

16  Q.  Were you involved in anything like that?

17  A.  No, I was not involved in his termination.

18  Q.  Turning to the reference to Joe in the last two messages,

19  who do you understand Joe to be?

20  A.  That would be Joe Draytoon.  He was at the time the

21  president of the National Bar Association.

22  Q.  What is the National Bar Association?

23  A.  That's another -- that's the largest, actually,

24  professional bar association for African American lawyers,

25  founded in 1932.  But it's really big.  You know, I was a

1    member at the time.  They meet every year and have lots of

2    committees.  They talk about a lot of cutting-edge issues.  We

3    get CLEs, continuing legal education at these conferences, meet

4    clients there, meet potential clients at these conferences.

5    It's a really big and amazing conference.

6    Q.  What did you understand these two messages referencing Joe

7    to be about?

8    A.  Oh, about a dinner that we had with Joe about sponsorship,

9    our firm sponsoring part of some of the conference.

10   Q.  At this time, after the defendant had been expelled from

11   the law firm, did you have an understanding why you were

12   receiving these messages from him?

13   A.  I don't -- no, I don't.

14   Q.  Mr. Cottle, can you please start reading again at the

15   message that begins "what did you say"?

16   A.  Sure.  9:20 p.m., "what did you say 'I am here to expand

17   the empire' without...right?"

18       9:22 p.m.  "Was that your MO in Pittsburgh?  Is that why

19   there are no other partners there?  We have Eric."

20       9:23 p.m.  "I cannot wait until the next time I hear you

21   talk about brotherhood with someone."

22       9:26 p.m.  "Laughing with him now, right?"

23       9:29 p.m.  "Lost the 15K we were getting every year, a real

24   asset."

25        9:31.  "Going to try to pick my pocket and tell me 'I am

MacWden2                        Cottle - Direct

1   concerned about you.'"

2   Q.  You can stop there.  Thank you.

3      Mr. Cottle, the reference to 15K in the message from 9:29

4   p.m., what do you understand 15K to mean?

5   A.  That would be something with Willie and maybe his

6   compensation at the firm, firm-related, that he -- yeah, that

7   would be between Willie and the law firm.

8   Q.  And drawing your attention to the message at 9:23 p.m. --

9   A.  Correct.

10  Q.  -- "I cannot wait until the next time I hear you talking

11  about brotherhood with someone."  What do you understand that

12  message to mean?

13  A.  Well -- I'm sorry.

14     You know, I was really concerned when I, when I saw this,

15  because Willie was at a conference with other Black men,

16  professionals.  I don't know if this was a threat.  I was just

17  concerned when I saw that brotherhood stuff, because he was

18  obviously at this conference.

19  Q.  And why would that be concerning to you?

20  A.  Well, it's a professional conference, and, you know, I've

21  been to many conferences.  It's not that -- they pretty much go

22  automatic, and so it, it's a positive kind of uplifting event,

23  especially when Black men get together.  Our reputation is at

24  stake.  A lot of us professional Black men that go to these

25  conferences -- they're at nice hotels, nice cities -- we're

MacWden2                          Cottle - Direct

1  kind of proud that they're there to walk around.  So you know,
2  I was concerned.  I was pretty concerned.  It was a big deal
3  that we were having this conference at this nice hotel, nice
4  venue, when we get together.
5  Q.  Can you please read the next message, the one that begins
6  "are you"?
7  A.  Oh.  OK.  9:32.  "Are you testifying against me well" --
8  sorry.  Strike that.  "Are you testifying against me as
9  well...brother?"
10     9:57.  "All a big game, right?  OK.  Let's play."
11  Q.  You can stop there.
12     What do you understand those messages to mean?
13  A.  Well, whatever he was talking about is on; I was saying
14  something's going on.  I think it was late at night.  I think I
15  just wanted to go to bed, maybe this would go away, honestly.
16  But I'm just trying to understand why I'm getting all these
17  messages now.
18  Q.  How did you react to the messages you received on the
19  evening of June 6?
20  A.  Well, I was pretty concerned right there.  The last one was
21  pretty concerning.  In my mind, going through that, I was
22  hoping that when I woke up the next day they would not be there
23  probably.  I probably went to sleep right after that, trying to
24  get ready for the next day.
25  Q.  Can you start reading the messages from the morning of June

MacWden2                              Cottle - Direct

```
 1   7 --
 2   A.  5:15 a.m.  "Invested all that time in you and now you will
 3   not...really."
 4       5:17.  "And without due process, top litigator on the
 5   planet."
 6       5:18.  "So what do we talk about, the weather?"
 7   Q.  You can keep reading, the next message, please.
 8   A.  "You are the partner designated by the firm to expand the
 9   empire on the East Coast, including" blank "and you're" --
10   sorry.  "And you know I have lost my health insurance for my
11   kids without due process."
12       6:07 a.m.  "Today, let's run our views by independent
13   people at the conference to see if they can identify a path
14   forward."
15       7:05 --
16   Q.  You can stop there.  Thank you.
17       Focusing on the last sentence you just read, "today let's
18   run our views by independent people at the conference to see if
19   they can identify a path forward," what do you understand that
20   message to mean?
21   A.  Well, at the time I was thinking that I'm going to --
22   Willie's going to approach me tomorrow in front of -- I mean
23   later today.  I don't understand what he's meaning by any of
24   this stuff.  And it just -- I think as I'm shaking my head now
25   reading it, I think I was probably doing the same thing then.
```

MacWden2                    Cottle - Direct

1   "Let's run it by independent people at the conference to see if

2   they can identify a path forward," yeah, I don't know what he

3   was talking about there.

4   Q.  Can you read the next message aloud, please?

5   A.  7:05 a.m.  "Heading to breakfast shortly.  Please save me a

6   seat.  I will find you."

7   Q.  What did you understand that message to mean?

8   A.  I don't know what it meant, but it sounded like he's going

9   to be trying to -- he's going to look for me tomorrow -- that

10  same day.  I may be running into Willie at breakfast before the

11  conference started.

12  Q.  How did you react when you saw the message at the end of

13  this series of texts "I will find you"?

14  A.  Yeah, I was really concerned.  I was -- I did not know what

15  was going to happen.  I remember getting concerned then, not

16  knowing what I will be getting into when I actually go to

17  breakfast for the start of the conference.  I think that I was

18  actually hoping this was all a joke and I wouldn't see any -- I

19  wouldn't see Mr. Dennis any further.

20  Q.  You testified earlier that the term "brother" and

21  "brotherhood" is sometimes used as a term of endearment.  After

22  reading these messages, how did you understand the defendant to

23  be using those terms here?

24  A.  Well, I thought -- I was starting to think now as a threat

25  almost; I'm going to be exposed for something.  I really didn't

MacWden2                          Cottle - Direct

1  know.  I was just really concerned.

2  Q.  After the defendant sent you the 23 text messages that you

3  just read aloud, what happened?

4  A.  Well, it was -- I was going to go to breakfast.  The

5  conference was now starting, so there's breakfast before the

6  actual conference starts.  So I left my hotel room.  The

7  conference is in the same hotel.  Go down the escalator, and

8  I'm headed to grab my breakfast and then take the breakfast --

9  breakfast is set up in this area.  We take it from there and

10  then into the room where the conference is to sit at a table.

11  So that's where I was headed.

12  Q.  And what happened then?

13  A.  Well, I went down and I went into the breakfast room, and I

14  think I saw Mr. Dennis in the area.  I just grabbed my

15  breakfast.  He didn't say anything to me.  I didn't say

16  anything to him.  And I knew people there.  And this is --

17  people are starting to gather.  The conference hasn't started.

18  People are starting to filter through, and then I got a table

19  with these other gentlemen that I knew, a big round table with

20  about ten people.  I just sat down at the table.  And the

21  screen is here and everybody's starting to gather now at the

22  conference.

23  Q.  And what happened after that?

24  A.  Well, as I'm sitting at the table, eating breakfast,

25  talking, I see Mr. Dennis approach from my right.  I picked up

MacWden2                    Cottle - Direct

1   peripheral vision coming in, and he had breakfast as well.  And

2   he's coming.  I'm just hoping -- and I know we had seats at our

3   table, two or three empty seats.  I hope he's not going to sit

4   here.  That's what I was saying to myself:  Oh, please don't

5   sit down.  But he sat at our table.

6   Q.  When the defendant sat at your table, what happened?

7   A.  Well, he went right into I would say a soft rant about many

8   of these issues here, most of them were about health care for

9   his kids; he didn't get due process.  Kind of things along that

10  line, I think.  Mostly health care, due process.

11      Started out very softly, and then -- I did not respond at

12  all.  And it -- he started to get, appearing more angry and

13  just -- he got pretty loud at the table and others were sitting

14  at the table.  And he said something about I'm a fake brother.

15  And I remember somebody saying to him, Hey, we were trying to

16  chill the event, right, because it started softly, got loud.

17  And when he said that, I just really wanted to -- you know, I

18  didn't say anything at all at this time.  I'm like, should I

19  say something?  Should I -- my brain was just trying to process

20  what was going on.  It's embarrassing, really embarrassing, so

21  far.  I'm getting nervous, and then I get up.  I decide to get

22  up from breakfast and go out -- sorry, get up from the table

23  and go back out to where the breakfast was.

24  Q.  What about this interaction with the defendant was

25  embarrassing to you?

MacWden2                     Cottle - Direct

1   A.  Well, he started to go through these issues that -- some of

2   the text messages.  There were other Black men at the table

3   with us.  I've never been to a conference where any of this

4   happened ever.  As many times as I've been, this has never

5   happened before.  And it's a professional conference with Black

6   men.  This is just like -- you just -- I was saying I just

7   didn't want this to happen.  I don't want them to not invite us

8   back to these things.  It was not a good look, and I just was

9   just very uncomfortable.

10  Q.  You testified that you then walked away?

11  A.  I walked off.  I got up from the table, and I was going to

12  just walk out and really just kind of -- I don't know what my

13  next step was going to be.  Maybe I'll just kind of hang out

14  here, go sit at another table.  As I walked out, I was stopped

15  by another gentleman.  We were just talking, and I saw Mr.

16  Dennis again in my peripheral.  He must have gotten up from the

17  table, and then he was taking my picture with his phone and I

18  witnessed -- I saw him taking my picture.  And I was looking at

19  him taking my picture, and he was there, and he was taking my

20  picture.

21       Yeah, that's kind of what happened next.

22  Q.  How did you react to seeing --

23           MS. SIMON:  I apologize.

24  Q.  How did you react to the defendant taking photos of you?

25  A.  I think I looked -- sorry.  I looked at him.  I think I was

1    shocked, like why is he taking my pictures.  I was concerned,

2    because I didn't know where those pictures were going, based on

3    everything, from the text messages and sitting at the table.

4    Yeah, I was -- I was just concerned.

5    Q.  After you saw the defendant taking photos of you, what did

6    you do next?

7    A.  Well, I wanted to continue to just get out of where the

8    conference was, and so I walked back out to where the breakfast

9    was being served, and that's -- and I went out there.  And then

10   Mr. Dennis followed me out there, and that's pretty much

11   when -- same topics again, him approaching me, kind of in my, I

12   would say getting close to my space now, my airspace.  And this

13   is the closest, you know, and he was angry.  Same, same themes.

14   And I think I was -- I wanted to -- I don't like confrontation.

15       So this is the same thing.  We're at this conference.  I

16   think I said something to him and he said something back.  But

17   Willie was angry.  He was not backing away from me.  I might be

18   tall, whatever, but nothing that my stature would afford me

19   walking around New York subways was concerning Mr. Dennis.  I

20   was surprised, you know, that he -- that he approached me in

21   that regard -- yeah -- at that point.

22   Q.  And how did you feel when he did that?

23   A.  Well, that's when I started to get threatened a little bit.

24   I was looking at his hands, like, does he have anything?  I was

25   getting, starting to get concerned a little bit.  I started

MacWden2                    Cottle - Direct

```
 1   saying to myself:  Wow, there's no security in this place;
 2   anybody could bring in a weapon; you know, this is going
 3   further than me just being annoyed.  I probably need to leave
 4   and get out of here.  I -- because I didn't want to say
 5   anything else.  I mean it was just -- that's kind of how I
 6   felt.
 7   Q.  When you say you were concerned whether the defendant had
 8   something in his hands --
 9   A.  I looked at his -- I'm sorry.
10   Q.  Sorry.
11   A.  No.
12   Q.  I apologize, Mr. Cottle.  I want to make sure I get out the
13   whole question so the court reporter can take it down.
14       When you say you were concerned that the defendant had
15   something in his hands, what were you referring to?
16   A.  I looked at his hands to make sure he didn't have anything
17   in his hands, because I didn't want -- this is -- I went into,
18   I don't know, protection mode.  So I just didn't want to make
19   sure I didn't get hurt with some object or anything like that,
20   because it was just too close for my comfort in that zone.  It
21   was -- I was -- it was just very uncomfortable.  Very
22   uncomfortable.
23   Q.  After the defendant approached again and got into your
24   physical space, as you testified, what did you do next?
25   A.  Well, I decided that was enough for me, and I walked away.
```

1    So I left.  I left the vestibule.  I went back to my room and

2    kind of reported it, what happened, and I got back on the train

3    and went back -- back home.

4    Q.  So you left the conference?

5    A.  Yes, I did.

6    Q.  Why did you do that?

7    A.  Well, I didn't feel -- No. 1, I didn't feel safe.  This was

8    not going to stop.  This was just at breakfast.  I mean this

9    wasn't even 30 minutes into the conference, and, you know,

10   there's no way I'm going to survive, I thought, eight hours of

11   this.  And I think I was just going to be embarrassed.  I think

12   it was going to be an embarrassment.  I'm not -- I don't want

13   to get into a physical confrontation with anybody and, I didn't

14   want to get baited into anything, you know.  I just wanted to

15   get out of there.  I tried to be as measured as I could, but I

16   did not want to stay there.  I was not comfortable staying

17   there.

18   Q.  Would you have left the conference if it were not for the

19   messages you received from the defendant and the defendant's

20   overall conduct at the conference?

21   A.  I would not.  I would have stayed, yes.  I would not have

22   left the conference.

23   Q.  You testified earlier that you were surprised to get these

24   text messages from the defendant.  Prior to June 6, 2019, did

25   you commonly communicate with the defendant over text message?

1    A.  Yeah, I would say so.  It was not uncommon.  You said prior

2    to this?

3    Q.  Yes.

4    A.  Yeah.

5    Q.  So why were you surprised to get these messages on June 6th

6    and 7th, 2019?

7    A.  I didn't expect to get 23 messages from Mr. Dennis that

8    night at all.  It -- I think I was just very surprised to get

9    these messages.

10   Q.  Why were you surprised?

11   A.  He was no longer at the firm.  He was the last -- this was

12   the last thing I just really expected to see from Mr. Dennis.

13   Q.  And you testified also that you were surprised to see him

14   at the conference?

15   A.  Yes.

16   Q.  Can anyone attend these conferences?

17   A.  Yeah.  If you pay for it and register, sure, I think.  Yes.

18   Q.  And so why were you surprised to see the defendant?

19   A.  I just didn't -- I just was surprised that he would travel

20   from D.C. -- from New York to D.C. to attend this conference;

21   other than that with the expenses.  I was just very surprised

22   that he was there, yeah.

23   Q.  Apart from the messages directed at you and the defendant's

24   conduct at this conference, what other factors affected your

25   reaction to the defendant in June 2019?

MacWden2                    Cottle - Direct

A.  Well, right after this conference, one of our attorneys,
Cally Bostick, she was getting an award from the National Bar
Association for being a 40 Under 40 recognized attorney for her
work.  So at the firm we were going to get a table and go to
her -- to the dinner honoring Cally and the other winners of
this -- it was a prestigious thing.

    I know Cally well.  I was happy for her, but she was scared
to go to that dinner because Mr. Dennis was -- threats that he
made to her as well.  I was aware of that.

    I went to the dinner.  I mean we had to make sure that
security -- I had the number to our security, undercover
officer that was there to protect us if Mr. Dennis showed up.
And we were -- I was concerned about that, and I know she was
as well.  So that kind of formulated my, you know -- that
incident with me, you know, getting ready for Cally's 40 Under
40 conference as well.  I knew that prior Mr. Dennis, you know,
he lost his privilege to come to our office.  His badge was
taken from him and he no longer had email access for similar
conduct to others.  I knew that.

    When I left my hotel and told my office what happened, they
were saying that they -- Willie sent a picture of me to
somebody or the other.  So I was aware of that.  I mean this is
just in June I was very concerned, so --
Q.  How, if at all, did that affect your perception of the
defendant's conduct?

MacWden2                      Cottle - Direct

A.  Well, it put in light that he's, he's threatened a lot of
people at our firm.  He's harassed a lot of people at our law
firm.  It was -- he was someone to be avoided and taken
serious.  You know, my mind, this -- threats are -- people get
hurt with gun violence, and this is just how this stuff starts,
angry employees threatening their co-employees.

    You know, this is -- I was anxious.  I'm not going to talk
for others, but knowing, you know, some of the circumstances
of, of Mr. Dennis's conduct and threats, it was -- I was
concerned.  I was -- you know, this all kind of formulated, you
know, how I reacted and kind of what I did after that.

Q.  Were you concerned for your own safety?

A.  Yes, I was.

Q.  Based on what happened, why were you concerned for your
safety?

A.  I didn't want to run into Mr. Dennis.  He -- you know,
it's -- 23 email messages backed up by approaching me at a
conference in front of a lot of people, I felt that he had
no -- I just thought he had nothing to lose.  Right?  And you
know, I'm 60 years old now.  I just don't -- I was just
concerned that someone would carry out on their actions and
their threats.  This, to me, was very serious.  These threats,
to me, were very serious.  I just took it very serious.

Q.  What steps, if any, did you take in response to the
defendant's conduct at this time in the summer of 2019?

MacWden2                    Cottle - Direct

1   A.   Around this time, June?  Listen, I changed the way I did a

2   lot of things.  I was very -- I used to travel with my

3   headphones on, kind of carefree on the subway.  I stopped doing

4   that.  I just was very vigilant of where I stood on the

5   platforms of train stations.  I was very aware of who got on

6   the train, looking around, make sure -- Mr. Dennis lived in

7   Harlem, in the city.  I was very conscious of that.  I was

8   conscious to the point where I would make sure that if I had

9   shoes on they would have rubber soles or just in case, you

10  know, I didn't want to have a leather-soled shoe on just in

11  case Mr. Dennis approached me.  I didn't want to slip or fall

12  or do any of those kind of things.

13       I just felt -- I just heightened my vigilance of being

14  around the office, what entrance I went into the office.

15  Should I go to lunch today?  Because I know -- he, you know,

16  Mr. Dennis had approached other lawyers outside the office.  Do

17  you want to deal with that?  It's -- you know, those are the

18  kind of choices that I would make.

19  Q.   You testified that you stopped wearing your headphones, you

20  were more vigilant on the subway platform, you wore shoes with

21  different soles.  Why did you take those specific steps?

22  A.   Because I -- if I encountered Willie or he approached me

23  the ways he did before, I just wanted to be more aware and

24  protect myself, be in a better position to protect myself from

25  him.  I didn't want him to sneak up on me.  I didn't want it to

1  be a surprise.  I didn't want any of that stuff.  So I just

2  kind of locked in to make sure that if I did see him or if he'd

3  approach me, I would be whatever ready that that be; I wouldn't

4  be caught off guard.

5  Q.  When you say ready, do you mean ready to protect yourself?

6  A.  I would be ready to protect myself.

7  Q.  Or to leave the situation?

8  A.  If that's warranted, that would be my first preference,

9  yes.

10 Q.  And you mentioned that you were concerned that you might

11 see the defendant in Harlem?

12 A.  I knew he was from Harlem.  I mean he's a city -- Willie,

13 you know, I mean he's familiar with the west subways.  You

14 know, I just -- the CCWC event, you know, kind of startled me

15 and made me pay more attention to my surroundings and be aware

16 of him.  Preparing for Cally's 40 Under 40 dinner celebration

17 or that preparation, you know, working with security, making

18 sure we all get there.  Is his name on the list?  You know,

19 just that concern that I had, that we had, are we going to be

20 safe at this conference?  Should we even go to this conference,

21 to her award?  We all decided to go to her award, let's go

22 there.  That -- you know, who does that?  You don't want to go

23 to conferences wanting to know if security will be there if Mr.

24 Dennis shows up.  That's just not -- that's not normal.

25     I thought well, maybe I'll be safe at the conference,

MacWden2                    Cottle - Direct

1    because I don't think -- you know, no one's following me around

2    on the streets.  So my point is that I just have to be

3    vigilant.

4              THE COURT:  Counsel, how much more do you have on

5    direct?

6              MS. SIMON:  Very short.  Maybe five minutes.

7              THE COURT:  All right.

8    BY MS. SIMON:

9    Q.  Did you receive any text messages from the defendant after

10   you received the string of 23 messages we discussed earlier at

11   the conference?

12   A.  I did not.  I blocked his number from my cell phone.

13   Q.  Why did you block his number?

14   A.  Because of the 23 text messages.  I didn't want to deal

15   with that anymore.

16   Q.  Why did you not want to deal with that anymore?

17   A.  It's upsetting.  It's just -- it's just who wants to deal

18   with being threatened and just harassed all hours of the night.

19   I just didn't want to deal with it.

20   Q.  Do you know whether or not the defendant sent you any

21   additional text messages after this point?

22   A.  I don't know, no.

23   Q.  And why don't you know?

24   A.  Because they were blocked.

25   Q.  Do you know whether the defendant continued to try to

1    contact you on any other means of communication, other than

2    your cell phone?

3    A.  Sure.  I'm aware that he attempted to contact me through my

4    firm email account.

5    Q.  Did you receive these emails directly?

6    A.  I did not.

7    Q.  Why not?

8    A.  The firm was blocking Mr. Dennis's emails so that we

9    wouldn't get them directly.

10   Q.  And if you weren't receiving them directly, how did you see

11   them?

12   A.  The -- our general counsel's office would forward them to

13   me.

14   Q.  And how did you know these emails were from the defendant?

15   A.  Because they were, you know, from his email.  They were --

16   you know, or at least from an email address that I think was

17   identified by, you know, that belonged to Mr. Dennis.

18   Q.  Did you recall seeing any particular email from the

19   defendant?

20   A.  Well, I know there was a National Bar Association

21   conference that was in New York that was part of Cally's

22   celebration.  There was a big conference there.  And there was

23   an email with a heading of National Bar Association, maybe,

24   yeah.

25   Q.  To the best of your recollection, where would you likely

MacWden2                        Cottle - Direct

1   have been when you saw this message?

2   A.  I was probably at work when I saw those, yes.

3   Q.  At work in the New York office of the firm?

4   A.  Yes.

5   Q.  Can you describe the email?

6   A.  I think the email -- I don't know verbatim, but they were

7   on these same subjects.  I think they were the same topics

8   here -- National Bar Association, sponsorship, my compensation.

9   I mean he was questioning about, You make a lot of money, you

10  should give more money.  Just more stuff, more of --

11  Q.  And you said that it referenced the National Bar

12  Association conference?

13  A.  Correct.

14  Q.  What is that?

15  A.  So, that's -- that's the biggest African American

16  professional conference.  They have annual conferences.  Their

17  annual conference was in New York that year.

18              (Continued on next page)

19

20

21

22

23

24

25

MACGden3                          Cottle - Direct

1  BY MS. SIMON:

2  Q.  When was the conference being held?

3  A.  It was that summer, so it was end of July or early August.

4  Q.  Of 2019?

5  A.  2019, yes.

6  Q.  Is this is a conference you were planning on attending?

7  A.  Yes.

8  Q.  And when did you see this email?

9  A.  Right around that time.  I think it was right before the

10 conference.

11 Q.  Do you recall specifically what the email said about the

12 conference?

13 A.  Not specifically about the conference, but I remember the

14 subject line was National Bar Association conference.

15 Q.  And what did that suggest to you?

16 A.  Whatever it did, it brought up the whole, you know, CCWC

17 emails.  I was planning on going to this conference.  I didn't

18 want to deal with -- run into Willie and deal with any of these

19 issues.  So based on all that, I didn't really fully attend the

20 conference.

21 Q.  When you say the "CCWC emails," are you referring to the

22 text messages you received from the defendant at the CCMC

23 conference?

24 A.  Yes, I am.  Thank you.

25 Q.  And you testified that after seeing this message, you

1  didn't fully attend the conference?

2  A.  Correct.

3  Q.  Was your decision not to fully attend the conference

4  related to the email from the defendant that you saw?

5  A.  Related to that email, prior -- and prior events as well,

6  yes.

7  Q.  And why did seeing this email and the defendant's prior

8  conduct affect your decision to attend the conference?

9  A.  I did not want -- this conference is in New York, so it's

10 likely that he would be there.  I did not want to run into

11 Mr. Dennis at the conference, I didn't want to be harassed at

12 this conference, embarrassed, I didn't want any of this stuff

13 to happen.  It just -- it wasn't worth it.

14 Q.  When you say you didn't fully attend the conference, what

15 do you mean by that?

16 A.  Well, I didn't go.  I think I went to some discrete dinners

17 or I met people very discretely, but I didn't go to any of the

18 events or attend the meetings or I didn't attend just the full

19 body of the conference.

20 Q.  Would you have skipped those events if it were not for the

21 messages the defendant sent you on this occasion and prior?

22 A.  I would have attended the conference.

23 Q.  How did you feel about missing the conference?

24 A.  Well, I wasn't happy about it.  But you know, you have to

25 weigh at this point whether I wanted to be harassed at this

MACGden3                    Cottle - Direct

1   conference or not.  I decided I just did not want to go, and I

2   missed the conference, miss the opportunities.

3   Q.  Are you aware that in October of 2020, the defendant filed

4   a lawsuit against K&L Gates?

5   A.  Yes, I'm aware of that.

6   Q.  Does that lawsuit have any impact on your testimony here

7   today?

8   A.  No, no.

9   Q.  When was the last time you saw the defendant prior to

10  today?

11  A.  Prior to today, the last time I saw Mr. Dennis was at

12  another conference in New Orleans in 2020, in February of 2020.

13  Q.  What conference was that?

14  A.  So this was a National Bar Association conference.  It was

15  the commercial law section.  It's a section of the bigger

16  conference.

17  Q.  Why did you go to this conference even though you skipped

18  the one in New York in 2019?

19  A.  So this was a more targeted conference with people that I

20  really wanted to meet.  It was in New Orleans, so I figured it

21  would be kind of safe to go to New Orleans.  I didn't expect to

22  run into anybody.  It's a really good conference.  We do an

23  expo there.  I went with another partner.  It's a good

24  conference.

25  Q.  What types of attendees are at this conference?

MACGden3                         Cottle - Direct

1    A.   This is focused now on lawyers.  So it's a lots of what we

2    call in-house counsel, lawyers that represent companies are

3    there.  And we work with these companies a lot.  Lots of them

4    are clients, some of them are potential clients, individuals

5    that I would like to become clients attend these conference.

6    This is probably one of the better conferences for networking.

7    There's an expo at this conference, where our firm does an

8    expo, we have a booth, we are almost like a vendor.  Companies

9    come by and we tell them about us and what I do.  And I think

10   sometimes we even speak at these conferences.  They're really,

11   really good conferences.

12   Q.   What happened when you saw the defendant at the conference?

13   A.   Well, the first I saw Mr. Dennis at the conference, it was

14   at breakfast, again.  This time, he was eating -- anyway, he

15   was eating bacon.  He was at a station eating bacon, I just

16   remember, with his hands.  And that's the first time I saw him.

17   And I was like, wow, Willie is at this conference.  That was my

18   first reaction.  And I remember seeing him there having bacon,

19   eating, and I went straight into the room for a -- there was an

20   event, the program, so I remember I just went straight into a

21   room for a program.

22   Q.   How did you react upon initially seeing the defendant?

23   A.   I was stunned to see him, number one.  And number two, I

24   was stunned to see him eating bacon with his hands out of the

25   tray.  And I looked at him, and I think I just shook my head

MACGden3                    Cottle - Direct

1    when I saw him.

2    Q.  Why were you stunned to see the defendant?

3    A.  Well, at first, I was stunned at that behavior.  That was

4    odd.  And number two, I didn't expect to see him in New Orleans

5    at this particular conference.

6    Q.  How did seeing him unexpectedly affect you?

7    A.  Well, it just kind of rose my antennas up again.  And I was

8    saying to myself, hopefully, here we go again -- hopefully

9    maybe not here we go again.  But I was concerned when I saw

10   him, initially.

11   Q.  What happened after you saw the defendant at breakfast?

12   A.  Well, like I said, I went to my -- I went to the conference

13   closed door -- you had to kind of have a badge to get into the

14   next part.  I kind of went in there, attended the whatever

15   one-hour session.  Then next we were going to set up -- another

16   partner and I were at the conference together, and we were

17   going to set up our booth at the expo at some point.  I don't

18   remember if it was the next day or later on, but that was the

19   next time I saw Mr. Dennis.

20   Q.  What happened when you saw him?

21   A.  Okay.  So we're setting up our booth at the conference

22   hall, and there was an empty booth over there.  I guess the

23   other law firm or company hadn't arrived yet.  We were setting

24   up our booth, and then we see Willie, Mr. Dennis sitting at the

25   empty booth just staring at us.  And my other partner and I

MACGden3                    Cottle - Direct

```
 1    said, well, there's Willie, he's over there.  And we just kind
 2    of looked back at him, and he was just kind of staring at us.
 3    And that stare went on for a little while, maybe 10 seconds,
 4    but it seemed longer than that.  And my partner and I were
 5    saying -- we were just talking about that, that Willie is
 6    there, let's just keep an eye on things and see where this
 7    goes.
 8    Q.  Did the defendant say anything to you?
 9    A.  No.
10    Q.  How did the defendant's conduct make you feel?
11    A.  I was -- like I said earlier, I was just edgy.  If you took
12    my blood pressure, it probably would have been up a little bit.
13    I was on edge.  Just making -- just being aware, you know, just
14    kind of seeing what's going on.
15    Q.  Why were you on edge?
16    A.  Because of the prior behavior, right.  It's just not one
17    incident, right.  It's a series of kind of incidents and kind
18    of what documents I've seen.  And I know firsthand the threats
19    he's made to others and what he's said in those threats and
20    referencing the Bible and mass shootings.  And all that stuff
21    that he has threatened people with, it's serious stuff.  When
22    you quote scriptures and you are being commanded by god and
23    articles of mass shootings at work to people, this is no stuff
24    to joke around, to play around with.  I took it serious.
25    Q.  What were you concerned might happen?
```

MACGden3                     Cottle - Direct

1    A.  I just thought we could be approached again by Mr. Dennis.

2    Q.  And when you say "approached," what do you mean?

3    A.  Physically, either more verbal exchange or more physical

4    space, just more -- these type of encounters, these kind of

5    threatening behaviors.  You know, we were on the lookout for

6    that.

7    Q.  And taking into consideration the full arc of your

8    interactions with the defendant between June of 2019 and

9    February 2020, how did the defendant's conduct make you feel?

10   A.  At times, scared, very nervous, threatened, shocked,

11   surprised, disappointed.

12              MS. SIMON:  One moment, please.

13              (Conferring)

14              MS. SIMON:  No further questions.  Thank you, your

15   Honor.

16              THE COURT:  Cross-examination.

17              MR. DENNIS:  Your Honor, I would, as I'm representing

18   myself and operating alone, I'd like to request 15 minutes to

19   organize my notes for my cross.  I'd also like to request a

20   copy, a hard copy for my cross-examination of the emails or the

21   text messages which the government provided to --

22              THE COURT:  Well, first of all, you were told

23   yesterday that this would be the first witness.  We can't

24   interrupt after every single witness.

25              You have chosen to represent yourself and certain

1    responsibilities go with that, and that is we have a duty to

2    this jury to move this case along.  I will accommodate your

3    request on this occasion, but you're not going to do this as a

4    regular matter with other witnesses.  So we will take a

5    15-minute break now.  And of course, the government will supply

6    you -- I suspect they already have supplied you with a copy of

7    those emails, but they'll probably do it again if it's of any

8    use to you.

9          MR. DENNIS:  Thank you, your Honor.

10          THE COURT:  Ladies and gentlemen, before I excuse you,

11    one quick thing.  I received a note from juror number 12 asking

12    a bunch of questions -- pretty good questions, I thought -- but

13    the way it works, just so you understand is, as the evidence

14    comes in, most of your questions will probably be answered.

15          If they're not answered, it will be because either the

16    parties decided they didn't want to introduce that evidence or

17    because of the rules of evidence that says that they're not

18    allowed to introduce certain types of evidence.  So they have

19    to play by the rules, just like we all do.  But thank you for

20    providing those questions, but I think you will see that by the

21    end of the whole evidence, the great majority of your questions

22    will be answered.

23          So we'll take a 15-minute break.

24          (Jury excused)

25          (Continued on next page)

MACGden3

 1                (Jury not present)

 2                THE COURT:  You may step down.  15 minutes.

 3                Let me have my law clerk hand each side the note we

 4     received from juror number 12.  I have marked it as Jury Note

 5     Number 1.

 6                This concerns you, Mr. Dennis.

 7                I am concerned that because Mr. Dennis is -- as was

 8     his choice -- pro se, he is not familiar with the niceties of

 9     the rules of evidence.  But I had questions in my own mind

10     about whether all the questions and answers put by this witness

11     complied with the rules of evidence.

12                For example, he was asked about a conversation he had

13     with Ms. Bostick, I think was her name.  And he related what

14     the substance of what she had told him.  Last time I checked

15     the federal rules of evidence, that was called hearsay.  Now,

16     it's possible that it fit within an exception to the hearsay

17     rule, and so I didn't sua sponte interrupt.  And it's not my

18     job to be the lawyer for Mr. Dennis.  But I think, in light of

19     Mr. Dennis' pro se status, if the government is about to

20     introduce evidence that at least on its face would not seem to

21     comply with the rules of evidence, they ought to come to the

22     sidebar and explain why it fits within an exception.

23                Let me ask, in the example I just gave, why in the

24     world would that fit within an exception of the hearsay rule?

25                MS. SIMON:  First of all, your Honor, I was trying to

MACGden3

1    elicit what he had observed that may have affected --

2            THE COURT:  No.  If you are saying -- and I hope

3    you're not saying -- that it fits within the lay opinion

4    exception, it does not remotely.

5            MS. SIMON:  No, your Honor.  I was merely saying that

6    he had observed Ms. Bostick's demeanor and that had on affect

7    on him.  But in terms of the content of the communication, the

8    government is not offering it for the truth of matter asserted,

9    but rather to show the witness' state of mindand --

10           THE COURT:  Well, how is the jury to know that?

11           If we are here -- part of this is Mr. Dennis' choice,

12   but that doesn't mean that it should be a free for all -- the

13   jury doesn't know that that evidence is not received for its

14   truth but only for its affect on Mr. Cottle.  Moreover, I'm not

15   even sure that it's still admissible even under that

16   limitation, given that it, in effect, relies on double or

17   triple hearsay as to what she had experienced, what that led

18   her to fear and then what affect it had on this witness.  I am

19   skeptical as to whether all those links could be shown.  But

20   I'm not going to strike it.  But I'm just cautioning the

21   government to get their act together.

22           MS. SIMON:  Understood, your Honor.

23           And the government would also be amenable to a

24   limiting instruction, if the Court preferred that the

25   information was only --

MACGden3

```
 1              THE COURT:  I think at this point it would just
 2   prejudice Mr. Dennis by reiterating that stuff would outweigh
 3   the benefit of saying it's not being offered for its truth.  So
 4   unless, Mr. Dennis, you want me to give that instruction, we'll
 5   just leave it alone.
 6              MR. DENNIS:  Yes, your Honor.
 7              THE COURT:  Very good.  I'll see you in 15 minutes.
 8              (Recess)
 9              THE COURT:  Mr. Dennis, you should use the lecturn
10   when you are cross-examining.
11              MR. DENNIS:  Okay, your Honor.
12              (Continued on next page)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

MACGden3                          Cottle - Cross

1              (Jury present)

2              THE COURT:  Cross-examination.

3    CROSS-EXAMINATION

4    BY MR. DENNIS:

5    Q.  Hi, Eric.

6    A.  Good morning, good afternoon.

7    Q.  Eric, I want to -- when you and I were together at the

8    firm, we often talked about your career as an athlete and some

9    of the things you accomplished in the area of track and field.

10   Can you share with the jury your background in sports and your

11   accomplishments?

12   A.  Sure.  I was a high school -- I ran track and field,

13   400 meters.  I was a high school, college all American in track

14   and field.  I went to Adelphi University.  I was an Olympic

15   hopeful.  I went to Saint Vincent and the Grenadines.  And that

16   was it.  And basketball, I played basketball as well.  And I

17   cycle as well.

18   Q.  As far as becoming an athlete in the Olympics, what did you

19   have to go through to just even be considered?

20   A.  Well, I was -- well, I'm proud of it -- I was good.  I

21   think I was fast and you have to be athletic and hit certain

22   times to be considered and things of that nature.

23   Q.  You seem like you are, as always, in pretty good shape.  Do

24   you still work out now?

25   A.  I do, I do.

MACGden3                      Cottle - Cross

1  Q.  Can you describe, what's your workout routine?

2  A.  Actually, I cycle now since my knees are bad, so I can't

3  run anymore.  So I cycle probably 80 miles a week, I ride a

4  road bike.  I try to go to the gym three or four days a week.

5  Sometimes I still coach and mentor other children.  My kids are

6  athletes.  My daughter ran track and my other daughter played

7  basketball in college as well.  And so we all kind of do

8  virtual workouts together and things like that.  We're a sports

9  family, I would say.  So I still try to stay active.

10 Q.  Do you lift weights as well?

11 A.  I try to.  Yes, I do.

12 Q.  I guess one of the things that came out, you are a

13 litigator.  How are you viewed among your peers as far as your

14 skill set?  How are you viewed among your peers, if someone

15 were to say, Eric Cottle, he is or I recommend him or I don't

16 recommend him?  How are you viewed by your peers, in terms of

17 how good you are at what you do?

18 A.  I would say it's favorable.  I think I'm respected in my

19 field.  And I think it would be very -- I think it's positive.

20 I would say it's positive.

21 Q.  Have you ever received any recognition for your litigation

22 skills and awards or anything?

23 A.  I don't know about awards, but I've published.  I published

24 in books on expert witnesses and offered to speak on topics at

25 times, on litigation topics, if that's what you're getting at.

MACGden3                    Cottle - Cross

1   Q.  Just however you would describe.  If you were going out and

2   you were pitching yourself to a client and you said, I want you

3   to hire me, what are the things you would say to them in order

4   to get them to retain you?  That's sort of where I'm going.

5              MS. SIMON:  Objection, your Honor.

6              THE COURT:  Sustained.

7   BY MR. DENNIS:

8   Q.  So one things that your biography says on the K&L Gates

9   website is that you have a significant practice regarding

10  asbestos claims, defending companies with asbestos claims.  Can

11  you describe what that practice is for the jury?

12             MS. SIMON:  Objection, your Honor.

13             MR. DENNIS:  I think that, your Honor --

14             THE COURT:  No, no, I don't want argument.

15             I will allow it as foundational, but we'll see how it

16  goes.

17             You may answer the question.

18             THE WITNESS:  Just repeat the question, again.  I'm

19  sorry.

20  BY MR. DENNIS:

21  Q.  Can you describe your practice representing companies in

22  asbestos claims?

23  A.  I represent -- my firm and I represent companies that are

24  sued in claims for asbestos and other work-related,

25  occupational disease or occupational exposures, alleged

MACGden3                        Cottle - Cross

1    occupational exposures.

2    Q.  And what are the types of claims?  Can you describe the

3    types of claims that would be made against the companies?

4              MS. SIMON:  Objection, your Honor.

5              THE COURT:  I think where you're going -- but correct

6    me if I'm wrong -- let me put to the witness a question.

7              Would you consider yourself a tough litigator?

8              THE WITNESS:  I think I'm measured more than tough.

9    I'm a measured litigator.

10             THE COURT:  Go ahead.

11             MR. DENNIS:  I would just like to enter into the

12   record that the government initially, in questioning

13   Mr. Cottle, asked him about his litigation skills and what he

14   did.  And I'm just delving a little bit deeper in a door that

15   they had already opened so that the jury has a more fuller

16   description --

17             THE COURT:  Mr. Dennis, as I explained to counsel for

18   both sides, including yourself in your role as counsel, when

19   there is a question raised as to an objection, I don't want

20   either side to engage in lengthy colloquy.

21             If you want to make a record later when we excuse the

22   jury, we'll have ample opportunity to do that.  I understood

23   why you felt you could put that question and that's why I

24   allowed the initial question, but the follow-up question to me

25   did not appear to be proper, and I have ruled.

MACGden3                    Cottle - Cross

1            Please put another question.

2    BY MR. DENNIS:

3    Q.   Eric, what office did you begin your career at at K&L

4    Gates?

5    A.   Pittsburgh.

6    Q.   And how many years were you in the Pittsburgh office?

7    A.   Six.

8    Q.   Six years.

9            So what year did you begin at the firm?

10   A.   2004.  And I think I came to New York in 2010.

11   Q.   So the first few years you were in the Pittsburgh office,

12   what were the biggest practices in the Pittsburgh office, what

13   were the practices that earned the most revenues for the

14   Pittsburgh office?

15   A.   I don't know.

16   Q.   Was it your litigation -- part of your litigation group?

17   A.   For the Pittsburgh office?

18   Q.   Yes.

19   A.   It could have been.  I'm not sure.

20   Q.   And you made partner in the Pittsburgh office?

21   A.   I made partner for the law firm, not for --

22   Q.   Which office were you in?

23   A.   I was in Pittsburgh.

24   Q.   At the time that you were in the Pittsburgh office, where

25   was the leadership of the firm residing in?  Where was the

MACGden3                          Cottle - Cross

1    chairman; what office was he in?

2    A.  I think Mr. Kalis may have resided in Pittsburgh.

3    Q.  Where was Bob Zinn, member of the executive committee?

4    A.  I don't know.  Pittsburgh.  I don't know.

5    Q.  Pittsburgh?

6    A.  I don't know.

7    Q.  And Mike Zanic, one of your mentors, what office is he in?

8    A.  My mentor?  I don't -- I would consider Mike Zanic as my

9    partner.

10   Q.  What office is he is?

11   A.  He was in Pittsburgh as well.

12   Q.  So you were in the Pittsburgh office, you made partner, you

13   obviously got to know a lot of the most powerful people in the

14   firm, and you came to New York.  In what year did you join the

15   New York office?

16   A.  So I came to -- I think, maybe, 2012, 2013, somewhere

17   around there.

18   Q.  Would it be fair to say when you came to New York in 2012

19   or 2013, being that you most of the time had worked in

20   Pittsburgh, you didn't have many relationships in the New York

21   area with people in the legal community?

22   A.  Oh, yeah, I would say so.

23   Q.  So can you describe how you were able to develop some of

24   those relationships?

25   A.  In the --

MACGden3                    Cottle - Cross

1    Q.  In the New York area?

2    A.  I attended -- well, I got a coach.  I hired someone that

3    would help me -- that was familiar with the New York legal

4    network, and so I hired an executive coach.  And she gave me a

5    game plan of how I should attack the New York market.

6    Q.  Given that I had practiced in New York for over 28 years,

7    did you and I -- did I introduce you to any people?  Did I take

8    you to any dinners or breakfasts or lunches to introduce you

9    around?

10   A.  Absolutely, yup.

11   Q.  Can you describe any of that to the jury?

12   A.  Oh, I think when I first arrived in Pittsburgh, you and

13   I -- I think we actually tried to put plans together to meet

14   people and go to lunches and -- I don't know, yeah, I would

15   agree with you.

16   Q.  Would you say I was completely open to anyone that you

17   wanted me to introduce you to and suggesting others that I

18   would introduce you to?

19   A.  I think you were very cooperative.

20   Q.  Did you have an opportunity to appear on the cover of the

21   Network Law Journal?

22   A.  I did.

23   Q.  Was that an introduction that I made and suggested that you

24   follow up on?

25   A.  I think you did make that introduction, yes.

MACGden3                         Cottle - Cross

1    Q.  One of the largest legal organizations for women, the

2    Corporate Counsel Women of Color, are you familiar with that

3    organization?

4    A.  Yes.

5    Q.  Can you tell the jury a little bit about it and who its

6    sponsors are?

7    A.  Well, when I was new at -- the firm was the -- I don't know

8    what it was, maybe a platinum sponsor.  But it was the biggest

9    sponsor of the CCWC conference.  I think we were a platinum

10   sponsor or -- we were a high sponsor for the conference.

11   Q.  We were the highest sponsor.

12        Would you name some of the companies that were some of the

13   sponsors on the -- for the Corporate Counsel Women of Color?

14   A.  Many.  I don't remember all --

15   Q.  Do you know any?  Can you name a few?

16   A.  You are talking about the sponsors?

17   Q.  Yes.

18   A.  I would be guessing.  If you show me something, I can

19   confirm that they were.

20        But they were companies -- other companies, large companies

21   that were also sponsors.  There were also large law firms that

22   were sponsors.  I'm just hesitant to name companies.  I'm not

23   sure.

24   Q.  So who was the founder and CEO of the Corporate Counsel

25   Women of Color?

MACGden3                     Cottle - Cross

1   A.  The founder and CEO, I believe it was Laurie Haden.

2   Q.  Do you know how the Corporate Counsel Women of Color

3   sponsorship came to K&L Gates?  Do you recall?

4   A.  It was there when I arrived.  We were sponsors.

5   Q.  So --

6   A.  The firm was a sponsor when I arrived, when I got involved

7   with it.

8   Q.  What year was that, again?

9   A.  2012, maybe, somewhere around there -- well, when I came to

10  New York office in 2012, 2013, I believe the firm was already a

11  sponsor of CCWC.

12  Q.  So you had never heard that that organization, which counts

13  as its sponsors, Microsoft, Goldman Sachs, AT&T --

14          THE COURT:  Counsel, you are testifying now.  That's

15  not evidence.  Put a question.

16  Q.  Were you aware that I was the one that brought that

17  organization and brought that sponsorship to --

18  A.  I believe so.  I believe you and I talked about that, I

19  believe, that you made the introduction to the firm.  I think

20  so.

21  Q.  Did I ever introduce you to the founder of the

22  organization?

23  A.  Yeah.  You have, yeah.

24  Q.  And did she have conversations with you about how the

25  sponsorship came to the firm?

MACGden3                              Cottle – Cross

1    A.  I don't recall.

2              MS. SIMON:  Objection, your Honor.

3              THE COURT:  Sustained.  Hearsay.

4    BY MR. DENNIS:

5    Q.  Not naming the names, having the clients there that the

6    firm had access to on a regular basis at the annual conference,

7    what was the impression of the firm about the value of the

8    conference to K&L Gates?

9              MS. SIMON:  Objection.

10             THE COURT:  Sustained.

11   BY MR. DENNIS:

12   Q.  Your testimony in part focused in on, I guess, June 6th of

13   2019.  And I guess during the course of your testimony, you

14   discussed how many of the text messages you did not have an

15   understanding or understood why I sent them to you,

16   particularly with respect to issues like healthcare and

17   relating to my kids, and there were a couple of other things.

18        But I want to ask you, in that regard, you mentioned that I

19   had been terminated from the firm in May of 2019.  Were you

20   aware that I was suspended from the firm in January of 2019?

21   You were in the same office, so...

22   A.  I could have been.  I don't recall.

23   Q.  From the date of my suspension, I never returned to the

24   office again, so I --

25             THE COURT:  No, no, no.  You can't testify.

1              MR. DENNIS:  Sorry.

2       BY MR. DENNIS:

3       Q.  So in January of 2019, were you aware that all my emails

4       and all my contacts in my phone system was terminated by the

5       firm?

6       A.  I'm aware that, at some point prior to when you were

7       terminated from the firm in May, that your emails and your

8       access to the office were stopped.  That's what I'm aware of.

9       Q.  Would you be able to opine on if a partner does not have

10      emails and phone and secretarial services, how can they

11      continue to service their client?

12             MS. SIMON:  Objection.

13             THE COURT:  I'll allow it.  Overruled.

14             You may answer.

15      A.  How can -- if you don't have access to your --

16      Q.  Your phone system, your emails, your secretary, how can you

17      service your clients?

18      A.  That's your question to me?

19      Q.  Yes.

20      A.  I don't know.  I mean, I looked at -- you were suspended

21      for whatever reason you were suspended for, and that's what

22      happened.  Beyond that, I don't have any opinions.

23      Q.  Do you know who served my clients after I was suspended in

24      January of 2019?

25      A.  I don't know anything about what happened or familiar with

MACGden3                    Cottle - Cross

1    you or anything after your suspension at all.

2    Q.  So there were no conversations in the New York office among

3    any of the partners regarding my situation, that I had been

4    suspended?

5            MS. SIMON:  Objection.

6            THE COURT:  You have to ask about his knowledge, not

7    about other persons' knowledge.  If you want to rephrase that.

8            I'll ask the witness.  I'm a little unclear.

9            Were you aware of the suspension or just of the

10   termination?

11           THE WITNESS:  I'm aware of both.

12           THE COURT:  Of both?

13           THE WITNESS:  Correct.

14           THE COURT:  Okay.  So the question was, during the

15   period between the suspension and the termination, were there

16   conversations among partners that you were a party to regarding

17   the suspension?

18           Just answer that yes or no.

19           THE WITNESS:  No.

20           THE COURT:  Okay.

21   BY MR. DENNIS:

22   Q.  After the suspension, when was the last time you saw me in

23   the office or -- when was the last time that you saw me

24   physically in the office of K&L Gates?

25   A.  I don't remember.

1  Q.  Was it February, March of 2019 or did you ever see me after

2  January of 2019?

3  A.  I don't think -- in the office?

4  Q.  Yes.

5  A.  I think once you were suspended, I don't think I saw you in

6  the office ever after that.  I don't recall seeing you in the

7  office.

8  Q.  In the context of the emails that you said you had received

9  and seen, did you have any thoughts, did you have any -- on the

10  emails I sent to the firm regarding the alleged sexual

11  harassment claims that were published in the American Lawyer?

12  A.  I didn't see an email that you sent to the firm like that,

13  if that's what you're asking.

14  Q.  Did you see the article?

15          MS. SIMON:  Objection.

16          THE COURT:  Well, you can answer that yes or no.

17          THE WITNESS:  Which article?

18  BY MR. DENNIS:

19  Q.  The article by Lindsay McKelling discussing the sexual

20  harassment of women associates by partners at K&L Gates.

21          THE COURT:  Sustained.

22  Q.  Do you recall receiving any of my emails regarding the

23  practice of the partners taking my clients from me?

24  A.  Emails that you sent to the firm?

25  Q.  Sent to you.

1   A.   Okay.  Hold on.  Do I recall seeing emails from you to me?

2   Q.   Emails or text messages.

3   A.   That partners were taking clients of yours?

4   Q.   Exactly.  As a result of my suspension and me not being at

5   the firm, clients were taking my partners -- my partners were

6   taking --

7   A.   I don't recall.  I don't recall --

8   Q.   You don't recall?

9   A.   -- seeing anything like that, no.

10  Q.   Do you recall me sending you text messages and emails

11  regarding the reduction of my compensation because the firm was

12  taking my clients and my business?

13  A.   What time frame is this?

14  Q.   This would have been following my suspension.

15  A.   I don't -- no, I don't see anything like that.  I don't

16  remember that, no.

17  Q.   What do you know about the firm hiring private security to

18  come to my home?

19           MS. SIMON:  Objection, your Honor.

20           THE COURT:  You can't really testify in that way.  I

21  also don't really see the relevance to any issue that this jury

22  has to decide.

23           Sustained.

24  BY MR. DENNIS:

25  Q.   Mr. Cottle, these claims that you are discussing now, did

MACGden3                    Cottle - Cross

1   you discuss these claims with the 17th precinct of New York?

2             MS. SIMON:  Objection.

3             THE COURT:  You can answer that question yes or no.

4   A.  No.

5   Q.  Do you have any knowledge of any of the partners at the

6   firm in the New York office having any conversations with the

7   17th precinct regarding charges similar to these?

8             THE COURT:  Sustained.

9   Q.  Did you have any conversations with the district attorney's

10  office of the City of New York regarding the claims?

11            MS. SIMON:  Objection.

12            THE COURT:  You can answer that yes or no.

13  A.  The district attorney's office?

14  Q.  Yes, the district attorney's office of the City of New

15  York.

16  A.  No.  District attorney's office of the City of New York,

17  no.

18      I want to make sure, did I have any conversation with the

19  district attorney's office?

20            THE COURT:  Yes, that is the question.

21            THE WITNESS:  I did not have any, no.

22  BY MR. DENNIS:

23  Q.  Did you have any knowledge of anyone at the firm --

24            THE COURT:  No, that's calling for hearsay, counsel.

25  You can't do that.

MACGden3                         Cottle - Cross

1   Q.  Do you have any knowledge of the firm hiring private

2   security to follow me at the CCWC conference in Chicago?

3            MS. SIMON:  Objection.

4            THE COURT:  Sustained.

5   BY MR. DENNIS:

6   Q.  I think you stated in your testimony earlier that as of the

7   day of the text messages on June 6th, I believe -- I want to

8   confirm -- that you stated you had no knowledge as to why I was

9   terminated from the firm, that was your response?

10  A.  I don't know if I said that.  I'm not sure.  Have to read

11  it back.  That I said I have no knowledge --

12  Q.  Of why I was --

13           THE COURT:  I'm not sure that was your testimony.

14           But the question is:  Do you have any personal

15  knowledge as to why Mr. Dennis was terminated from the firm?

16           What's the answer?

17           THE WITNESS:  I'm trying to think.  Do I have personal

18  knowledge?  I was not involved -- I was not involved in your

19  termination.

20           THE COURT:  These are questions you should just answer

21  yes or no.

22           THE WITNESS:  Okay.

23           THE COURT:  When Mr. Dennis was terminated, was an

24  announcement sent out to the partners?

25           THE WITNESS:  Yes.

MACGden3                          Cottle - Cross

1          THE COURT:  And did that announcement give a reason

2     for the termination or no?

3          THE WITNESS:  I don't think that announcement did.  I

4     don't recall.

5          THE COURT:  Go ahead.

6          MR. DENNIS:  I actually want to --

7     BY MR. DENNIS:

8     Q.  Under the firm's partnership agreement, the only way that a

9     partner can be expelled is through a full vote of the

10    partnership.  Did you receive any information regarding a vote

11    with respect to my termination from the partnership?

12    A.  I would not.  I'm not an equity partner.  I don't have

13    voting rights.  I don't have any involvement in your -- in that

14    at all.

15    Q.  Do you have any knowledge of whether any equity partners

16    received information relating to --

17         THE COURT:  No, no.  Now we're getting into hearsay

18    again.

19         Ladies and gentlemen, so you're clear, there are,

20    typically, in law firms two kinds of partners; salaried

21    partners and so-called equity partners who get a percentage of

22    the profits as opposed to a salary.  And when a decision is

23    made to expel a partner, it is a decision that has to be made

24    by the equity partners, but not by the salaried partners.

25         Go ahead.

MACGden3                    Cottle - Cross

1    BY MR. DENNIS:

2    Q.   Earlier, you testified as to -- or the question is:  What

3    partners have you spoken to in the office at K&L Gates about

4    your testimony here?

5    A.   Today, nobody.

6    Q.   Not today.  This has been -- I'm sure you've been on the

7    witness list for the government for some time.

8    A.   I didn't speak to anybody.

9    Q.   For two years now?

10   A.   I didn't speak to anybody about my testimony today.

11   Q.   At any --

12   A.   Or at this trial.

13   Q.   Or at any point in time?

14   A.   About the trial, testifying here?

15   Q.   Yeah.

16   A.   No.

17   Q.   So just to make sure it's on the record, since the

18   indictment was handed down on October 28th, 2020, you have not

19   spoken to a single partner at K&L Gates about this matter at

20   all?

21   A.   Well, that's a different question.  The indictment was

22   handed out in October 2028?

23   Q.   October 28th, 2020.

24   A.   Well, maybe, we may have spoken.  I may have spoken to

25   someone, yeah.

MACGden3                    Cottle - Cross

1    Q.   Would you be able to identify the partners that you did

2    speak to about --

3    A.   I don't know if it was spoke -- but when you were indicted

4    and it was public record -- I don't remember who, but they were

5    like Willie was indicted or something or the other.  It was

6    just reporting what had happened.  That was the extent of it.

7    Q.   Were you surprised -- given that you obviously claim to be

8    allegedly one of the victims, were you surprised to hear about

9    this?

10   A.   I don't think I had a feeling one way or the other when it

11   happened.

12   Q.   But you had knowledge of it?

13   A.   It was public record when you were arrested.

14        You are talking about when you were arrested?

15   Q.   When I was arrested, which time -- I was arrested a couple

16   different times.  What I'm referring to is this indictment came

17   down --

18        THE COURT:  I thought you were asking about when you

19   were indicted.

20   Q.   This indictment came down October 28th, 2020.

21   A.   Yeah.  I don't think so.

22   Q.   That obviously means that the government did work before

23   that date in order to prepare this indictment.

24        MS. SIMON:  Objection.

25   Q.   And you were listed as one of the victims.

MACGden3                    Cottle - Cross

1   A.  Got it.

2   Q.  Did the government contact you?

3   A.  Yes.

4   Q.  Okay.  They contacted you?

5   A.  Yes.

6   Q.  Did you discuss this with anyone at the law firm?

7   A.  General counsel.  I think I might have discussed it with

8   Chip Tea or Jeff Maletta.

9   Q.  And you did not discuss it with any of the powers, Mike

10  Zanic, Bob Zinn, Mike Caccese, none of the powers of the law

11  firm, that there was a case in the Southern District of New

12  York, in which you were allegedly a victim?

13  A.  Nope, I did not.

14  Q.  And how many conversations did you have, over the two-year

15  period, did you have with Jeff Maletta?

16  A.  Less than five, maybe.  Maybe less -- maybe five to ten

17  times.  I think we -- well, hold on.  I want to try to be as

18  exact as I can.

19      Most of the conversations I had with Jeff were right after

20  this incident, so maybe three or four.  I don't know.  Maybe --

21  I could have had 15 conversations with him.  I'm not sure.

22          THE COURT:  Who is Mr. Maletta?

23          THE WITNESS:  Mr. Maletta is the firm's general

24  counsel.

25          And just to be accurate, I may have had conversations

MACGden3                     Cottle - Cross

with Chip Tea, who is our deputy general counsel, as well.  And

they represent the legal team I would speak to about this.

BY MR. DENNIS:

Q.  So earlier, you mentioned your conversations with Calvina

Bostick?

A.  Correct.

Q.  Who is also one of the other victims.  Did you talk to her

about this at all, about this case?

A.  No.

Q.  So you talked to her on text messages, but never about this

case?

A.  We talked about the case -- so let's just get it straight.

I talked to Calvina about the incident -- is that what you're

referring to as well?

Q.  I'm actually talking about this particular --

A.  No, I never talked to her about this case.

Q.  So you never, independent -- just so we're clear, in terms

of the timeline, again, so June 6, 2019, you received these

text messages from me which gave you concern.  And in your

testimony, you talked about Cally Bostick and about why -- how

she was concerned.

     Between June 6, 2019 and the date when the sealed

indictment was filed, October 28th, 2020, you and Cally Bostick

never talked about this issue again, even despite having all

the fear and intimidation and changing your lifestyle, you

MACGden3                    Cottle - Cross

1    never talked about it again?

2    A.  Well, that's different than talking about the case.

3        If I talked to Cally about your harassment of her, yes.  I

4    have talked to her about that.  We've talked about that before.

5    So yes, I did speak to her about you, but not -- we didn't

6    speak about the case.  I just want to make sure we understand

7    that.

8    Q.  Did not speak about that this has now escalated to where

9    we're in the Southern District Court of New York, you guys --

10   okay, I just want that -- okay.

11       Let's go to June 6th, 2019.  Corporate counsel for men --

12   how many people were in the room that day?

13   A.  Well, the tables were filling up.  We had about eight at

14   ours.  I don't know, about 50 people, maybe, in the room.

15   Q.  In the entire room, 50 people that were at the breakfast?

16   A.  I don't recall.

17   Q.  Maybe a hundred?

18   A.  I don't know --

19   Q.  Maybe --

20   A.  I'm sorry.  At the time of breakfast, I don't think

21   everyone was there yet.  It was early.  So I would say around

22   50 or so.

23   Q.  And you talked about the fact that I came up and I had

24   breakfast in my hands.  Did you think I was going to hit you

25   with a roll?

MACGden3                        Cottle - Cross

1          In the course of those text messages, you said that -- you

2     stated you had no understanding as to why I was talking about

3     my children and healthcare, even when you knew that I had -- I

4     just want to be clear, you knew I had been terminated from the

5     firm.  So in your mind, what did you expect termination to

6     mean, in terms of -- as a lawyer, in terms of what that would

7     mean?

8     A.  I didn't have any expectation.  I was not involved in your

9     termination.  All I knew, you were terminated from the firm.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MacWden4                          Cottle - Cross

1  BY MR. DENNIS:

2  Q.  You mentioned how -- you discussed how one of my text

3  messages raised asking you if you were going to testify against

4  me.  As a litigator, if you had a client who was terminated and

5  had no income, what would you expect them to do legally?

6          THE COURT:  Sustained.

7  BY MR. DENNIS:

8  Q.  When did you first become aware of my EEOC filing against

9  the firm in March, on March 3, 2020?

10 A.  I don't know.

11 Q.  Where do you currently reside?  You don't have to give the

12 address or, you know -- or just give a city.

13 A.  Maplewood, New Jersey.

14 Q.  Maplewood, New Jersey.

15     Have I ever been to your house?

16 A.  No.

17 Q.  What did you -- and how do you travel in to the city?

18 A.  For work, the train.  I take the New Jersey Transit and

19 then the subway.  For work.

20 Q.  And I live, I live in north Manhattan, 146th Street.

21 During all those years we were together -- you came to New York

22 in 2012, you said, say five -- did we ever encounter each other

23 on the subway system cars?

24 A.  I don't think so.  I don't recall if we ever have.

25 Q.  You know we're coming from different directions?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MacWden4                    Cottle - Redirect

1   A.  Correct.

2   Q.  Prior to June 6 of 2019, did I ever threaten you

3   physically?

4   A.  No.

5   Q.  Prior to June 6, 2019, did I ever cause you to have any

6   fear of me?

7   A.  No.  I wouldn't say I had fear of you, no.

8               MR. DENNIS:  I have no other questions, your Honor.

9               THE COURT:  All right.

10              Any redirect?

11              MS. SIMON:  One moment, please, your Honor?

12              THE COURT:  Counsel.

13              MS. SIMON:  Yes.

14  REDIRECT EXAMINATION

15  BY MS. SIMON:

16  Q.  Mr. Cottle, I just want to clarify.  You were asked

17  questions on cross regarding your conversations with

18  Mr. Maletta, the general counsel of the firm, and Mr. Tea, the

19  deputy general counsel of the firm?

20  A.  Correct.

21  Q.  When you testified that you spoke to them, were you

22  referring to the June 2019 to February 2020 time period?

23  A.  Yes.  That's accurate, yes.

24  Q.  Yes.  And without getting into the substance of those

25  conversations, why did you choose to contact your firm's

1    general counsel office during that time period?

2    A.  Because of that incident at CCWC.  I had to report that

3    because -- that's the reason I contacted them, especially with

4    the pictures being taken of me.

5    Q.  And when you say the incident at CCWC, are you --

6    A.  CCMC, men's conference.  Sorry.

7    Q.  The one in June 2019?

8    A.  Correct.

9    Q.  And why did you feel you needed to contact the general

10   counsel's office regarding that?

11   A.  Well, Willie had made what I would say these aggressive

12   moves, this harassment towards me, and I think I just needed

13   to -- and I knew he had made those to others as well, so I

14   needed to report that to the firm.

15            MR. DENNIS:  Objection, your Honor.

16            THE COURT:  No, but I'll give you recross on this, if

17   you wish.

18   BY MS. SIMON:

19   Q.  Did you discuss your testimony today with Mr. Maletta?

20   A.  No.

21            MS. SIMON:  No further questions.

22            THE WITNESS:  Thank you.

23            THE COURT:  OK.  Recross.

24   RECROSS EXAMINATION

25   BY MR. DENNIS:

1    Q.  One question.  You just mentioned you had discussed it with

2    others in your response just now to the cross-examination to

3    you.  Can you give us the names of who those others were?

4    A.  Did I say discuss it with others?

5              THE COURT:  No.  I'm sorry.  I misunderstood what the

6    objection was.  I'm going to sustain part of your objection,

7    but you can still pose your questions.

8              Ladies and gentlemen, you've heard some testimony from

9    this witness about how he heard alleged reports of other

10   harassment from Ms. Bostick, for example.  That is not being

11   received for its truth.  He wasn't there when whatever happened

12   to Ms. Bostick happened to her.  It's being received only to

13   explain his state of mind and why he, in this case, reported to

14   counsel and why he took other steps.  So you can only consider

15   it for that limited purpose, but not for its truth.

16             If you have other questions, Mr. Dennis --

17             MR. DENNIS:  No.  I just.

18             THE COURT:  I misunderstood what you were getting at.

19             MR. DENNIS:  OK.

20             THE COURT:  Thank you very much.

21             You may step down.

22             THE WITNESS:  Thank you, your Honor.

23             (Witness excused)

24             THE COURT:  Please call your next witness.

25             MS. KUSHNER:  The government calls Philip Fanara.

MacWden4                    Fanara - Direct

1    PHILIP FANARA,

2         called as a witness by the government,

3         having been duly sworn, testified as follows:

4              THE COURT:  Counsel.

5    DIRECT EXAMINATION

6    BY MS. KUSHNER:

7    Q.  Mr. Fanara, where do you work?

8    A.  I'm an independent contractor for AT&T.

9    Q.  How long have you been in that role?

10   A.  I've been in that role for almost ten years.

11   Q.  Prior to that, what did you do?

12   A.  I worked for them as an employee for an additional 16

13   years.

14   Q.  What is AT&T?

15   A.  It sells communication products.

16   Q.  What types of services does it provide?

17   A.  Wireless communication services.

18   Q.  Are you familiar with the records of AT&T?

19   A.  Yes.

20   Q.  I'm showing you what's been marked for identification

21   purposes as Government Exhibit 402, Government Exhibit 405,

22   Government Exhibit 406, and Government Exhibit 408.  Do you

23   recognize those documents?

24   A.  Yes.

25   Q.  What are they?

1    A.   They're various reports for AT&T.

2    Q.   Have you reviewed these records in advance of your

3    testimony here today?

4    A.   Yes.

5    Q.   Are all these records kept in the regular course of AT&T's

6    business?

7    A.   Yes.

8    Q.   And is it the regular practice of AT&T to make and to keep

9    such records?

10   A.   Yes.

11   Q.   Were these records made or the documents received at or

12   near the dates reflected on those documents?

13   A.   Yes.

14          MS. KUSHNER:  The government offers Government

15   Exhibits 402, 405, 406, and 408 into evidence.

16          THE COURT:  Any objection?

17          MR. DENNIS:  No objection, your Honor.

18          THE COURT:  Received.

19          (Government Exhibits 402, 405, 406, and 408 received

20   in evidence)

21   BY MS. KUSHNER:

22   Q.   Turning your attention to Government Exhibit 402, what type

23   of information is shown here?

24   A.   This is a subscriber information for an AT&T Wireless

25   customer.

MacWden4                    Fanara - Direct

1   Q.  And who is the subscriber here?

2   A.  Willie Dennis.

3   Q.  And what is the phone number to which Willie Dennis is

4   subscribed to?

5   A.  646-418-3329.

6   Q.  Do you see here where it says "customer since" on the

7   left-hand side?

8   A.  Yes.

9   Q.  What does that mean?

10  A.  That's when the customer first activated the wireless

11  service with AT&T.

12  Q.  And who is the customer here?

13  A.  Willie Dennis.

14  Q.  And how long has he been a customer for, according to this

15  record?

16  A.  This record was set up in September 30, 2022.  So from

17  September 24, 2009, to September -- at least September 30,

18  2022.

19  Q.  Does the September 30, 2022, date simply reflect the date

20  this document was prepared?

21  A.  Yes.

22  Q.  Do you see towards the middle of this document where it

23  says "billing party"?

24  A.  Yes.

25  Q.  Who is listed as the billing party?

1    A.  Willie Dennis.

2    Q.  And what's the billing address?

3    A.  P.O. Box 872, New York, New York 10150.

4    Q.  And do you see right below that there's a chart titled

5    "user information"?

6    A.  Yes.

7    Q.  What type of information is captured in this chart?

8    A.  That information is provided on what the user is, who the

9    user is and the call number associated with that.

10   Q.  And what is the phone number for the user here?

11   A.  646-418-3329.

12   Q.  Who is the user listed here?

13   A.  Willie Dennis.

14   Q.  And do you see at the bottom it says "contact home email"?

15   A.  Yes.

16   Q.  What email address is listed there?

17   A.  It's willie.dennis@kls.com.

18   Q.  Turning your attention to Government Exhibit 406, and

19   directing your attention to page 2 of this document, what type

20   of information is shown here?

21   A.  This shows the account notes of a particular wireless

22   customer of AT&T.

23   Q.  And turning your attention to Government Exhibit 405, what

24   type of information is captured here?

25   A.  This shows payment information for a wireless customer of

MacWden4                      Fanara - Cross

1    AT&T.

2    Q.  And what wireless customer is reflected on this record?

3    A.  It's for phone number 646-418-3329.

4    Q.  Do you see the column to the right titled "payment detail"?

5    A.  Yes.

6    Q.  What type of information is reflected in that column?

7    A.  It shows you where the payment detail information came from

8    to pay the bills for the AT&T Wireless customer.

9    Q.  And what's the check name listed for each entry shown here?

10   A.  They're all Willie Dennis.

11   Q.  And turning your attention to Government Exhibit 408, what

12   type of information is shown here?

13   A.  It's an IMEI report.

14   Q.  What is an IMEI report?

15   A.  That shows the serial number of the device that's used for

16   an AT&T Wireless customer.

17            MS. KUSHNER:  One moment, please.

18            No further questions.

19            THE COURT:  Any cross?

20            MR. DENNIS:  Yes.

21   CROSS-EXAMINATION

22   BY MR. DENNIS:

23   Q.  I just want to clarify.  So, AT&T -- define it for the

24   jury -- has maintained my records for 2009?

25   A.  Yes.

1   Q.   Through the date -- through the date of -- would you --

2   A.   The subscriber information I just saw, guessing again, but

3   if I see it again, in the upper left-hand corner, it should say

4   September 30, 2022.

5   Q.   OK.  Do you have any information or would AT&T have any

6   information relating to the deletion of all my emails from my

7   phone on January 30 of 2019?

8   A.   I have no idea about that, sir.

9           MR. DENNIS:  I have no other questions, your Honor.

10          THE COURT:  All right.  Thank you very much.  You may

11  step down.

12          THE WITNESS:  Thank you.

13          (Witness excused)

14          THE COURT:  Please call your next witness.

15          MS. SIMON:  The government calls Jeffrey Maletta.

16   JEFFREY MALETTA,

17       called as a witness by the government,

18       having been duly sworn, testified as follows:

19          THE COURT:  Counsel.

20  DIRECT EXAMINATION

21  BY MS. SIMON:

22  Q.   Mr. Maletta, what do you do for a living?

23  A.   I'm an attorney.

24  Q.   Where do you currently work?

25  A.   I work at the law firm of K&L Gates.

MacWden4                    Maletta - Direct

1    Q.  How many lawyers does K&L Gates have?

2    A.  Approximately 1,850.

3    Q.  How many offices does K&L Gates have?

4    A.  47.

5    Q.  Are you based in a particular office?

6    A.  I'm in the office in Washington, D.C.

7    Q.  Does K&L Gates have a New York office?

8    A.  It does.

9    Q.  Where is the office located?

10   A.  In midtown Manhattan.

11   Q.  What is your current position at K&L Gates?

12   A.  I'm a partner and I am the general counsel to the firm.

13   Q.  How long have you been general counsel?

14   A.  For about five and a half years.

15   Q.  Generally, what are your duties and responsibilities as

16   general counsel?

17   A.  I'm responsible for giving legal advice to the firm, to its

18   lawyers.  I also oversee the process of examining new matters

19   and new clients to see if there are conflicts or other reasons

20   we can or cannot take on a new client.  And I advise the

21   management committee.  And from time to time I'm asked to

22   handle special matters, address issues that certain partners

23   may have raised from time to time.

24   Q.  What is the management committee?

25   A.  The management committee is a group of, I believe,

1    currently 16 partners in the firm who are charged and have the

2    responsibility for managing the firm's operations and practice.

3    It has the authority really to run the firm in almost all

4    respects.

5    Q.  Do you know an individual by the name of Willie Dennis?

6    A.  I do.

7    Q.  How do you know Willie Dennis?

8    A.  Mr. Dennis was a partner in the firm.

9    Q.  Do you see Mr. Dennis in the courtroom today?

10   A.  I do.

11   Q.  Can you please identify him by an article of clothing he's

12   wearing?

13   A.  Oh, he's seated --

14          THE COURT:  I like the way you're doing it.  Where is

15   he seated?

16          THE WITNESS:  He's seated directly ahead of you,

17   slightly to your right.

18          THE COURT:  The record will reflect the identification

19   of the defendant.

20          MS. SIMON:  Thank you, your Honor.

21   Q.  Mr. Maletta, during what time period was the defendant a

22   partner at K&L Gates?

23   A.  I believe since -- I'm not sure of the start date.  I

24   believe from around 2005 to 2019.

25   Q.  What happened in 2019?

MacWden4                    Maletta - Direct

1  A.  In 2019, he was expelled as a partner of the firm.

2  Q.  We'll come back to that in a moment.

3      When the defendant was working at K&L Gates, what office

4  did he work in?

5  A.  He worked in the New York office.

6  Q.  Is that the New York office in Manhattan?

7  A.  Yes.

8  Q.  Can you describe the nature of your interactions with the

9  defendant prior to 2018?

10 A.  They were very limited.  I believe we had one interaction

11 when he had a client that had an issue with the Securities and

12 Exchange Commission about producing some documents.  It was not

13 an investigation of the client, if I recall.  It was simply a

14 document request from the agency, and I handled that for the

15 client.

16 Q.  How, if at all, did your interactions with the defendant

17 change over time?

18 A.  In 2018, I was asked by the firm's managing -- global

19 managing partner -- excuse me -- to meet with Mr. Dennis to

20 talk about some matters he had been raising with the global

21 managing partner.

22 Q.  What, if anything, did you discuss with the defendant

23 regarding his separation from the law firm?

24 A.  Well, Mr. Dennis and I met once in New York in a restaurant

25 near Penn Station, where he raised some issues he had about

MacWden4                    Maletta – Direct

1    certain things that were going on in the law firm.  I –– I

2    listened to what he had to say, and I said I would look into

3    them and I would get back to him for further, for further

4    conversations.

5        About two weeks after that, shortly after Thanksgiving, I

6    had a conversation with him where he said that he, at least as

7    to one of the issues, he didn't want to pursue it anymore; he

8    had decided that he wanted to explore other opportunities and

9    leave the law firm.

10            MR. DENNIS:  Objection, your Honor.

11            THE COURT:  Ground.

12            I'm sorry?

13            MR. DENNIS:  Untrue statement.

14            THE COURT:  Well ––

15            MR. DENNIS:  I never ––

16            THE COURT:  That's for cross-examination.

17    BY MS. SIMON:

18    Q.  Mr. Maletta, turning your attention to January 2019, can

19    you describe the defendant's conduct at that time?

20    A.  We had some exchanges of information back and forth, and in

21    about the middle of January, he began to send emails, which

22    would be forwarded to me, and some text messages to some

23    partners in the firm, making allegations against the partners

24    or about the partners, which were not true.  This continued for

25    several days, and I made several requests for Mr. Dennis to

MacWden4                    Maletta – Direct

1    stop sending the emails; that if he had issues, he could

2    present them to me and that I would convey them to the

3    management committee, which had the authority to address the

4    issues, but that he should not send these emails, repetitive

5    emails to people in the firm.

6    Q.  And why did you take those steps?

7    A.  Because people who were receiving the emails were coming to

8    me and complaining about them, that they were disruptive; they

9    were harassing in some respects, and that they were disrupting

10   the operation of the firm.

11   Q.  Based on your observations, how did you react to the

12   messages?

13   A.  Personally --

14          THE COURT:  I'm sorry.  How did he react to what?

15          MS. SIMON:  I'm sorry.

16   Q.  The messages that you saw from the defendant in January

17   2019.

18   A.  Well, in my view, they were -- they were frequently very

19   repetitive.  The statements, the allegations he was making were

20   not true.  I had told Mr. Dennis in certain cases, and the

21   recipients had told Mr. Dennis in at least one case, that they

22   were not true, that he repeated -- kept making, kept sending

23   these emails.  And so my view of it was that we had to caution

24   him that he had to stop sending the emails.

25          MS. SIMON:  Your Honor, may I please have a brief

MacWden4                          Maletta – Direct

1    sidebar?

2                THE COURT:  I'm sorry?

3                MS. SIMON:  May I please have a brief sidebar?

4                THE COURT:  Yes.

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MacWden4                         Maletta – Direct

1              (At sidebar)

2              THE COURT:  Yes.

3              MS. SIMON:  Your Honor, the government is about to

4    elicit testimony regarding the warning emails that were sent by

5    Mr. Maletta to Mr. Dennis and to seek to introduce those

6    documents.  These were the subject of the government's motion

7    *in limine*, and the government is offering those documents to

8    show their effect on the defendant, and your Honor had reserved

9    on the relevance of those documents.  The government believes

10   that those documents are relevant because they bear both on the

11   defendant's --

12             THE COURT:  Yes, I think the foundation has now been

13   laid for that through previous witnesses as well as the

14   introduction here, so I will allow it.  Of course, there will

15   be cross-examination.

16             MS. SIMON:  Can I, before we -- I didn't hear

17   everything that she just said.

18             THE COURT:  Oh, I'm sorry.  She wants to introduce the

19   warnings that were given to you by Mr. Maletta, whatever they

20   happen to be.  They're being introduced for your state of mind.

21   Basically, the government's argument is that after you got

22   these warnings and you continued to send emails, you intended

23   for them to have an ulterior purpose of harassment.  That's

24   their argument.  Obviously you disagree, but that's the basis

25   for the proffer, so I'm going to allow it.

MacWden4                    Maletta - Direct

1              MR. DENNIS:  One question.  You put a date.  You said

2      you made the initial in May.

3              MS. SIMON:  No.  I'm sorry.  These were emails that

4      were sent by Mr. Maletta in January and February of 2019.

5              MR. DENNIS:  But did you make a motion in May?

6              Can you read back exactly --

7              MS. SIMON:  No.  Motions *in limine*.

8              MR. DENNIS:  In May.

9              THE COURT:  No, no, no.  These were the motions *in

10     limine*.

11             MS. SIMON:  Sorry.  And also, your Honor, the

12     government intends to offer at the same time several emails

13     that were sent by the defendant to K&L Gates email addresses.

14             THE COURT:  Of course.

15             MS. SIMON:  We intend to do it at the same time just

16     for efficiency.

17             THE COURT:  That's fine.

18             (Continued on next page)

19

20

21

22

23

24

25

1              (In open court)

2    BY MS. SIMON:

3    Q.  Mr. Maletta, you have a binder sitting in front of you

4    containing documents marked for identification as Government

5    Exhibits 501 through 504, 509, 515, 516, 520, 523 through 526,

6    528, and 529.

7              THE COURT:  Incidentally, ladies and gentlemen, all

8    the exhibits will be sent to you before you start your

9    deliberations so you don't have to worry that you don't

10   remember any particular exhibit.  They'll all be given to you

11   at the time of your deliberations.

12   A.  I have the binder, yes.

13   Q.  Do you recognize that binder?

14   A.  I do.

15   Q.  How do you recognize it?

16   A.  This is a binder of exhibits that your office provided to

17   me a few days ago.

18   Q.  What are the documents contained in that binder?

19   A.  The documents contained in the binder are copies of emails

20   to -- some from Mr. Dennis directed to me, some from Mr. Dennis

21   directed to other people, received -- well, some of them --

22   they were all received at the law firm, on the law firm's email

23   server.

24   Q.  And referring to Government Exhibits 501 and 502 --

25   A.  Yes.

MacWden4                    Maletta - Direct

1  Q.  -- are those also -- what are those documents?

2  A.  These are emails that I sent to Mr. Dennis in late January

3  2019.

4  Q.  And referring to all of the exhibits in the binder, were

5  you able to confirm that those documents are true and correct

6  copies of emails sent or received from K&L Gates email

7  addresses?

8  A.  Yes, I was able to locate all of the documents and the

9  email files in our Outlook email system.  They were, therefore,

10  on the server in the law firm, and I can access them through my

11  Outlook at the firm.

12  Q.  And what fields did you review to confirm that information?

13  A.  Well, the "to" and "from" lines first; the subject matter

14  and the text of the emails themselves.

15  Q.  And did you look at the time stamp on the emails?

16  A.  I did.

17  Q.  And are they in a particular time zone?

18  A.  They have a time stamp of UTC, which I understand is

19  Universal Time.

20  Q.  How does UTC compare to Eastern Time?

21  A.  UTC is, depending on the season, whether we're in Daylight

22  Savings Time or regular standard time, is either four or five

23  hours ahead of Eastern Standard Time or Eastern Daylight Time.

24  Q.  Does the data reflected in these emails -- such as the

25  date, time, sender, recipient -- reflect records that are made

1  and kept in the regular course of business by K&L Gates?

2  A.  Yes, these are located on our server.

3  Q.  Is that data recorded by K&L Gates's server at or near the

4  time of the events recorded therein?

5  A.  That's when the emails would have been received by the

6  server, at the time that's reflected on the emails.

7  Q.  Is it the regular practice of K&L Gates to maintain these

8  records?

9  A.  Yes, insofar as individual -- we maintain records on the

10 server.  Individual lawyers may delete individual emails from

11 time to time from their own Outlook boxes.

12          MS. SIMON:  The government offers Government Exhibits

13 501 through 504, 509, 515, 516, 520, 523 through 526, 528, and

14 529.

15          THE COURT:  Any objection?

16          MR. DENNIS:  No objection, your Honor.

17          THE COURT:  Received.

18          (Government Exhibits 501-504, 509, 515, 516, 520,

19 523-526, 528, and 529 received in evidence)

20 BY MS. SIMON:

21 Q.  Mr. Maletta, turning your attention back to the defendant's

22 conduct in early 2019, what steps, if any, did you take in

23 response to these emails sent by the defendant to firm

24 employees in January 2019?

25 A.  Well, first we sent -- I sent him, I spoke to him and I

1   sent emails asking him to stop sending emails on these issues,

2   on these matters to other lawyers in the firm and to direct any

3   emails and any discussion he wished to have on these topics to

4   me, if that's what he wished to do.

5   Q.  I'm showing you an exhibit marked Government Exhibit 501.

6   A.  Yes, I have that.

7        MS. SIMON:  And your Honor, permission to publish that

8   to the jury?

9        THE COURT:  Yes.

10  BY MS. SIMON:

11  Q.  Mr. Maletta, what is the date of this email?

12  A.  The email is dated Saturday, January 26, 2019.

13  Q.  Who is the sender?

14  A.  I sent this email.

15  Q.  Who did you send it to?

16  A.  I sent it to Mr. Dennis.

17  Q.  Did you send it to Mr. Dennis at a particular email

18  address?

19  A.  Yes.  That email address willie.dennis@klgates.com, is the

20  firm's -- that's the firm's domain name, and that is our

21  internal email address for the law firm or our law firm email

22  address.

23  Q.  Can you please read the email aloud?

24  A.  "Willie, I have become aware that despite repeated requests

25  to stop, you are once again sending multiple emails to partners

MacWden4                    Maletta - Direct

1    around the firm.  In many of the emails you repeat allegations

2    which, as we have told you repeatedly, are not true.  In some

3    cases you have started texting partners these comments as well.

4    This conduct must stop immediately.  At a minimum, it amounts

5    to harassment of some of our partners, and the statements in

6    some cases are defamatory.  If you persist, the firm will be

7    forced to take action to protect its partners from this

8    behavior.

9       "I have instructed recipients of these emails not to

10   respond to them.  If you have matters you wish to communicate

11   to the firm, you may do so by sending emails to me.  I will see

12   that others receive the information as appropriate."

13   Q.   Why did you send this message to Mr. Dennis?

14   A.   By this time, he had been sending emails to individuals in

15   the firm, as to which I stated here, are not true and he's

16   beginning to send them to other people around the firm, making

17   comments about partners and other lawyers in the firm that were

18   not true.  The conduct was proving to be disruptive.  Certain

19   individuals found it -- appeared to be harassing for certain

20   individuals, because they were repeated emails or repeated text

21   messages, and I wanted him -- we wanted him or our management

22   wanted him to stop this conduct so that we could address the

23   issues that he had raised earlier in the appropriate way and

24   not disrupt the firm the way he was doing.

25   Q.   In January 2019, approximately how many emails did Mr.

1   Dennis send to K&L Gates employees?

2   A.   Dozens.   Perhaps -- perhaps hundreds.   A very large number

3   of emails.

4   Q.   Drawing your attention to the last paragraph, you state, "I

5   have instructed recipients of these emails not to respond to

6   them."   Did you, in fact, instruct K&L Gates employees not to

7   respond to Mr. Dennis's communications?

8   A.   Yes, I did.

9   Q.   Why did you do that?

10  A.   Because we wanted to have a dialogue with Mr. Dennis on the

11  issues that was headed -- that was in the appropriate, through

12  the appropriate channel, with me as general counsel and then me

13  reporting whatever I needed to report to management, the

14  management committee, so decisions could be made.

15  Q.   What did the defendant do after you sent him this email?

16  A.   He continued to send emails and to larger groups of people

17  and at one point said he was going to send, I believe, an email

18  to the entire firm complaining about one partner in particular.

19  Q.   How would you describe these emails?

20  A.   They were much the same as the emails we've seen before.

21  They were false.   They made false allegations about one

22  individual in particular, about how he cost the firm millions

23  of dollars in terms of the client relationship, when in fact

24  that lawyer had had nothing to do with the client relationship

25  he was complaining about.

MacWden4                    Maletta - Direct

1      Other emails accused other partners, another partner of

2  gross negligence, and at times I believe he said he wanted the

3  firm to sue this individual partner.  And these emails were

4  sent to a fairly significant group of -- number of partners in

5  the firm.

6            MS. SIMON:  One moment, please.

7            Your Honor, may I have one moment?

8            THE COURT:  Yes.

9  BY MS. SIMON:

10 Q.  Mr. Maletta, what steps, if any, did you take in response

11 to the defendant's conduct next?

12 A.  After he'd disregarded this email, exhibit 501, and

13 continued to send the emails, consulted with other members of

14 management, and we decided that we had to stop him from sending

15 emails over the email system.  So we blocked his access to the

16 email system, the firm's email system, and we asked him not to

17 come into the office and deactivated his key card to the

18 office, because, in an attempt to put an end to the disruptive

19 behavior.

20 Q.  And when did you take these steps?

21 A.  A few days after this.  I believe it was effective on

22 January 30.

23 Q.  I'm sorry.  I didn't quite hear that.

24 A.  I'm sorry.  I believe it was effective on January 30.

25 Q.  Of 2019?

1    A.  Of 2019, yes.

2    Q.  What does it mean that the defendant was blocked from the

3    firm's email?

4    A.  He could not access the firm's email address -- rather,

5    email, so that he could no longer send emails of the nature of

6    what he'd been sending before over the firm's system, using his

7    firm email address.  He could not access the email system

8    generally inside the firm, so he was not able to continue

9    sending the emails we had described earlier.

10   Q.  Why did you take the steps that you just described at the

11   end of January 2019?

12   A.  Because despite repeated admonitions, repeated warnings

13   that we'd given him and repeated requests to have him stop

14   sending these emails around the firm, because of the disruption

15   they were causing and the complaints we were getting about

16   them, this was the only way we felt we could address the issue

17   at the time.

18   Q.  I'm sorry.  You may have already mentioned this, but did

19   you take any other steps with respect to the defendant's

20   conduct at this time?

21   A.  We also deactivated his key card so that he could not

22   access the office, because we were concerned about the

23   disruption it might be causing.

24   Q.  Turning your attention to Government Exhibit 502 --

25   A.  I see it, yes.

MacWden4                    Maletta - Direct

1    Q.   -- what is the date of this email?

2    A.   The date is Wednesday, January 30, 2019.

3    Q.   Who sent this email?

4    A.   I sent the email.

5    Q.   Who did you send it to?

6    A.   I sent it to Mr. Dennis.

7    Q.   Did you send it to Mr. Dennis at a particular email

8    address?

9    A.   This one I sent to his K&L Gates email address.

10   Q.   Can you read the first paragraph of this email aloud?

11   A.   "Willie, we have repeatedly requested that you refrain from

12   sending emails within the firm containing false allegations

13   against it and making demands of other partners and that you

14   communicate any concerns you may have exclusively to me as the

15   firm's general counsel.  Unfortunately, you have not honored

16   these reasonable requests, and therefore, you leave us no

17   choice but to take steps to prevent this conduct from

18   continuing."

19   Q.   Why did you write that to Mr. Dennis?

20   A.   Well, explaining to him why we were doing what we were

21   doing, that he had failed to abide by the reasonable requests

22   that we work through his issues through firm channels.

23   Q.   Can you please read the first two sentences of the second

24   paragraph?

25   A.   "Effective immediately your access to the firm's emails and

1   the IT systems has been suspended.  Your key card access to the

2   office has also been suspended, and you should not come into

3   the office until advised that you may do so."

4   Q.  Why did you write that?

5   A.  Well, we told him that his email, we had to advise him that

6   his email had been suspended, his access had been suspended,

7   and similarly, his key card access had been suspended, and

8   until we advised him further he should not come into the

9   office.

10  Q.  Drawing your attention to the version of Government Exhibit

11  502 that's on the screen, do you see those question marks --

12  A.  I do.

13  Q.  -- in there?

14      Are those question marks in the paper copies of the

15  exhibits that you have?

16  A.  I don't believe -- let me check.

17      No, they're not.

18  Q.  And did you write those question marks in the emails to Mr.

19  Dennis?

20  A.  No, I did not.

21  Q.  And did you confirm that the versions in your binder, the

22  paper copies, are the true and correct versions of the

23  documents on K&L Gates's server?

24  A.  Yes, the ones in my binder are what you see on the server.

25  Q.  Yes.  And so are these question marks here on the screen

1    just a formatting issue, as you understand it?

2    A.   That's what I would understand.  They're not on the emails

3    as I reviewed them to confirm that what I have in the binder

4    is, in fact, on the system.

5    Q.   Drawing your attention to the third paragraph, can you

6    please read the first sentence aloud?

7    A.   "We will be making a financial proposal to you shortly as

8    part of an overall separation from the firm."

9    Q.   Do you know whether a financial proposal was made to the

10   defendant?

11   A.   Yes, there was.  It was in connection with his earlier

12   stated intention that he wanted to explore leaving the firm and

13   would do so in exchange for some consideration about some

14   client matters.

15   Q.   Do you know whether Mr. Dennis accepted that financial

16   proposal?

17   A.   He did not.

18   Q.   What, if anything, did Mr. Dennis say in response to the

19   financial proposal made to him by the firm?

20   A.   We made a proposal to him and sent it to -- and sent it to

21   him by email.  And shortly thereafter, he said that it was not

22   acceptable, and he proposed or made a request that we pay him

23   instead approximately, somewhere in the neighborhood of about

24   $20 million, but millions of dollars.

25   Q.   Drawing your attention back to Government Exhibit 502, can

1  you please look at the second paragraph again and read the last

2  two sentences aloud?

3  A.  "We will make arrangements to monitor your inbox and will

4  forward any client-related matters to the appropriate lawyers

5  in the firm.  We will also forward any personal emails to you

6  at an email address you provide."

7  Q.  And can you also read the first sentence of the last

8  paragraph aloud?

9  A.  "Willie, it is our intention to work with you cooperatively

10  in good faith as we attempt to effect an amicable separation."

11          MS. SIMON:  Thank you.  Ms. Geier, you can please take

12  Government Exhibit 502 down.

13  Q.  Mr. Maletta, what happened next after the defendant was

14  locked out of his K&L Gates email account?

15  A.  He used a personal Gmail account and ultimately more than

16  one Gmail account to continue to send emails in the direction

17  or addressed to people in the firm, partners in the firm and

18  other people of the firm.

19  Q.  How do you know that?

20  A.  Because we set up a rule after, shortly after he began to

21  do that, because he was trying to, seemed like he was

22  recreating the problem that we had tried to address in sending

23  emails to everybody in the firm, making similar allegations.

24  We set up a rule through the IT system where the emails that he

25  sent in to the firm from a particular Gmail account would be

1    captured and they would be directed to me and to Mr. Tea, Chip

2    Tea, who is the deputy general counsel for the law firm.

3    Q.  And you referred to a personal email account?

4    A.  Mr. Dennis had a personal email account that he was using

5    and we had seen before, actually.  We didn't know if it was the

6    one he wanted to continue to use, which is why we asked him if

7    that was the appropriate account, but he had a personal email

8    account, which I believe was woc2020@gmail.com.

9    Q.  And how did you know that email address was associated with

10   the defendant?

11   A.  Well, because when we received the emails, because of the

12   nature of the emails, the subject matter of the emails, content

13   of the email, it was pretty clear that it was Mr. Dennis

14   sending the emails.  And we'd also, I believe, by this time

15   seen a personal email address that he'd used and copied to

16   himself when sending firm communications.

17   Q.  You testified regarding a rule regarding emails from Mr.

18   Dennis's Gmail that were directed to you and Mr. Tea.  When was

19   that rule set up?

20   A.  It was set up shortly after January 30, once he began

21   sending emails in to the firm that were similar to the emails

22   that he had been sending before we'd blocked his firm account.

23   He'd sent similar emails coming in to the firm using the Gmail

24   account to the same effect, that it was causing, potential to

25   cause disruption.  So we blocked that so that we could avoid

MacWden4                    Maletta - Direct

1   the problem that we were having the first time around.

2   Q.  And after that rule or block was set up, did you see emails

3   from Mr. Dennis's woc2020@gmail.com that were directed at K&L

4   Gates's email addresses?

5   A.  Yes, I did.

6   Q.  What were the nature of the messages in February 2019?

7   A.  Many of them were similar to the messages we'd seen

8   earlier, raising the same types of allegations, making the same

9   types of -- well, same types of allegations, saying the same

10  sorts of things about the partners that he had been saying

11  earlier, prior to the time we took off the email in the firm.

12  He also sent some other -- he also sent some communications

13  directly to me and to Mr. Tea and to one or two other people in

14  management, complaining.

15  Q.  Focusing only on the week or so the defendant was locked

16  out of his firm email address at the end of 2019, to your

17  knowledge, approximately how many emails were sent from the

18  woc2020@gmail.com account to K&L Gates employees?

19  A.  I think between the time he was locked out and within a

20  week or ten days thereafter, I believe he sent about,

21  approximately a hundred emails directed at the firm, at people

22  in the firm.

23  Q.  And you mentioned that you took steps to impose the rule

24  concerning Mr. Dennis's emails from that WOC2020 Gmail address?

25  A.  Yes.  A rule's essentially, as I understand it, an IT

MacWden4                    Maletta - Direct

1    program that is put in to the email system so that when

2    something comes in, it is directed to a certain file, to a

3    certain person.  That's what we mean when we say a rule.  And

4    so we set up a rule so that we would see the emails as they

5    came in.  They would be captured and they would be sent to me

6    as the general counsel and to Mr. Tea as the deputy general

7    counsel.

8    Q.  When you say they were sent to you and to Mr. Tea, were

9    those emails sent to their intended recipients?

10   A.  Not at first, no.

11   Q.  So the rule routed the emails to you rather than to the

12   intended recipient?

13   A.  That's correct.

14   Q.  And why did you impose this particular system?

15   A.  To avoid the problem we were having before we'd taken Mr.

16   Dennis off the firm email system, that he was effectively

17   bombarding people with emails that were disruptive to the work

18   of the firm.  We can't have that.  You can't have that in the

19   firm.

20   Q.  And why not?

21   A.  Because it disrupts the work of the firm.  You sit at your

22   screen and see email after email after email come in on topics

23   which, in many cases, the allegations were untrue.  In many

24   cases, they were -- in some cases, they were insulting.  In

25   other cases, they were just harassing.  And just the number and

1    volume of emails that were coming in when you're sitting at

2    your workstation and your email lights up with additional

3    emails on a regular basis, it's very disruptive to the work of

4    the office.

5    Q.  What did you do with the emails from the defendant when you

6    received them after January 2019?

7    A.  I read them.

8    Q.  Did you do anything else after you read them?

9    A.  Kept them on, in files.  Mr. Tea and I kept -- Mr. Tea kept

10   a folder, a regular folder of all emails Mr. Dennis sent to the

11   firm.  And then in certain cases, where we saw certain things

12   in the emails that were particularly concerning, we felt, to a

13   particular individual, we would advise that individual that

14   this had come in, because we felt they needed to know about

15   this.

16   Q.  And when you say particularly concerning, what do you mean

17   by that?

18   A.  That were, made statements about the individual that could

19   be concerned -- that would indicate that they could be some

20   form of, of not necessarily a threat of violence, but they were

21   disturbing comments, and we felt people had a right to know

22   that.

23   Q.  Why did you feel people had a right to know?

24   A.  They had a right to know what was being said about them.

25   Q.  What did the defendant do after the firm blocked his

1    woc2020@gmail.com address?

2    A.  Eventually he set up other Gmail accounts.  I believe he

3    had a total of six, and he used those separate email accounts

4    to send emails in to the firm, some of them similar, many of

5    them similar to what he had sent earlier on his firm email

6    account and on his WOC2020 account.

7    Q.  And how did you know those email addresses were associated

8    with Mr. Dennis?

9    A.  Generally, the subject matter and the content of the emails

10    were very similar to what we'd seen on the WOC2020 account.

11    Q.  Did you see some of these emails?

12    A.  I did.

13    Q.  What, if anything, did you do in response?

14    A.  We set up a rule so that these emails would be captured and

15    blocked much the same way as the WOC2020 emails that were

16    captured and blocked from going to the intended recipient or

17    the addressee, and they were forwarded to me and to Mr. Tea for

18    review.

19    Q.  Between January and May 2019, did you continue to see

20    emails from email addresses you believed to be associated with

21    the defendant directed at K&L Gates email addresses?

22    A.  Yes.

23    Q.  Can you describe the nature of those emails?

24    A.  Many were very similar to what had gone before.  There were

25    some new types of emails, where he was communicating with

MacWden4                         Maletta - Direct

1    outside parties and making false allegations about the firm,

2    including to a clerk of the court at one point.  And then there

3    were emails where he would address -- he addressed some

4    directly to me and to Mr. Tea on issues.

5    Q.  Based on the data routed to you, between January and May

6    2019, approximately how many emails did the defendant send to

7    K&L Gates email addresses?

8    A.  It would have been hundreds.

9    Q.  You testified earlier that the defendant stopped working at

10   K&L Gates in May 2019?

11   A.  That's correct.

12   Q.  What happened in May 2019?

13   A.  He was expelled by a vote of the partnership.

14   Q.  Was there a process for his expulsion?

15   A.  There is a process.  It's in the partnership agreement,

16   which is the contract which all partners sign and forms the

17   basis of governing how the firm operates.  Under certain

18   circumstances, the management committee can consider a matter

19   and make a recommendation to the partnership that the

20   partnership vote to expel the partner, and that process was

21   followed here.

22   Q.  And what was the vote for Mr. -- what was the vote for Mr.

23   Dennis's expulsion?

24   A.  The vote is required -- the partnership agreement requires

25   a two-thirds vote of what are called the equity partners.  It's

MacWden4                    Maletta - Direct

a class of partners, about 400 of them.  And the vote easily

passed the two-thirds requirement.  My recollection is that

there were no "no" votes.

Q.  To your knowledge, has a partner ever been expelled from

the K&L Gates partnership before?

A.  No.  Many occasions recommendations have been made,

conversations are held with that partner, and in every other

instance the partners have withdrawn voluntarily.

Q.  How, if at all, did the decision to expel the defendant

relate to the defendant's email messages that you saw in --

between January and May 2019?

A.  It was a very significant portion.  It's not the only

reason.  There were other reasons, but it was a very material

reason for the decision -- continuing sending emails while he

was a partner despite requests that the activity stop, requests

from management through general counsel it stop, which he

disregarded, and then the continuing sending of emails through

multiple email addresses afterwards from outside the firm on

the Gmail accounts, including similar emails making false

allegations but also emails that were sent to outside third

parties which made false statements about the firm,

essentially.

                    (Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MACGden5                    MALETTA - DIRECT

1   BY MS. SIMON:

2   Q.  Did any of the other reasons for Mr. Dennis' expulsion from

3   the firm involve discrimination against Mr. Dennis?

4   A.  No.  No, it was based all on his conduct, with email and

5   other conduct.  You did not have that kind of conduct with a

6   partner at your law firm.  No law firm could stand this.  It

7   was very disruptive and damaging to the reputation of the firm.

8   Q.  Was it related at all to any complaints by Mr. Dennis of

9   discrimination?

10  A.  No.

11  Q.  After the defendant was expelled from the law firm, did you

12  continue to communicate with him regarding certain

13  administrative matters?

14  A.  We did.  After he was expelled from the law firm, he

15  received notices about how to continue his benefits, including

16  his health insurance.  It's called COBRA, which is a federal

17  statute that requires employers to offer employees to continue

18  to seek health insurance and other benefits that they have

19  through their employer.  And he received those notifications.

20      For some reason, he seemed not to appreciate what he had

21  received.  He communicated to the firm about setting up

22  arrangements for COBRA benefits, continuing health insurance

23  and we assisted him.

24  Q.  How did you communicate with Mr. Dennis regarding these

25  matters?

MACGden5                          MALETTA - DIRECT

1    A.  It was by email, one of the email accounts.

2    Q.  One of the email accounts you referenced previously?

3    A.  I believe it was the woc2020 account that we used in

4    communicating.

5    Q.  What time period are the conversations that you are

6    describing?

7    A.  There were two really.  There was one in May of 2019, May

8    and June of 2019.  We also helped him at that time -- in

9    addition to continuing his health insurance benefits, we also

10   helped him get access to his retirement funds that he needed to

11   pay off an outstanding debt.

12   Q.  And after May 2019, did Mr. Dennis contact the firm again

13   regarding his health insurance?

14   A.  He did.  At the end of the year, he contacted the firm to

15   say that he had been unable to or had forgotten to or

16   overlooked the steps he needed to take to renew his -- continue

17   his health insurance and could the firm help him get that

18   health insurance back on, and we did.  We took steps at that

19   point to contact the insurer and made it possible for him to

20   continue his health insurance benefits.

21   Q.  Was this at the end of 2019?

22   A.  This was the end of 2019, yes.

23   Q.  Did there come a time when the defendant filed a civil

24   lawsuit against K&L Gates?

25   A.  Yes, he did.

MACGden5                          MALETTA - DIRECT

1    Q.  Does the lawsuit name the firm and certain partners

2    individually?

3    A.  Yes, it does.

4    Q.  Does it name you individually?

5    A.  I am one of the individuals who is named, yes.

6    Q.  At a high level, what is the nature of the defendant's

7    lawsuit?

8    A.  It's a lawsuit that alleges discrimination.

9    Q.  When was the lawsuit filed?

10   A.  The lawsuit was filed in November of 2020.

11   Q.  Is the lawsuit ongoing?

12   A.  It's still pending.  It's stayed.  It's not active.  And in

13   fact, the lawsuit -- the claims have been referred to

14   arbitration under the partnership agreement, which is the

15   required way of disputes -- resolving disputes with partners.

16   Q.  Is K&L Gates opposing that lawsuit?

17   A.  Yes.

18   Q.  Prior to the filing of the lawsuit, did you receive any

19   communications regarding claims by Mr. Dennis concerning his

20   employment?

21   A.  We did receive a copy, I believe, in August of 2020 of

22   what's called a right to sue letter, which is a letter issued

23   by a federal agency called the Equal Employment Opportunity

24   Commission, the EEOC.  As I understand the law, it's a

25   requirement before you file a lawsuit making certain

MACGden5                    MALETTA - DIRECT

1    allegations of certain types of discrimination, that you

2    present whatever your claims may be to the EEOC as a

3    prerequisite, as a requirement before you are allowed to file a

4    lawsuit.  And we received notice or a copy of the right to sue

5    letter from the EEOC in August.  We didn't -- we did not know

6    that a claim had been made before then.

7    Q.  What is your understanding of the significance of a right

8    to sue letter?

9    A.  It simply says to the -- it advises the person who has made

10   the claim that he or she has satisfied the administrative

11   requirement of going to the EEOC with whatever the claim is and

12   that he satisfied the requirement and he may file a lawsuit, if

13   he chooses.

14   Q.  Is the right to --

15   A.  The one we received had no determination on the merits of

16   the claim whatsoever.

17   Q.  Thank you.  You anticipated my next question.

18       Does the existence of the defendant's lawsuit have any

19   impact on your testimony here today?

20   A.  No.

21   Q.  After the defendant was expelled from the firm in May 2019,

22   did you continue to receive emails from the defendant sent to

23   K&L Gates employees?

24   A.  Yes.  They would be directed to me and to Mr. Tea by the

25   rule, whenever he sent an email addressed to someone in the

MACGden5                        MALETTA - DIRECT

1  firm.

2  Q.  I'm showing you a document marked Government Exhibit 503.

3      What is the date of this email?

4  A.  The email is Friday, June 7th, 2019.

5  Q.  Who is it from?

6  A.  It's from Mr. Dennis at his woc2020 Gmail account.

7  Q.  Who is this email to?

8  A.  It's addressed to Michael Zanic.

9  Q.  Who is Michael Zanic?

10 A.  Michael Zanic was a partner in the Pittsburgh office of K&L

11 Gates.  He spent some time in management of the firm and was --

12 his practice was principally litigation.

13 Q.  Did you receive this email around the time it was sent?

14 A.  Yes, I did.

15 Q.  If it's addressed to Mr. Zanic and not to you, how did you

16 receive it?

17 A.  I mentioned earlier the rule that we had set up for email.

18 When emails came in from one of Mr. Dennis' several email

19 accounts addressed to people in the firm, in order to avoid the

20 problems we had been having earlier, those emails would be

21 captured and directed to me and to Mr. Tea and not sent to

22 however many people he had addressed them to.  So we would get

23 them, I would see them.  They would come on my email and they

24 would come in on Mr. Tea's email.

25 Q.  Can you read the subject line and the body of the email

MACGden5                         MALETTA - DIRECT

1   aloud.

2   A.  Subject line is "Now."

3   Q.  And the body?

4   A.  "He just came into the room."

5   Q.  Now, directing you to Government Exhibit 504.

6   A.  I have it.

7   Q.  Who is this email from?

8   A.  It's from Mr. Dennis at the woc2020 Gmail account.

9   Q.  Who is it to?

10  A.  It's addressed, again, to Mr. Zanic.

11  Q.  And what is the date and time of this email?

12  A.  This email is at 11:55 -- I'm sorry, it's on June 7th, 2019

13  at 11:55 a.m. UTC, which would have been, I believe,

14  7:00 o'clock, 7:55 Eastern Daylight Time.

15  Q.  And how does the time of Government Exhibit 504 compare to

16  the time of Government Exhibit 503?

17  A.  It's shortly thereafter, a few minutes.

18  Q.  And who is this a photo of in Government Exhibit 504?

19  A.  The gentleman in profile is Eric Cottle.  He's a partner in

20  the firm.

21  Q.  When you saw these emails, Government Exhibit 503 and

22  Government Exhibit 504, what did you understand them to mean?

23  A.  That Mr. Dennis was waiting for Mr. Cottle at this meeting.

24  It appears it's a -- it appears to be a meeting or a conference

25  in a conference room of some sort and that he was taking a

MACGden5                    MALETTA - DIRECT

1   picture of him and sending them to Mr. Zanic to let Mr. Zanic

2   know that he knew where Eric was, he was following him.

3   Q.  What did you do upon seeing these emails?

4   A.  I wrote to Mr. Zanic.  I sent these emails and some related

5   emails to Mr. Zanic to explain what was going on, and Mr. Tea,

6   I believe, he and I discussed communicating with Mr. Cottle

7   about the situation.

8   Q.  Why did you take those steps?

9   A.  First of all, we needed to let Mr. Zanic know that this was

10  going on.  He was a mentor for Mr. Cottle and had been for

11  years.  And we wanted to alert Mr. Cottle to the fact that

12  these emails were coming in, including photographs of him.

13  Q.  Why did you want to alert Mr. Cottle to that news?

14  A.  Because he had a right to know what Mr. Dennis was up to at

15  this point.

16            THE COURT:  I'm sorry, counsel, I think we need to

17  give the jury their lunch break, so maybe this is a good time.

18            MS. SIMON:  I think this is a good time, your Honor.

19  Thank you.

20            THE COURT:  Ladies and gentlemen, we'll take an hour

21  for lunch and then we'll resume at about ten minutes before

22  2:00.

23            MR. DENNIS:  During lunch, I'd like to get a copy of

24  the transcript from Mr. Cottle's --

25            THE COURT:  Let the jury go, and then we'll take this

MACGden5                          MALETTA – DIRECT

1    up.

2              MR. DENNIS:  Okay.

3              (Jury excused)

4              (Continued on next page)

MACGden5                      Maletta - Direct

1              (Jury not present)

2              THE COURT:  You can step down.  We will see you in one

3    hour.

4              THE WITNESS:  Thank you.

5              THE COURT:  Mr. Dennis, you wanted a copy of his

6    testimony so far?

7              MR. DENNIS:  Yes.

8              THE COURT:  Okay.  I think that can be arranged.

9              Now, what I'll ask you in return is that you use part

10   of the lunch hour to prepare your cross so we don't have a big

11   delay.  It doesn't have to be worked on.

12             Print it out the same way I saw it, and you can charge

13   the government for it.

14             We'll see you in an hour.

15             (Recess)

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

MACGden5                    Maletta – Direct

1                         AFTERNOON SESSION

2                            1:50 p.m.

3              (In open court; jury present)

4              THE COURT:  Counsel.

5              MS. SIMON:  Thank you, your Honor.

6   BY MS. SIMON:

7   Q.  Mr. Maletta, before the lunch break, we were discussing

8   Government Exhibits 503 and 504.

9              MS. SIMON:  Ms. Geier, can you please pull up

10  Government Exhibit 504.

11  Q.  Mr. Maletta, after you saw these emails, referring to

12  Government Exhibit 503 and 504, did you receive any other

13  emails from the defendant directed at Mr. Cottle?

14  A.  Yes.  Subsequently, we did.

15  Q.  Turning to Government Exhibit 509.

16       Mr. Maletta, what's the date of this email.

17  A.  It's Thursday, June 13th, 2019.

18  Q.  Who is it from?

19  A.  It's from Mr. Dennis at his woc2020 email account.

20  Q.  Who is it to?

21  A.  To Eric Cottle.

22  Q.  Is it to Mr. Cottle at a particular email address?

23  A.  It's at his klgates.com email address.

24  Q.  And is anyone else copied on the email?

25  A.  Yes, Mr. Tea, Charles Tea.  Chip Tea is the deputy general

MACGden5                          Maletta - Direct

1   counsel of the firm.

2   Q.   Drawing your attention to the top email in the chain.  Can

3   you please read it aloud.

4   A.   Also, Eric, if you find this email menacing as Mr. Tea has

5   suggested you do, please let me know.  You can tell me.  Best,

6   Willie.

7   Q.   Was this the only email you saw from Mr. Dennis directed to

8   Mr. Cottle during this time period?

9   A.   No.  There were others.

10  Q.   And can you remind the jury how you saw this email if it

11  was directed at Mr. Cottle?

12  A.   We had set up a rule through the IT system that when emails

13  came into the firm, to the firm's address from certain

14  addresses that Mr. Dennis was using, including the woc2020

15  address, that they would be captured by the rule and sent to me

16  and to Mr. Tea, the deputy general counsel.

17  Q.   Directing your attention to June 2019, during that time

18  period, did you continue to have emails from the defendant's

19  email addresses routed to your email inbox?

20  A.   Yes.

21  Q.   And did you see emails from the defendant in and after

22  June 2019?

23  A.   Yes, yes.

24  Q.   In June and July 2019, what was the tone of the defendant's

25  emails?

1    A.  They changed considerably over the period June through July

2    and into August.  They got -- in my view, they got more

3    disturbing.

4    Q.  When you say "disturbing," what do you mean by that?

5    A.  Well, they raised topics that he had not raised before;

6    family members, some biblical quotations which were unsettling

7    to read about, some direct attacks on other -- on women in the

8    firm or emails directed to them which they considered menacing.

9    Q.  Drawing your attention to Government Exhibit 515.

10        What is the date of this email?

11   A.  This is Sunday, June 16, 2019.

12   Q.  Who is it to?

13   A.  This is to Mr. Bicks, John Bicks.

14   Q.  Who is John Bicks?

15   A.  John Bicks is the managing partner of the New York office.

16   He's responsible for the management of that office.

17   Q.  The New York office of K&L Gates?

18   A.  Of K&L Gates, yes.

19   Q.  And is there anyone cc'ed on this email?

20   A.  Yes, Mr. Greg Vassilakis, who is the director of

21   administration, who handles the administrative aspects of the

22   operations of the office.

23   Q.  Can you please read the first email in the chain.

24   A.  Yes.  Btw -- which I understand means by the way -- what is

25   your wife's name?  I need to share with her what you time my

1  wife.  I am sure you do not mind since you communicated with my

2  wife first... clown.

3  Q.  And can you also read the bottom message on the chain.

4  A.  Hi, John.  What are you teaching your kids today, how to

5  get away with sneaky, unethical moves?

6  Q.  Was this the only email you saw from the defendant during

7  this time period that mentioned people's wives or children?

8  A.  No, no.  There were a series of emails further on sent to

9  partners in the firm with similar messages, some of them

10  considerably longer than this, repetitive emails, one after

11  another within a day or part of a day, asking partners what

12  their wives' names were, could Mr. Dennis, the sender of the

13  emails, talk to wives, accusing the partners of talking to his

14  wife.  I think there were probably seven or eight of those

15  series directed to partners in the firm over that two or

16  three-day period.

17  Q.  And what, if anything, did you do when you saw such emails

18  referencing partners' wives and children?

19  A.  Well, I communicated with the partners, sent them copies of

20  the emails and called them and told them what was going on.  I

21  wanted to alert them that this was happening, that someone was

22  out there saying they might contact their wife.

23  Q.  Why did you take those steps?

24  A.  First of all, this was different.  This was, as I said,

25  more disturbing, to get messages from someone saying he's going

MACGden5                    Maletta - Direct

1    to contact your wife.  The partners certainly had a right to

2    know that.  They certainly had the right to tell their wives

3    that this was happening, to alert wives.

4    Q.  Mr. Maletta, I'm going to show you Government Exhibit 516.

5    A.  I see it.

6    Q.  What's the date of this email?

7    A.  Friday, June 21st, 2019.

8    Q.  And is this one email or is this a series of emails?

9    A.  This appears -- this is a series of emails.

10   Q.  Who is it from?

11   A.  It's from Mr. Dennis at his woc2020 Gmail account.

12   Q.  Who is it to?

13   A.  It's to me.

14   Q.  At a particular email address?

15   A.  That's my law firm email address, klgates.com.

16   Q.  Can you please start reading in the middle of the page

17   there, with the email on June 21st, 2019 at 2:20 a.m.

18   A.  Such a liar.

19        And then the email --

20   Q.  And then you can keep reading going up.

21   A.  In sequence, okay.

22        First email is:  Such a liar.  The next email is:  Liar,

23   liar, liar.  I am going to pay you back big time.  You will

24   never forget.  The next portion was:  Wanted to break me and my

25   family.  Let's go.  The next email is:  No destroy my family,

MACGden5                    Maletta - Direct

1  zero sum game we are playing now.

2  Q.  Do you recall seeing this email around the time it was

3  sent?

4  A.  I do.

5  Q.  What did you understand this email to mean?

6  A.  That in some ways it's a threat, that he's going to get

7  even with me for something.  It's going to be possibly directed

8  at my family, possibly not.  I can't tell that from what's

9  here.  But it certainly is disturbing for me to see that.

10  Q.  What did you understand the phrase in the 3:31 p.m. email,

11  "I am going to pay you back big time" to mean?

12  A.  It sounded like he was going to exact some kind of revenge

13  for something I had done.

14  Q.  After seeing the defendant's emails in June 2019, what

15  steps, if any, did you take in response to the defendant's

16  conduct?

17  A.  Given what we were seeing, in terms of the emails, which

18  were directed to the partners in the firm and it looked like to

19  others in the firm as well, we engaged a lawyer to help us

20  decide what actions to take.

21  Q.  What was that lawyer's name?

22  A.  Thomas Moore.

23  Q.  And what, if any, additional steps did you take at that

24  time?

25  A.  Well, when the emails continued to come in, we hired a

MACGden5                    Maletta - Direct

1   security investigative service to help us get advice and to

2   help us decide how best to handle the situation.

3   Q.  What was the name of that security service?

4   A.  Sage security or Sage investigations.

5   Q.  Why did you engage Sage?

6   A.  We felt things had reached such a point, given what we had

7   seen in terms of the emails, in terms of his -- Mr. Dennis

8   showing up at meetings where our partners were present, that we

9   felt we needed to take some additional steps, explore taking

10  additional steps to provide security to the people in the law

11  firm and the New York office in particular.

12  Q.  When you say "security," what do you mean by that?

13  A.  Well, we wanted to know -- we wanted to have security

14  around the office, so when people were coming and going to the

15  office that they would not encounter Mr. Dennis, if you will,

16  unaware.  We wanted to know where Mr. Dennis was as well, as we

17  didn't know what he might be planning or what he might be doing

18  in light of the tone and tenor of the emails we were getting.

19  Q.  What did you direct Sage to do?

20  A.  We directed them, at that point, to provide security around

21  the office and monitor activity around the office and to try to

22  determine if Mr. Dennis was in the area.

23  Q.  Turning your attention to Government Exhibit 520.

24      What is the date of this email?

25  A.  Sunday, July 14, 2019.

MACGden5                    Maletta – Direct

1   Q.  Who is it from?

2   A.  It's from Mr. Dennis at a different Gmail account than he

3   had used in the earlier emails.

4   Q.  And what email account is that?

5   A.  This is bllj4848@gmail.com.

6   Q.  Who is the email to?

7   A.  It's addressed to Mr. Bicks.

8   Q.  Is it copying anybody else?

9   A.  It copies Mr. Vassilakis.

10  Q.  Could you read the subject line and then the body of the

11  email.

12  A.  Subject line is:  In service this morning.  And the body of

13  the email is:  We are reading this passage "The lord preserves

14  all that love him, but the wicked he will destroy."  Amen.

15  Q.  Do you recall seeing this email around the time it was

16  sent?

17  A.  I do.

18  Q.  What do you understand this email to mean?

19  A.  Mr. Dennis is sending a piece of biblical scripture which

20  talks about the destruction of the wicked.  And in the context

21  of what we were seeing at that time, there's no reason to send

22  anybody an email like this.  It's disturbing to see someone

23  quoting scripture about the destruction of the wicked when you

24  have a reason to believe that Mr. Dennis believes you are among

25  the wicked.

MACGden5                    Maletta - Direct

1  Q.  Turning your attention to Government Exhibit 523.

2      What is the date of this email?

3  A.  August 4, 2019.

4  Q.  Who is it from?

5  A.  It's from Mr. Dennis.

6  Q.  Who is it to?

7  A.  It's to Mr. Bicks, the managing partner in New York.

8  Q.  Is it copying someone?

9  A.  Again, Mr. Vassilakis.

10 Q.  Can you please read the body of the email aloud, starting

11 with the bottom email.

12 A.  The bottom email reads:  Endless unnecessary violence and

13 death.  Gun control now.  At least 9 dead, 16 injured in mass

14 shooting in downtown Dayton; police say.  The shooting took

15 place in the city's Oregon District.  Read in ABC News, and

16 then a cite to an Apple News site.  The next email sent says:

17 Heading to service now and will pray on this as well as our

18 other issues.

19 Q.  What did you understand this email to mean?

20 A.  I -- the -- well, there's no reason -- I don't understand

21 the real meaning, no reason for him to send this.  There was no

22 communication.  There had been no communications or discussions

23 on this topic.  My only conclusion is that somehow he wanted to

24 put this idea in front of us, the idea of a mass shooting.  And

25 then the notion in the top email, he will pray on this, meaning

MACGden5                        Maletta - Direct

1    the mass shooting, as well as on our issues, is linking two

2    things in the same email, which is disturbing to me, that these

3    are being thought of and discussed or thought of in the same

4    reference point.

5    Q.  Why would it be disturbing to link the idea of a mass

6    shooting and your issues?

7    A.  Well, it indicated to me possibly that the sender was

8    thinking that he was going to contemplate something, in terms

9    of what he's talking about here, the mass shooting, in terms of

10   the issues he seemed to have with people in the law firm.  But

11   we never -- this was new.  We had never seen anything like

12   this, the biblical quotes and the mass shooting, they were part

13   of the continuum, as things were getting more and more

14   disturbing.

15   Q.  Turning to Government Exhibit 524.

16       What is the date of this email?

17   A.  The date is August 6th, 2019.

18   Q.  Who is it from?

19   A.  It's from Mr. Bicks.

20   Q.  I'm sorry, who is it from?

21   A.  It's from Mr. Dennis, I'm sorry.  It's to Mr. Bicks.  I

22   apologize.

23   Q.  Is anyone else copied on the email?

24   A.  Yes, a series of people copied on it, including

25   Mr. Vassilakis, some other lawyers, partners in the New York

MACGden5                          Maletta – Direct

1    office.

2            MR. DENNIS:  Your Honor, can we have a sidebar.

3            THE COURT:  All right.

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MACGden5                      Maletta - Direct

1          (At sidebar)

2          MR. DENNIS:  For all the individuals' names who are

3     showing up in these emails that they're saying they were cc'ed,

4     in other words, they received them, will I have an opportunity

5     to call them as witnesses to confirm that this is an email that

6     they actually received?

7          THE COURT:  I'm sorry.  I didn't hear you.

8          MR. DENNIS:  They have an opportunity -- this is

9     testimony, it's testimony from -- I assume, it's testimony

10    from, other than Mr. Maletta, but the other parties that are

11    named on there, named in the --

12         THE COURT:  The emails are already in evidence without

13    objection, and he's simply reading what the emails say, so I

14    don't -- after your cross is over if you still have an

15    application to call someone else, I'll consider it then.  But

16    so far, I don't see that anything has been introduced that

17    isn't already part of the received evidence.  But if the

18    question is you want to call some of the people who these

19    emails were sent to.

20         MR. DENNIS:  Yes.  Yes, that's part of the question.

21         THE COURT:  We'll take that up at the end of the day.

22         MR. DENNIS:  Okay, all right.

23         (Continued on next page)

24

25

MACGden5                           Maletta - Direct

```
1            (Jury present)

2    BY MS. SIMON:

3    Q.  Mr. Maletta, turning back to Government Exhibit 524, do you

4    recall seeing this email around the time it was sent?

5    A.  Yes, I do.

6    Q.  Can you please read the subject line.

7    A.  Subject line is:  Re: ABC News, at least 9 dead, 16 injured

8    in mass shooting in downtown Dayton, police say.

9            MS. SIMON:  Ms. Geier, can you please zoom out.

10   Q.  And I direct you to the email at 9:11 p.m. on August 5th.

11       Mr. Maletta, can you please read this email.

12   A.  Time for us to wrap things up, there are much bigger issues

13   which need to be addressed.

14   Q.  And then returning to the top email in the chain.

15   A.  The top email in the chain appears to be a photograph or a

16   screenshot of some sort.  And it says, from Sunday service at

17   the top, and then there appears to be a photograph.

18   Q.  Can you read what's in the photograph aloud.

19   A.  It looks like the first word is worship.  Then the text

20   says, fret not thyself because of evildoers -- then the word is

21   cut off, I believe it's neither, the workers of iniquity.  And

22   then in bold language, for they shall soon be cut down like

23   green herb.  Trust in the lord and do good; so shall thou shalt

24   be fed.

25   Q.  And whose words did you just read or is this in the email
```

MACGden5                    Maletta - Direct

1    from Mr. Dennis?

2    A.  Those are from -- they are words from a copy of what

3    appears to be scripture in text, there's a photograph of that

4    embedded into the email.

5    Q.  What did you understand this email to mean?

6    A.  I wasn't sure what it really meant, but it was disturbing

7    in many ways because it talks about evildoers being cut down

8    like the green herb.  And based on what we have been seeing

9    from Mr. Dennis, we had a pretty clear idea who he thought were

10   evildoers.  That would be the people he had been emailing and

11   accusing them of things.

12   Q.  And just to be clear, who sent this email?

13   A.  Mr. Dennis sent it to Mr. Bicks and then cc'ed a number of

14   other partners in the office.

15   Q.  Turning to Government Exhibit 525.

16       Who is this email from?

17   A.  This is an email from Mr. Dennis.

18   Q.  Who is it to?

19   A.  It's to Mr. Bicks with a cc to Mr. Vassilakis.

20   Q.  What is the date on the email?

21   A.  The date is August 8, 2019.

22            MS. SIMON:  If you could zoom out, Ms. Geier.

23   Q.  Is this one email or a series of emails?

24   A.  It appears it is a string of emails.  They appear to be

25   sent a few minutes apart.

MACGden5                    Maletta - Direct

1  Q.  Who were those emails sent by?

2  A.  They were sent by Mr. Dennis, that's his Gmail account.

3  Q.  Can you read Mr. Dennis' emails aloud, starting with the

4  bottom email, including the time stamp.

5  A.  The bottom email is sent at 4:34 a.m., it says, see

6  article, the suspect's motive appears to be robbery, anger and

7  hate, which is bolded in blue and underscored.  At least four

8  dead and two injured in Southern California stabbing rampage;

9  suspect arrested.  A series of stabbings and robberies in

10 southern California Wednesday night killed and injured multiple

11 people, police said.  Read in USA Today.

12      The next email in the sequence was sent or received at

13 4:37 a.m. from Mr. Dennis.  It says, John, this is not good for

14 the country.  Do you love our nation?  There were 253 mass

15 shootings in 2019 as of Wednesday, according to the

16 not-for-profit Gun Violence Archive.

17      And then the last email above, sent a few minutes after

18 that is, and I assure you this is not fake news, those people

19 did die.

20 Q.  Do you recall seeing this email around the time it was

21 sent?

22 A.  I do.

23 Q.  What did you understand this email to mean?

24 A.  Again, it's not -- I don't understand what the meaning

25 really is, just to be the linking of this mass shooting, the

1    stabbing, the fact that the motive appears to be anger and hate

2    and that's underscored was concerning, very concerning because

3    there was certainly a lot of anger in the other emails we were

4    seeing, and it appears to be linking those to issues Mr. Dennis

5    was having with us and the firm.

6    Q.  Turning to Government Exhibit 526.

7        What is the date of this email?

8    A.  This is on Sunday, September 1st, 2019.

9    Q.  Who is it from?

10   A.  It's from Mr. Dennis to Mr. Bicks.

11            MS. SIMON:  Ms. Geier, if you could zoom out again,

12   please.

13   Q.  Is this one email or a series of emails?

14   A.  It's a series of, appears to be, five emails.

15   Q.  Who sent all of those emails?

16   A.  They're all sent by Mr. Dennis.  That's his Gmail address.

17   Q.  Can you please read it aloud, starting with the bottom

18   email, including the time stamps.

19   A.  The first email is sent at 7:27 p.m. on August 31st, and it

20   says, John, you have to speak up.  Substantive legislation to

21   stop the killing.  Five dead, 21 injured in shooting in Western

22   Texas; suspect killed.  Police said the active shooter was shot

23   and killed at the Cinergy in Odessa.

24        And then the next one sent two minutes later on

25   August 31st, 2019 says, and John why do you think all these

mass shootings have increased dramatically over the past two
years?

And the next one sent two minutes after that, I know you
never change your mind, but really how many more people have to
die before you act?

And then above that, a few minutes later, at 7:35 p.m., and
I know you know more than all of them.  But all the law
enforcement agencies believe things would be safer if there
were less arms, particularly automatic, in the hands of
citizens.  Think a law enforcement office lost his life today.
Don't you care.

And then above that, death toll just increased to seven.
That's the final email in the chain, and that was sent -- from
the date, it would have been sent very early on Sunday morning
on the 1st.

Q.  What did you understand this email or email chain, I should
say, to mean?

A.  I don't understand what it meant, other than to put notions
of mass shootings in front of Mr. Bicks and others, because
this is not a topic of conversation anybody had been having
before.  It has nothing to do with the issues that Mr. Dennis
said he was having with the firm.  So when we saw this, it was
just his effort -- seemed to be part of an effort to put this
topic in front of people, the topic that there were mass
shootings going on.

MACGden5                    Maletta - Direct

1    Q.  Was this email the only email from the defendant in the

2    summer of 2019 referencing mass shootings?

3    A.  No, I believe there were several others.

4    Q.  Now, after you saw the documents we just looked at,

5    Government Exhibit 520, 523, 524, 525 and 526, what did you do

6    with those emails after you saw them?

7    A.  Well, they were sent to Mr. Bicks, shared with Mr. Bicks,

8    of course.

9    Q.  I'm sorry, I didn't --

10   A.  They were sent to Mr. Bicks, shared with Mr. Bicks.

11   Q.  Why did you provide them to Mr. Bicks?

12   A.  Several reasons.  First of all, they were addressed to

13   Mr. Bicks, and they are on a topic that was at least disturbing

14   to read about, someone is sending emails about mass shootings

15   to you.  Second of all, he's the managing partner of the New

16   York office and he has a responsibility for the security in

17   that office.  If measures have to be taken for security there,

18   he certainly has to be involved in that decision process.

19   Q.  Why did you need to provide the emails to Mr. Bicks?

20   A.  Well, the emails were coming into the K&L Gates address,

21   and therefore were being, by rule, diverted to me and to

22   Mr. Tea so we would see them first.  But we certainly need to

23   get them in Mr. Bicks' hands.  That's why we sent them to

24   Mr. Bicks.

25   Q.  Moving on.  I'm showing you a document marked Government

MACGden5                    Maletta - Direct

1    Exhibit 528.

2         Who is this email from?

3    A.   This is an email from Mr. Dennis.  This is another of the

4    email addresses that he used.

5    Q.   What email address is that?

6    A.   This is rule of law ethics, ruleethics50@gmail.com.

7    Q.   How did you know that email address was associated with

8    Mr. Dennis?

9    A.   Well, from this and other emails that we saw that used this

10   email address -- and there were many of them -- it was clear

11   that it was Mr. Dennis' address, he often signed it Mr. Dennis.

12   They were often on topics that he raised before and sometimes

13   even forwarded other emails that he had sent to us.

14   Q.   Who is this email to?

15   A.   This is to a woman, a partner, Ndenisarya Bregasi and to

16   Mr. Cottle, Eric Cottle, with a copy to Greg Vassilakis.

17   Q.   What is the date of this email?

18   A.   Tuesday, September 10, 2019.

19   Q.   Is this one email or is it a series of emails?

20   A.   I believe this is part of a series of emails.

21   Q.   Who sent all of the emails in this chain?

22   A.   They're all from the same email address,

23   ruleethics50@gmail.com, which is one of the Gmail accounts

24   Mr. Dennis was using.

25   Q.   Can you please read it aloud, starting with the bottom

MACGden5                      Maletta – Direct

1   email in the chain.

2   A.   First email:  Are you guys meeting today?  I am sure, Eric,

3   Ndenisarya shared with you that she tried to have me arrested

4   at my home.  As I shared with you, she is sneaky and not to be

5   trusted.  She is willing to endanger women and children to get

6   her coins.

7        Then above was a question:  Was it good?  In the second

8   email.

9   Q.   What did you understand this email to mean?

10  A.   Well, first, it's an attack.  It looked to be an attack on

11  Ms. Bregasi.  And there's a suggestion in it that Ms. Bregasi

12  and Mr. Cottle were having some kind of relationship.

13              MR. DENNIS:  Objection, your Honor.

14              THE WITNESS:  That's the question --

15              THE COURT:  Hang on.

16              Sustained.

17  BY MS. SIMON:

18  Q.   Turning to Government Exhibit 529.

19        What is the date of this email?

20  A.   September 11, 2019.

21  Q.   Who is it from?

22  A.   Mr. Dennis at his woc2020 Gmail.

23  Q.   Who is it to?

24  A.   It's addressed to me, Ndenisarya Bregasi and Mr. Cottle

25  with a cc to Mr. Vassilakis.

1    Q.  Is this one email or a series of emails?

2    A.  It's a series of emails.  It's two emails, I guess.

3    Q.  And who sent the emails in the chain?

4    A.  Mr. Dennis.

5    Q.  Can you read aloud, starting with the bottom email.

6    A.  The bottom email is Nden/Jeff.  And Nden, I believe, he

7    means Ndenisarya.

8        Are you guys doing drinks after work today?

9        The next email above that is, maybe Eric could join and

10   make it a three some.  Nden, you good with that.

11   Q.  Do you recall seeing this email at the time?

12   A.  I do.

13   Q.  And how did you react to seeing this email?

14   A.  Well, this and other emails targeting Ms. Bregasi or sent

15   to Ms. Bregasi were new, they were different, emails addressed

16   to women in the firm, which he had been doing over the summer,

17   and I felt I had to tell Ms. Bregasi about it.

18              MR. DENNIS:  Objection.

19              THE COURT:  Overruled.

20   BY MS. SIMON:

21   Q.  I want to draw your attention to the top email.  It says,

22   maybe Eric could join and make it a three some?

23   A.  Yes.

24   Q.  Do you have an understanding of who Eric is in that email?

25   A.  Eric is, I believe, Mr. Cottle, who is a recipient, an

1    addressee of the email.

2    Q.  And were these the only messages that you saw from the

3    defendant suggesting that members of the firm were engaged in

4    sexual affairs?

5              MR. DENNIS:  Objection, your Honor.

6              THE COURT:  Well, as phrased.

7              But there is a legitimate question lurking there.  Why

8    don't you rephrase it.

9              MS. SIMON:  Thank you, your Honor.

10             THE COURT:  Did you see other messages of this kind?

11   BY MS. SIMON:

12   Q.  Did you see other messages of this kind?

13             THE COURT:  Good question.

14             MS. SIMON:  It was well phrased.  I couldn't have

15   improved on it, your Honor.

16             THE WITNESS:  I did see other emails, I received other

17   emails.

18             MR. DENNIS:  Objection.

19             THE COURT:  Overruled.

20   BY MS. SIMON:

21   Q.  Turning back to Exhibit 529.

22       What do you understand a three some to be?

23             MR. DENNIS:  Objection.

24   A.  My understanding is --

25             THE COURT:  Hold on.  There is an objection.  You have

MACGden5                    Maletta - Direct

1  to wait.

2              THE WITNESS:  I'm sorry.  I beg your pardon, your

3  Honor.

4              THE COURT:  Overruled.

5              MR. DENNIS:  Is it golf?

6              THE WITNESS:  Three some is often a reference to a

7  sexual --

8              MR. DENNIS:  Objection.

9              THE WITNESS:  Three people engaged in sexual acts.

10             MR. DENNIS:  Objection.

11             MS. SIMON:  Thank you, Mr. Maletta.

12             THE COURT:  Overruled.

13             You may have cross on this, of course.

14             MR. DENNIS:  Thank you, your Honor.

15  BY MS. SIMON:

16  Q.  What legal steps, if any, did you take in September 2019 in

17  response to the defendant's conduct?

18  A.  With our lawyer, we had our lawyer draft a cease-and-desist

19  letter, which is a formal letter telling someone who is engaged

20  in this type of conduct to cease sending emails and contacting

21  the law firm.

22  Q.  What is the name of that lawyer?

23  A.  The lawyer is Thomas Moore.

24  Q.  What was your role with respect to the cease-and-desist

25  letter you just described?

1    A.  I reviewed it and I authorized it to be sent.

2    Q.  You have in front of you a folder containing a document

3    marked for identification marked as Exhibit 231A.

4    A.  Yes.

5    Q.  Do you recognize that document?

6    A.  I do.

7    Q.  How do you recognize it?

8    A.  This is a copy of the cease-and-desist order that Mr. Moore

9    sent at our instruction.

10          MS. SIMON:  The government offers Government

11   Exhibit 231A.

12          THE COURT:  Any objection?

13          Received.

14          MR. DENNIS:  Objection.  I'm sorry, your Honor.

15   Objection as to admission of this email.

16          THE COURT:  That's what I just asked you.

17          MR. DENNIS:  Yes.

18          THE COURT:  So you are objecting?

19          MR. DENNIS:  Yes.

20          THE COURT:  Ground?

21          MR. DENNIS:  Speculation, statutory.

22          THE COURT:  No, no.  I think this is being offered as

23   something that was allegedly sent to you that bears, the

24   government claims, on your state of mind and.  Of course, you

25   can have a different position and explore it on cross.  But

MACGden5                       Maletta - Direct

```
 1   it's not being offered for its truth.  It's just being offered

 2   for the fact that this was sent to you.  So with that

 3   understanding, the objection is overruled.

 4            MR. DENNIS:  Yes, I received that.  It was a prior

 5   email that I was --

 6            THE COURT:  I'm sorry.

 7            MR. DENNIS:  A prior --

 8            THE COURT:  Well, we can't go back.

 9            (Government Exhibit 231A received in evidence)

10            MS. SIMON:  Your Honor, permission to publish

11   Exhibit 231A to the jury.

12            THE COURT:  Yes.

13   BY MS. SIMON:

14   Q.  Mr. Maletta, what is the date of Government Exhibit 231A?

15   A.  It's September 20th, 2019.

16   Q.  Who is it from?

17   A.  It's from our counsel, Mr. Moore, Thomas Moore.

18   Q.  Who is it to?

19   A.  It's addressed to Mr. Dennis.

20   Q.  There's a street address listed there.  Can you please read

21   it aloud.

22   A.  417 West 146th Street, New York, New York.

23   Q.  What is that address?

24   A.  I understand that to have been Mr. Dennis' address in New

25   York City.  It's the address we had for him at the firm.
```

MACGden5                    Maletta - Direct

1   Q.  And there's a list of email addresses there?

2   A.  Yes.

3   Q.  Can you please read them aloud.

4   A.  Woc2020@gmail.com, pmglm71947@gmail.com,

5   bllj4848@gmail.com, htdr123@gmail.com, wd66644@gmail.com,

6   ruleethics50@gmail.com.

7   Q.  What are those email addresses that you just read aloud?

8   A.  Those are the email addresses from which we received emails

9   being sent by Mr. Dennis to people in the firm.

10  Q.  Did you direct that the cease-and-desist letter be sent to

11  those email addresses?

12  A.  Yes, we did.  I did.

13  Q.  Why did you do that?

14  A.  Because we associated all of those email addresses with

15  Mr. Dennis and we wanted to be sure, by sending it to all of

16  his email addresses, that he got a copy of the letter.

17  Q.  Can you please read the subject line.

18  A.  Re: unlawful harassment -- final notice.

19  Q.  Were there attachments to the document?

20  A.  There were attachments.  It was Tab A with attachments to

21  it.

22  Q.  Without describing their contents, what were those

23  attachments?

24  A.  Those attachments were a collection of emails that he had

25  sent -- and I believe some text messages -- that he had sent to

1    firm personnel.

2    Q.   Drawing your attention to the second paragraph there on the

3    first page.

4         Can you please read it aloud.

5    A.   You have been notified repeatedly that your communications

6    directed to firm personnel -- many of which contain statements

7    that are false, offensive, menacing and/or threatening -- are

8    unwelcome and must stop, see e.g. Tab A.  Yet, you have

9    persisted in sending them.  If you do not immediately

10   cease-and-desist from all efforts to communicate with firm

11   personnel, the firm and affected individuals will have no

12   alternative but to continue to work with law enforcement and

13   pursue all available remedies, including criminal sanctions.

14   Q.   Can you please read the next paragraph aloud.

15   A.   There is no doubt that your conduct constitutes harassment

16   and menacing.  Just since your expulsion from the firm on

17   May 13, 2019, which became necessary in part because of your

18   unrelenting harassment, you have directed more than 1,000

19   emails, text messages and faxes to scores of individuals in the

20   firm.  Many of the emails and text messages are sent by you in

21   rapid succession to multiple recipients at virtually all hours

22   of the day and night and without response such that you had to

23   understand the communication was unwelcome.

24   Q.   Turning to page 8.

25        Can you please read the first paragraph and then the first

MACGden5                      Maletta – Direct

1   few sentences of the next paragraph through the bolded text.

2   A.  Take notice that:  Henceforth, any further communications

3   with the firm and its personnel must be addressed solely to me.

4   I repeat that last point for emphasis:  You are to communicate

5   with no one at the firm.  In any manner or form.  By any method

6   or medium.

7   Q.  After this cease-and-desist letter was sent in

8   September 2019, did the defendant stop sending messages to K&L

9   Gates employees?

10  A.  No.

11  Q.  Based on the data routed to you, approximately how many

12  messages did the defendant send to K&L Gates email addresses in

13  2019 and 2020 after he was blocked by the firm?

14  A.  Several thousand; perhaps 3,000, as many as 3,000.

15           MR. DENNIS:  Objection.

16           THE COURT:  Ground?

17           MR. DENNIS:  Speculation.  He had the emails from --

18           THE COURT:  I hear you.

19           So how do you know that was the approximate amount?

20           THE WITNESS:  I have a -- I collected many of the

21  emails in a folder of my Outlook section that were emails sent

22  after January 31, 2019.  I did not collect all of them.  I

23  tried to collect most of them.  And the count of emails I have,

24  which is exclusive of texts, is about 2,600 or 2,700.

25           THE COURT:  All right.  Go ahead.

MACGden5                    Maletta - Direct

BY MS. SIMON:

Q.  Other than emails, did you see any other types of messages
that the defendant sent to K&L Gates employees in 2019 and
2020?

A.  Yes.

Q.  What types of messages?

A.  We saw --

Q.  Besides emails, what other types of messages did you see?

A.  Aside from emails, I saw copies of text messages that he
sent to people in the firm or associated with the firm.
Originally, there were some sent in 2019.

    Beginning in 2020, Mr. Dennis sent almost exclusively text
messages to people who were either in the firm or recently
retired from the firm.

Q.  Based on text messages you saw from Mr. Dennis, who were
these text messages being sent to?

A.  Several people.  I believe the first series of texts in
2020 went to a retired partner of the firm, Mary O'Day, and
were directed to her husband, Peter Kalis, who was the former
managing partner of the firm.  They were sent to Ms. O'Day's
telephone number, text messages, but they were addressed to --
alternatively or sometimes simultaneously to Ms. O'Day and
Mr. Kalis.

        MR. DENNIS:  Objection.

A.  And she sent me screenshots of these.

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

MACGden5                    Maletta - Direct

1    Q.  And any other people to whom you saw text messages?

2    A.  Mr. Bicks began to receive text messages, and he sent me

3    copies of the screenshots.

4                MR. DENNIS:  Objection.

5                Is this --

6                THE COURT:  Sustained.  Sustained.

7    BY MS. SIMON:

8    Q.  After you saw text messages from the defendant in 2019 and

9    2020, what steps, if any, did you take in response to the

10   defendant's conduct?

11   A.  Well, in August --

12               MR. DENNIS:  Objection.

13               THE COURT:  Overruled.

14   A.  In August, the volume and the tenor of text messages were

15   such that we engaged Sage security to provide -- Sage

16   investigations to provide security to one of our lawyers in

17   particular, and the firm paid for that security.  We also paid

18   for that lawyer to relocate out of New York City and eventually

19   support her moving to a new address, a more secure address.

20   Q.  When was this?

21   A.  This was in August and September of 2020.

22   Q.  Which lawyer are you referring to that you testified that

23   the firm hired security for and helped relocate?

24   A.  The lawyer is Cally Bostick, and she was a -- is a partner

25   in the New York office.

MACGden5                    Maletta - Direct

1   Q.  Why did you take these steps?

2   A.  She expressed to me considerable concern about what she was

3   seeing and receiving, given where she lived and her sense of --

4   what she said was her sense of vulnerability.

5          THE COURT:  Counsel, I'm unclear how that question and

6   answer avoids the ban of the hearsay rule.

7          MS. SIMON:  Understood, your Honor.  I was intending

8   to inquire why Mr. Maletta took certain steps.

9          THE COURT:  Yes.  But that doesn't open the door for

10  the admission of hearsay for its truth.  And it's not clear to

11  me what other relevance it has.

12         Are we going to hear from that witness?

13         MS. SIMON:  Ms. Bostick?

14         THE COURT:  Yes.

15         MS. SIMON:  Yes, your Honor.

16         THE COURT:  So I think we need to save it for that.

17         The jury will disregard the last question and answer.

18  BY MS. SIMON:

19  Q.  Based on your observations, how did the defendant's conduct

20  in 2019 and 2020 affect the firm's employees?

21         MR. DENNIS:  Objection.

22         THE COURT:  Sustained.

23         Nice try, but no cigar.

24  Q.  As general counsel of the firm, how did the defendant's

25  conduct affect your professional life in 2019 and 2020?

231|alphanum"left header}center header

1              THE COURT:  Sustained.

2              You just can't get much help from your colleagues

3    these days.  Put another question.

4              MS. SIMON:  I will try one more.

5    BY MS. SIMON:

6    Q.  Over the course of 2019 and 2020, how much time did you

7    personally spend dealing with the defendant's conduct?

8              THE COURT:  Sustained.

9              Congratulations.  Even Aaron Judge struck out a few

10   times last night, so this can happen.

11             MS. SIMON:  One moment, your Honor.  May I have one

12   moment.

13             THE COURT:  Yes.

14             (Conferring)

15             MR. DENNIS:  Your Honor, can I have a restroom break.

16             THE COURT:  I think the government is about to finish.

17   As soon as they're finished, we'll give the jury a

18   mid-afternoon break, and I think that will be useful to you as

19   well.

20             MS. SIMON:  No further questions, your Honor.

21             THE COURT:  Ladies and gentlemen, we'll take a

22   15-minute break at this time, and then we'll resume.

23             (Jury excused)

24             (Continued on next page)

25             (Jury not present)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

232|alphanum"left header}center header

1              THE COURT:  And you can take a break as well.

2              THE WITNESS:  Thank you, your Honor.

3              THE COURT:  We'll see you in 15 minutes.

4              (Recess)

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MacWden6                    Maletta – Cross

1                THE COURT:  OK.  Let's get the jury in.

2                (Jury present)

3                THE COURT:  All right.  Everyone please be seated.

4                Cross-examination.

5    CROSS-EXAMINATION

6    BY MR. DENNIS:

7    Q.  Good afternoon, Jeff.

8         I want to start with a couple basic questions.  Jeff, what

9    year did you join the firm?  What year did you join K&L Gates?

10   A.  1983.

11   Q.  1983.  So you have been there for -- well, you probably --

12   how many years?

13   A.  39 years.

14   Q.  39 years.  OK.  And you are a graduate of which college?

15   A.  I went to Harvard College.

16   Q.  And you're a graduate of which law school?

17   A.  I went to Stanford Law School.

18   Q.  Did you receive any recognition or awards while you were at

19   Stanford?

20   A.  I was a member of the law review.  I guess that's a reward

21   of some sort.

22                THE COURT:  Or a function of --

23   BY MR. DENNIS:

24   Q.  That's one of the things, highest things that you can

25   receive at law school, one of the highest --

1        THE COURT:  No, no.  You can ask him that, but you
2    can't testify.
3    Q.  Jeff, would you describe what the law review means?
4        THE COURT:  I'll cut it short.  Is being on the law
5    review generally considered a high honor for a law student?
6        THE WITNESS:  Yes.
7        THE COURT:  OK.
8    BY MR. DENNIS:
9    Q.  So you currently serve as general counsel of K&L Gates?
10   A.  I do.
11   Q.  When selecting a general counsel for an international,
12   global law firm, what are the qualities that the partners look
13   for in selecting a general counsel?
14       MS. SIMON:  Objection.
15       THE COURT:  No.  I'll allow it within a question or
16   two.  I don't think it's generally relevant, but you can
17   inquire a little bit into his background.  I'll allow it.
18       Go ahead.
19   A.  Well, I can't be sure, since they're asking me to serve as
20   general counsel, exactly what they were looking for, but I did
21   have a lot of experience with the law firm.  I've been there
22   for 39 years.  And I also had been assistant general counsel
23   for perhaps 15 or 20 years before I became general counsel.
24   Q.  Assuming one would think they'd want someone with the
25   highest ethical standards.  OK.

MacWden6                    Maletta - Cross

1          Just to clarify for the audience, because I want them to

2     know who all the players are, who we're talking about.  In your

3     opening and during your examination, you were being questioned

4     as to, I guess you mentioned a number of times Charles Tea?

5     A.  Yes.

6     Q.  Mr. Tea is the deputy general counsel?

7     A.  That is correct.

8     Q.  Where does Mr. Tea reside at?  What office does he reside

9     out of?

10    A.  Mr. Tea is in the Pittsburgh office.

11    Q.  OK.  Does Mr. Tea have a spouse who also works at the firm?

12    A.  Yes, he does.

13    Q.  What's her name?

14    A.  Her name is Melissa Tea.

15    Q.  Does she have a title within the firm?

16    A.  I'm not sure -- well, right now, I believe she's something

17    called a practice area leader for litigation.

18    Q.  When I was there, that was considered a very prominent

19    post, because we're an international law firm, so practice

20    leader --

21               THE COURT:  Whoa, whoa, whoa.  Counsel, put a

22    question.

23    BY MR. DENNIS:

24    Q.  Could you describe what a practice leader is?

25    A.  Practice area leader tries to coordinate the work of a

MacWden6                    Maletta - Cross

1    particular practice group -- in this case, litigation.

2    Q.   And Ms. Tea is in which office?

3    A.   She's in the Pittsburgh office as well.

4    Q.   She's in the Pittsburgh office as well.

5         Earlier we had testimony from Mr. Cottle, and Mr. Cottle, I

6    think, joined the firm in -- obviously, just for the record,

7    you obviously know Mr. Cottle; yes?

8    A.   I do know Mr. Cottle, yes.

9    Q.   He joined the firm in 2004.  He's a litigator.  During his

10   testimony -- you also mentioned during your testimony that you

11   had received text messages that were sent to Peter Kalis.

12   Which office was Peter Kalis in?

13   A.   I was forwarded copies of screenshots of text messages that

14   were sent to his wife, Mary O'Day, but they were addressed to

15   Mr. Kalis.  They were sent to her email address and sent -- but

16   they were talking to him in many occasions.

17        Mr. Kalis was the global managing partner.  He was

18   originally in the Pittsburgh office, but he also maintained

19   offices, I believe, in -- no, mostly in the Pittsburgh office.

20   That would be correct.

21   Q.   And Mary O'Day, which office was she in?

22   A.   She was in the Pittsburgh office as well.

23   Q.   And Ms. Mary O'Day was the wife of Peter Kalis, correct?

24   A.   Yes.

25   Q.   And they were both partners at the same time, correct?

MacWden6                    Maletta - Cross

1   A.  They were.

2   Q.  In the Pittsburgh office?

3   A.  That's correct.

4   Q.  Mr. Charles Tea and his wife Melissa Tea were both partners

5   at the same time in the Pittsburgh office, correct?

6   A.  That's correct.

7   Q.  All holding very significant titles within the firm?

8   A.  Ms. O'Day did not hold a significant title in the firm.

9   She was a litigator.

10  Q.  OK.  So when I was questioning Mr. Cottle --

11          THE COURT:  No, no, no.  Put a question to this

12  witness.  Don't discuss what some other witness said or what

13  you asked of another witness.

14          MR. DENNIS:  OK.

15  Q.  Would any partner who was in the Pittsburgh office since

16  2004 not know that Peter Kalis was a resident in the Pittsburgh

17  office?

18          MS. SIMON:  Objection.

19          THE COURT:  No.  I think that's an argument you can

20  make on summation, but I don't think it's a question for this

21  witness.  Sustained.

22          MR. DENNIS:  OK.

23  Q.  Which office was, is Bob Zinn in?

24  A.  Mr. Zinn's in the Pittsburgh office.

25  Q.  In your testimony, you mentioned -- you stated that --

MacWden6                    Maletta - Cross

1    which office is -- and what title does Mr. Zinn hold?

2    A.   Currently, I don't believe he holds any title.

3    Q.   Does he sit on the executive committee?

4    A.   No.  We don't have an executive committee, by the way.  I'm

5    sorry.

6    Q.   What is the name of the highest committee that you have in

7    the firm?

8    A.   The partnership agreement vests responsibility for managing

9    the firm in a management committee.

10   Q.   Uh-huh.

11   A.   And that's the entity that manages almost every aspect of

12   the firm's business.

13   Q.   OK.  Let me go forward for a second.  We're going to skip

14   the timeline.

15        When I was voted out of the firm, I was expelled in May of

16   2018, who made the -- what was the name of the committee that

17   made the recommendation to the partners for the expulsion?

18   A.   In your question, I think you said 2018.

19   Q.   OK.

20   A.   It was May of 2019.

21   Q.   Thank you.

22   A.   And the management committee made a recommendation to the

23   partnership.

24   Q.   And who were the members of the management committee?

25   A.   At that time there were 16 of them.  They were drawn from

MacWden6                    Maletta - Cross

1    all offices of the firm.  I can try to list them all from

2    memory.  Membership changes over time.

3    Q.  That's OK.  Was Bob Zinn on the committee?

4    A.  He may have been on the committee at that time, yes.

5    Q.  May have been.  OK.

6        Was Mike Zanic on the committee?

7    A.  In May of 2019, he was not.

8    Q.  OK.  And Bob Zinn is located where?

9    A.  Mr. Zinn's in Pittsburgh.

10   Q.  OK.  And Mike Zanic is located in Pittsburgh?

11   A.  Yes, he's in the Pittsburgh office.

12   Q.  OK.  Earlier, in your statement, earlier in your

13   conversation, you made the claim -- or you made the statement

14   that Mike Zanic was a mentor of Eric Cottle.  Eric Cottle

15   earlier did not describe Mike Zanic --

16         THE COURT:  No, no, no.  You can't do that.

17   BY MR. DENNIS:

18   Q.  Why did you describe Mike Zanic as a mentor of Eric Cottle?

19   A.  Because that's how I understood their relationship to be.

20   They worked in roughly the same areas, I believe, and they knew

21   each other.  And Mr. Zanic was a senior lawyer, and he was a

22   mentor to younger lawyers.

23   Q.  Do you know why Mr. Cottle would not think that he was a

24   mentor?

25         MS. SIMON:  Objection.

1  A.  I don't know.

2          THE COURT:  Sustained.

3  A.  It's not an official designation.

4          THE COURT:  When the objection is sustained, you don't

5  answer.

6          THE WITNESS:  Yes.  My apologies.

7  BY MR. DENNIS:

8  Q.  Earlier in your examination, you talked about the

9  meeting -- well, let's -- actually, a better place to start is

10  where do you reside, Jeff?  Where do you live?

11  A.  I live in Washington, D.C.

12  Q.  Have I ever been to your home in Washington, D.C.?

13  A.  Not to my knowledge.

14  Q.  So, you mentioned your travel from Washington, D.C. to New

15  York to meet with me?

16  A.  I did, yes.

17  Q.  Had you ever traveled from Washington -- and this is in the

18  fall of 2018.  Had you ever traveled from Washington, D.C. to

19  meet with me?

20  A.  Prior to that time?

21  Q.  Yes.

22  A.  No.

23  Q.  OK.  What was the nature of the conversation?  What did the

24  conversation -- what were the issues that we covered in the

25  conversation?

MacWden6                    Maletta - Cross

A.  The matters we covered in the conversation were a number of

topics you had raised with, I believe, Mr. Segerdahl, who was

the global managing partner, and a series of topics that

affected you personally.  That took up about half of the

conversation.

Q.  Do you remember what those topics were that made you, for

the first time ever -- I'd been at the firm 14 years -- to

travel to New York?

A.  It's not the first time I traveled to New York.

Q.  To visit with me.

        THE COURT:  I think the pending question is do you

remember what those topics were.

        THE WITNESS:  OK.  Sorry.

A.  The topics were -- there was a client we had a relationship

with and you had questions about how that relationship was

being managed.  There was a question about your compensation

and whether somebody was affecting, working against your

interest in compensation.  There was a question, I believe, of

a contribution or membership fee be paid to an organization out

of the New York budget that you wanted paid, and I think

Mr. Bicks said we did not have it in the budget to pay that.

And I think the other one, from memory, was your -- a question

about whether or not we should invite a judge or why a judge

hadn't been invited to speak at the firm in a certain time

frame.

MacWden6                    Maletta - Cross

1      Those were the topics I remember.

2  Q.  So --

3  A.  I'm sorry.  Those are the business topics that I remember.

4  Q.  So just to make sure I have it correctly, we had never --

5  you never traveled before to meet with me in New York, but the

6  reason you came is because, one, some sort of contribution, a

7  budget issue, and something relating to a judge.  Is that -- do

8  you remember any information -- you were traveling, just to

9  make sure the record's correct, on behalf of James Segerdahl?

10 A.  Mr. Segerdahl asked me to meet with you to communicate with

11 you on these issues because he did not have time at the time to

12 meet with you.  So he asked me to do it.

13 Q.  Did James Segerdahl comment that 30 days earlier I had

14 talked to him and had given him a presentation about the

15 Microsoft relationship and what -- and the amount of revenues

16 that we had lost?

17      MS. SIMON:  Objection.

18      THE COURT:  Sustained.

19      By the way, how does Mr. Segerdahl spell his last

20 name.

21      THE WITNESS:  S-E-G-E-R-D-A-H-L.

22      THE COURT:  Put another question.

23 BY MR. DENNIS:

24 Q.  Do you recall during our conversation that we discussed the

25 conflict between Microsoft and Amazon?

MacWden6                    Maletta - Cross

1    A.  Not in that conversation, no.

2    Q.  Do you have any emails -- did I send you an email in the

3    fall of 2018 regarding the Amazon-Microsoft conflict?

4    A.  You sent me some emails in which you said there was a

5    conflict between those two companies.  In fact, there is not a

6    conflict, but you did send me emails purporting to describe

7    that, yes.

8    Q.  You just mentioned the fact that there is no conflict.  Did

9    you send in writing a response to me saying that there is no

10   conflict?

11   A.  I'm not -- I'm sorry.

12   Q.  Did you send me something in writing?

13   A.  I'm not --

14          MS. SIMON:  Objection.  Relevance, your Honor.

15          THE COURT:  No.  It certainly seems far afield, but

16   I'll allow it.  Overruled.

17          Go ahead.

18   A.  I'm not sure I did, but I believe Mr. Segerdahl did.  But I

19   explained the difference to you.  I remember that.

20   Q.  As a general counsel of an international law firm,

21   representing multinational companies, is it not appropriate for

22   the general counsel to rule on issues of conflict?

23   A.  I give advice on issues of conflict sometimes.  Yes, that's

24   true.  It's part of my job.

25   Q.  Who else in the firm would want to charge you for conflict

1    resolution?

2              MS. SIMON:  Objection.

3              THE COURT:  Sustained.  Put another question.

4    BY MR. DENNIS:

5    Q.  So just to continue our convo, we discussed at the

6    outset -- so we're correct when -- Mr. Maletta, you and I had a

7    meeting in the fall of 2018, discussing various business issues

8    related to the firm, is that correct?

9    A.  That was part of the conversation, yes.

10   Q.  Did we -- so, I want to continue this timeline and turn to

11   the emails that have been posted today.  Other emails that I've

12   seen, they've been short snippets.  Did you, as I'm known to be

13   a writer, did you receive emails that had significant more

14   content in them?

15   A.  Emails from you, I received many emails that were much,

16   much longer.

17   Q.  Did you receive -- did any of the partners receive any

18   emails relating to the article published in December 8 --

19   December of 2018, relating to the sexual harassment --

20             THE COURT:  No, no, no.  Now, look, first of all, I've

21   ruled on that previously.

22             Second, asking did any of the partners receive, that's

23   hearsay.  So put another question.

24             MR. DENNIS:  OK.  And I'll backtrack, your Honor.

25   What I was referring to was that Mr. Maletta, or Jeff has

MacWden6                    Maletta - Cross

1    talked about this thing about him being the control, so if he

2    was, my understanding was emails were being funneled to him, he

3    was then in turn reading them and then -- that was my -- then

4    sending them out to the partners who he thought was

5    appropriate.

6    Q.  Is that -- Mr. Maletta, or Jeff, can you confirm that or

7    clarify my understanding before we go any further?

8    A.  After July -- after January 30, that's how it worked.

9    Prior to that time you were sending emails directly to people

10   throughout the firm.

11   Q.  OK.  Now we're now moving the timeline, and we're in

12   January of 2019.  On -- did you see the email that I sent to

13   Jim Segerdahl on January 29 regarding the firm's ten-year $5

14   million financial loss?

15   A.  I probably did.  I can't remember it now.

16   Q.  That was sent on January 29.  What caused you to send an

17   email to me on January 30, at 1:44 a.m. in the morning,

18   claiming that the firm had suspended my access to the office's

19   emails, etc., etc.?

20   A.  Prior to that time, you had sent out to people in the firm

21   a series of emails that made demonstrably false claims that you

22   had been told were false by many people, by the target of those

23   emails and by me and by others, alleging that a partner in the

24   firm, senior partner of the firm, head of the Asian practice,

25   was grossly negligent and had cost the firm millions of

1   dollars.

2           MR. DENNIS:  Your Honor, can we have a sidebar?

3           THE COURT:  All right.

4           (Continued on next page)

MacWden6                    Maletta – Cross

1            (At sidebar)

2            MR. DENNIS:  Mr. Maletta has repeatedly said that I

3    made grossly negligent statements about –– to –– about clients

4    and partners of the firm.  One of those clients is Microsoft,

5    and he –– that's the one that's the substance of what we're

6    talking about.  He's saying I'm grossly negligent.  I need to

7    be able to dive in and say OK, let's talk about it.

8            THE COURT:  Well, I agree with that.  I totally agree

9    with it.  The question you put to him, though, is what caused

10   him, and he's giving the answer, which obviously is an answer

11   favorable to the government's position.  So you have a right to

12   say to him:  Now, you say I made false statements or I made

13   misleading statements.  What statements are you talking about,

14   and how do you know they were false or misleading?

15           You can get into that in any detail you want to, but

16   that's the way you have to go at it.

17           MR. DENNIS:  OK.

18           THE COURT:  OK?

19           MR. DENNIS:  All right.

20           (Continued on next page)

21

22

23

24

25

1          (In open court)

2    BY MR. DENNIS:

3    Q.  Jeff, you have, you stated that I made false and misleading

4    statements.  What statements are you saying were false and

5    misleading?

6    A.  You accused Mr. Tang, who was a partner of many years and

7    head of the Asian practice, of being responsible for lost

8    opportunities and millions of dollars relating to a particular

9    client.  Mr. Tang had nothing to do with that client.  You

10   repeated that assertion even though Mr. Tang told you that,

11   even after I told you that and others told you that, and you

12   repeated that assertion to others in the firm, repeatedly.  And

13   you were asked to stop, and you didn't.  That's one.

14        You claim --

15   Q.  We'll just -- before we move on, I want to -- you said I

16   asked Mr. Tang, I said Mr. Tang was guilty of mismanagement.

17   Is that --

18   A.  I believe you used the word "grossly negligent."

19   Q.  Grossly negligent.  OK.  Describe what I said was grossly

20   negligent about his behavior --

21            MS. SIMON:  Objection.

22   BY MR. DENNIS:

23   Q.  -- for which --

24            THE COURT:  No.  I'm going to allow this to a limited

25   extent.

1          What was the specific allegation that Mr. Dennis was

2     making about Mr. Tang?

3          THE WITNESS:  That he had been responsible for the

4     loss of millions of dollars in revenue with respect to this

5     client.

6          THE COURT:  I'm sorry.  Forgive me for interrupting.

7     Responsible in what way?

8          THE WITNESS:  That's not clear.

9          THE COURT:  Pardon?

10          THE WITNESS:  That was not clear, your Honor.

11          THE COURT:  Oh, I see.  OK.  Well, if it wasn't clear,

12     how do you know it was false?

13          THE WITNESS:  Because Mr. Tang had nothing to do with

14     this particular client relationship.

15          THE COURT:  How did you know that?

16          THE WITNESS:  Because I knew Mr. Tang -- his

17     responsibilities were management of the Asian offices and not

18     this client relationship.  This was a different client

19     relationship with other lawyers.

20          THE COURT:  All right.

21          Counsel.

22     BY MR. DENNIS:

23     Q.  So, Mr. Maletta, or Jeff, earlier you were saying that you

24     give out conflict reviews.  Other people in the firm do as

25     well.  Are you sure you're right about this issue as well, that

MacWden6                    Maletta - Cross

1    Mr. Tang was not involved in the relationship?

2    A.   Mr. Tang, I believe, was on the management committee in

3    some respects, in some respects general oversight of the firm,

4    but he had no involvement with this particular client -- as a

5    relationship partner or as a managing partner of the work.

6    Q.   I sent an email out.  I sent an email to Mr. Tang, as you

7    point out, on January 29, stating that I was going to raise

8    these issues with the full partnership as an equity partner,

9    and on January 30, at 1:44 a.m., you suspended access to my

10   offices and emails, the office emails and everything else, and

11   my assistant.  Was it related to that email?  Was your

12   suspension of my service related to that email I sent to David

13   Tang?

14   A.   The intention to send those types of false emails out to

15   the entire firm, after we had asked you many times to not send

16   the emails to the firm but to deal with me and through me with

17   management, was one of the reasons we did what we did at that

18   time.

19   Q.   I want to make sure that the jury is clear, that I'm clear

20   in your answer.  When you say the entire firm, my

21   communications, correct -- were my communications only being

22   sent to, this communication only sent to partners of the firm?

23   A.   Some communications had been --

24   Q.   This particular communication.

25   A.   I don't know if this email communication was --

MacWden6                    Maletta - Cross

1   Q.  You don't know?

2   A.  -- to partners of the firm, but I believe that's what you

3   said in the email.

4   Q.  So, January 29, you don't know if that was sent to the

5   partners in the firm?

6   A.  I think that's what you said in the email, but I don't have

7   it in front of me, so I can't tell you for sure.

8   Q.  And my emails prior to this point, were they sent to the

9   firm, or were they sent to my partners?

10  A.  Some were sent to partners.  Some were sent to members of

11  the diversity committee, who were not all equity partners.  But

12  they were generally sent to partners in the firm, yes.

13  Q.  Are those emails in -- part of the production?  Have you

14  produced those emails that I sent to -- that I sent to firm

15  members and not partners?

16          MS. SIMON:  Objection.

17          THE COURT:  Well, I think he can ask the witness the

18  question whether he or, to his knowledge, someone at K&L Gates

19  produced those emails to the government.

20          Can you answer that?

21  A.  Well, I think the emails were produced, and I believe all

22  the emails that I saw, to go back to the previous question,

23  were directed to partners in the firm, either equity partners

24  or income partners in the firm.

25  Q.  On January 30, at 1:44 a.m. in the morning, when you

MacWden6                    Maletta - Cross

1    informed me that the firm had suspended my access --

2              MR. DENNIS:  Actually, can we call up -- it was up

3    there earlier, the email from January 30 at 1:44 a.m.?  Can we

4    put that on the screen?

5              THE COURT:  Let me ask the government.  What's the

6    exhibit number?

7              MS. SIMON:  It's Government Exhibit 502.

8              THE COURT:  OK.  Put that on the screen.

9    BY MR. DENNIS:

10   Q.  If we can just revisit -- Jeff, do you have it in front of

11   you?  Revisit this.  In the very first line, you used the word

12   "we."  When you say we, who are you referring to?  This is --

13   this is a -- this is an email from you to me.  You say we.  So

14   who is the we?

15   A.  I was speaking for the management group that was dealing

16   with your issues at this point.

17   Q.  And who -- obviously, given that this is my life, who was

18   the management group?

19   A.  Conversations with Mr. Segerdahl, Mr. Tea, Mr. Caccese, and

20   in some cases perhaps Mr. Bicks.  I can't remember whether

21   Mr. Bicks was involved in all of them or not.

22   Q.  In the partnership agreement, is there a provision for --

23   is there a provision for suspending a partner?

24   A.  There are provisions for the management committee to take

25   what steps are necessary for the management of the firm.

MacWden6                    Maletta - Cross

1   There's nothing specific addressing suspension of a partner.

2   Q.  Oh, OK.  Let's go back to the "we" now.  So, it's not a

3   partnership agreement, and correct me if I'm wrong.  It's not

4   in the partnership agreement, but the management committee can

5   take action.  So in general -- have you ever sent an email like

6   this to any other equity partners of the firm?

7   A.  I don't think the need has arisen, so no.

8   Q.  By the way --

9   A.  -- that I can remember.

10  Q.  -- how old is KL Gates?

11  A.  Some of the constituent parts of the firm go back early

12  part of the 20th century.

13  Q.  OK.  So this has never arisen before, an unusual case.  So

14  going back to "we," because it is obviously really, really

15  important as to who made this decision, and I'll -- we'll --

16  can you tell us -- you know, obviously, given your

17  background -- who is the "we" that made the decision that night

18  this should be sent out?

19  A.  Mr. Segerdahl, with input from me, Mr. Tea and Mr. Caccese

20  as well.  And I believe Mr. Bicks.

21  Q.  Was Mr. Bicks on the management committee?

22  A.  Not at that time, no.

23  Q.  So we -- we have this email going out that is not covered

24  by the exec -- not covered by the partnership agreement, but

25  the exec -- the management committee has the right to do this,

MacWden6                    Maletta - Cross

1    and correct me if I'm wrong, the management committee at that

2    time was about 16 partners.  Is that right?

3    A.  I believe so, yes.  16 partners.

4    Q.  16 partners?

5    A.  I'm sorry.  I missed the first part of your question.

6    Q.  OK.  Management committee was approximately 16 partners?

7    A.  At that time approximately 16, yes.

8    Q.  And we -- so right now, so this email -- but this email,

9    which is suspending all my resources, is basically being done

10   by, correct me if I'm wrong, you said yourself, Mr. Caccese,

11   Mr. Tea, and Mr. Bicks.  Is there anyone else?

12   A.  Mr. Segerdahl, who is --

13   Q.  The --

14   A.  Mr. Segerdahl is the global managing partner of the firm.

15   Q.  And Mr. Bicks was not on the executive committee, was not

16   on the management committee?

17   A.  Not at that time, no.

18   Q.  So out of those, out of those 16, there were four

19   individuals who essentially were making that decision with one,

20   Mr. Bicks, Mr. Bicks being in the room, being a partner -- and

21   why was Mr. Bicks in the room?

22   A.  As I said earlier, I'm not sure he was.

23   Q.  Oh, you're not sure.

24   A.  But I believe he was involved in the process at some point.

25   But I'm not certain he was.

MacWden6                    Maletta - Cross

```
1    Q.  So --

2              THE COURT:  When you said that Mr. Segerdahl is the

3    global managing partner, what does that entail?

4              THE WITNESS:  Global managing partner, roughly akin to

5    a CEO to the extent you can have one in a law firm, he's

6    responsible for the day-to-day management of the firm.  He is

7    the, if you will, I think the chief executive officer may be

8    the best answer, way to describe him in general terms.  He has

9    the ability to make decisions that affect the firm.  He has the

10   ability to act for the management committee in exigent

11   circumstances and subject to the management committee's review.

12   BY MR. DENNIS:

13   Q.  Let's go to the second paragraph.  Can you read that second

14   paragraph aloud, please.

15   A.  "Effective immediately your access to the firm's email and

16   IT systems has been suspended.  Your key card access to the

17   office has also been suspended, and you should not come into

18   the office until advised that you may do so.  We will make

19   arrangements to monitor your inbox and will forward any

20   client-related matters to appropriate lawyers in the firm.  We

21   also will forward any personal emails to you at an email

22   address you provide."

23   Q.  Since you're the author of this email -- I asked Mr. Cottle

24   this earlier, but if I lost my -- upon losing my email, access

25   to my IT systems, how was I supposed to service my clients on
```

MacWden6                    Maletta – Cross

Wednesday morning at 9 a.m.?  How was I -- what -- how was I

supposed to service my clients?

A.  At the time you were not actively really representing,

doing much day-to-day work on client matters.  They were being

serviced by other partners in the firm, and we made

arrangements for any communications that came in to your email

address about client matters to be routed to those clients --

to those lawyers, rather.

Q.  So let me make sure I understand.  You're saying at the

time, after 14 years at the firm, I was not really doing any

legal work to -- for me to worry about client needs or client

responsibility.  Is that --

A.  All the matters, all the matters were being effectively

handled by other lawyers in the firm, and they had the

day-to-day responsibility for the matters.  You, in fact,

billed very little time in 2018.

Q.  Thank you, Jeff.

      So on the matters that were going on, can you read the

second-to-the-last paragraph -- second-to-last sentence in that

paragraph again:  "We will"?

A.  "We will make arrangements to monitor your inbox and will

forward any client-related matters to the appropriate lawyers

in the firm."

Q.  So at 1:44 a.m. in the morning, I guess this -- correct me

if I'm wrong, this team of four had made this decision to

MacWden6                    Maletta - Cross

1  suspend these services but at the same time had made the

2  appropriate arrangements so that no clients were being injured

3  at 9 a.m. the next morning.  Is that accurate?

4  A.  We were in a position to do that, yes.  It was very little

5  client email coming in to your inbox.

6  Q.  And so -- and the clients that were -- what -- where did

7  they -- who's servicing them and who's getting the recognition

8  credit for the matters?

9            MS. SIMON:  Objection.

10           THE COURT:  Well, sustained, among other reasons,

11  because it's a compound question.  There may be a question

12  there you can put, but not the one you put.

13           MR. DENNIS:  I'll move on, your Honor.

14           THE COURT:  All right.

15           Mr. Dennis, just so I can keep in mind the schedule

16  for the jury, can you give me a ballpark of how much more you

17  have?

18           MR. DENNIS:  I probably, at least another -- about 45

19  minutes.

20           THE COURT:  I'm sorry.  I can't hear you.

21           MR. DENNIS:  About 45 minutes.

22           THE COURT:  Yes.  OK.  I'm going to give you whatever

23  time you want.  I just wanted to know if you think you can

24  finish -- you're not compelled to, but if you think you can

25  finish in 45 minutes, then I'll ask the jury to stay five

MacWden6                    Maletta – Cross

1   minutes late so we can finish it.  If you don't, if you think

2   that's not going to happen, maybe you should go for a half

3   hour, and then we'll excuse the jury until tomorrow, whichever

4   you prefer.

5          MR. DENNIS:  OK.  Let's do a half an hour and excuse

6   the jury go until tomorrow.

7          THE COURT:  All right.  That's fine.

8   BY MR. DENNIS:

9   Q.  So, Mr. Maletta, I think we were looking at the third

10  paragraph.  Can you read that first sentence?

11  A.  "We will be making a financial proposal to you shortly as

12  part of your overall separation from the firm."

13  Q.  And how soon after you sent this email did you make the

14  financial proposal?

15  A.  I think we made it either later the same day or the next

16  day.  We had it ready prior to the time that this happened, but

17  we sent it out afterwards, I believe -- no, I'm sorry.  It's

18  not -- we sent it out afterwards.

19  Q.  Yeah.  I have it as 6:03 p.m. on January 30.

20         At one point you made the comment during examination that I

21  had asked for $20 million.  Do you have any -- do you have

22  anything in writing that showed prior to you making this

23  financial proposal that I asked for $20 million?

24  A.  No.  The $20 million number comes from your response.

25  Prior to that time you asked -- made several proposals for

MacWden6                    Maletta - Cross

1    millions of dollars, sometimes not particularly distinct how

2    many millions of dollars, but you had put that number forward.

3    Q.  OK.  I just heard -- I -- the first time I heard 20 million

4    was from you today.

5              THE COURT:  No, no, no.  Counsel, you cannot testify.

6              MR. DENNIS:  OK.  All right.

7    Q.  So prior to January 30, January 29, I sent emails to, as

8    you said -- well, I sent emails to many, many partners on the

9    same email trail.  Have you submitted any of those emails to

10   the government?

11   A.  The government has made requests for documents, as I

12   understand it, and we've provided the documents.

13   Q.  I understand, but the request, since you're the general

14   counsel, you were reviewing -- I sent emails with many

15   partners' names listed on there.  As you pointed out, I was

16   sending it -- I have not seen any of those emails with all

17   those partners in the content --

18             THE COURT:  Sustained.

19   BY MR. DENNIS:

20   Q.  Can you read for us, the jury, the second sentence in the

21   third paragraph?

22   A.  "Going forward, with respect to all firm and client-related

23   matters, we again request that you communicate exclusively with

24   me or with the firm's deputy general counsel, Chip Tea, at

25   charles.tea@klgates.com.

MacWden6                    Maletta – Cross

Q.  As I had clients at the firm, was there a reason why the
firm did not or you and, I guess, the executive committee or
the management committee did not want me to communicate with
any of the partners at the firm?

A.  Because, for the reasons we explained, the prior
communications were viewed, in large measure, as harassing,
obstructing the business, interfering with the business of the
firm, and making statements that weren't true.

Q.  OK.  So that we ––

A.  It was interfering with the business of the firm.

Q.  Just to make sure our timeline is clear, were any of those
emails deemed to be intimidating, or did anyone feel any
physical fear?

A.  I don't know what people were actually feeling.  I know
what I was told by people.

              (Continued on next page)

MACGden7                    Maletta - Cross

1    BY MR. DENNIS:

2    Q.  Or were you told by people that they felt physically in

3    danger?

4    A.  They felt that they were being -- some people mentioned

5    harassment and some people felt they were menacing.

6    Q.  Are you able to identify any emails where, prior to

7    January 30th, 2019, that people said that they felt they were

8    being menaced?

9    A.  I can't put my finger on an email right now.

10        I do remember the comments from one individual.  And I

11   remember comments from another individual.

12   Q.  Which partners made those comments to you?

13   A.  Ms. Wahi conveyed comments about harassment to me.  And

14   Mr. Tang expressed concern to me about the tone of a number of

15   the emails and texts that you had sent to him.

16   Q.  So earlier you testified that Mr. Tang was in Asia; is that

17   correct?

18   A.  He is in Asia most of the time.  His family lives in -- and

19   he's in the Seattle office sometimes, and his family lives in

20   Seattle.

21   Q.  So his family is in Seattle, he's in Asia.  I want to be

22   clear, did he feel physical --

23   A.  I don't know what he felt.

24   Q.  Did he communicate to you that he felt physically in

25   danger?

1    A.  He expressed concern to me about the tone and tenor of the

2    emails.

3    Q.  And just to make clear -- because I know I don't want the

4    jury -- the emails I sent to him related to -- what did it

5    relate to?

6    A.  Well, the general subject matter was a particular client

7    matter and your accusations against him.  The repetitive nature

8    of the emails and the comments about him were insulting on top

9    of that.

10   Q.  So would it be appropriate to say the emails were basically

11   about business issues?

12   A.  Not entirely, no.  It was a little bit of that in there,

13   but a lot more criticism of his conduct.

14   Q.  Have your submitted to the government any emails to

15   validate what you have just -- what you just stated?

16   A.  We've produced emails that are in our possession that the

17   government has asked for.

18   Q.  As the general counsel of K&L Gates, an international law

19   firm, who -- I expect Mr. Tang communicated with you.  Would

20   Mr. Tang have communicated with you first these concerns?

21            MS. SIMON:  Objection.

22            THE COURT:  Sustained.

23            But just so we can move this along.  The emails that

24   led to the separation and ultimately termination of Mr. Dennis

25   concerned mostly his allegations against Mr. Tang or did they

MACGden7                      Maletta - Cross

1  include other matters?

2           THE WITNESS:  They included other individuals.

3           THE COURT:  What were the other matters?

4           THE WITNESS:  He made allegations against a partner

5  named Paul Sweeney, that Mr. Sweeney had been grossly negligent

6  and had worked against Mr. Dennis by trying to get Mr. Dennis'

7  compensation reduced.

8           THE COURT:  And so I think what Mr. Dennis is

9  inquiring about is were those emails basically complaints he

10  had about the performance, as he alleged it, of these two

11  partners?

12           THE WITNESS:  In some respects, yes, your Honor.

13           THE COURT:  Okay.  But what troubled the firm was that

14  both these were, in the firm's view, inaccurate, but also they

15  were becoming vociferous and multitudinous; is that a fair

16  statement?

17           THE WITNESS:  That's a fair statement, your Honor.

18  And they were also disruptive to the people receiving them.

19           THE COURT:  I'm sorry, Mr. Dennis, just to try to move

20  this along.

21           So is it fair to say that, at that point -- as opposed

22  to later -- the focus was not so much on whether these were

23  causing emotional distress as opposed to whether they were

24  being disruptive of the business of the firm; is that correct?

25           THE WITNESS:  I think that's mostly correct, your

MACGden7                    Maletta - Cross

1    Honor.

2              THE COURT:  Okay.

3              THE WITNESS:  They were very disruptive to the firm.

4    That was --

5              THE COURT:  Later on, if I understood your earlier

6    testimony, there were emails that you believed went a step

7    further to inflicting emotional distress.

8              Do I have that right?

9              THE WITNESS:  That's correct, your Honor.

10             THE COURT:  So given that, Mr. Dennis, I wonder if you

11   want to focus more on the later periods because that's really

12   where the dispute seems to be, which is why I put those

13   questions.

14             MR. DENNIS:  I think, your Honor, one of the things

15   that I had promised to the jury when I was -- was that I want

16   to make sure that there was a distinction that there was --

17   there's a distinction between the period when the emails were

18   just business related and when they turned to a much more

19   aggressive tone, so I was trying to -- and I think this

20   January 30th is a --

21             THE COURT:  Forgive me for interrupting, but I think

22   that's what the witness just confirmed, which was that, while

23   the firm was very unhappy with your emails and your accusations

24   and ultimately decided to terminate you, the focus on emotional

25   distress, which is what this jury has to look at among other

 1   things, was primarily the product of later emails.  So I don't

 2   think there's major disagreement between you and the witness on

 3   that point.  That's why I'm hoping that this might move things

 4   along.

 5            MR. DENNIS:  I'm going to -- with your Honor's sort of

 6   guidance, I'm going to try to move it along.  I have a few more

 7   questions --

 8            THE COURT:  I'm going to give you all the time you

 9   want.  I'm just trying to focus it.

10            Ultimately, as the jury has already heard from me,

11   they need to decide whether you intentionally used emails and

12   text messages to inflict substantial emotional harm on various

13   people.  And while the witness has said that maybe there is

14   some of that earlier on, he has admitted that, at least from

15   his perspective, it was the later emails that were of that

16   nature.

17            The earlier ones were of this disruptive nature, and

18   the business took steps that they thought were appropriate from

19   a business standpoint.  But the jury is not concerned with

20   business.

21            The jury is concerned with whether the allegations

22   that the government made about emotional distress and

23   threatening and things like that have been proved.  And I'm

24   just suggesting, for your consideration, that you might want to

25   focus on those later emails, because that's where the dispute

1    seems to lie.

2                MR. DENNIS:  Yes, my plan is, certainly -- that's why

3    I said we would need more time.  So my plan is to focus in on

4    those.  Also, my plan is to make sure that my state of mind --

5    Jeff -- may I proceed, and then you can help guide me, because

6    I don't know exactly how to --

7    BY MR. DENNIS:

8    Q.  Jeff, upon suspending my services and essentially losing my

9    client base, was there any consideration given to what I would

10   be able to do next and how I would be able to provide for my

11   family on February 1st?

12               MS. SIMON:  Objection.

13               THE COURT:  Again, maybe to help move things along.  I

14   assume that you were, to use the vernacular, pissed at what had

15   occurred -- maybe that's too weak a term -- but you were very

16   upset that you had been terminated; first suspended, then

17   terminated.  The question for the jury is whether -- it doesn't

18   matter whether you were right or wrong.  The question is what

19   acts you then took and did you do them intentionally to create

20   emotional distress or did you do them just because you were

21   ticked off.

22               So again, I think the focus is much more on the later

23   events.  But I think the jury understands already that you and

24   the management of this firm were no longer looking kindly at

25   each other.

MACGden7                    Maletta - Cross

1            (Pause)

2            THE COURT:  I tell you what, Mr. Dennis, do you want

3    to break now.  That will give you a chance to gather your

4    thoughts overnight, and then we can finish with this witness

5    tomorrow.

6            MS. SIMON:  Your Honor, may we have a quick sidebar

7    before the jury is excused.

8            THE COURT:  Sure.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          MS. SIMON:  The government understands if this is how

3     the Court wanted to proceed.  I wanted to make the Court aware

4     that my understanding is that this witness has -- his family is

5     expecting him back home tonight, and he has travel plans

6     tonight.  And I am curious --

7          THE COURT:  I am sympathetic to that.  I will

8     apologize to him once we have excused the jury.  Mr. Dennis has

9     a right to have a full cross-examination of this important

10    witness.

11         I was trying to be very helpful to him by moving

12    things on and trying to get him to focus on where I think the

13    real dispute is, but it's his call.  He's representing himself.

14         And the record should reflect that there was at this

15    stage a very long pause, and it was clear to me that Mr. Dennis

16    was thinking about where he wanted to go next.  And I don't

17    want to artificially force him to make that decision quickly.

18    So I do apologize to the witness.  I will say that directly to

19    the witness.  But I think we have to continue with this witness

20    tomorrow.

21         Now, having said that, Mr. Dennis, I'm going to give

22    you no more than a half hour with this witness tomorrow.  I

23    don't think there's any basis for going more than that.  You

24    have already gone 40 minutes or so.  Okay?

25         MR. DENNIS:  Okay, your Honor.

MACGden7                          Maletta – Cross

1              MS. SIMON:  Thank you, your Honor.

2              (Continued on next page)

MACGden7                    Maletta - Cross

1          (Jury present)

2                THE COURT:  Ladies and gentlemen, the lawyers are very

3     upset with me because I'm threatening to let you go a few

4     minutes early again.  I'm a recidivist.  But notwithstanding

5     how tough they are, I'm going to let you go now.

6                I really appreciate the fact you were all here at 9:30

7     this morning.  So let's be sure we're all here at 9:30

8     tomorrow, and we'll start promptly at 9:30.  We'll see you

9     tomorrow.

10               (Jury excused)

11               (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

271|alphanum"left header}center header

```
 1            (Jury not present)

 2            THE COURT:  So let me apologize to the witness.  As

 3   you can see, when we have a pro se situation, I can't really

 4   control the time quite the way I would otherwise.  And I know

 5   you had travel plans.  I have told Mr. Dennis he'll be limited

 6   to a half hour to complete his cross tomorrow, so you should be

 7   out of here by 10:30, I would think.  But in any event, my

 8   apologies.

 9            Anything further we need to raise with counsel?

10            MS. SIMON:  Yes, your Honor, one brief issue the

11   government would like to raise.

12            I wanted to note that the government very likely would

13   like to request an instruction regarding the discovery in this

14   matter.  The government produced to Mr. Dennis --

15            THE COURT:  All right.  So why don't you prepare

16   something you can hand up to me tomorrow.  And why don't we all

17   convene at 9:20, and then I'll go over and show it, of course,

18   to Mr. Dennis in advance so he can respond to it.

19            MS. SIMON:  That's perfect, your Honor.  Thank you.

20            THE COURT:  We'll see you all tomorrow at 9:20.

21            (Adjourned to October 13, 2022, at 9:20 a.m.)

22

23

24

25
```

INDEX OF EXAMINATION

Examination of:                                    Page

ERIC COTTLE

Direct By Ms. Simon . . . . . . . . . . . . .86

Cross By Mr. Dennis . . . . . . . . . . . . 131

Redirect By Ms. Simon . . . . . . . . . . . 155

Recross By Mr. Dennis . . . . . . . . . . . 156

PHILIP FANARA

Direct By Ms. Kushner . . . . . . . . . . . 158

Cross By Mr. Dennis . . . . . . . . . . . . 162

 JEFFREY MALETTA

Direct By Ms. Simon . . . . . . . . . . . . 163

Cross By Mr. Dennis . . . . . . . . . . . . 233

GOVERNMENT EXHIBITS

Exhibit No.                                   Received

 518-A  . . . . . . . . . . . . . . . . . . .94

 402, 405, 406, and 408 . . . . . . . . . . 159

 501-504, 509, 515, 516, 520, 523-526, . . . . 174

         528, and 529

 231A  . . . . . . . . . . . . . . . . . . 224