MadWden1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

          v.                        20 Cr. 623 (JSR)

WILLIE DENNIS,

          Defendant.
                            Trial
------------------------------x

                            New York, N.Y.
                            October 13, 2022
                            9:20 a.m.

Before:

                   HON. JED S. RAKOFF,

                            District Judge
                            -and a Jury-

                     APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  SARAH L. KUSHNER
     KIMBERLY J. RAVENER
     STEPHANIE SIMON
     Assistant United States Attorneys

WILLIE DENNIS, Defendant Pro Se

Also Present:  Colleen Geier, Paralegal Specialist
                 Special Agent Elisabeth Wheeler, FBI

MadWden1

```
 1              (Trial resumed; jury not present)
 2              THE COURT:  The first item on the agenda is the
 3  government wanted to propose an instruction on discovery.
 4              MS. KUSHNER:  Yes, your Honor.
 5              We provided just now a copy of our proposed limiting
 6  instruction to Mr. Dennis.  If your Honor would like, I can
 7  hand up a written version.
 8              THE COURT:  Yes, please hand it up.
 9              Well, this is more wordy than is my custom, but I will
10  work on it and give something to the jury along these lines.
11              Any comments from Mr. Dennis?
12              MR. DENNIS:  Give me a second, your Honor?
13              THE COURT:  Sorry?
14              MR. DENNIS:  Can you just give me a second?  I just
15  received it two minutes ago.
16              THE COURT:  OK.  Take your time.
17              MR. DENNIS:  No objection, your Honor.
18              THE COURT:  OK.
19              MR. DENNIS:  Your Honor, I'd also like to make a
20  motion for a dismissal.
21              THE COURT:  On what ground?
22              MR. DENNIS:  Your Honor, yesterday, the testimony
23  yesterday demonstrated that KL Gates produced to the people
24  materials that have not been made available to me.  I'm at a
25  disadvantage because I have no capacity to prove precisely what
```

MadWden1

1   has been withheld from me, but after Mr. Cottle and Mr. Maletta

2   each claimed they could not answer questions because they did

3   not have access to emails, which they asserted had been turned

4   over to the people, I move to dismiss this indictment because

5   I've been denied access to *Brady* material.

6          THE COURT:  I don't know what the factual basis for

7   your assertion is.  First of all, I don't think there's any

8   evidence in this case that any materials that were furnished by

9   K&L Gates to the government were not also turned over to you.

10  But let me ask the government.

11         MS. SIMON:  Yes.  You're entirely correct, your Honor.

12         THE COURT:  YES.

13         MS. SIMON:  The government provided to Mr. Dennis all

14  of the emails that we received from K&L Gates on more than one

15  occasion.  We provided them, relevant documents we received

16  from K&L Gates in January of 2022.  We provided the returns

17  from his gmail, the defendant's various Gmail accounts,

18  including emails he sent to individuals at K&L Gates.  We

19  provided the identified set of data in April 2022 and provided

20  the full return prior to that.

21         My understanding is Mr. Dennis still has access to his

22  own Gmail accounts, and then later we followed up to ensure

23  that we had all the metadata from K&L Gates that provided the

24  entire, what I understand to be the entirety of Mr. Dennis's

25  email accounts from K&L Gates to the defendant.

MadWden1

 1          THE COURT:  All right.

 2          Second, there's no basis.

 3          MR. DENNIS:  Your Honor, the only issue I'm focused

 4  on is yesterday Mr. Cottle and Mr. Maletta each claimed they

 5  could not answer questions because they did not have access to

 6  emails which they asserted had been turned over to the people.

 7          THE COURT:  Excuse me.  I don't understand.  My

 8  recollection, but you have the transcript, so maybe you can

 9  point me to a specific situation, was that on a number of

10  occasions, when you asked them questions about what you

11  asserted were emails you had sent, or things like that, they

12  said they couldn't remember, but that if they were shown the

13  email by you, they might be able to refresh their recollection,

14  or words to that effect.  So I have no idea what you're

15  claiming was that they said was improper.

16          MR. DENNIS:  OK, your Honor.

17          During -- what I'd like to get copies of, in

18  anticipation of the end of trial, would be the testimony taken

19  down for each of the K&L Gates witnesses.

20          THE COURT:  I'm sorry.  That's a different question.

21  We're talking about your motion to dismiss, which you just

22  made.

23          MR. DENNIS:  And you mentioned that I needed to refer

24  to the record.

25          THE COURT:  I'm saying I don't think you have raised

MadWden1

1   even a remote predicate for that notion so the motion is

2   denied.

3        Now, there's one other thing that Mr. Dennis raised at

4   the sidebar yesterday that we will take up later today, which

5   is the Court needs to know from Mr. Dennis what witnesses, if

6   any, he intends to call on his case, other than himself.

7        You don't have to make the decision as to yourself

8   until the close of the government's case.  But any other

9   witness we need to know soon, and we need to know specifically

10  what you think they could say that you have reason to believe

11  would be relevant to this case.  So I'm going to ask you at the

12  close of business today -- so you'll have the entire lunch hour

13  and any of the breaks to put this together -- to tell me at the

14  end of the day who it is, if anyone, you want to call as a

15  witness and what specifically you think they will say.

16       MR. DENNIS:  Thank you, your Honor.

17       May I request of the government that they just inform

18  me of the witnesses who will be testifying today?

19       THE COURT:  Yes, absolutely.

20       MS. SIMON:  The government expects that after

21  Mr. Maletta is done with his testimony, the government would

22  next call Denise Smith, who is a Google custodian; and then

23  Christian Isolda from the FBI; Steve Flatley from the FBI, CART

24  examiner.  And after that we would call John Bicks from K&L

25  Gates.

MadWden1

1          THE COURT:  OK.  Let's get the witness on the stand,

2   and let's bring in the jury.

3          Remember, Mr. Dennis, you have a half hour more of

4   cross-examination.

5          (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MadWden1                    Maletta – Cross

1         (Jury present)

2    JEFFREY MALETTA, resumed.

3         THE COURT:  Please be seated.

4         Good morning, ladies and gentlemen.  And once again,

5    thank you so much for your promptness.  This is a great day to

6    have a trial, because the weather is so lousy outside.

7         Anyway, we are ready to continue with the

8    cross-examination of Mr. Maletta.

9         MR. DENNIS:  Good morning, ladies and gentlemen of the

10   jury.

11   CROSS-EXAMINATION CONTINUED

12   BY MR. DENNIS:

13   Q.  Good morning, Jeff.

14   A.  Good morning.

15   Q.  Mr. Maletta, on January 30, 2019, at 1:44 a.m. in the

16   morning, when two members of KL Gates's executive committee

17   notified me that I had been suspended, you knew that action was

18   contrary to the firm's bylaws, didn't you?

19   A.  The firm doesn't have bylaws, and no, it was not contrary

20   to the partnership agreement.  And no, it was not contrary to

21   the partnership agreement.

22   Q.  You testified yesterday that the powers of firm through the

23   partnership agreement are invested in the management committee.

24   Is that correct?

25   A.  Yes, almost all the power of the management, business of

MadWden1                    Maletta – Cross

1   the firm is vested in the management committee.

2   Q.  OK.  And you testified yesterday that the "we" that we

3   referred to in the email --

4            MR. DENNIS:  Can we call that email up from yesterday,

5   the January 30 email?  Can we put that on the screen for

6   everyone?

7            THE COURT:  Yes.

8   BY MR. DENNIS:

9   Q.  That "we" that you referred to was the only two members of

10  the management committee out of the 16 members were Michael

11  Caccese and James Segerdahl.  So there wasn't a quorum.  There

12  wasn't even -- that was less than 10 percent of the members

13  that made this decision.

14      Mr. Maletta, at the time you also knew that no partner at

15  KL Gates had ever been suspended in the way that I was

16  suspended, didn't you?

17  A.  Well, first of all, just going back to your first

18  statement, the two members you mentioned were the chairman of

19  the management committee and global managing partner.  And I

20  don't know whether others historically had been suspended from

21  the system.  I know since that time other people have been

22  suspended from the system for various reasons.

23  Q.  OK.  Just to clarify, you stated yesterday you have been at

24  the firm for 39 years.  Is that correct?

25  A.  That's correct.

1    Q.  Mr. Maletta, at 1:44 a.m., on July 30, you knew that if the

2    executive committee would violate the partnership agreement and

3    do that to me, they would violate it towards any other partners

4    of the firm, didn't you?

5    A.  First of all, there was no violation of the partnership

6    agreement.

7    Q.  Mr. Maletta, at the time you also knew that the executive

8    committee's violation of the partnership agreement was

9    depriving me of millions of dollars of income by destroying my

10   client relationships that day, didn't you?

11            THE COURT:  Sustained.  Argumentative.  Irrelevant to

12   the issues in this case and already covered yesterday at some

13   length.  Sustained.

14   BY MR. DENNIS:

15   Q.  Mr. Maletta, you also knew that the email that was sent by

16   cutting me off from the firm's email, locking me out of my

17   computer file and locking me out of my office, you were making

18   it almost impossible for me to defend my reputation, didn't

19   you?

20   A.  That's not true.

21   Q.  Mr. Maletta, you also knew that when the email was sent to

22   these two members of the executive committee, they had no

23   intention of notifying the KL Gates partners that I had been

24   suspended?

25            THE COURT:  Sustained.  Hearsay.

MadWden1                        Maletta - Cross

1   BY MR. DENNIS:

2   Q.  Mr. Maletta, just days after my suspension, the firm

3   communicated with my wife's divorce lawyer, Michael Mueller,

4   didn't it?

5            MS. SIMON:  Objection.

6            THE COURT:  Let me find out before we get to other

7   possible objections.

8            Do you have any knowledge of that?

9            THE WITNESS:  I do, your Honor.

10            THE COURT:  All right.  You may answer the question

11   that was put:  "Just days after my suspension, the firm

12   communicated with my wife's divorce lawyer, Michael Mueller,

13   didn't it?"

14   A.  Yes.  The purpose of the communication --

15            THE COURT:  No, no.  You've answered the question.

16            THE WITNESS:  Sorry.  Apologize.

17   BY MR. DENNIS:

18   Q.  And the firm sent to Mr. Mueller certain financial records;

19   yes or no, Mister --

20   A.  No.

21   Q.  What information did the firm send to Mr. Mueller?

22   A.  The firm advised Mr. Mueller that it appeared that you had

23   provided him with confidential internal firm and perhaps client

24   information, and that would have been a violation of perhaps

25   the attorney-client privilege but certainly duties of

MadWden1                    Maletta - Cross

1    confidentiality to the firm and the clients, and we warned him

2    that he could not use that information in connection with the

3    divorce proceedings.  And if he intended to do so, we wanted an

4    opportunity to object.

5    Q.  And you knew, Jeff, that by giving that information to

6    Mr. Mueller, that was similar to just giving it to my

7    ex-wife --

8            THE COURT:  Sustained.

9            The answer to the previous question was not that he

10   provided that information.  He said that it appeared that you

11   had provided Mr. Mueller with confidential information, so it's

12   sustained.

13           MR. DENNIS:  He made the assertion, he made the

14   allegation, but there's no -- he made no -- he just said I did

15   not, that I provided.

16           THE COURT:  Mr. Dennis, I appreciate you're not a

17   trial lawyer, but what I've tried to convey to you is that you

18   have to listen carefully to the answer because you can't put a

19   question that is contrary to the answer given unless it relates

20   to something else that's in evidence.  There's nothing in

21   evidence right now, other than the statement from the witness

22   that you provided the confidential information to Mr. Mueller,

23   not that he did.

24           MR. DENNIS:  Objection.  There is information in the

25   files that basically says Mr. Maletta provided confidential

MadWden1                    Maletta - Cross

1    information.

2         THE COURT:  No, no, no.  I'm talking about the

3    testimony in this case, which is what is the only thing that

4    this jury is supposed to hear.  And I also disagree with your

5    assertion and your continuing attempt to put before this jury

6    information that is not proper evidence.

7         Now, just put a new question, please.

8    BY MR. DENNIS:

9    Q.  So, Mr. Maletta, you did communicate with my ex-wife's

10   attorney without my knowledge or consent.  Is that -- yes or

11   no?

12   A.  I'm not sure it was without your knowledge.

13   Q.  You're not sure if it was without my -- I was not on an

14   email that you sent to him.  How would it be with my knowledge,

15   if I didn't --

16        MR. DENNIS:  Never mind.  We'll move on.  I think the

17   point's been made.  Without -- OK.

18   Q.  Mr. Maletta, on May 8, the firm went through a ceremony to

19   expel me from the firm; yes or no?

20   A.  I believe on May 8 is the date that the memo was circulated

21   to the partners concerning the expulsion.

22   Q.  But nothing really changed with the expulsion, because the

23   relationship had already ended on January 30, when I was

24   suspended, didn't it?

25   A.  That's not correct.

MadWden1                     Maletta - Cross

1  Q.  Please elaborate some.

2  A.  At that point you were still a partner in the firm.  You

3  remained on the website as a partner in the firm, and you still

4  had the legal relationship to the firm of a partner.  At that

5  point, after the expulsion, all of that ended.

6  Q.  Since January 30, I had what you just claimed were -- but I

7  had no emails, did not have a phone, did not have the ability

8  to come to the offices.  So the only thing that changed was

9  that -- OK.

10      So essentially, because I had no phone, no email, no access

11  to the offices, by suspending me in the early morning of

12  January 30, that was the act that ended my career at K&L Gates,

13  wasn't it?

14  A.  Not necessarily.

15  Q.  Please elaborate.

16  A.  Still possible, after January 30, that an accommodation

17  could have been reached.  Either you could have withdrawn from

18  the firm, which is something that you had been discussing with

19  us, and moved to another firm, another platform, I guess, is

20  the phrase you used.  And that could have been done and in a

21  manner that allowed you to remain on the firm website and make

22  an orderly transition to another position at another firm.

23  Q.  Mr. Maletta, on September 4, 2019, the firm made a

24  complaint with the New York Police Department --

25          MS. SIMON:  Objection, your Honor.

MadWden1                    Maletta - Cross

1    BY MR. DENNIS:

2    Q.  -- and had armed police officers --

3              THE COURT:  Excuse me.

4    BY MR. DENNIS:

5    Q.  -- come to my home --

6              THE COURT:  Excuse me, counsel.  When there's an

7    objection, you stop, because the objection was to improper

8    information that you are putting before the jury that I've

9    already explained to you repeatedly in the pretrial proceedings

10   is not part of this case.  Sustained.

11             MR. DENNIS:  Your Honor --

12             THE COURT:  Sustained.  Move on.

13             MR. DENNIS:  -- we know these facts are true.

14             THE COURT:  Mr. Dennis --

15             MR. DENNIS:  Why can't I --

16             THE COURT:  Excuse me.

17             MR. DENNIS:  Why can't I --

18             THE COURT:  Excuse me, Mr. Dennis.  If you want to be

19   a witness at the end of the government's case, you have a

20   perfect right to be a witness.  You also have a perfect right

21   not to be a witness.  That's your constitutional choice.  Until

22   that time, you have to act as a lawyer.  A lawyer does not

23   assert any facts.

24             If you want to make a proffer on facts, you can come

25   to the sidebar, as I've allowed you to do before, but in front

MadWden1                     Maletta - Cross

1    of the jury, you cannot make statements of fact.  Many of the

2    facts you've asserted would be contested by the government.

3    Some may be true but irrelevant, but that has nothing to do

4    with the point.  The point is that you just ask questions, and

5    if an objection is made and sustained, you move on to another

6    question.

7              Do you understand?  That's basic principles of trial

8    lawyering.

9              MR. DENNIS:  Your Honor, I've been a member of the bar

10   for 30 years.  I have never had a single incident of any sort

11   of ethical violation, any accusations of perjury, or anything,

12   over my 30 years.  When I make a statement, I know in a court

13   of law I can be held in contempt.  I can be held under perjury.

14   When I make a statement that's backed by official governmental

15   records --

16             THE COURT:  Mr. Dennis --

17             MR. DENNIS:  -- so to me --

18             THE COURT:  Come to the sidebar.

19             (Continued on next page)

20

21

22

23

24

25

1    (At sidebar)

2    THE COURT:  I'm going to try once more, but we've gone

3    over this so many times that I despair of getting through to

4    you.  A lawyer cannot make assertions of fact to the jury.

5    That is left solely to the witnesses.  Therefore, whether it's

6    a true fact or not a true fact is irrelevant.  It is not your

7    right in your capacity representing yourself to make assertions

8    of fact to the jury.  If you want to make assertions of fact to

9    the jury, you can do that by testifying if you wish to do so or

10   by calling other witnesses if they're relevant.

11   Now, in addition, on this particular matter of the

12   arrest and all like that, I think, if my memory is correct,

13   that I have ruled that that is irrelevant at least four

14   previous times, including in a formal motion *in limine* by the

15   government as well as in subsequent colloquies in this court.

16   So you knew -- you knew -- that that had been ruled out, but

17   you decided to try to ask about it anyway.  And you decided to

18   ask about it, and then you made an assertion that, oh, yes, you

19   knew you were telling the truth, and that was completely

20   improper.  Now, if you're begging to be held in contempt, I

21   will consider that, but I think you would be much better off to

22   just move on.

23   MR. DENNIS:  Your Honor, based on the testimony that

24   Mr. Maletta provided over yesterday and today, I think he

25   opened the door for conversations about his activities relating

MadWden1                    Maletta - Cross

1    to the New York City Police Department.

2             THE COURT:  Where do you think he opened that door?

3             MR. DENNIS:  I can get the transcript, but he talked

4    about the fact that, No. 1, he hired a personal security

5    firm -- I think it was called Sage security -- to protect the

6    partners of the firm.

7             THE COURT:  Yes.  What does that have to do with --

8             MR. DENNIS:  -- official action.

9             THE COURT:  What does that have to do with New York

10   City police?

11            MR. DENNIS:  Well, he also filed a complaint with the

12   New York City police.

13            THE COURT:  I didn't hear any testimony to that

14   effect.

15            MR. DENNIS:  Well, someone filed a complaint with the

16   New York City police.

17            THE COURT:  What is the relevance of any of this to

18   any of the issues in the case?

19            MR. DENNIS:  The relevance to this?

20            THE COURT:  Yes.

21            MR. DENNIS:  It's, once again, Mr. Maletta is

22   testifying as to how the partners were fearful of me and the

23   actions that he's taken to protect the partners of the firm.

24            THE COURT:  And?

25            MR. DENNIS:  It's not that he can talk about some

MadWden1                    Maletta - Cross

1     actions and not all actions that were taken.  He can't pick

2     which ones he took.

3              THE COURT:  So what is the relevance of other actions?

4              MR. DENNIS:  What are your actions that you've taken?

5     You allowed him to testify as to he hired security firms; he

6     moved people out of the country.  He did all this without

7     contacting a law enforcement agency?  You just made this

8     decision up unilaterally, that you're going to move people out

9     of the country?

10             THE COURT:  First of all, that totally misstates the

11    testimony.

12             MR. DENNIS:  It doesn't misstate the testimony.

13             THE COURT:  Secondly, I'm still lost on the relevance.

14             MR. DENNIS:  I don't understand.  I don't understand

15    why I can't ask about what are all the actions you took in

16    order to protect the KL Gates partners who you thought were

17    injured or being harmed?  What are all the steps that you took?

18    Why did you just hire a security firm?  Did you have any

19    professional -- you're not a law enforcement officer.

20             THE COURT:  OK.  Let's assume I allow you to ask that

21    question.  What is the relevance of his answer?  Regardless of

22    what his answer is, what is the relevance to any issue in this

23    case?

24             MR. DENNIS:  Once we know what the answer is --

25             THE COURT:  Well --

MadWden1                        Maletta – Cross

1          MR. DENNIS:  I can't speculate, because I don't know

2     what the answer is.

3          THE COURT:  Let's assume the answer is what you think

4     it is.  Let's assume he says, which I think is probably not the

5     case, but let's assume that he says I reported it to the

6     police.

7          MR. DENNIS:  I object.

8          THE COURT:  What's the relevance of that?

9          MR. DENNIS:  You assume if he hired a security firm,

10    if he moved people, why would he not have gone and reported it

11    to a law enforcement agency?  That doesn't make sense.  That's

12    illogical.

13         THE COURT:  Please listen to me, Mr. Dennis.  I'm

14    saying assuming that's true, even though I have my doubts about

15    it, assuming it's true, what's the relevance?

16         MR. DENNIS:  Well, I think the relevance is, what was

17    the determination -- did the law enforcement agencies agree

18    with you that these people were in danger?

19         THE COURT:  Oh, no.  That's where I thought you were

20    going.  I have ruled that out repeatedly -- repeatedly.  That

21    is absolutely improper.  It is not proper evidence for the jury

22    to consider in any way, shape, or form, so I'm not going to

23    allow further questioning on this.

24         MS. SIMON:  Your Honor, the government would request

25    that your Honor remind the jury that the defendant's statements

MadWden1                    Maletta – Cross

1    regarding his own legal career and the absence of any

2    accusations of perjury or accusations that he --

3              THE COURT:  All right.  I'll see what I can do.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MadWden1                    Maletta – Cross

1          (In open court)

2          THE COURT:  Ladies and gentlemen, I instruct you that

3   all that you just heard is completely irrelevant.  The issue in

4   this case, for you, is whether the government has shown beyond

5   a reasonable doubt that the defendant, through emails and text

6   messages, harassed, intimidated, and threatened other persons

7   and caused them substantial emotional distress and that he did

8   that intentionally.  Those are the only questions.  It doesn't

9   matter whether, for example, the law firm properly terminated

10  or improperly terminated him.  It doesn't matter whether there

11  was some --

12          MR. DENNIS:  I object.

13          THE COURT:  -- police action or not some police

14  action.  It is completely irrelevant.

15          I appreciate, and that you will appreciate, that Mr.

16  Dennis has chosen to go be his own lawyer and he doesn't have

17  the same familiarity with the rules of evidence that a trial

18  lawyer would have.  That's his choice, and he's made his

19  choice, but that doesn't mean that we can't play by the rules

20  of evidence.  We have an obligation to the rule of law to stick

21  to the rules of evidence.

22          So again, the issue in this case, for you, is whether

23  the government has shown beyond a reasonable doubt that the

24  defendant, by use of emails and text messages, harassed,

25  intimidated, or threatened other human beings -- for whatever

MadWden1                    Maletta - Cross

1    reason -- in such a way that it caused them substantial

2    emotional distress and that he did that intentionally,

3    intending to cause them emotional distress.  Those are the only

4    issues in the case.

5            Mr. Dennis, you have a few more minutes.

6            MR. DENNIS:  I object, your Honor, and I'd like a

7    sidebar.

8            THE COURT:  All right.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MadWden1                    Maletta - Cross

1            (At sidebar)

2            MR. DENNIS:  In your instructions to the jury just

3    now, you did not mention that one of the things that would

4    provide for them to not convict me is the context in which my

5    emails -- with which my emails were sent, which is what I've

6    been trying to develop, what is the context of -- not simply

7    just the emails themselves but the context.  If they were

8    business-related emails --

9            THE COURT:  Let me make sure, because you've raised

10   that repeatedly, is your contention that if, because you felt

11   you had been mistreated -- as I understand it, your view is

12   severely mistreated -- in your view, by K&L Gates, that that's

13   a defense to sending illegal, threatening emails?  Is that your

14   position?

15           MR. DENNIS:  Objection.

16           THE COURT:  Objection to what?  I'm just asking a

17   question.

18           MR. DENNIS:  You just used the word "illegal."  I did

19   not send any illegal --

20           THE COURT:  That's, of course, the question for the

21   jury, but my point is I'm failing to see what the defense is

22   here.

23           If, to take an analogy, I felt that a bank had

24   improperly taken my money from my bank account so I went in and

25   robbed the bank to get my money back, that would be no defense.

MadWden1                    Maletta - Cross

1   I would still be guilty of bank robbery.  So that's why I'm

2   having very great difficulty in seeing what your defense is

3   here.

4           MR. DENNIS:  Hopefully that will be fleshed out.  But

5   more importantly, I think, for purposes of Mr. Maletta, I'd

6   like to be on the record that the Court had denied my request

7   for every witness, saying they were not relevant.  So I don't

8   have a single witness of my own, including no one from K&L

9   Gates' management team, which is becoming clear as this trial

10  moves forward that there was involvement and knowledge about

11  many of the different things.  The only witness that is

12  appearing before this case who had knowledge is Mr. Maletta.

13  Every other partner is -- like Mr. Cottle and Ms. Bostick are

14  not equity partners, who have no information about the

15  management.

16          THE COURT:  But that's not responsive to my question.

17  And in addition, the record will speak for itself what the

18  situation is with respect to witnesses, but this is not a trial

19  of whether K&L acted properly or improperly in terminating you.

20  That's, in fact, I gather, the subject of the civil action

21  you've brought, but this is an action -- you know, I tried so

22  hard yesterday to help you out, Mr. Dennis, and I don't know

23  why you didn't take me up on it.

24          I pointed out to the jury, very much favorably to you,

25  that by Mr. Maletta's own admission to questions that I put to

MadWden1                    Maletta – Cross

1    him, that what they saw as you causing a problem that led to

2    your termination was not threatening, but disruption.  And so

3    what I suggested to you repeatedly was that given that

4    concession by them, made in response to questions by me, that

5    they weren't terminating you because of threatening emails;

6    they were terminating you because of disruption, business

7    disruption and what they considered improper statements about a

8    partner and so forth, that you should move on to the later

9    events, because that's where the case turns.

10           Now, I'm sorry that you didn't see that as a benefit

11   to you, but that was my intent, and I did it not only to

12   benefit you but to clarify for the jury that all this stuff

13   that's gone on at K&L Gates -- whether you were telling the

14   truth, whether you were telling falsehoods, whether you were

15   properly terminated, whether you were improperly terminated --

16   is a sideshow so far as this case is concerned.  What is of

17   concern is what happened thereafter.  But you're your own

18   lawyer here, and you made your own decision and you came back

19   this morning to go back over the same irrelevant stuff, and so

20   be it.  Now, I'm going to give you ten more minutes.

21           (Continued on next page)

22

23

24

25

MadWden1                        Maletta – Cross

1              (In open court)

2    BY MR. DENNIS:

3    Q.  Jeff, you knew about the EEOC discrimination charge that I

4    filed against KL Gates on March 3, 2020; yes or no?

5    A.  Yes, I do.  Yes, I do.

6    Q.  Because of your experience with the EEOC complaints, being

7    the general counsel of an international, global law firm, you

8    knew that was a prerequisite to a step for a person can sue the

9    firm; yes or no?

10   A.  It is a prerequisite before someone can sue the firm.

11   Q.  Thank you.

12   A.  My familiarity --

13   Q.  Thank you.  The judge has given us very few minutes.

14   A.  My familiarity --

15   Q.  The judge has limited us to a few minutes.  Just yes or no,

16   please.

17        So when I sued the firm for discrimination on November 3,

18   2020, you were not really surprised, were you?  Yes or no.

19   A.  No.

20   Q.  And you, as the general counsel of KL Gates, an

21   international, global law firm, asked the judge in the civil

22   case to halt my case against KL Gates until this trial was

23   finished --

24              MS. SIMON:  Objection.

25   BY MR. DENNIS:

MadWden1                    Maletta - Cross

1    Q.  -- yes or no.

2            THE COURT:  Well, I'll let the witness answer, but

3    then I have an instruction to the jury.

4            Can you answer it yes or no, Mr. Witness?

5            THE WITNESS:  I'm trying to recall whether we asked or

6    the government asked, your Honor; I'm not certain, but there

7    was a request to halt the civil case, yes.

8            MR. DENNIS:  Thank you.

9            THE COURT:  Ladies and gentlemen, as you are to be

10   advised, halting a civil case until a criminal case proceeds is

11   the norm in this and virtually every other court in the United

12   States.

13   BY MR. DENNIS:

14   Q.  So, Jeff, as we discussed, my filing of the civil suit on

15   March 3, 2020, was a prerequisite to the actual civil case I

16   was going to file.

17           THE COURT:  I'm sorry.  I don't think you meant what

18   you just said.  You said your filing of the civil suit was a

19   prerequisite to the civil suit.

20           MR. DENNIS:  Was a step before filing the actual civil

21   claim.

22           THE COURT:  The first thing you do is file a

23   complaint.  Isn't that what you're asking?

24           MR. DENNIS:  Yes, your Honor.

25           THE COURT:  OK.

MadWden1                    Maletta – Cross

1          MR. DENNIS:  No.  I meant -- the question was going to

2    be --

3    Q.  After I started this issue, the firm approached the United

4    States Department of Justice and asked them to arrest me based

5    on emails I sent after September 4, is that correct?  Yes or

6    no.

7          MS. SIMON:  Objection.

8          THE COURT:  No.  I'll allow that.

9    A.  The firm -- certainly I didn't approach the Department of

10   Justice and ask them to arrest you.  I think the Department of

11   Justice makes their own determination, and not the firm.

12   Q.  How did the Department of Justice learn about this case,

13   Jeff, learn about these emails?

14   A.  I'm not certain --

15   Q.  Uh-huh.

16   A.  -- how it first came to the attention of the Department of

17   Justice.

18   Q.  Uh-huh.

19   A.  I was contacted by the FBI in the first instance.  That was

20   my first contact with the Department of Justice.

21   Q.  How did the FBI --

22          MS. SIMON:  Objection.

23   Q.  -- become aware of these emails?

24          THE COURT:  If you know.

25   A.  I believe one of the victims, one of the targets of the

1  emails or the text messages complained to the government.  But

2  I did not do it.

3  Q.  And they had not come to you first, as the general counsel

4  of the international, global law firm of KL Gates, to discuss

5  this prior to contacting the FBI?

6          MS. SIMON:  Objection, your Honor.

7          THE COURT:  You mean the person who complained?

8          MR. DENNIS:  Yes, the partner who complained.

9          THE COURT:  Sustained.

10  BY MR. DENNIS:

11  Q.  So, Jeff, to understand, make sure I understand, your first

12  time learning about this is when the FBI came to you and

13  instructed you that a partner of the law firm had contacted

14  them about the issues, is that correct?  Yes or no.

15  A.  I'm not sure what the "this" is.

16  Q.  Had contacted them about emails that were allegedly

17  harassing them.

18  A.  I'm not sure I understand the question.

19  Q.  All right.  I'm going to repeat the question.

20      From what I understand, from your testimony, is that you

21  first learned of this from the FBI contacting you about an

22  email or emails that some partner at K&L Gates had sent to them

23  regarding harassment.  Yes or no.

24          THE COURT:  No, no.  What he's asking is what do you

25  mean by the word "this," when you said he first learned of

1    this.

2                MR. DENNIS:  First learned of this case that we're

3    all, this matter that we're currently all involved --

4                THE COURT:  I think, if I can help you out, what you

5    mean to ask him is was his first knowledge that the federal

6    government was investigating this matter the conversation that

7    he just relayed.  Is that what you wanted to ask?

8                MR. DENNIS:  Yes.

9                THE COURT:  All right.  So what's the answer.

10   A.  The first knowledge I had that the government was

11   investigating the matter was a telephone call from an FBI

12   agent.

13   BY MR. DENNIS:

14   Q.  And to -- which partner did they call you about?

15   A.  I don't think they mention --

16                MS. SIMON:  Objection, your Honor.

17                THE COURT:  No.  I'll allow that, but it assumes in

18   evidence, which may or may not be true, that they mentioned a

19   specific partner.

20                Go ahead.  You may answer.

21   A.  I don't recall if they mentioned a specific partner at the

22   time.  They may have.  I just don't remember one way or

23   another.

24   Q.  When did you learn of which partner was the -- did you ask

25   on the phone call which -- when you were communicating, did you

MadWden1                         Maletta - Cross

 1    ask on the phone call which partner are you -- filed this

 2    complaint?

 3              THE COURT:  No complaint was filed.

 4    BY MR. DENNIS:

 5    Q.  Did you ask which partner submitted this information?

 6    A.  I didn't ask on the phone call.

 7    Q.  When did you first learn of -- who was the first partner

 8    you learned of who submitted information to the FBI?

 9              MS. SIMON:  Objection, your Honor.

10              THE COURT:  No.  I'll allow that.

11    A.  My understanding is that a lawyer for one of the

12    individuals approached the government at some point.  I have --

13    that's my understanding of how it came about.

14    Q.  The witnesses who are testifying here today, or who have

15    been testifying -- one is Eric Cottle.  How many conversations

16    have you had with Mr. Cottle about this matter?

17              THE COURT:  Well, what do you mean by this matter?  Do

18    you mean about the arrest --

19              MR. DENNIS:  This kind of case.

20              THE COURT:  -- or do you mean about the specific case

21    that we're here about?

22              MR. DENNIS:  About his complaint to the FBI.

23              THE COURT:  I don't know that we've heard that

24    Mr. Cottle complained to the FBI.

25    BY MR. DENNIS:

MadWden1                    Maletta - Cross

1   Q.  Mr. Maletta, which partner complained to the -- were you

2   told by the FBI submitted a complaint to them?

3              MS. SIMON:  Objection.

4              THE COURT:  Sustained.

5              Just to move it along, did you ultimately learn which

6   partner's lawyer had brought this matter to the FBI?

7              THE WITNESS:  Yes, your Honor.  I have an

8   understanding, yes.

9              THE COURT:  And which partner's lawyer?

10              THE WITNESS:  Ms. Bostick had independent counsel --

11              MR. DENNIS:  Thank you, Jeff.

12              THE WITNESS:  -- concerning these matters, and my

13   understanding is that her lawyer approached the government.

14              THE COURT:  OK.

15              MR. DENNIS:  Thank you, Jeff.

16   Q.  What date did you learn that it was her?

17   A.  I don't know.

18   Q.  Approximately --

19   A.  It was sometime before the FBI called me -- no, that's not

20   accurate.  I learned of the possibility that it might happen

21   before I was called by the FBI.  But Ms. Bostick had a separate

22   counsel on this.

23   Q.  What year was this?

24   A.  2020, I believe.

25   Q.  2020.  OK.

1          And how many conversations -- as the general counsel of an

2     international, global law firm, how many conversations have you

3     had with Ms. Bostick since learning of her complaint -- her --

4     of her raising this issue, her bringing this to the FBI's

5     attention?

6     A.  A few.

7     Q.  A few?  One, two, three?

8     A.  Four -- three, four.

9     Q.  Over two years.

10         Who was the next partner who you learned had filed a

11    complaint with the FBI?

12    A.  I'm not sure there was a complaint ever filed.  I think it

13    was a contact made by the lawyer with someone in the Department

14    of Justice.  I'm not aware that anybody else did that.  Someone

15    may have.  I have not heard that.

16    Q.  Well --

17              THE COURT:  Counsel, just so you know, you have two

18    more minutes.

19    BY MR. DENNIS:

20    Q.  I take it the facts show that --

21              THE COURT:  No, no.

22    BY MR. DENNIS:

23    Q.  Mr. Cottle has testified that he is -- Mr. Cottle has been

24    identified as one of the victims.  Did he ever or do you know

25    that he was one of the victims?

MadWden1                    Maletta - Cross

1   A.  If you're asking my opinion whether he's one of the

2   victims --

3   Q.  Do you know that the FBI -- that he had contacted the FBI?

4   A.  I'm not aware that he had contacted the FBI.  I'm aware

5   that in the course of the investigation they interviewed him.

6   Q.  John Bicks.  Did Mr. Bicks contact the FBI, or --

7   A.  I'm not aware that Mr. Bicks directly contacted the FBI.  I

8   am aware, as in Mr. Cottle's case, that the FBI interviewed

9   Mr. Bicks.

10  Q.  How many conversations have you had with Mr. Bicks since

11  2020 about this matter?

12  A.  Ten, 15, perhaps.

13  Q.  And with Ms. Bostick, you said four or five, is that

14  correct?

15  A.  I think.  She had her own lawyer.

16  Q.  Over a two-year period, four or five times.

17      And Mr. Cottle?

18  A.  Fewer.  Three or four, perhaps.  I may have had more with

19  Ms. Bostick over time.

20  Q.  Have you discussed this case with any of the members of the

21  management committee of KL Gates?

22  A.  Yes.

23  Q.  When did you have your first conversation with the

24  management committee?

25  A.  About this criminal prosecution?

MadWden1                    Maletta - Cross

1    Q.  Yes.

2    A.  When it became known to us that there was an investigation

3    underway, I advised the management committee in my role as

4    general counsel.

5    Q.  Which date?  Can you give us a date, please?

6    A.  Probably would have been sometime in -- whenever there was

7    another management committee meeting.  Perhaps in October of

8    2020.  Perhaps in November.  I'm not sure.

9    Q.  And who were the members of the management committee at the

10   time?

11   A.  You want me to try and list all of them at this point?

12   Q.  It's only 16.  You're the general counsel.  Yes, please.

13   A.  Mr. Caccese is the chairman of the management committee.

14   Mr. Segerdahl is the global managing partner of the firm.

15   They're members of the management committee.  I believe at that

16   point Ms. Ackerman had joined the committee.  Ms. Wahi was on

17   the committee.  Ms. Alito was on the committee.  Mr. Budner --

18   Q.  Can you give full names?

19           THE COURT:  No, because it's irrelevant.  You've

20   finished your cross-examination.

21           MR. DENNIS:  I object.

22           THE COURT:  Excuse me.

23           MR. DENNIS:  I object.

24           THE COURT:  Excuse me.

25           Any redirect?

1              MR. DENNIS:  I object, your Honor.

2              THE COURT:  Your objection is duly noted, Mr. Dennis.

3              MR. DENNIS:  He's the only person from the management

4     committee at KL Gates --

5              THE COURT:  You're excused.

6              MR. DENNIS:  -- that I've been entitled to interview

7     during this trial on which my --

8              Jeff, my freedom is at risk.

9              (Witness excused)

10             THE COURT:  Please call your next witness.

11             MS. SIMON:  The government calls Denise Smith.

12    DENISE SMITH,

13        called as a witness by the government,

14        having been duly sworn, testified as follows:

15             THE COURT:  Counsel.

16    DIRECT EXAMINATION

17    BY MS. SIMON:

18    Q.  Good morning, Ms. Smith.

19    A.  Good morning.

20    Q.  Where do you work?

21    A.  I work at Google.

22    Q.  What is Google?

23    A.  Google is an internet search company.

24    Q.  I'm sorry.  I couldn't hear you.

25    A.  Internet search company.

MadWden1                           Smith - Direct

1   Q.   What kinds of services does Google provide?

2   A.   Google has many products: internet search, email, storage,

3   multiple services.

4   Q.   How long have you worked at Google?

5   A.   Almost 18 years.

6   Q.   What is your title?

7   A.   I'm a legal assistant.

8   Q.   What do you do as a legal assistant?

9   A.   We comply with lawful requests from law enforcement for

10  user data.

11  Q.   As part of your duties, do you participate in responding to

12  search warrants?

13  A.   Yes.

14  Q.   When Google gets a search warrant to produce the contents

15  of an email account, what is Google able to produce?

16  A.   Google will produce the contents of the mailbox.

17  Q.   The email mailbox?

18  A.   Yes.

19  Q.   As part of your duties, do you participate in responding to

20  subpoenas?

21  A.   Yes.

22  Q.   What does Google typically produce in response to a

23  subpoena?

24  A.   Basic subscriber information.

25  Q.   What does that include?

MadWden1                          Smith – Direct

1    A.  This would include information that was given during, when

2    the account was created, such as name, phone number, this kind

3    of information.

4    Q.  To your knowledge, has Google responded to a subpoena for

5    records concerning the accounts ruleethics50@gmail.com,

6    pmglm71947@gmail.com, woc2020@gmail.com, and

7    bllj4848@gmail.com?

8    A.  Yes.

9    Q.  Has Google also responded to a search warrant issued by a

10   judge for those same accounts?

11   A.  Yes.

12          MS. SIMON:  Your Honor, permission to approach the

13   witness?

14          THE COURT:  Yes.

15   BY MS. SIMON:

16   Q.  Ms. Smith, I just handed you a drive marked Government

17   Exhibit 300.  Do you recognize the drive?

18   A.  Yes.

19   Q.  How do you recognize it?

20   A.  Because it has my initials here.

21   Q.  And what does that signify to you?

22   A.  That I have looked at the contents, and I certified that

23   these were the contents that were produced by Google.

24   Q.  And what is on the drive?

25   A.  The drive has contents of the email addresses, all four

MadWden1                          Smith - Direct

1    email addresses, the contents that was created -- produced on

2    the search warrant and on the subpoenas that we received.

3    Q.  And are you referring to the four Gmail accounts that I

4    earlier identified?

5    A.  Could you repeat, please?

6    Q.  Are you referring to the four Gmail accounts that I

7    previously identified?

8    A.  Yes.

9    Q.  And were you able to confirm that Government Exhibit 300

10   contains true and accurate copies of the records provided by

11   Google in response to the subpoena and the search warrant?

12   A.  Yes.

13              MS. SIMON:  Your Honor, permission to approach the

14   witness again?

15              THE COURT:  Yes.

16              MS. SIMON:  Thank you.

17   Q.  I just handed you documents marked Government Exhibit 301

18   through 304.  Do you recognize those documents?

19   A.  Yes.

20   Q.  How do you recognize them?

21   A.  They have my initials here.  I have seen the documents

22   before.

23   Q.  What are those documents?

24   A.  This is a production of a Google subscriber information for

25   each of the four accounts, the email accounts.

MadWden1                         Smith - Direct

1    Q.  Are they true and accurate copies of those subscriber

2    records?

3    A.  Yes.

4    Q.  Are these records in Government Exhibit 301 through 304

5    made and kept by Google in the regular course of business?

6    A.  Yes.

7    Q.  Were those records made by Google at or near the time of

8    the events recorded therein?

9    A.  Yes.

10   Q.  Is it the regular practice of Google to maintain these

11   records?

12   A.  Yes.

13            MS. SIMON:  The government offers Government Exhibits

14   301, 302, 303, and 304.

15            THE COURT:  Any objection?

16            MR. DENNIS:  No objection, your Honor.

17            THE COURT:  Received.

18            (Government Exhibits 301, 302, 303, and 304 received

19   in evidence)

20            MS. SIMON:  Permission to publish to the jury, your

21   Honor?

22            THE COURT:  Yes.

23            MS. SIMON:  Ms. Geier, can you please pull up for the

24   jury Government Exhibit 301.

25   Q.  Ms. Smith, what is this?

MadWden1                    Smith - Direct

1    A.  This a production of basic subscriber information for an

2    email address, one of the email addresses.

3    Q.  Which email address?

4    A.  Bllj4848@gmail.com.

5    Q.  What is the name on this account?

6    A.  Willie Dennis.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MS. SIMON:

2   Q.  What is the recovery email?

3   A.  Recovery name is pmjlm71947@gmail.com.

4   Q.  Can you explain what a recovery email is?

5   A.  If you forget your password, you can use the recovery email

6   to recover the account.

7   Q.  What is the recovery SMS?

8   A.  It's (646)418-3329.

9   Q.  Can you explain to the jury what recovery SMS is?

10  A.  It's just a phone number that you can use to receive also

11  information in case you forget your password to access your

12  email address.

13  Q.  The data points that you just referenced, the name, the

14  recovery email and the recovery SMS, who provides that data?

15  A.  The person who is signing up for that email account.

16          MS. SIMON:  Ms. Geier, can you please put up

17  Government Exhibit 302.

18  Q.  Ms. Smith, what account does this refer to?

19  A.  Pmglm71947@gmail.com.

20  Q.  What is the name on this account?

21  A.  Willie Dennis.

22  Q.  What is the recovery SMS?

23  A.  (646)418-3329.

24          MS. SIMON:  Ms. Geier, can you please pull up

25  Government Exhibit 303.

MADGden2                          Smith - Direct

1  Q.  What account is this in reference to?

2  A.  It's ruleethics50@gmail.com.

3  Q.  What is the name on this account?

4  A.  Rule of the law ethics.

5  Q.  What is the recovery SMS?

6  A.  (646)418-3329.

7  Q.  What is the recovery email?

8  A.  Wd66644@gmail.com.

9  Q.  Drawing your attention to the field created on, can you

10  read that date aloud.

11  A.  Yes.  It's 2019, 08/23 at 19:21:51, that's the time,

12  19:21:51 U T C.

13  Q.  What's the created on date?

14  A.  It's the date when the account was created.

15         MS. SIMON:  Ms. Geier, can you please put up

16  Government Exhibit 304.

17  Q.  What account is this?

18  A.  Woc2020@gmail.com.

19  Q.  What is the name on the email account?

20  A.  Willie Dennis.

21  Q.  What is the recovery email.

22  A.  Htdr123@gmail.com.

23  Q.  What is the recovery SMS?

24  A.  (646)418-3329.

25         MS. SIMON:  Ms. Geier, you can take down Government

1  Exhibit 304.

2  Q.  Ms. Smith, turning back to the records that Google provided

3  concerning the four email accounts in response to a search

4  warrant, which you testified are included on Government

5  Exhibit 300, the drive.

6  A.  Yes.

7  Q.  Does the information that the government provided to the

8  government include emails?

9  A.  Yes.

10  Q.  For the emails Google provided in response to those search

11  warrants, is the data reflected in those emails, such as the

12  date, the time, the sender and the recipient made by Google at

13  or near the time of the events reported therein?

14  A.  Yes.

15  Q.  Who created the content of the emails?

16  A.  The owner of the account, whoever.

17  Q.  Does Google alter the contents in any respect?

18  A.  No.

19  Q.  Is it the regular practice of Google to keep and maintain

20  these records?

21  A.  Yes.

22  Q.  Are the records on Government Exhibit 300 a true and

23  correct copy of the records maintained on the Google servers?

24  A.  Yes.

25           MS. SIMON:  Your Honor, permission to approach the

MADGden2                        Smith - Direct

1    witness one final time.

2                THE COURT:  Yes.

3    BY MS. SIMON:

4    Q.  Ms. Smith, I just handed you Government Exhibit 231 and

5    Government Exhibit 231A.  Government Exhibit 231A is already in

6    evidence.

7        Ms. Smith, do you recognize these documents?

8    A.  Yes.

9    Q.  How do you recognize them?

10   A.  They have my initials on them.

11   Q.  What are those documents?

12   A.  This is an actual email that was -- that was in the -- the

13   mailbox that we produced content on.

14   Q.  And which exhibit are you referring to?

15   A.  The 231, it's the email.  And then the 231A, which is the

16   attachment to an email.

17   Q.  Did your confirm that Government Exhibit 231 and 231A are

18   true and correct copies of the email and one of the attachments

19   included in the search warrant returns on Government

20   Exhibit 300?

21   A.  Yes.

22   Q.  And which email accounts did your check?

23   A.  I checked the woc2020@gmail.com, pmglm71947@gmail.com,

24   bllj4848@gmail.com and ruleethics50@gmail.com.

25   Q.  And were you able to confirm that Government Exhibit 231

MADGden2                    Smith - Direct

1  and 231A were in all four accounts?

2  A.  Yes.

3          MS. SIMON:  The government offers Government

4  Exhibit 231.  As I mentioned, 231A is already in evidence.

5          THE COURT:  Any objection?

6          MR. DENNIS:  No objections, your Honor.

7          THE COURT:  Received.

8          (Government Exhibit 231 received in evidence)

9          MS. SIMON:  Could you please pull up Exhibit 231 for

10  the jury.

11  BY MS. SIMON:

12  Q.  Ms. Smith, can you read who this email is from?

13  A.  Thomas Moore, the email is Tom@ThomasMoore.legal.

14  Q.  And who is this email to?

15  A.  It's to multiplier accounts, it's woc2020@gmail.com,

16  pmglm71947@gmail.com, bllj4848@gmail.com, htdr123@gmail.com,

17  wd66644@gmail.com and ruleethics50@gmail.com.

18  Q.  Thank you.

19          MS. SIMON:  Ms. Geier, can you please pull up

20  Government Exhibit 231A.

21  Q.  Ms. Smith, is Government Exhibit 231A that we are looking

22  at now one of the attachments to Government Exhibit 231?

23  A.  Yes.

24          MS. SIMON:  One moment, please.

25          (Conferring)

MADGden2                     Smith - Cross

1            MS. SIMON:  No further questions, your Honor.

2            THE COURT:  Cross-examination.

3            MR. DENNIS:  Yes, your Honor.

4    CROSS-EXAMINATION

5    BY MR. DENNIS:

6    Q.  Good morning, Ms. Smith.

7    A.  Good morning.

8            MR. DENNIS:  Can I ask the court reporter to call up

9    the email account created on -- in April of 2019.  I don't

10   remember which one that was.  It was called up earlier.

11           MS. KUSHNER:  It's Ms. Geier, it's not the court

12   reporter.  She's our paralegal.

13           MR. DENNIS:  I'm sorry, Ms. Kushner.

14           THE COURT:  I didn't hear that either.  What's the

15   problem?

16           MS. KUSHNER:  I'm just saying it's not the court

17   reporter.  It's our paralegal, Ms. Geier.  She's asking to be

18   addressed.

19           MR. DENNIS:  Ms. Geier, can you call up the email, can

20   you call up the report that you put up earlier from April 2019,

21   the Google report that showed the email created.

22           THE COURT:  For the record, which exhibit is this?

23           MS. KUSHNER:  It's Government Exhibit 302.

24           MR. DENNIS:  That's fine.

25   BY MR. DENNIS:

MADGden2                    Smith - Cross

1    Q.  Ms. Smith, I just wanted to -- I never looked at one of

2    these reports, but I had a couple questions for you.  When you

3    look and you see the recovery email, can you tell us what that

4    means, like in real -- just laymen's terms, like what exactly

5    is that used for by Google?

6    A.  This email is just if you want to have a different way --

7    if you forget your password and you want to have a way to

8    recover your email, you can enter a secondary email so that the

9    password hint, it's going to be sent to that email.

10   Q.  So in my case, mine was -- if you look, recovery SMS,

11   (646)418-3329, that would be my recovery?

12   A.  It's the recovery email that was provided by the person who

13   was creating the account.

14   Q.  So in that case, that's my cell phone number; right?  That

15   is my cell phone number?

16   A.  If you say so, yes, I believe you.

17   Q.  So if I wanted to recover my emails, I have to go to my

18   cell phone number under your system?  Is that where I would go?

19   A.  No.  It's going to send you a message maybe with a code or

20   something that's going to be used to recover your email, for

21   you to gain access again to your email.

22   Q.  Do your records show or would they show that all my emails

23   and text messages were deleted from (646)418-3329 on

24   January 30th of 2019?

25   A.  No.

MADGden2                        Smith - Cross

1        MS. SIMON:  Objection, your Honor, assumes a fact not

2   in evidence.

3        THE COURT:  Sustained.

4   Q.  If my emails were deleted, would Google be able to

5   recognize that?

6        MS. SIMON:  Objection.

7   Q.  If my emails were deleted from my phone, would Google be

8   able to recognize that?

9        THE WITNESS:  Should I answer?

10        THE COURT:  I'm a little unclear what the question is.

11        When someone deletes an email, does that show up in

12   the Google records relating to that email; is that the

13   question?

14        MR. DENNIS:  Yes.

15        THE COURT:  All right.

16        What's the answer?

17        THE WITNESS:  I can't really give any testimony here

18   as an expert.  I'm not an expert.

19        THE COURT:  You don't know.

20        THE WITNESS:  I'm just a custodian of records.

21        MR. DENNIS:  Thank you.  I have no other questions for

22   this witness.

23        THE COURT:  Anything else?

24        MS. SIMON:  No, your Honor.  Thank you.

25        THE COURT:  Thank you.  You may step down.

MADGden2                    Isolda – Direct

1          Please call your next witness.

2          MS. KUSHNER:  The government calls Christian Isolda.

3    CHRISTIAN ISOLDA,

4        called as a witness by the Government,

5        having been duly sworn, testified as follows:

6          THE DEPUTY CLERK:  State your name and spell it slowly

7    for the record.

8          THE WITNESS:  My name is Christian, C-H-R-I-S-T-I-A-N,

9    I-S-O-L-D-A.

10          THE COURT:  Counsel.

11   DIRECT EXAMINATION

12   BY MS. KUSHNER:

13   Q.  Good morning.

14   A.  Good morning.

15   Q.  Where you do you work?

16   A.  I work at the Federal Bureau of Investigation.

17   Q.  Is that also known as the FBI?

18   A.  It is.

19   Q.  And what is your title there?

20   A.  My title is an information technology specialist, digital

21   forensics examiner.

22   Q.  Are you assigned to a particular office of the FBI?

23   A.  I am.

24   Q.  Do you work within a particular unit at the FBI?

25   A.  I do.

MADGden2                         Isolda – Direct

1   Q.   What unit?

2   A.   The unit is called the computer analysis response team,

3   also nobody as CART.

4   Q.   How long have you been with CART?

5   A.   I've been with CART just over three years.

6   Q.   What are your responsibilities as a forensic examiner at

7   CART?

8   A.   Some of my job duties include the preservation, collection,

9   extraction and analysis of digital media.

10  Q.   What do you mean by digital media?

11  A.   Digital media includes digital items such as cell phones,

12  computers, laptops, hard drives, stuff like that.

13  Q.   What do your mean when you say one of your responsibilities

14  is to extract digital media?

15  A.   To extract the data off the digital media, essentially

16  trying to make a copy of the data on the device.

17  Q.   Have you received any training on how to do that type of

18  extraction?

19  A.   I have.

20  Q.   What type of training?

21  A.   I have received numerous trainings through the FBI as well

22  as outside vendors, including mobile device extraction and

23  analysis and other types of digital extraction abilities.

24  Q.   Have you conducted extractions on cell phones in

25  particular?

1    A.  I have.

2    Q.  Approximately how many times have you conducted an

3    extraction of a cell phone?

4    A.  I have extracted over 600 cell phones.

5    Q.  And how do you perform an extraction of a cell phone?

6    A.  There's a couple different ways.  Most of the time it is

7    done through a software tool or program on the computer.

8    Q.  Any particular tools or programs that you use?

9    A.  Some involve tools such as Cellibrite and GrayKey.

10   Q.  What is GrayKey?

11   A.  GrayKey is a software tool used to extract mobile devices

12   that's paired with a hardware device as well.

13   Q.  What do you mean by a hardware device?

14   A.  A hardware device in this case, it's a box where you

15   essentially plug the phone into to talk to the computer.

16   Q.  What is the purpose of GrayKey?

17   A.  GrayKey's purpose is mostly to extract mobile devices such

18   as cell phones.

19   Q.  Can anyone at the FBI use GrayKey to extract cell phones?

20   A.  There's a certain subset of digital forensic examiners who

21   have the ability to use GrayKey.

22   Q.  Do you know how many people are authorized to use GrayKey

23   at the FBI New York office?

24   A.  At the FBI New York office, there's currently three people

25   assigned to do GrayKey.

MADGden2                          Isolda - Direct

1    Q.  Are your one of them?

2    A.  I am.

3    Q.  Do you do anything to verify the accuracy of the extraction

4    of a phone using GrayKey?

5    A.  I do.

6    Q.  What do you do?

7    A.  After an extraction, a digital fingerprint or a hash value

8    is provided to the extraction or of the extraction.  I also

9    verify that digital fingerprint to be valid at the end of the

10   extraction.

11   Q.  Are you comparing something against the hash 0value?

12   A.  I'm comparing when I move or when the extraction is

13   finished, I compare the fingerprint whenever I move it around

14   and when finished.

15   Q.  What are you looking for when you do that?

16   A.  I'm making sure that the hash values match from start to

17   finish of my process.

18   Q.  And why do you do that?

19   A.  To make sure that the extraction is valid and nothing has

20   been changed during the process.

21   Q.  I want to turn to your work now in this case.  Were you

22   asked to provide assistance in the case of Willie Dennis?

23   A.  I was.

24   Q.  What were you asked to do?

25   A.  I was asked to extract the cell phone in this case.

1   Q.  Do you recall what type of cell phone?

2   A.  The cell phone was an iPhone 8 plus.

3   Q.  I'm showing you what's been marked for identification

4   purposes as Government Exhibit 159.

5       Do you recognize what's shown here?

6   A.  I do.

7   Q.  How do you recognize it?

8   A.  I recognize it by the stickers that have been put on it and

9   the identifiers from the sticker.

10  Q.  Taking a step back for a moment.  Did you have possession

11  of the cell phone in this case to perform the extraction of it?

12  A.  I did.

13  Q.  How did you come into possession of the phone?

14  A.  A chain of custody was signed over to me, as well as the

15  evidence, and I took custody of the device.

16  Q.  Do you recall from whom you took that custody?

17  A.  I do.

18  Q.  Who?

19  A.  Digital forensic examiner, Steven Flatley.

20  Q.  Is Government Exhibit 159 a true and accurate photograph of

21  what the device looked like when you received it?

22  A.  It is.

23          MS. KUSHNER:  The government offers Government

24  Exhibit 159 into evidence.

25          THE COURT:  Any objection?

MADGden2                         Isolda - Direct

```
 1              MR. DENNIS:  No objection, your Honor.

 2              THE COURT:  Received.

 3              (Government Exhibit 159 received in evidence)

 4   Q.  Is this the phone you extracted in this case?

 5   A.  It is.

 6   Q.  What kind of phone is it?

 7   A.  It's an iPhone 8 plus.

 8   Q.  What color is it?

 9   A.  Black.

10   Q.  And how do you recognize that this is the particular phone

11   you received in this case?

12   A.  The number 1B26 as well as the MDUS number match the

13   request that I was provided.

14   Q.  Where do you see those two numbers?

15   A.  On the sticker that's on the phone.

16   Q.  Which sticker?

17   A.  The bottom sticker contains the MDUS number.

18   Q.  Showing you what's been marked as Government Exhibit 106

19   for identification purposes.

20       Do you recognize this?

21   A.  I do.

22   Q.  What is it?

23   A.  That is the front of the iPhone we just spoke about,

24   Q.  True and accurate photo of the phone front of the phone?

25   A.  It is.
```

MADGden2                    Isolda - Direct

1   Q.  Is there anything else depicted in this photograph?

2   A.  There's also the case of the phone that it was held in.

3          MS. KUSHNER:  The government offers Government 106

4   into evidence.

5          THE COURT:  Any objection?

6          MR. DENNIS:  No objections, your Honor.

7          THE COURT:  Received.

8          (Government Exhibit 106 received in evidence)

9   BY MS. KUSHNER:

10  Q.  Were you asked to do anything with the phone when you

11  received it?

12  A.  I was asked to extract the phone.

13  Q.  Did you do that in this case?

14  A.  I did.

15  Q.  Did you use any particular tools to extract the cell phone.

16  A.  I used GrayKey to extract the cell phone.

17  Q.  Were you able to successfully conduct an extraction of the

18  cell phone?

19  A.  I was.

20  Q.  Before running an extraction do you do anything to ensure

21  that the data on the phone is protected?

22  A.  I do.

23  Q.  What do you do?

24  A.  One of the main things that we do is to ensure that

25  airplane mode is enabled, as well as making sure that Wi-Fi and

1   bluetooth are disabled as well.

2   Q.   Why do you do these things?

3   A.   I do these things to ensure that no data is being sent to

4   and from the device while it's in our custody.

5   Q.   By stopping any data from going into the device, does that

6   provide any protection of the data of the device?

7   A.   It does.

8   Q.   How?

9   A.   It allows -- or it stops communications from entering the

10  phone, which could unintentionally delete data.

11  Q.   Did you do anything to verify the protection of the data in

12  this case?

13  A.   I did.

14  Q.   What did you do?

15  A.   After the extraction finished, I generated a hash of the

16  extraction.

17  Q.   And then what did you do?

18  A.   After the extraction was finished and the hash was

19  generated, I copied it to a hard drive and provided the hard

20  drive to the lead forensic examiner in this case.

21  Q.   What exactly was contained on that hard drive?

22  A.   Contained on the hard drive was all the contents from the

23  GrayKey extraction.

24  Q.   Did you do anything with the physical phone after you

25  completed the extraction?

MADGden2                     Isolda - Cross

1   A.  After the extraction was done, I signed the chain of

2   custody and relinquished the device back to the lead examiner

3   in this case.

4   Q.  Did you have any further involvement in this case after

5   that?

6   A.  I did not.

7           MS. KUSHNER:  One moment, please.

8           (Conferring)

9   BY MS. KUSHNER:

10  Q.  You said you relinquished the phone back to the examiner in

11  this case.  Who was that?

12  A.  Steven Flatley.

13          MS. KUSHNER:  No further questions.

14          THE COURT:  Cross-examine.

15          MR. DENNIS:  Yes.

16  CROSS-EXAMINATION

17  BY MR. DENNIS:

18  Q.  Can we call back up Exhibit 159.

19      I'm just sitting HERE laughing, I imagine with all the cell

20  phones that are being collected around country at this time,

21  your office must be very busy at this time.

22  A.  Yes, we are very busy.

23  Q.  I can imagine.  Every day someone's cell phone is being

24  taken.

25      How many of these extractions do you carry out in a week,

1    let's say?

2    A.   It depends on the workload.  On average, approximately five

3    or six.

4    Q.   Just a couple things that I was wondering about, as I was

5    looking at this, I see that there's four stickers on here.  Can

6    you go through what each one means in terms of the FBI.

7        Will are four stickers on the back of the phone.  Can you

8    sew them?

9    A.   Yes, I can see them.

10   Q.   Can you tell us what each one --

11   A.   I can try.  I didn't put these stickers on, but I can try

12   to walk you through what they mean.

13   Q.   Yeah, please.

14   A.   The first sticker identifies the case number and the date

15   as well as the initial -- of who put the sticker on the device.

16   Q.   So that day is December 20th, 2021; is that correct?

17   A.   That is correct.

18   Q.   So that moans that the FBI had it in its possession at

19   least of December 20th, 2021?

20   A.   Correct.

21   Q.   And might be earlier; correct?

22   A.   Correct.

23   Q.   Let's keep going down.  What's the next one, the New York

24   CART lab?  What does that mean?

25   A.   That is a sticker that has a unique identifier, the NYC

1    number, followed by a string of numbers that is the unique

2    identifier that matches the initial sticker.

3    Q.  And the little one, what does that mean?

4    A.  I am not sure what that one was.  That doesn't look like a

5    sticker we would put on.

6    Q.  Okay.  Someone else put that on.

7        And then the final one.

8    A.  The final one is similar to the first one.  It just has --

9    the difference between it has the 1B number as well as the MDUS

10   number as well.

11   Q.  It has, you said, the 1B number?

12   A.  Correct.

13   Q.  And what does that mean?

14   A.  The 1B number is an internal identifier to identify that

15   evidence item.

16   Q.  Which one would have been put on first, the 1B number or

17   the subsequent one?

18           MS. KUSHNER:  Objection, your Honor.

19           THE COURT:  Well, if the witness knows, I'll allow him

20   to answer.

21   A.  I don't know.  I didn't --

22           THE COURT:  No.  All right.

23   BY MR. DENNIS:

24   Q.  For this particular phone, you talked about the extraction

25   process.  How long did it take you to extract the information

1    off of this phone?

2    A.  I can't recall.

3    Q.  A week, a month?

4    A.  Well, definitely not that long.  I returned it within a day

5    of receiving the device.

6    Q.  So you returned it, let's say December 21st or

7    December 25th, let's say, by Christmas?

8    A.  Yes, it was returned within the day.

9    Q.  And you returned it to Steve Flatley?

10   A.  Stephen Flatley.

11   Q.  As far as the FBI process and procedures, where it would it

12   go after it was returned to Mr. Flatley?

13   A.  Where would what go?

14   Q.  What would be the next step for Mr. Flatley to --

15   A.  To process and analyze the data.

16   Q.  Once you had extracted all the information, would there be

17   any other need for you to keep the phone in your possession?

18   A.  For my possession, no.

19   Q.  Because in fact, all of the information has been taken off

20   the phone; correct?

21          MS. KUSHNER:  Objection, your Honor.

22          THE COURT:  I'll allow it.  If you know.

23   BY MR. DENNIS:

24   Q.  I did not receive my phone back until August of 2020 --

25          THE COURT:  No, no, counsel.  You have testifying.

MADGden2                        Isolda - Cross

1          MR. DENNIS:  Strike that.

2   Q.  Biased on your knowledge and your experience -- and I think

3   we recognize how trained you are in this area -- in your

4   experience, would there be any need for the FBI to retain the

5   phone until August 2020?

6          MS. KUSHNER:  Objection, your Honor.

7          THE COURT:  Sustained.

8   Q.  You talked about when the email was in your possession, you

9   placed it on airplane mode -- can you describe that process

10  again, what you did, what you actually did in terms of changing

11  the device settings.  I remember?

12  A.  The email?

13  Q.  Well, what you did to the phone.  Maybe we will have the

14  court reporter read it back.

15         I think you said you put it in airplane mode.  What else

16  did you do?

17  A.  I verified that it was in airplane mode.

18  Q.  The reason why you verified that was because?

19  A.  It's a standard process to confirm that no data is coming

20  in or out of the phone.

21  Q.  So once the phone is -- no data is coming in it.  If you

22  turn airplane mode off, does data still come back into the

23  phone again?

24  A.  It depends.

25  Q.  What does it depend upon?

MADGden2                    Isolda - Cross

1  A.  It depends if there's a sim card in or it's connected to a

2  network for the data to start flowing in and being sent up.

3  Q.  Was there a sim card in this phone?

4  A.  I don't recall.

5  Q.  So for example, if there was a sim card in the phone and

6  airplane mode was disabled, any messages that I was getting,

7  conceivably could be read on that phone; correct?

8  A.  If the -- if airplane mode was disabled and the sim was in

9  the phone, the messages could be.

10  Q.  So between the time the government took possession of the

11  phone and the time that it was returned to me, at any point in

12  time, someone could see any communications that would have came

13  in.  So between the time that I -- the government took

14  possession of the phone and the time that it was returned to

15  me, at any point in time, someone could see any commnications

16  that were coming in on email, on messaging, on my WhatsApp;

17  correct?

18  A.  Can you restate the question, please.

19  Q.  From the time my phone was -- during the time my phone was

20  in the government's possession, if the sim card was in and

21  someone had enabled and taken it off airplane mode, it's

22  possible that any messages, via email, via text via WhatsApp

23  could be read, based on your testimony?

24  A.  Could be read?

25  Q.  Or could be viewed.  Were coming into the phone.

MADGden2                    Isolda – Cross

A.   If the phone had no airplane mode enabled and the sim card

was in and it connected to the network, new data could be put

onto the phone, correct.

          MR. DENNIS:  No more questions, your Honor.

          THE COURT:  Anything else?

          MS. KUSHNER:  No, your Honor.

          THE COURT:  Thank you very much.  You may step down.

          I think this is probably a good point to take our

mid-morning break, so let's take 15 minutes.

          (Jury excused)

          (Continued on next page)

MADGden2

```
 1              (Jury not present)

 2              THE COURT:  I'll see you in 15.

 3              MS. KUSHNER:  Briefly, before the next witness, can we

 4    ask the Court for permission to present the next witness under

 5    rule 702.

 6              THE COURT:  So what you need to do in that regard is

 7    bring out the qualifications.  But what you should not do is me

 8    in front of the jury to say that he or she is qualified as an

 9    expert, that's the jury's decision.  So if I -- if you have

10    reached a point where you think you have qualified the person

11    as an expert, I will do a sidebar and I will hear from you at

12    sidebar.

13              MS. KUSHNER:  Thank you.

14              MR. DENNIS:  Can someone share with me what is rule

15    702.

16              THE COURT:  702 is before a person -- normally, a

17    witness can only say what they saw, heard, observed.  That's a

18    lay listening.  If someone wants to offer an opinion, they have

19    to be qualified as an expert.  So for example -- not in this

20    case, but I'll give you an example -- a fingerprint expert, the

21    person would describe their qualifications and would describe

22    the expertise, the Court would make an initial determination of

23    there's a case for the jury to determine if the person is an

24    expert or not.  And then at the very end, I will give

25    instructions for what they have to find to qualify this
```

MADGden2

1    witness.

2           MS. KUSHNER:  Your Honor, to be clear, the defendant

3    has received a letter notice that it was our intention to call

4    Mr. Flatley.

5           THE COURT:  What is this person an expert in?

6           MS. KUSHNER:  In forensic examination of cell phones

7    and other devices.

8           THE COURT:  All right.  Well, we'll see how it goes.

9           (Recess)

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MadWden3                        Flatley - Direct

1              (Jury present)

2              THE COURT:  Please be seated.

3              Swear in the witness.

4     STEPHEN FLATLEY,

5          called as a witness by the government,

6          having been duly sworn, testified as follows:

7              THE COURT:  Counsel.

8     DIRECT EXAMINATION

9     BY MS. KUSHNER:

10    Q.  Good morning.

11    A.  Good morning.

12    Q.  Where do you work?

13    A.  I work for the Federal Bureau of Investigation.

14    Q.  Is that also sometimes known as the FBI?

15    A.  Yes, ma'am.

16    Q.  How long have you worked at the FBI?

17    A.  For 17-1/2 years.

18    Q.  Do you currently work in a particular unit in the FBI?

19    A.  Yes, I do.  I work in the operational technology division,

20    the digital evidence staffing and education unit.

21    Q.  What is your title in that unit?

22    A.  I am an information technology specialist, forensic

23    examiner, program coordinator.

24    Q.  How long have you been in that role for?

25    A.  For approximately six months.

MadWden3                    Flatley - Direct

Q.  And prior to that, did you work in a particular unit at the

FBI?

A.  Yes, I worked for the New York division of the FBI in CART,

the computer analysis response team, for 17 years.

Q.  And what was your title at CART?

A.  Information technology specialist, forensic examiner.

Q.  What did you do at CART?

A.  CART process -- collects and processes digital evidence.

Q.  And what do you mean by digital evidence?

A.  So, anything that can be stored in a digital format.  So

normally, laptops, cell phones, CDs, DVDs, thumb drives, things

of that nature.

Q.  What did you do with that digital evidence?

A.  We collect it and preserve it, and then we process it to

make it available for the case agents to review.

Q.  Do you conduct any examinations of the digital evidence?

A.  Yes, I have.

Q.  What is that referred to as?

A.  I don't understand the question.

Q.  When you examine a device, what do you do exactly?

A.  We collect the evidence off of it, making as much of an

effort to not change it as possible.  Sometimes it's possible;

sometimes it's not.  We then take that evidence and we process

it with some software so that it -- it puts it into a

human-readable format, and then we give it to the investigators

MadWden3                        Flatley - Direct

1  to look through for anything that might be relevant to the
2  case.
3  Q.  When you say you take evidence off of it, are you ever
4  removing data from a device for examining?
5  A.  We copy it.
6  Q.  Does that alter the data on the device itself?
7  A.  No, it does not.
8  Q.  Is any data on the device itself taken off such that you
9  can no longer see that data on the device itself?
10  A.  No, it's not.
11  Q.  Approximately how many electronic devices have you examined
12  in the course of your 17-1/2 year career at the FBI?
13  A.  In the neighborhood of a couple thousand.
14  Q.  And of those, approximately how many have been cell phones?
15  A.  Oh, at least about a thousand.
16  Q.  Do you have any degrees?
17  A.  Yes.  I have a bachelor's in business and computer science
18  from Boston College, and I have a master's in digital forensics
19  and cyber security from John Jay College.
20  Q.  And when you examine or analyze a particular device, do you
21  typically know anything about the case in which that device is
22  involved?
23  A.  Usually nothing at all.
24  Q.  And when you're conducting an examination of a cell phone,
25  are there any particular tools that you use?

MadWden3                    Flatley - Direct

A.   It depends on the type of the cell phone, but generally the
go-to tool for a cell phone would be any of the Cellebrite
products, either a product called 4pc, which will download the
information off the phone, and another product called Physical
Analyzer, which will then take that download and pull it apart
and put it into human-readable format.

Q.   Do you have training using those various tools?

A.   Yes, I do.

Q.   During your time with the FBI, what, if any, particular
training have you received in the field of -- is it correct if
I call it forensic examination?

A.   That would be fine, yes.

Q.   What training have you received?

A.   I've received a combination of industry standard and
on-the-job training in the neighborhood of about 600 hours.

Q.   Do you do anything to keep up to date on the field of
forensic examination?

A.   We're required to take a proficiency test every year to
prove that we can still do our job and also to take at least
one mandatory training course a year.

Q.   Do you yourself provide any training on forensic
examination?

A.   Yes, I do.  I'm an adjunct professor at Fordham University,
and I'm also now in the education unit, but I was also part of
the field instructor program through the digital evidence

1   staffing and education unit.

2   Q.  And through that unit, what type of training do you

3   provide, and to whom?

4   A.  I provide training to support people, agents and task force

5   officers in the collection and processing of digital evidence.

6   Q.  And what are your other -- what are your CART

7   responsibilities in your current role?

8   A.  So, my current role is to provide training and to develop

9   curriculum and to assist, where necessary, with staffing needs.

10  Q.  How long have you been teaching as an adjunct professor?

11  A.  Since 2011.

12          MS. KUSHNER:  Your Honor, may we have a sidebar?

13          THE COURT:  Yes.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

MadWden3                    Flatley - Direct

1          (At sidebar)

2          MS. KUSHNER:  The government would like to offer

3     Mr. Flatley's evidence pursuant to Rule 702 based on his

4     training and experience the last 17-1/2 years.

5          THE COURT:  What's he going to give as his opinion?

6          MS. KUSHNER:  He's going to give -- if necessary, he

7     might give his opinion on ability to alter any data on cell

8     phone in conducting an extraction and also whether there's any

9     evidence or indicia of any tampering or hacking of the

10    defendant's cell phone, if necessary.  Mostly it will be

11    focused on what he specifically did in this case.

12         THE COURT:  All right.  Well, it sounds like it may

13    not come up at all, but you have satisfied that he's at least

14    preliminarily qualified to give those opinions, and then it

15    will be a jury question after that.

16         MS. KUSHNER:  OK.  Do you need me to state anything

17    about Rule 702 on the record in front of the jury?

18         THE COURT:  No.  Absolutely not.

19         MS. KUSHNER:  OK.

20         THE COURT:  Absolutely not.

21         MS. KUSHNER:  OK.

22         THE COURT:  Good.

23         (Continued on next page)

24

25

1            (In open court)

2    BY MS. KUSHNER:

3    Q.  Examiner Flatley, you mentioned earlier that you use

4    various Cellebrite products in connection with extracting

5    digital evidence, and you mentioned two of those products.  Can

6    you explain what Cellebrite is?

7    A.  Cellebrite is a company that manufactures software and

8    hardware that reads data off of cell phones.

9    Q.  And the two products that you mentioned, can you explain

10   what each of those are?

11   A.  Sure.  So, the first one I mentioned was 4pc, which is a

12   software product which copies the data off of a cell phone.

13   And the other one I mentioned was Physical Analyzer, which then

14   takes the data that that first product generated and puts it

15   into human-readable format.

16   Q.  Did there come a time when you examined digital evidence in

17   this case involving Willie Dennis?

18   A.  Yes, I did.

19   Q.  What type of digital evidence did you examine?

20   A.  So, I examined several cell phones and some email search

21   warrant returns.

22   Q.  Showing you what's already in evidence as Government

23   Exhibit 159, do you recognize this?

24   A.  Yes, I do.

25   Q.  How do you recognize it?

MadWden3                    Flatley - Direct

1   A.  My initials are on it.

2   Q.  Where are your initials?

3   A.  There is a sticker on the very top, and then on the bottom,

4   it had my initials in the -- on the right-hand side.

5   Q.  And what is this?

6   A.  This is a cell phone that I examined in the case.

7   Q.  There are two other stickers on this phone.  Did you place

8   either of those on the phone?

9   A.  So, of the four stickers in total, I only placed three of

10  them on the phone.  The smaller sticker that's a little worn

11  was there when I got the phone.

12  Q.  And what kind of cell phone is this?

13  A.  It's an iPhone 8.

14  Q.  And is it a particular -- sorry.

15      What, if anything, did you do with this Apple iPhone 8?

16  A.  So, whenever we get a piece of digital evidence, no matter

17  what it is, we place these stickers on it.  We put on one

18  sticker that has the case number and the date and our initials

19  and a unique identifier, which is also placed on there with a

20  barcode so it's readable by a barcode scanner.

21      And then at the bottom, this particular phone had to go for

22  what we call a deeper dive.  So it's called an MDUS request, or

23  a mobile device unlock service request.  So we place another

24  sticker on that with that particular number and other

25  identifying marks for the phone.

1   Q.  And what is that request?

2   A.  The MDUS?  That's for a more fully -- a deeper extraction

3   of the phone than sometimes Physical Analyzer can support or

4   4pc can provide.

5   Q.  Is there a specific tool that's able to accomplish this

6   deeper dive of the phone?

7   A.  Yes.  In this case, it's GrayKey.

8   Q.  What, if anything, did you do with the phone after entering

9   this MDUS request?

10  A.  So, after that request is entered, one of the technicians

11  who does those extractions then takes the phone and does the

12  extraction and gives you back the phone and an external drive

13  with the extraction on it.  I then take that extraction and

14  load it on to my workstation and then pull it apart with

15  Physical Analyzer.

16  Q.  And did all those things happen in this case with this

17  particular cell phone?

18  A.  Yes, they did.

19  Q.  What did you do -- you said you received an external

20  drive --

21  A.  Yes.

22  Q.  -- at some point?

23      What was on that external drive?

24  A.  It was the GrayKey extraction for this phone.

25  Q.  And is there anything you do or anything you did to verify

1   that the extraction on the external drive was an accurate copy

2   of the cell phone that the data was extracted from?

3   A.   Yes.  So, when the GrayKey does its extraction, it runs a

4   hash algorithm against the data that it removed from the phone,

5   and that is a math problem, so a mathematical algorithm, which

6   generates a number that uniquely identifies all of that data

7   set.  After we copy that data set to another device or anywhere

8   else, we run that hash algorithm again to make sure that

9   everything got over.  So he runs the -- the hash gets run by

10  the GrayKey.  Then we run it once we put it on to our drive,

11  and then we run it again when we put it on our network, and as

12  long as all those numbers match, then we haven't changed

13  anything on the phone at all.

14  Q.   When you received the external drive, did you receive

15  anything else?

16  A.   The phone back.

17  Q.   And what did you do with the phone itself?

18  A.   I returned it to evidence.

19  Q.   Why didn't you need it anymore at that point?

20  A.   Because now we have the extracted evidence, so we always

21  work off a copy because we don't want to change what was on the

22  original.  So we just have the copy, and we can generate an

23  infinite number of extra copies as long; as we verify them with

24  the hash, we know we haven't changed anything.

25  Q.   And in this case, what did you do with the external drive

MadWden3                        Flatley - Direct

1    with the extraction copy of the phone on it?

2    A.  After I copied the -- copied up to our network, then I just

3    erased it.

4    Q.  Sorry.  You erased what?

5    A.  The scratch copy that was on the external drive.

6    Q.  Because you had a copy on your network?

7    A.  Correct.

8    Q.  What did you do with the copy on your network system?

9    A.  Then that also gets -- we generate another copy of that and

10   check that into evidence for safekeeping.

11   Q.  What did you do with the extraction itself?

12   A.  With the extraction?  I processed it with Physical

13   Analyzer.

14   Q.  And what did that accomplish?

15   A.  Put it into a format where somebody could review it for

16   anything that might be relevant to the case.

17   Q.  Is there anything that you do to confirm that Physical

18   Analyzer is running properly, as it should be?

19   A.  We have a team of people down at Quantico that verify all

20   of the software before we use it to make sure that it works the

21   way the manufacturer says it works and that it's not doing

22   anything that would alter or -- alter any of the data.

23   Q.  After you ran the extraction in this case through Physical

24   Analyzer, what did you do?

25   A.  I made it available for the case agent to review.

MadWden3                          Flatley - Direct

1    Q.   And in what format would that be?

2    A.   So, the easiest way to make these data dumps viewable is

3    through a program called Reader or UFED Reader, and UFED is

4    universal forensic extraction device.  So it makes a very large

5    file, called a UFDR file, and the reader file then can process

6    that and a person can look through it, pretty much what it

7    looks like when we do it through Physical Analyzer.

8    Q.   To your right, Examiner Flatley, is a CD.  Do you see that?

9    A.   Yes, I do.

10   Q.   It's marked as Government Exhibit 100?

11   A.   Yes.

12   Q.   Do you recognize it?

13   A.   Yes, I do.

14   Q.   How do you recognize it?

15   A.   It has my initials on it.

16   Q.   And prior to your testimony today, did you review any

17   contents contained on this CD?

18   A.   Yes, I did.

19   Q.   And what is on the CD?

20   A.   It was items that were deemed to be relevant to the case.

21   Q.   What file is it in?

22   A.   It's a UFDR file.

23   Q.   Is this part of the data that was extracted from the cell

24   phone?

25   A.   Yes, it is.

MadWden3                    Flatley - Direct

Q.  And is it all the data that was extracted from the cell

phone?

A.  No.  It's only the relevant data.

          MR. DENNIS:  Counsel, can I see that thing he just

held up?

          Physically, I can't see you.

          THE WITNESS:  Oh, I'm sorry.

          MR. DENNIS:  My eyesight.  I haven't eaten enough

carrots.

          THE WITNESS:  I hear you.

          MS. KUSHNER:  Sure.  We can show it directly to Mr.

Dennis.

          THE COURT:  All right.

BY MS. KUSHNER:

Q.  You said that the CD contains a UFDR file, is that right?

A.  Yes, ma'am.

Q.  What is a UFDR file?

A.  It is the file that the Reader program parses out to show

the data that was put into it.

Q.  And when you say relevant data on the CD, did you pick what

data is on the CD?

A.  No, I did not.

Q.  Is it just a portion of the data that was extracted from

the phone?

A.  That's right.

MadWden3                    Flatley - Direct

1   Q.  And did you do anything to determine that this portion of

2   the data is accurate data from the phone?

3   A.  Yes, I physically go over it and make sure that the data

4   that we selected is or was on the phone.

5   Q.  I'm showing you what's been marked for identification

6   purposes as Government Exhibit 113-1.  Do you recognize this?

7   A.  Yes, I do.

8   Q.  What is it?

9   A.  It's a preliminary device report generated by Physical

10  Analyzer.

11  Q.  Preliminary device report of what?

12  A.  The cell phone that I examined.

13  Q.  And is this a true and accurate copy of that report?

14  A.  Yes, it is.

15  Q.  Where does the information on this report come from?

16  A.  It comes from the phone itself.

17  Q.  And did you verify the accuracy of this data compared to

18  the data on the phone itself?

19  A.  Yes, I did.

20  Q.  And was it true and accurate data that was also contained

21  on the phone?

22  A.  Yes, it was.

23          MS. KUSHNER:  The government offers Government Exhibit

24  113-1 into evidence.

25          THE COURT:  Any objection?

MadWden3                    Flatley - Direct

1          MR. DENNIS:  No objection, your Honor.

2          THE COURT:  Received.

3          (Government Exhibit 113-1 received in evidence)

4          MS. KUSHNER:  Can you publish it for the jury,

5    Ms. Geier.

6    Q.  What type of evidence -- what type of data is captured on

7    this front page, Examiner Flatley?

8    A.  Mostly it's device identifier information.

9    Q.  I'm going to ask you about some particular information on

10   this page.  Do you see the line towards the bottom -- if we

11   could zoom out -- that says MSISDN?

12   A.  Yes.

13   Q.  What is MSISDN signify?

14   A.  It signifies the phone number of the phone.

15   Q.  Can you read that number here?

16   A.  Sure.  It's 1-646-418-3329.

17   Q.  And right above that, do you see a line that says ICCID?

18   A.  Yes, I do.

19   Q.  What is ICCID?

20   A.  It's the international circuit card identifier.

21   Q.  And can you read the number for that identifier?

22   A.  Sure.  It's 8901410427093I535434.

23   Q.  And turning your attention back to the full page, do you

24   see the line, the first line that says Apple ID on this page?

25   A.  Yes, I do.

MadWden3                    Flatley - Direct

1    Q.  What is an Apple ID?

2    A.  In order for you to connect to Apple's services, iCloud or

3    whatever, they require you to have an Apple ID, which is

4    normally an email address.

5    Q.  What is the Apple ID listed there?

6    A.  It's pmglm71947@gmail.com.

7    Q.  And a little bit further down, do you see the line where it

8    says device name?

9    A.  Yes, I do.

10   Q.  And what is provided there?

11   A.  It says Willie E.'s iPhone.

12   Q.  Is that a name that the FBI input, or where does it come

13   from?

14   A.  The user would input that, the owner of the phone.

15   Q.  Where does this specific data come from?

16   A.  This data comes from the phone itself.

17   Q.  And a little farther down, do you see that there's another

18   Apple ID listed here?

19   A.  Yes, I do.

20   Q.  And what's that Apple ID?

21   A.  It's willie.dennis@k&lgates.com -- or KL Gates.  I'm sorry.

22   Q.  A little farther down, do you see where it says detected

23   phone model?

24   A.  Yes, I do.

25   Q.  What's listed there?

1    A.  It says IPhone 8 Plus.

2    Q.  And turning your attention to page 2 of this exhibit, what

3    type of data is captured on this page?

4    A.  It's mostly account data.  So, if there was any account for

5    any application or anything on the phone, it would be listed

6    here.

7    Q.  And how many user accounts are listed here?

8    A.  There are 26.

9    Q.  And can you explain why there might be multiple user

10   accounts identified on a phone?

11   A.  So, some of them are for different applications.  So if you

12   have two different email addresses coming to a phone, it would

13   be -- both of them would show up in this page.  Or if you have

14   another application, like WhatsApp or Telegram, those kind of

15   things would show up on this page.

16   Q.  Do you see lines 2 through 18 on this page?

17   A.  Yes, I do.

18   Q.  Are there usernames listed for each of those accounts?

19   A.  Yes, there are.

20   Q.  How many unique usernames are listed in rows 2 through 18?

21   A.  Some of them are -- so, there's seven different ones.

22   Q.  Can you read the account on row 2?

23   A.  On row 2 it's pmglm71947@gmail.com.

24   Q.  And row No. 6?

25   A.  It's the same.  Pmglm71947@gmail.com.

MadWden3                    Flatley - Direct

1   Q.  Sorry.  Row No. 6.

2   A.  Oh.  Willie.dennis@klgates.com.

3   Q.  And row No. 11?

4   A.  Is woc2020@gmail.com.

5   Q.  Row No. 12?

6   A.  Htdr123@gmail.com.

7   Q.  Row No. 16?

8   A.  Bllj4848@gmail.com.

9   Q.  And rows 17 and 18.

10  A.  Wd66644@gmail.com and ruleethics50@gmail.com.

11  Q.  And looking now to row 19, do you see where it says native

12  messages?

13  A.  Yes.

14  Q.  What does that indicate?

15  A.  That is the native texting application for the iPhone.

16  Q.  And what phone number is listed for those native messages?

17  A.  So, the phone number's plus one 646-418-3329.

18  Q.  And right below that, row No. 20, do you know what Signal

19  is?

20  A.  It's a messaging application.

21  Q.  And is there a user ID listed for that application?

22  A.  Yes.  The user ID profile name is Willie.

23  Q.  And looking at row 22, where it says WhatsApp, what does

24  WhatsApp indicate?

25  A.  WhatsApp is another messaging application.

1    Q.  And in the next column, which I believe is account name,

2    what name is listed there?

3    A.  It says Willie.

4    Q.  And the third column, which is the username, what is listed

5    there?

6    A.  It's 1-646-418-3329@s.whatsapp.net.

7    Q.  And zooming back out and returning to page 1 of Government

8    Exhibit 113-1, do you see where it says time zone on the page?

9    A.  The -- yes, I do.

10   Q.  What time zone is listed here?

11   A.  It says Santo Domingo.

12   Q.  And it says UTC minus 4 next to it.  Do you know what that

13   means?

14   A.  So, UTC is Universal Time Code.  It used to be called

15   Greenwich Mean Time, but it's the universally understood and

16   internationally understood place on the planet where the clock

17   starts.  So everything is expressed in hours either plus or

18   minus from UTC.  So this is four hours back from UTC.

19   Q.  And what does it mean that the time zone listed here is

20   Santo Domingo, if you know?

21   A.  So, that would be the time zone that the phone was last set

22   to.

23   Q.  And do you know what time zone we're currently in here?

24   A.  We are currently in Eastern Standard -- Eastern Daylight

25   Time, which is UTC minus 4.

MadWden3                    Flatley - Direct

1   Q.  Are we always UTC minus 4 in New York City?

2   A.  No.  When we go to standard time, we're UTC minus 5.

3   Q.  In front of you, to your right, is a binder that contains

4   Government Exhibits 102-1 through 102-8, Government Exhibits

5   103-1 through 103-4, 103-6 through 103-35, 103-37 through

6   103-46; 104-1 through 104-9, 104-11 through 104-13, 105-1

7   through 105-11, 105-13 through 105-18, 105-20 through 105-30,

8   105-32 through 105-41, 105-43, 105-45 through 105-53, 105-57

9   through 105-59, 105-61 through 105-68, 105-70 through 105-72,

10  106-1 through 106-5, 107-1 through 107-13, 107-15 through

11  107-26, 107-29 through 107-40, 107-42 through 107-49, 107-51

12  through 107-64, 108-1 -- 108-1 through 108-4, and 109-1.  Do

13  you recognize this binder?

14  A.  Yes, I do.

15  Q.  How do you recognize it?

16  A.  I initialed it, and I reviewed it prior to trial.

17  Q.  And in general, what's contained in this binder?

18  A.  It is excerpts of text messages from the phone I examined.

19  Q.  And did you do anything to verify that these were text

20  messages on the phone you examined?

21  A.  Yes, I visually verified them.

22  Q.  What do you mean?

23  A.  So, I looked at these and I looked at the report that I

24  generated and matched the two to make sure that they were

25  correct.

MadWden3                    Flatley - Direct

Q.  And are the text messages contained in that binder true and
accurate copies of text messages that were contained on the
phone?

A.  Yes, they are.

Q.  Were the texts in this binder sent by a particular
individual?

A.  Yes, they were.

Q.  Who were they sent by?

A.  They were sent by Willie Dennis, the owner of the phone.

Q.  All the text messages in there were sent by Willie Dennis?

A.  Yes, they were.

          MS. KUSHNER:  The government offers into evidence all
the exhibits that were just read into the record.

          THE COURT:  Any objection?

          MR. DENNIS:  No, your Honor.  No objection.

          THE COURT:  Received.

          (Government Exhibits 102-1 to 102-8, 103-1 to 103-4,
103-6 to 103-35, 103-37 to 103-46, 104-1 to 104-9, 104-11 to
104-13, 105-1 to 105-11, 105-13 to 105-18, 105-20 to 105-30,
105-32 to 105-41, 105-43, 105-45 to 105-53, 105-57 to 105-59,
105-61 to 105-68, 105-70 to 105-72, 106-1 to 106-5, 107-1 to
107-13, 107-15 to 107-26, 107-29 to 107-40, 107-42 to 107-49,
107-51 to 107-64, 108-1 to 108-4 and 109-1 received in
evidence).

BY MS. KUSHNER:

MadWden3                    Flatley - Direct

1   Q.  I'm just going to pull up one as an example, so turning

2   your attention to Government Exhibit 109-1.  It should be the

3   last -- it's in front of you as well.

4        Do you see at the top of the message where it says "from"?

5   A.  Yes, I do.

6   Q.  What does that field indicate?

7   A.  That indicates who sent the text message.

8   Q.  And the line right underneath it that says "to" --

9   A.  Yes.

10  Q.  -- what does that indicate?

11  A.  That indicates who it was sent to.

12  Q.  And do you see there's another "to" line right below that?

13  A.  Yes.

14  Q.  What does that indicate?

15  A.  That would be, a copy of that message would also go to that

16  account.

17  Q.  And below the text, the content of the message, where it

18  says participant, what does that indicate?

19  A.  That is the people that were on that particular thread.

20  Q.  And to the right, where it says delivered, what does that

21  indicate?

22  A.  That indicates that the message was delivered to the

23  recipient.

24  Q.  And what information is provided about that delivery?

25  A.  The date and time that it was done.

MadWden3                          Flatley - Direct

1  Q.  And next to that column, where it says read, what does that

2  indicate?

3  A.  So, for iPhones, they have a feature called read receipts,

4  so if you send somebody a text message and they have read

5  receipts turned on, then it will send back a response to the

6  phone, the person who sent them the message, saying the message

7  had been receive -- had been delivered and then also had been

8  read by that person.

9  Q.  And is read receipt a function that a user can turn on or

10 off his or her phone?

11 A.  Yes, it's user selectable if they want it or not.

12 Q.  So does the fact that there was no information provided

13 under the read column indicate one way or the other whether a

14 text message was sent?

15 A.  It was sent, but it may not have been read.

16 Q.  But even if there's no information about whether a text was

17 read or not, does that indicate one way or the other whether or

18 not this was read if the recipient had the feature read receipt

19 turned off?

20 A.  Correct.  So, if they had it turned off, you wouldn't know

21 if they read it or not.

22 Q.  At the top, where it says "from," do you see where it says

23 plus one?

24 A.  Yes.

25 Q.  What does that mean?

MadWden3                          Flatley - Direct

1   A.  That is just an indication that it -- the number could be

2   used for international dialing.

3   Q.  And do you see the bottom left-hand corner of this message

4   where it says status?

5   A.  Yes.

6   Q.  And right next to it, it says sent?

7   A.  Correct.

8   Q.  What does that signify?

9   A.  That the message did go out; it did not remain in the

10  phone.

11  Q.  To the bottom right-hand side, what information is

12  reflected there?

13  A.  The time and date that it was sent.

14  Q.  And in this instance, it says UTC plus zero.  What does

15  that mean?

16  A.  That means that it's being expressed in straight UTC time,

17  not the local time zone.

18  Q.  And if you were to convert that, for example, into the

19  local time zone in New York City, what would that be?  This is

20  November of 2020.

21  A.  So, at that time, November of 2020, I believe that is after

22  we've come off Daylight Savings Time, so you subtract five

23  hours from 2:29.

24  Q.  And if we were between March and November, what -- how many

25  hours would be subtracted to convert it into New York City

MadWden3                         Flatley - Direct

1    time?

2    A.  We'd only take off four.

3    Q.  Where does all this information on this text come from?

4    A.  So, all the text messages in an iPhone are stored in what's

5    called a SQLite database.  It's just a small database that the

6    phone uses to keep track of its data for, in this particular

7    case, text messages.  So all of those different fields would be

8    a field in that SQLite database.

9    Q.  So is this accurate data copied from the phone?

10   A.  Yes, it is.

11   Q.  And other than the black -- were the black bars on the

12   original versions of these text messages on the phone?

13   A.  No, ma'am.

14   Q.  Other than that, has this message been altered in any way?

15   A.  No, it has not.

16   Q.  Next to you is a second binder with what's been marked for

17   identification purposes as Government Exhibits 102-1 --

18   sorry -- 120-1 through 120-7 and 120-9 through 120-10.  Do you

19   recognize these exhibits?

20   A.  Yes, I do.

21   Q.  How do you recognize them?

22   A.  I reviewed them prior to trial, and I put my initials on

23   the front of the binder.

24   Q.  What are they?

25   A.  They are printed copies of Excel spreadsheets that I

1  generated detailing the metadata of those text messages or some

2  of -- select number of text messages.

3  Q.  Metadata of text messages on the phone we've been

4  discussing?

5  A.  Yes, ma'am.

6  Q.  And were these text messages identified or isolated in any

7  particular way?

8  A.  They are per different thread with different users, the

9  people that have been sent text messages.

10  Q.  Do each of these charts contain the full set of metadata

11  for a particular thread on the phone?

12  A.  No.  There was some that was irrelevant, that was either

13  blank or not applicable that we removed.

14  Q.  When you say blank, why would it be blank?

15  A.  There is a standard that they put out.  Not every message

16  meets that standard.  So if you had a message that was coming

17  from iMessage as opposed to WhatsApp, or something like that,

18  the fields might be a little different.  But it parses them all

19  the same.

20  Q.  In terms of the text messages that contained content, do

21  these reports contain all the text messages with content that

22  were on a particular text chain?

23  A.  It protects -- it has the metadata.  It does not have the

24  content of the actual message itself.

25  Q.  And do these charts contain true and accurate metadata

MadWden3                     Flatley - Direct

1   information extracted from the iPhone we've been discussing?

2   A.  Yes, they do.

3   Q.  And as you said, just to be clear, is there any content,

4   any text messages contained in these charts?

5   A.  No, there's no content.

6   Q.  Where does the data itself come from?

7   A.  It comes from the phone.

8           MS. KUSHNER:  The government offers Government

9   Exhibits 120-1 through 120-7 and 120-9 through 120-10.

10          THE COURT:  Any objection?

11          MR. DENNIS:  No objection, your Honor.

12          THE COURT:  Received.

13          (Government Exhibits 120-1 to 120-7 and 120-9 to

14  120-10 received in evidence)

15  BY MS. KUSHNER:

16  Q.  Turning your attention to Government Exhibit 120-1, do you

17  recognize this?

18  A.  Yes, I do.

19  Q.  What is it?

20  A.  It's a printed copy of an Excel spreadsheet that I

21  generated detailing metadata from a certain text thread on the

22  phone.

23  Q.  Just to be clear, what do you mean when you say text

24  thread?

25  A.  It's a conversation between two people or sometimes

MadWden3                    Flatley - Direct

1   multiple people.

2   Q.  I want to just go through each column with you.  So, the

3   first column, what information is captured there?

4   A.  That would be the number of the text message.  So if there

5   were a number of different messages back and forth in the

6   thread, that would be the number of the particular text.

7   Q.  And does this whole report capture one text thread?

8   A.  Yes, it does.

9   Q.  And to -- the next column, it says start time and date.

10  What's captured there?

11  A.  The date where the thread started.

12  Q.  And in the next column, there's also a time stamp, is that

13  right?

14  A.  Correct.

15  Q.  And the next column says last activity date.  What

16  information is captured there?

17  A.  So, that would be the last date that this thread was

18  active.

19  Q.  And the time stamp for the last activity in the text

20  thread, is that in the next column?

21  A.  Correct.

22  Q.  And then the column next to that titled participants, what

23  information is captured there?

24  A.  That is who is actually on that particular thread.

25  Q.  And the source column, what information is captured there?

1   A.  That's the application that was used for the actual text.

2   Q.  And the next column?

3   A.  The account, in this case pmglm71947@gmail.com.

4   Q.  And the "from" column.

5   A.  That's who the message was sent from.

6   Q.  And the "to" column, what does that indicate?

7   A.  It's who it was sent to.

8   Q.  And then the final three columns, what does status

9   indicate?

10  A.  So, status will indicate whether it was sent by this

11  person, received by that person, or if it was -- for instance,

12  if a message had failed, it would say failed to send, or

13  something like that, in that column.

14  Q.  And the next column that says time stamp and date, what

15  information is captured there?

16  A.  The time and date of the actual message.

17  Q.  Do all the other reports in this binder contain the same

18  type of information?

19  A.  Yes, they do.

20  Q.  Sticking with this report, what does this report reflect?

21  A.  It reflects a text thread between Willie Dennis and Cally

22  that began on September 17, 2019, and lasted until -- it just

23  went gray on me.

24      There we go.

25          MS. KUSHNER:  It should be at the top column,

MadWden3                         Flatley - Direct

1   actually, Ms. Geier.

2          Go back to the first page.

3          THE WITNESS:  Oh.  Sorry.

4          MS. KUSHNER:  Column --

5   Q.  I think you were talking about column No. 4, Examiner

6   Flatley.

7   A.  Right.

8       So, it started on September 17, 2019, and lasted until

9   January 19, 2021.

10  Q.  OK.  And approximately -- how many texts were sent during

11  that time period of September 17, 2019, to January 19, 2021,

12  directing you to the last page of this exhibit?

13  A.  644.

14  Q.  And how do you know that?

15  A.  Because the last number in the column on the last page is

16  644.

17  Q.  And do you know who sent each of these text messages?

18  A.  Yes.  Willie Dennis.

19  Q.  How do you know that?

20  A.  Because it's in the "from" column for every message.

21  Q.  For all 644 messages?

22  A.  Yes, ma'am.

23  Q.  Did the other individual on this chain, who is saved in the

24  phone as Cally -- did Cally send any messages on this text

25  chain?

1    A.  No, she did not.

2    Q.  Turning your attention to Government Exhibit 120-2, what's

3    shown here?

4    A.  It's an Excel spreadsheet detailing the metadata for a text

5    thread that I retrieved from the phone.

6    Q.  And what was the time period of this text thread?

7    A.  So, it started on May 26, 2020, and lasted until November

8    24, 2020.

9    Q.  And who were the participants on this text thread?

10   A.  John Bicks, Rob Matlin and Willie Dennis.

11   Q.  And how many texts were sent on this text thread between

12   May 26, 2020, and November 24, 2020?

13   A.  113.

14   Q.  Do you know who sent these messages?

15   A.  Willie Dennis.

16   Q.  How do you know that?

17   A.  His name is in the "from" column for every one of them.

18   Q.  Did John Bicks or Rob Matlin, the other two individuals on

19   this text thread, send any of these text messages?

20   A.  No, they did not.

21   Q.  And this is the entire text thread, correct?

22   A.  Yes, ma'am.

23            MR. DENNIS:  Objection.

24            THE COURT:  Ground.

25            MR. DENNIS:  Did you do any analysis of the phones of

1     John Bicks or --

2                 THE COURT:  No, no, no.  That's cross.

3                 MR. DENNIS:  OK.

4                 THE COURT:  You may continue.

5     BY MS. KUSHNER:

6     Q.  Turning your attention to Government Exhibit 120-3, what's

7     shown here?

8     A.  It's a printed version of an Excel spreadsheet for --

9     representing the metadata from a text thread that I downloaded

10    from the phone.

11    Q.  And what was the time period for this text thread?

12    A.  It started in June of 2020, and continued until August --

13    June 10, 2020, and continued until August 25 of 2020.

14    Q.  And do you see the "from" column here?

15    A.  Yes, I do.  It's Willie Dennis.

16    Q.  And what number is listed?

17    A.  64664183329.

18    Q.  Sorry.  Can you repeat that?

19    A.  Plus one 646-418-3329.

20    Q.  And approximately -- I'm sorry.

21        Who are the other individuals on this text thread?

22    A.  So, it was Mary M. O'Day, Rob Matlin, Cally and Willie

23    Dennis.

24    Q.  And how many text messages were sent on this text chain

25    during the time period of June 10, 2020, to August 25, 2020?

MadWden3                          Flatley - Direct

1    A.  64.

2    Q.  Who sent those messages?

3    A.  Willie Dennis.

4    Q.  Did anyone else on this chain send any messages on this

5    chain?

6    A.  No, ma'am.

7    Q.  Turning your attention to Government Exhibit 120-4, what's

8    shown here?

9    A.  It's a printed version of an Excel spreadsheet that I

10   generated detailing the metadata for a text thread that I

11   downloaded from the phone.

12   Q.  And what was the time period of this text thread?

13   A.  It started in -- on June 10 of 2020 and continued until

14   October 14 of 2020.

15   Q.  And who was on this text thread?

16   A.  Cally, John Bicks, Rob Matlin, Whitney Smith and Willie

17   Dennis.

18   Q.  And how many text messages were sent on this text thread

19   from the time period June 10, 2020, through October 14, 2020?

20   A.  869.

21   Q.  And who sent those 869 text messages?

22   A.  Willie Dennis.

23   Q.  Did anyone else on this text chain send any text messages

24   on this text chain?

25   A.  No, ma'am.

MadWden3                    Flatley - Direct

1    Q.  Turning to Government Exhibit 120-5, what's shown here?

2    A.  It's a printed version of an Excel spreadsheet I generated

3    for a text thread that I downloaded off the phone.

4    Q.  What was the time period for this text thread?

5    A.  It started in August, August 27 of 2020, and went until

6    September 6 of 2020.

7    Q.  And who was on this text thread?

8    A.  Gerry Novack, Rob Matlin, Cally and Willie Dennis.

9    Q.  And in the "from" column, what information is listed there?

10   A.  That's Willie Dennis.

11   Q.  And what account is provided?

12   A.  Pmglm71947@gmail.com.

13   Q.  And how many text messages were sent on this text thread

14   which you said started on August 27, 2020, and ended on

15   September 6, 2020?

16   A.  45.

17   Q.  Who sent those 45 text messages?

18   A.  Willie Dennis.

19   Q.  Did anyone else on this text chain send any texts on this

20   text chain?

21   A.  No, ma'am.

22        MR. DENNIS:  Objection as to the witness's ability to

23   make that determination based on his qualifications.

24        THE COURT:  No.  Again, you may inquire on that on

25   cross.  The objection as to his testimony now is overruled.

MadWden3                    Flatley - Direct

1  BY MS. KUSHNER:

2  Q.  Turning your attention to Government Exhibit 120-7, what is

3  shown here?

4  A.  It's an Excel spreadsheet, printed version of an Excel

5  spreadsheet that I generated detailing the metadata from a text

6  thread from the phone.

7  Q.  And what was the time period from this text thread?

8  A.  It started on September 6 of 2020 and lasted until April 8

9  of 2021.

10  Q.  And who were the individuals on this text thread?

11  A.  They were -- it was Mary M. O'Day, John Bicks, Rob Matlin,

12  Cally, Michael Zanic, Nicholas S. Hodge, Whitney Smith, a phone

13  number that begins with 1-617 and Willie Dennis.

14  Q.  And during this time period of September 6, 2020, to April

15  8, 2021, how many text messages were sent on this text thread?

16  A.  88.

17  Q.  Sorry.  Looking at Government Exhibit 120-7.

18  A.  Oh.  I'm sorry.  That was 120-6.

19      120-7, 3,715.

20  Q.  Text messages?

21  A.  Yes, ma'am.

22  Q.  And who sent those 3,715 text messages on this text thread?

23  A.  Willie Dennis.

24  Q.  Did anyone other than the defendant send any messages on

25  this text thread?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MadWden3                          Flatley - Direct

1   A.   There were a couple of read receipts that were in there, so

2   somebody had read receipts turned on and read the message and

3   their phone responded, but they themselves did not respond.

4   Q.   And does that account for just eight of the 3,715 entries

5   on this page?

6   A.   Yes, ma'am.

7   Q.   All the other entries are text messages that were sent by

8   the defendant?

9   A.   That is correct.

10  Q.   Turning your attention to Government Exhibit 120-9, do you

11  recognize what's shown on the screen?

12  A.   Yes, ma'am.  It's a printed version of an Excel spreadsheet

13  I generated detailing the metadata from a text thread that I

14  downloaded off the phone.

15  Q.   And what was the time period of this text thread?

16  A.   It started on October 5 of 2020 and went until October 24

17  of 2020.

18  Q.   And who were the individuals on this text thread?

19  A.   Mary M. O'Day, Cally and Willie Dennis.

20  Q.   And how many text messages were sent between October 5,

21  2020, and October 24, 2020, on this text thread?

22  A.   53.

23  Q.   Who were these text messages sent by?

24  A.   They were sent by Willie Dennis.

25  Q.   Did any of the other individuals on this text thread send

MadWden3                        Flatley - Direct

1    any texts on this text thread?

2    A.  No, ma'am.

3    Q.  And turning your attention to Government Exhibit 120-10 --

4    it should be the last exhibit in the binder -- do you recognize

5    this?

6    A.  Yes, I do.

7    Q.  What is it?

8    A.  It's an Excel spreadsheet detailing the metadata of a text

9    thread that I downloaded from the phone.

10   Q.  And what time period was this text thread?

11   A.  It started on October 17, 2020, and went up until November

12   3, 2020.

13   Q.  And the first row here, it says "from," and it says system

14   message, system message, and then there's no one listed under

15   the "to" column.  What does that indicate to you?

16   A.  That it was just a system message.  It wasn't an actual

17   text from a person.

18   Q.  Were the other messages in this thread messages, such as in

19   row 2, from a WhatsApp.net in the name of Willie to a number in

20   the name of Cally?

21   A.  That's correct.

22   Q.  And so how many text messages were sent on this text chain

23   between October 17 through November 3?

24   A.  That would be eight.

25   Q.  During this time period, did the other individual, Cally,

MadWden3                    Flatley - Direct

1   on this thread send any texts on this thread?

2   A.  No, ma'am.

3   Q.  Who sent the texts?

4   A.  Willie Dennis.

5   Q.  Showing you now what's been marked for identification

6   purposes as Government Exhibits 901 through 905, do you

7   recognize these?

8   A.  Yes, ma'am.

9   Q.  How do you recognize them?

10  A.  I reviewed them prior to court today.

11  Q.  What are they?

12  A.  It's a summation of the number of text messages sent on a

13  particular day on a particular thread from the phone.

14  Q.  And are those -- are the particular threads the threads

15  we've been discussing?

16  A.  Yes, ma'am.

17  Q.  And did you review this, the data on these exhibits, and

18  compare them with the information in the charts that you

19  generated?

20  A.  Yes, I did.

21  Q.  And did you confirm that the data on these exhibits is

22  accurate compared to the data on the charts you created?

23  A.  Yes, it is.

24          MS. KUSHNER:  The government offers Government

25  Exhibits 901 through 905.

MadWden3                          Flatley - Direct

1           THE COURT:  Any objection?

2           MR. DENNIS:  No objection, your Honor.

3           THE COURT:  Received.

4           (Government Exhibits 901-905 received in evidence)

5    BY MS. KUSHNER:

6    Q.  Turning your attention to Government Exhibit 901, what does

7    each column here stand for?

8    A.  So, the first is the date of the messages.  The second is

9    who the message was from.  The third is who the message was to.

10   And the last is the total number of messages sent on that day.

11   Q.  And what's shown here, is this just certain texts that were

12   sent on particular days within the text chain reflected on

13   Government Exhibit 120-1?

14   A.  Yes, ma'am.

15   Q.  Can you walk us through each row here?

16   A.  Sure.

17       So, on August 29, 2020, Willie Dennis texted Cally a total

18   of 88 times.

19       On August 30th and 31st, 2020, Willie Dennis texted Cally a

20   total of 106 times.

21       And on September 1, 2020, Willie Dennis texted Cally a

22   total of 28 times.

23   Q.  And turning your attention to Government Exhibit 902, what

24   information is captured here?

25   A.  It is the number of text messages that Willie sent John

MadWden3                          Flatley - Direct

1  Bicks and Rob Matlin on November 17, 2020.

2  Q.  And how many messages was that?

3  A.  There were 46.

4  Q.  And is this just an example of one day from the chain

5  reflected in Government Exhibit 120-2?

6  A.  Yes, ma'am.

7  Q.  Turning your attention to Government Exhibit 903, what's

8  shown here?

9  A.  The number of text messages that Willie Dennis sent Mary M.

10  O'Day, Rob Matlin and Cally on August 25, 2020.

11  Q.  And how many messages was that?

12  A.  46.

13  Q.  And is this just an example of one day of messages sent on

14  the text threads shown in Government Exhibit 120-3?

15  A.  Yes, ma'am.

16  Q.  And turning your attention to Government Exhibit 904, can

17  you walk us through what's shown here?

18  A.  Sure.

19      The -- on August 25, 2020, Willie Dennis texted Cally, John

20  Bicks, Rob Matlin and Whitney Smith a total number of 60 times.

21      On August 28th and 29th, 2020, Willie Dennis texted Cally,

22  John Bicks, Rob Matlin and Whitney Smith a total of 55 times.

23      On August 30, 2020, Willie Dennis texted Cally, John Bicks,

24  Rob Matlin, Whitney Smith 96 times.

25      On September 1, 2020, Willie Dennis texted Cally, John

1    Bicks, Rob Matlin and Whitney Smith 117 times.

2         On October 10, 2020, Willie Dennis texted Cally, John

3    Bicks, Rob Matlin and Whitney Smith 70 times.

4    Q.  And are these just examples of certain days on the text

5    threads shown in Government Exhibit 120-4?

6    A.  Yes, ma'am.

7    Q.  And finally, turning your attention to Government Exhibit

8    905, what's shown here?

9    A.  It's the number of text messages sent by -- sent on

10   September 26th and 27th, Willie Dennis -- from Willie Dennis;

11   I'm sorry -- to Mary M. O'Day, John Bicks, Rob Matlin, Cally,

12   Michael Zanic, Nicholas S. Hodge, Whitney Smith and a number

13   beginning with 617 a total of 90 times.

14   Q.  And are all the other messages reflected in this chart sent

15   from and sent to the same individuals you just stated?

16   A.  Yes, ma'am.

17   Q.  Can you just go through how many messages Willie Dennis

18   sent on the remaining days shown here?

19   A.  Sure.

20        So on September 9, 2020, there were 91 messages.

21        On October 4th and 5th, 2020, there were 103 messages.

22        On October 6th and 7th, 2020, there were 169 messages.

23   Q.  And turning your attention to Government Exhibit 112-2 for

24   identification purposes, do you recognize what's shown here?

25   A.  Yes.  It's a printed copy of the web history, or a portion

MadWden3                        Flatley - Direct

1    of the web history, for the phone.

2    Q.  What phone?

3    A.  For the phone that I downloaded.

4    Q.  That we've been discussing this whole time?

5    A.  Yes, Willie Dennis' phone.

6    Q.  And what is web history?

7    A.  So, every time you go out on to the internet, either with a

8    personal computer or a phone, it keeps a record of the pages

9    that you visited so that if you want to go back to that page,

10   it's easier for you to do that.  This is just a -- a record of

11   that.

12   Q.  And is this a true and accurate copy of the web history

13   data extracted from Willie Dennis's phone?

14   A.  Yes, it is.

15           MS. KUSHNER:  The government offers Government Exhibit

16   112-2 into evidence.

17           THE COURT:  Any objection?

18           MR. DENNIS:  I have no objection, your Honor.

19           THE COURT:  Received.

20           (Government Exhibit 112-2 received in evidence)

21   BY MS. KUSHNER:

22   Q.  And turning -- sorry.

23       On this, page 1, the right column, the last column on this

24   page, where it says deleted, what does that indicate?

25   A.  That the information had been deleted from the phone.

MadWden3                    Flatley - Direct

1   Q.  And would that have been data that was already captured at

2   the time you extracted it?

3   A.  Yes.  So, the way phones deal with deleted data is, since

4   everything is stored in a database, it doesn't actually get rid

5   of the data; it just marks a column that means it's deleted so

6   that that data is no longer shown.  At a certain time, it will

7   go back and clean up that table, but for a certain amount of

8   time, that data will still be available.

9   Q.  And showing you what's been marked for identification

10  purposes as Government Exhibit 112-1, do you recognize this?

11  A.  Yes, I do.

12  Q.  How do you recognize it?

13  A.  I reviewed it prior to trial today.

14  Q.  What is it?

15  A.  It is a record of the search history through the Safari

16  browser on the phone that I downloaded.

17  Q.  On Willie Dennis's phone?

18  A.  Yes, ma'am.

19  Q.  What type of information -- where does the information on

20  this page come from?

21  A.  It comes from the phone itself.

22  Q.  And is it true and accurate data that came from the phone

23  itself?

24  A.  Yes, it is.

25          MS. KUSHNER:  The government offers Government Exhibit

MadWden3                    Flatley - Direct

1  112-1 into evidence.

2          THE COURT:  Any objection?

3          MR. DENNIS:  No objection, your Honor.

4          THE COURT:  Received.

5          (Government Exhibit 112-1 received in evidence)

6  BY MS. KUSHNER:

7  Q.  At the top of the page, it says searched items.  What type

8  of information is captured in this exhibit?

9  A.  So, when you open the Safari browser on your iPhone, it

10  will give you a little bar at the bottom that you can type

11  things into, what you're looking for.  So if you were to type

12  CNN.com versus CNN, it would bring you to CNN.  If you type any

13  other information that you're looking for, it will then go out

14  and search the internet for it and return things for you to

15  look at.

16  Q.  The column that says source, what information is reflected

17  there?

18  A.  That was the application that was used.  In this case, it

19  was the Safari browser, which is the native browser for the

20  iPhone.

21  Q.  The column that says value, what information is captured

22  there?

23  A.  That is the information that the user typed into that bar

24  at the bottom when the page came up.

25  Q.  There's a column all the way over that says deleted.  What

MadWden3                    Flatley - Direct

1    information is captured there?

2    A.  If that person then went back and deleted that particular

3    item, that would indicate that it had been deleted.

4    Q.  And turning your attention to page 11 of this exhibit,

5    Government Exhibit 112-1, do you see section row 304?

6    A.  Yes, ma'am.

7    Q.  Is that one of the searched items that was entered into the

8    phone?

9    A.  Yes, it was.

10   Q.  And what was the date of that search?

11   A.  October 23, 2020.

12   Q.  And what search was typed into the phone?

13   A.  "Finding someone's home phone number."

14   Q.  And was this search deleted?

15   A.  Yes, it was.

16   Q.  And if data like this shows as deleted, who would have been

17   in a position to delete it?

18   A.  That would have been the user of the phone.

19              MS. KUSHNER:  One moment, your Honor?

20              No further questions.

21              THE COURT:  Cross-examination.

22              MR. DENNIS:  Could we have a look at the disk that we

23   were shown earlier?

24              THE COURT:  Yes.  Does someone want to come and get

25   it?

MadWden3

1          MR. DENNIS:  Can I show it to the jury?

2          THE COURT:  Sure.

3          MR. DENNIS:  Focus in on.  I'll ask the jury, just

4   read this section.  You can look at the whole thing, but I'm

5   going to point you to the part that says this medium is

6   sensitive but unclassified (inaudible).  This medium is

7   sensitive but unclassified, if you would just look at that,

8   that's the section I want you to focus in on.  Do you want to

9   physically take it or --

10         THE COURT:  Do you want to pass it around?

11         MR. DENNIS:  Pass it around.

12         THE COURT:  But go on with your questions while they

13  are looking at it.

14         MS. KUSHNER:  Your Honor, we have an objection.  We

15  just want to note that Government Exhibit 100 is not in

16  evidence.

17         THE COURT:  Oh.  Well, if it's not in evidence, then

18  what do you mean you have no objection?

19         MS. SIMON:  They can read the contents of the CD, but

20  the contents of it were offered for identification by Examiner

21  Flatley and the contents were not offered into evidence.

22         THE COURT:  Do you want to offer it?

23         MS. KUSHNER:  No.

24         THE COURT:  Do you want to offer it?

25         MR. DENNIS:  I don't know.  I thought it was offered.

MadWden3

1          THE COURT:  Well, they're saying it wasn't offered.

2          MR. DENNIS:  I guess my question really is --

3          THE COURT:  Do you want to offer it or not?

4          MR. DENNIS:  Yes.

5          THE COURT:  OK.  Any objection?

6          MS. KUSHNER:  Yes, your Honor.

7          THE COURT:  Ground.

8          (Continued on next page)

MADGden4

1          MS. KUSHNER:  It contains the defendant's own

2    statements.  It has not been introduced by the government or

3    the parties.

4          THE COURT:  Come to the sidebar.

5          (Continued on next page)

MADGden4

1              (At sidebar)

2              THE COURT:  So this was initially marked as Government

3       Exhibit 100.  And in the government's index, what was it listed

4       as?

5              MS. KUSHNER:  Government Exhibit 100.

6              THE COURT:  You have not put a title on it?

7              MS. KUSHNER:  No.  It's the file name 1B26 and the

8       date that the report was generated.  It's a very longs file

9       name.

10             THE COURT:  What is your objection to this being

11      received?

12             MS. KUSHNER:  It's his phone with all of his own

13      statements, his own text messages.  So what we did was examiner

14      Flatley authenticated the contents of the phone, then the

15      binder has excerpts, portions of the contents of the phone,

16      which the government is offering into evidence.

17             THE COURT:  So you are saying it also includes other

18      messages?

19             MS. KUSHNER:  A lot of other phone messages, including

20      other nonstatutory victims and things like that and irrelevant

21      material.

22             THE COURT:  So do you really want to offer this?

23             MR. DENNIS:  I'm just finding out what it is now.

24             THE COURT:  I didn't know either.

25             Now that you know, do you want to offer it?

MADGden4

```
 1              MR. DENNIS:  No, that's fine.

 2              THE COURT:  That's fine, you don't want to offer it?

 3              MR. DENNIS:  No.

 4              THE COURT:  Very good.

 5              MR. DENNIS:  Can I ask, since it was shown, can I ask

 6    what this means?

 7              THE COURT:  While we are at the sidebar, let's ask.

 8              MS. KUSHNER:  It's just a CD that our office has.  All

 9    of our CDs are like that.

10              THE COURT:  Protected from unauthorized disclosure.

11    It has other really fun things like, use felt tip pen only.  I

12    think since it's not being offered, it's what it's labeled.  It

13    doesn't mean anything and shouldn't be before the jury.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25
```

MADGden4                    Flatley - Cross

1           (Jury present)

2           THE COURT:  So ladies and gentlemen, both sides are

3    agreed that this should not be in evidence.  Anything on the

4    label is irrelevant.

5           MR. DENNIS:  It struck my attention because it had the

6    extremely classified language on there.

7           THE COURT:  Come on, Mr. Dennis.

8    BY MR. DENNIS:

9    Q.  In any event, I just wanted to go through a couple of the

10   things that you said during the course of your testimony.  I

11   have mentioned this before, obviously your department and every

12   department is very busy analyzing cell phones, extracting

13   information and passing it along to make sure it ends up in the

14   courtroom, across the country; is that correct?  Right now,

15   your department is very busy doing that?

16   A.  Yes, we have had a sufficient amount of work.

17   Q.  Is it greater than it has been?

18   A.  No, not really.  It's just usually pretty high level.

19   Q.  During your testimony, one of the things you said, a

20   statement you said was, we make an effort to not change it as

21   much as possible.

22          What did you mean -- when you made that statement, we make

23   an effort to not change it as much as possible?

24   A.  So with traditional computer forensics, we have a computer,

25   usually like a desktop computer, we can go in with the computer

1    off, take the hard drive off, and copy it bit for bit from the

2    very beginning to the very end and nothing can interfere with

3    that.  So the operating system or anything like that is off at

4    the time.  And it cannot make any -- it can't protect itself,

5    so to speak.

6        With a phone, it's different, because the phone, we have to

7    go through the interface that the phone provides us.  We cannot

8    rip the guts out of the phone and copy it without it being --

9    the closest thing we can do to that is the GrayKey, which has

10   some things in it to get around some of the protections that

11   the phone will put into place.  But with a regular cell phone,

12   that's not necessarily possible.

13       Now, when I say no changes, what I mean to say is that no

14   changes to the user data.  So whatever data the user has placed

15   on the phone will come down.  But there are other things like

16   the phone, like the internal operations of the phone, if they

17   are on, they will change and there's nothing we can do about

18   that.  But the data that the user has placed on the phone will

19   come down bit for bit.

20   Q.  So all of this language that you were saying, it's the

21   first time I've heard it.

22   A.  I'll explain anything you need, sir.

23   Q.  I appreciate that.

24       There was another statement that you made where you said

25   that in this case, with respect to this phone, you had to do a

MADGden4                    Flatley - Cross

1   deeper dive.

2   A.   Yes.   As I was explaining, iPhones have two areas inside

3   them; one area is called the protected area and the other one

4   is just the regular data.   The usual software that we use,

5   Cellebrite, used for a PC, cannot get into the protected area,

6   but the GrayKey can.

7   Q.   So with all cell phones or iPhone 8s, you have to do a

8   deeper dive; is that right?

9   A.   For all iPhones.   Not all cell phones, just all iPhones.

10              MR. DENNIS:   Can you call up, I believe it was,

11  preliminary data report 113-1.   I don't know if you would be

12  able to put that on the screen.

13              Can you enlarge it.   I'm sorry, maybe it wasn't this

14  one.   I'm looking for the first report.

15  Q.   I have the date here as 9/17/2019, when you testified as to

16  text messages I sent to Cally Bostick.

17  A.   Okay.

18  Q.   Do you recall that date and the number of text messages I

19  sent on that date?

20  A.   It sounds familiar, yes.

21              MR. DENNIS:   Can we call that exhibit up.

22  Q.   My recollection was -- because we're doing a timeline for

23  the jury -- was that on that date, you said on 9/17/2019 that I

24  sent 64 or 70 messages?

25  A.   I would have to see that summary again, please.

MADGden4                        Flatley - Cross

1          MS. KUSHNER:  It's government 120-1.  That's not the

2     right number counsel used.

3          THE WITNESS:  Okay.

4          MR. DENNIS:  Is this the one?

5     BY MR. DENNIS:

6     Q.  So the date is going to be important, 9/17/2019.  And how

7     many text messages did I send on that day?

8     A.  I would have to see that summation again, I'm sorry.

9     Q.  I thought it was at the end.

10    A.  Well, for this particular exhibit, though, 120-1, for the

11    entirety of that thread, it was 644.  That wasn't just one day.

12    That was multiple days.  That was between September 17th and

13    January 19th, so during that time period.

14    Q.  That time period, which starts on September 17th, 2019?

15    A.  Yes, sir.

16    Q.  I'm going to make sure that everyone --

17         MR. DENNIS:  Can we see --

18    Q.  Actually, I can ask you rather than look for it.

19         Do you recall on one of the exhibits -- I'm not sure if

20    it's 120-1, but this is a really important point -- on one of

21    the exhibits it showed the last iCloud backup date.  Do you

22    know or do we need to find when was the last iCloud backup date

23    on the mobile phone that you were testing?

24    A.  I do not recall, sir.

25         THE COURT:  Maybe since it's almost time for the lunch

MADGden4                          Flatley - Cross

1    break, what I suggest is why don't you, the government and this

2    witness spend a few minutes during the lunch break identifying

3    each exhibit you want to ask him about so that we won't have to

4    go searching.

5              MR. DENNIS:  Okay.

6              THE COURT:  So ladies and gentlemen, we'll take an

7    hour lunch break at this time.

8              (Jury excused)

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MADGden4

1           (Jury not present)

2           THE COURT:  I'll see you in an hour.  But coordinate

3   with the witness and the government so when we resume we can

4   move more quickly.

5           (Recess)

6           (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MadWden5                          Flatley - Cross

                            AFTERNOON SESSION

                                 1:45 p.m.

 1              THE COURT:  Let's bring in the jury.

 2              (Jury present)

 3              THE COURT:  Please be seated.

 4              All right.  Mr. Dennis.

 5              Mr. Dennis.

 6              MR. DENNIS:  Yes.  Just give me two minutes, your

 7     Honor.

 8              THE COURT:  All right.

 9              MR. DENNIS:  This will be a very short -- (inaudible).

10              May I ask, Ms. Geier, would you be able to call up

11     exhibit 113-1?

12              THE COURT:  I'm not seeing anything.

13              Oh, there it is.

14     BY MR. DENNIS:

15     Q.  All right.  Where I want to pick up from, I guess, is you

16     received, the FBI or the (inaudible) -- you received a copy of

17     my phone on what date?  What was the actual date that you

18     received --

19     A.  That I received the phone?

20     Q.  The phone.

21     A.  The phone itself, I would have to look at the chain of

22     custody to verify that.

23              MR. DENNIS:  Can someone provide a --

MadWden5                    Flatley - Cross

1  Q.  Do you want to give us an estimate of around when?  We know

2  that we see your signature, your initials, on the phone --

3  A.  Do you have -- yes.  Do you have that?

4  Q.  -- on December 20 of 2021.

5  A.  That would be correct, yes.

6  Q.  Would that be the date that you received the phone?

7  A.  Yes.

8  Q.  OK.  Fine.

9       And when you get a copy of a phone, what information is on

10  there about -- about, you know, identifying information, like

11  what case it belongs to?  What information do you have on the

12  folder so that you know where it goes or where it came from,

13  from whence it came?

14  A.  So, that exhibit you just had up --

15  Q.  Uh-huh.

16  A.  -- the identifying properties of it, the model number, the

17  serial number, the IMEI, those things are downloaded

18  electronically by -- or in this case, it was parsed out by

19  Physical Analyzer.  We then -- or I then look at that report

20  and look physically at the phone and make sure I got the right

21  one.

22  Q.  OK.  Does it have the name of the case on it?

23  A.  It has the case number on the phone.

24  Q.  And so -- let's see.  Where would that be?

25  A.  So, it's at the very top there.  9E-NY-3324003.

MadWden5                    Flatley - Cross

1    Q.  And if I plug that number in somewhere, would that show me

2    the actual case name?

3    A.  Yes.

4    Q.  And when the case began?

5    A.  Correct.

6    Q.  Would you, as part of your process of taking it in, would

7    you plug that number in somewhere and make sure it all matched

8    up?

9    A.  No, sir.  Because we receive a service request from the

10   case agent detailing that number, and then detailing the

11   evidence, the item that they would give us, and we match that

12   up.  The name of the case doesn't really mean anything to me.

13   I just go by that number.

14   Q.  OK.  So we have the name of the case, which -- you didn't

15   look at it, but it's in that number.  So you would -- well, the

16   name of the case shows that it started in 2020.

17            MR. DENNIS:  Can we keep that slide up, please?

18   Q.  It started in October of 2020.  So you received the phone

19   December of 2021, right -- you received the phone --

20   A.  Yes.

21   Q.  OK.  So that's a year and a half after the grand jury

22   indictment was brought down, so year and a half, 2020 it

23   started.  The phone isn't taken until, given to the government

24   until 12/20/21, a year and 11 months later.

25            MR. DENNIS:  Can you actually go back to 13, 113-1.

MadWden5                    Flatley - Cross

1    Timeline.  The intake form, 1113-1.

2             Can you make it larger so that we can see the last

3    cloud backup date?

4    Q.  So the backup date, the last iCloud backup date was --

5    well, can you tell us when the last iCloud backup date was?

6    A.  It says here May 22 of 2021.

7    Q.  OK.  So just to keep our timeline going, the indictment was

8    in October of 2020.  That means between October of 2020, when

9    the indictment was received, and at least until this date in --

10   more information was coming in prior to my being arrested.

11   Were you able to access that information?  Were you able to

12   access that information?  Did you access that information, the

13   information between October of 2020 and this last backup date?

14   Did you access all that information?

15   A.  I don't look at the data.  I just make it available for the

16   case agent to process, to look at.

17   Q.  Well, in your process, if it's on the phone, you would have

18   extracted it, correct?

19   A.  Correct.

20   Q.  OK.  So (inaudible) the purposes of that.  OK.

21            And we talked earlier -- when the phone is in your

22   possession, if there's a SIM card in the phone and if the phone

23   is not on airplane mode, would someone be able to -- from a

24   technology standpoint, be able to see new information, new data

25   that's coming in on a real-time basis?

MadWden5                    Flatley - Cross

1    A.  So, our standard process is as soon as we get a phone, and

2    that's meaning as soon as it comes into our possession, we put

3    it into airplane mode.  We turn off the Bluetooth and the wi-fi

4    so as to isolate it from the network.

5    Q.  OK.  So the question, again, if it's in your possession and

6    the SIM card is in there and the airplane mode is not

7    activated, new data is coming in -- can come in?

8    A.  It could be, sure.

9    Q.  Were you able to detect, when reviewing the phone, that on

10   January 30, emails were deleted and text messages were deleted

11   from the phone, the physical phone itself?  Were you able to

12   detect that?

13   A.  I didn't look for such data.  I just processed it.

14           MR. DENNIS:  It would have been helpful to me.

15   A.  But if I may, sir --

16           THE COURT:  You've answered the question.

17           THE WITNESS:  I'm sorry?

18           THE COURT:  You answered the question.

19   BY MR. DENNIS:

20   Q.  During the course of your testimony, you discussed text

21   messages that had been sent to a number of people, but

22   including Mary O'Day.  Did you see a reply from Mary O'Day to

23   any of my text messages?

24   A.  No, sir, I did not.

25   Q.  Did you see the reply that Robert Zinn made to any of my

MadWden5                         Flatley - Cross

1    messages?

2    A.  I did not see any reply to any of the messages, sir.

3    Q.  Did you see any of the replies that Michael Caccese made to

4    my text messages?

5    A.  No, sir.

6    Q.  All right.  And your software technology would have been

7    able to identify any responses?

8    A.  Yes.

9    Q.  Could it have?

10   A.  Yes, sir.

11   Q.  On September 8 -- September 28, 2020, I sent an E -- a text

12   message to John Bicks at 9:45 a.m.  Did you detect that

13   message?

14   A.  I did not review the text messages, sir.

15   Q.  So what do you know that's -- I'm trying to figure out --

16   you had -- there were some text messages they called up earlier

17   that you identified as being extracted?

18   A.  Yes, sir.

19   Q.  So I guess I'm asking did you extract this text message as

20   well, the one on November -- September 28, 2020?

21   A.  I would have to review the report, and if you can tell me

22   in what exhibit that is, I could look at it.

23   Q.  This was a text message I sent to John Bicks, which

24   basically said --

25             THE COURT:  No, no, no.

1          MR. DENNIS:  What should I do?  He needs me to

2     identify the extracted --

3          THE COURT:  If there's an exhibit you want to show

4     him, but you can't testify.  I've tried to make that clear

5     repeatedly.

6          MR. DENNIS:  OK.

7          THE COURT:  Put a question.  You're not putting a

8     question.  You're making a statement.

9          MR. DENNIS:  I'm asking him.  I'll go back to the

10    witness then.

11    Q.  You've identified in this courtroom today specific text

12    messages that you extracted from the phone?

13    A.  Yes.

14    Q.  Using the processing analysis that you gave to the jury,

15    very (inaudible).  Now I'm asking you, I've got one text

16    message here that I'm sure you (inaudible) -- and I'm asking

17    you if you extracted this from the phone.  It's dated 9/28,

18    2020.

19    A.  I would have to know out of all this where that would be,

20    sir.  If it was in one of the exhibits that the government's

21    given, then I could take a look.

22    Q.  Oh, OK.  But you don't -- so it's not in an exhibit, you

23    can't -- you can't state -- you can't make a --

24    A.  Correct, because I don't know where it came from.

25          MR. DENNIS:  Your Honor, would we be able to add this

MadWden5                    Flatley - Cross

1    as an exhibit?  Because it's really important, I think,

2    regarding the proof of my innocence.

3            THE COURT:  I come back, once again, if you can

4    identify this and if you choose to take the stand, subject to,

5    of course, cross-examination, which you are not required to do,

6    then you may be able to introduce this.  But when some other

7    witness is on the stand, you can't introduce something just on

8    your say-so, because you're not acting as a witness at that

9    point; you're acting as a lawyer.  If you want to have him

10   check these items and see if this is something that he

11   extracted, that's permissible.  If you want to show him

12   whatever it is you have in your hand and ask him if he

13   recognizes it, that's permissible.  But for you to read into

14   evidence something that's not in evidence based on your say-so

15   is not permissible.

16           MR. DENNIS:  Your Honor, I'm not trying to read into

17   evidence, and maybe this is just confusing to me because I have

18   it.  I'm seeing if the witness has been able to identify

19   specific text messages that were helpful to the prosecution.

20   All right?  And I didn't object to them being admitted.

21           THE COURT:  Excuse me.

22           MR. DENNIS:  So the only matter I was asking him to

23   identify and if you could give me, identify -- the jury doesn't

24   have to see it.

25           THE COURT:  You can ask him.  You can put it in front

MadWden5                          Flatley – Cross

1    of him.

2              MR. DENNIS:  OK.

3              THE COURT:  But you can't read it.  That's my point.

4              MR. DENNIS:  OK.

5              MS. KUSHNER:  Can the government see it first?

6              MR. DENNIS:  Yeah, sure.

7              MS. KUSHNER:  The government objects and would ask for

8    a sidebar.

9              THE COURT:  OK.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  Let me see this.

3          MS. KUSHNER:  We have no problem with the procedure of

4    showing him and asking if he recognizes it.  I just want to

5    flag for the Court this is a piece of 3500 that was produced to

6    the defendant in advance.  This is a screenshot of a phone that

7    was taken and then emailed from one of our victims to himself

8    to save messages that the defendant was sending him.  This

9    message is not in evidence.  The government is not putting it

10   in evidence, and this is a reference to the September 24, 2019,

11   police incident that your Honor has previously ruled is not

12   currently in evidence, and there's no basis for asking about

13   it.

14         THE COURT:  So that the record is clear, this is a

15   text message sent, apparently, from Mr. Dennis to Mr. Bicks and

16   others, saying "you sent this aggressive officer to my home at

17   10:30 p.m. at night, where he called me a perpetrator in front

18   of my neighbor."  And then it attaches the card from the

19   detective.

20         I don't see the relevance of this.  I thought we had

21   gone over this at least ten times before.  What's the

22   relevance?

23         MR. DENNIS:  It was simply the government was allowed

24   to put before him, identifying certain, did you extract this

25   information, and I'm asking for the similar, to be able to do

MadWden5                    Flatley – Cross

1    the same thing.  I don't understand.

2              THE COURT:  As you correctly said, there was no

3    objection by you to what they put in, so I didn't have to rule

4    on whether what they put in was relevant or irrelevant.  But

5    they are objecting to this, and so I do have to rule on whether

6    it's relevant or irrelevant, and it's irrelevant.  So the

7    objection is sustained.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MadWden5                          Flatley – Cross

1              (In open court)

2              MR. DENNIS:  Sidebar again, your Honor?

3              THE COURT:  Yes.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MadWden5                    Flatley - Cross

1          (At sidebar)

2          MR. DENNIS:  As a *pro se* defendant representing

3     myself, I would like to at this point understand what was the

4     relevance of the text messages, which were identified by the

5     current witness and asked by the government to identify.  What

6     was the relevance?

7          MS. KUSHNER:  Your Honor, the text messages are all

8     text messages the defendant sent to the statutory victims

9     charged in this case.  They are the very messages on which the

10    charges in this case are based.

11         MR. DENNIS:  This text message provides context and

12    coloring to the ones that they submitted and, if needed, would

13    help to exonerate me.

14         THE COURT:  We've been through this, but I will repeat

15    it one more time.

16         First, the fact that you felt you were mistreated by

17    them is not a defense if the emails you sent are found by the

18    jury to have been threatening, caused them substantial

19    emotional harm, etc.  And I gave the analogy before, but I'll

20    give it again.  If you're in a controversy with a bank and the

21    bank, in your view, illegally closed down your account and took

22    away your money and then you, in retaliation, went and robbed

23    the bank to get your money back, you would still be guilty of

24    bank robbery, and the fact that they had, in my hypothetical,

25    committed a wrongdoing would be neither here nor there on the

MadWden5                    Flatley - Cross

1  charge of bank robbery.  It's the same situation here.

2          You've spent a very large portion of your time trying

3  to show that you were, in your view, mistreated by the firm.

4  That doesn't excuse sending threatening emails, etc., if

5  that's, in fact, what the jury found that you did.  So it's not

6  a defense, and therefore, it's irrelevant.

7          Now, I know you're unhappy about that, but that's the

8  law.

9          MR. DENNIS:  Can I ask you what the dates were of the

10  text messages that you -- what were the dates?

11          MS. KUSHNER:  I mean, there's hundreds of them.

12          MR. DENNIS:  But the ones you had him identify.

13          MS. KUSHNER:  They range from 2019 to early 2021, I

14  believe.

15          MR. DENNIS:  I think you called up two or three

16  specifically on the screen.

17          MS. KUSHNER:  I called up one.  It was November 25,

18  2020.

19          MR. DENNIS:  November 5?

20          MS. KUSHNER:  25th.

21          MR. DENNIS:  2020?

22          MS. KUSHNER:  Yes.

23          THE COURT:  OK.

24          (Continued on next page)

25

MadWden5                          Flatley - Cross

1          (In open court)

2          MR. DENNIS:  I had several more text messages that I

3    wanted you to identify being extracted, but at this point I

4    don't think that, if you have not reviewed them in advance, you

5    would be able to comment, so we'll move on from there.

6    Q.  I guess, to wrap it up, you do not recall or do not know if

7    you extracted any text messages that were sent to me by John

8    Bicks -- I'm sorry, by Michael Caccese, correct?  Just yes or

9    no.

10   A.  Yes.  I didn't review any of the messages for content, so I

11   wouldn't know who they were to or from until after the report

12   was printed and it was put in front of me.

13   Q.  And you did not detect any messages from Mary O'Day to me?

14   A.  No, sir.

15   Q.  Right.  I think in your testimony, correct me, you only

16   detected messages that were sent out, is that right; that were

17   sent by me?  Is that correct?

18   A.  What was put in the report was messages or texts that you

19   had sent to other people, yes.

20   Q.  So nothing was put in the report about messages that were,

21   text messages that were sent to me?

22   A.  I didn't see anything like that, no.

23   Q.  OK.  All right.

24          Oh, I have just one last question.

25          Everything that you extract off the phone goes on to a disk

MadWden5                    Flatley - Redirect

1   or -- where, what was the word you used?  Where is it stored

2   at?

3   A.  So, when we extract the information off the phone, it goes

4   on to a -- either a network drive or another hard drive, but

5   it's put on to some other media storage.  And then we go, use

6   that, use copies of that to do our extraction, to make the data

7   human readable.

8   Q.  OK.  Earlier today we had a -- yesterday, we had someone

9   affiliated with Google testify.  Would the information, at

10  least with respect to the emails and text messages that were

11  extracted off the phone by you, match identically with what

12  would be in the Google cloud system or where Google saves its

13  messages?  Would it match identically?

14  A.  Not identically.  You would probably have more information

15  on the phone than you would in Google.  Simply, Google only

16  does Google stuff.  So the other things that were on the phone

17  would not be present in Google.

18          MR. DENNIS:  Thank you for this education.  Appreciate

19  it.

20          THE COURT:  Anything else from the government?

21          MS. KUSHNER:  Very briefly, your Honor.

22  REDIRECT EXAMINATION

23  Q.  Examiner Flatley, when you said reports that you had

24  reviewed contained only messages from the defendant, were you

25  referring to reports contained in Government Exhibits 102-1

MadWden5                    Flatley - Redirect

1    through -- sorry, 120-1 through 120-7, 120-9 and 120-10, the

2    charts we discussed?

3    A.  Yes, ma'am.

4    Q.  And do those charts contain all text messages that were

5    sent within a particular text chain?

6    A.  Correct.

7    Q.  And the extraction of the entire phone would have included

8    an extraction of all text messages sent to or from that phone,

9    is that right?

10   A.  Yes, that's correct.

11            MR. DENNIS:  Objection.  I think that's --

12            THE COURT:  Do you want to put another question?

13            MR. DENNIS:  Yeah.

14            THE COURT:  All right.  Go ahead.

15            MS. KUSHNER:  One moment.

16            THE COURT:  Are you through?

17            MS. KUSHNER:  One moment, your Honor?

18   Q.  Referring back to Government Exhibits 120-1 through 120-7,

19   120-9 and 120-10, the charts of particular text threads, had

20   there been a text sent to the user of the phone, would those

21   texts have been captured, since it's the entire text thread in

22   those charts?

23   A.  Yes, it would.

24   Q.  And were there any such texts in any of those text threads?

25   A.  No, ma'am.

MadWden5                        Flatley - Recross

1           MS. KUSHNER:  No further questions.

2           THE COURT:  All right.

3           Go ahead.

4           MR. DENNIS:  Can I ask the court reporter to -- can I

5    ask the court reporter just to read back the questions that

6    Ms. Kushner just put to the witness?

7           THE COURT:  The very last one?

8           MR. DENNIS:  Yeah -- no.  Starting when she came

9    for -- what's the word, recross-examination?

10          THE COURT:  This was redirect.  You're having recross

11   now.

12          MR. DENNIS:  Redirect.  Can you start with the first

13   question that she put?

14          THE COURT:  Go ahead.

15          (Record read)

16          MR. DENNIS:  Stop right there.

17   RECROSS EXAMINATION

18   Q.  I was rather confused, because when I was asking you

19   earlier if you had -- if there -- seeing text messages that

20   were sent to me from Mary O'Day, text messages that were sent

21   to me from Michael Caccese and text messages that were sent to

22   me from Robert Zinn, and can you repeat what your response to

23   me was to those?

24   A.  I didn't review the content of the phone, so I didn't see

25   any text messages at all.

MadWden5                    Redirect - Flatley

```
 1   Q.  So you don't know if it contains all the ones that were

 2   sent or received then?  There's no way that you can -- that you

 3   would know?

 4   A.  Correct.

 5           MR. DENNIS:  OK.  Thank you.

 6           THE COURT:  Anything else?

 7           Anything else?

 8           MS. KUSHNER:  Yes.  Briefly, your Honor.

 9   REDIRECT EXAMINATION

10   BY MS. KUSHNER:

11   Q.  What did you do to verify that the extraction of the phone

12   contained true and correct copy of the data on the phone?

13   A.  Can you be more specific?  I mean --

14   Q.  Sorry.  At the beginning of your testimony, you testified

15   about a hashtag and the steps that you take to verify the

16   accuracy of an extraction, and you said you did that here,

17   right?

18   A.  Yes.  It's hash algorithm -- hashtag, sorry.  But, yes, we

19   run a hash so that everything that was extracted by the

20   software, we don't lose any of it, as we copy things along; we

21   make sure that we have everything.

22   Q.  That would include all data on the phone?

23   A.  Yes, ma'am.

24   Q.  Including all the text messages sent to or from the phone?

25   A.  Yes, ma'am.
```

MadWden5                          Redirect - Flatley

1   Q.  You were not asked to review all of those text messages

2   sent to or from the phone?

3   A.  That's correct.

4   Q.  But you verified what was extracted from the phone was a

5   true and accurate copy of the phone itself?

6   A.  Yes, ma'am.

7   Q.  And had --

8           MS. KUSHNER:  One moment, your Honor?

9   Q.  Per your testimony here today, you were asked subsequently

10  to review specific text messages that were contained in the

11  extraction of the phone, right?

12  A.  That is correct.

13  Q.  And did you do anything to verify that those text messages

14  were, in fact, on the phone?

15  A.  Yes, I reviewed the copy that you gave me and the

16  electronic report that I had and made sure that the data was

17  accurate.

18  Q.  You compared the specific text messages we asked you to

19  review with the report reflecting the extraction of the phone?

20  A.  Yes, ma'am.

21          MS. KUSHNER:  No further questions.

22          THE COURT:  Anything else?

23          MR. DENNIS:  No further questions.

24          THE COURT:  Thank you very much.  You may step down.

25          THE WITNESS:  Thank you, your Honor.

MadWden5                          Bicks – Direct

1              (Witness excused)

2              THE COURT:  Call your next witness.

3              MS. KUSHNER:  The government calls John Bicks.

4     JOHN BICKS,

5         called as a witness by the government,

6         having been duly sworn, testified as follows:

7     DIRECT EXAMINATION

8     BY MS. KUSHNER:

9     Q.  Good afternoon, Mr. Bicks.

10    A.  Good afternoon.

11    Q.  How old are you?

12    A.  62.

13    Q.  Where do you work?

14    A.  At K&L Gates.

15    Q.  What is that?

16    A.  K&L Gates is a large global law firm.

17    Q.  What is your title there?

18    A.  I am an equity partner in the firm, and I am the managing

19    partner of the firm's New York office.

20    Q.  I'll come back to your job at K&L Gates in a moment.

21        Are you married, Mr. Bicks?

22    A.  I am.

23    Q.  And do you have any children?

24    A.  I do.

25    Q.  How many children do you have?

1    A.  Four.

2    Q.  How old are they currently?

3    A.  My oldest is 30.  My youngest is 20.

4    Q.  Without stating an address, where do you live?

5    A.  I live in Ridgewood, New Jersey.

6    Q.  How long have you lived there for?

7    A.  17 years.

8    Q.  And do you live there with anyone?

9    A.  I do.

10   Q.  Who?

11   A.  Currently just my wife.

12   Q.  And in 2019, did anyone else live with you and your wife in

13   the house?

14   A.  Yes.  In 2019, our youngest son was still with us.  He

15   hadn't yet gone off to college.

16   Q.  And in 2020, did anyone else live with you in the house at

17   any point?

18   A.  At times during 2020, I had all of my children living with

19   us at home during Covid.

20   Q.  You said you were an equity partner.  Does that mean you're

21   a lawyer?

22   A.  Yes.

23   Q.  How long have you been a lawyer for?

24   A.  37 years.

25   Q.  Where did you go to law school?

MadWden5                         Bicks - Direct

1    A.  To the University of South Carolina School of Law.

2    Q.  And before that, did you go to college?

3    A.  I did.

4    Q.  Where did you go?

5    A.  To Haverford College.

6    Q.  What did you do after law school?

7    A.  After law school, I joined the office of the district

8    attorney of New York County and worked for six years as an

9    assistant district attorney.

10   Q.  And after that?

11   A.  I went into private practice in 1991.

12   Q.  And when did you join K&L Gates?

13   A.  In 2011.

14   Q.  And what title -- what was your title when you joined?

15   A.  Equity partner.

16   Q.  And you said you were currently also the managing partner

17   of the New York office.  How long have you been in that role

18   for?

19   A.  Eight years, approximately eight years.

20   Q.  And do you work currently in the New York office?

21   A.  Yes.

22   Q.  Where is K&L Gates's New York office located?

23   A.  599 Lexington Avenue in Manhattan, corner of 53rd Street.

24   Q.  Are you familiar with an individual named Willie Dennis?

25   A.  I am.

MadWden5                        Bicks - Direct

1   Q.  How are you familiar with him?

2   A.  Mr. Dennis was my partner at the firm from the time that I

3   arrived until 2019.

4   Q.  The firm being K&L Gates?

5   A.  Correct.

6   Q.  Is Mr. Dennis still at the firm?

7   A.  He is not.

8   Q.  While he was at the firm, did you have in-person

9   interactions with Willie Dennis?

10  A.  We did.

11  Q.  What office was he based in?

12  A.  Also the New York office.

13  Q.  Sitting here today, do you see Willie Dennis?

14  A.  I do.

15  Q.  Where is he sitting?

16  A.  Sitting at defendant's counsel table, wearing a red

17  necktie.

18          MS. KUSHNER:  Let the record reflect the witness has

19  identified the defendant as Willie Dennis.

20          THE COURT:  Yes.

21  BY MS. KUSHNER:

22  Q.  What is your role and responsibilities as managing partner

23  of the New York office?

24  A.  So, in that capacity, I'm charged with supervising all of

25  the operations of the office, everything from the practice of

MadWden5                         Bicks - Direct

1   law that's done by the lawyers there, the accounting, finance,

2   HR; all matters related to the operation of the office as a

3   business unit.

4   Q.  You said the defendant stopped working at K&L Gates in

5   2019.  Why did he stop working there?

6   A.  He was expelled from the firm by a vote of the partnership.

7   Q.  And approximately what month was that in 2019?

8   A.  May of 2019.

9             (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MADGden6                          Bicks - Direct

1    BY MS. KUSHNER:

2    Q.  After the defendant stopped working at K&L Gates in May of

3    2019, did the defendant try to email you?

4    A.  Yes.

5    Q.  Did you receive those emails directly from the defendant

6    into your inbox?

7    A.  I did not.

8    Q.  So how do you know that he tried to email you?

9    A.  Those emails were forwarded to me by a representative of

10   our office of general counsel, which was quarantining any

11   emails that were being sent from Willie to me at that time.

12   Q.  So you ultimately saw emails that were addressed to you?

13   A.  Correct.

14   Q.  And what was the email address they were addressed to?

15   A.  It would have been my work email, John.Bicks@klgates.com.

16   Q.  I'm showing you what's been marked as Government

17   Exhibit 524 for identification.

18   A.  I see it.

19   Q.  Do you recognize this?

20   A.  I do.

21   Q.  How do you recognize it?

22   A.  This was an email that was forwarded to me by the general

23   counsel's office.

24   Q.  And actually, I'm sorry, it's in evidence already, so I

25   will ask Ms. Geier to publish it for the jury and then ask you

```
 1   about it.
 2        Who is this email from?
 3   A.  It's from Willie Dennis.
 4   Q.  And who is it to?
 5   A.  Addressed to me.
 6   Q.  What's the date?
 7   A.  August 6th of 2019.
 8   Q.  And the re line?
 9   A.  Re: ABC news:  At least 9 dead, 16 injured in mass shooting
10   in downtown Dayton, police say.
11   Q.  And the image in the email, can you read the first two
12   lines in the image?
13   A.  The first two lines, fret not thyself because of what
14   evildoers nor the workers of iniquity.  For they shall soon be
15   cut down like the green herb.
16   Q.  Do you recall receiving that email?
17   A.  I do.
18   Q.  What was your understanding of it?
19   A.  I didn't have a particular understanding of it.  At the
20   time Willie and I had never discussed scripture, biblical
21   matters while he was at the firm, so it didn't mean
22   particularly much to me, other than being a --
23             MR. DENNIS:  Objection.
24             THE COURT:  I'm sorry.
25             MR. DENNIS:  Objection.
```

MADGden6                           Bicks - Direct

1          THE COURT:  Ground?

2          MR. DENNIS:  Sidebar.

3          THE COURT:  All right.

4          (Continued on next page)

MADGden6                          Bicks - Direct

1          (At sidebar)

2          MR. DENNIS:  Mr. Bicks and I frequently had

3     conversations about god and scripture.

4          THE COURT:  But don't you see, I tried to point this

5     out to you before that it's perfectly fair for you to

6     cross-examine him by asking him, isn't it a fact that we had

7     lots of conversations, to impeach therefore his statement.  But

8     it's not a ground of objecting to his testimony at the time he

9     is on direct.  This is why we have cross-examination so that if

10    you think that he has said something that is not true, then you

11    can confront him with your questions on cross and say, come on,

12    isn't it a fact that we had many conversations or whatever you

13    want -- however you want to phrase it, but that's

14    cross-examination.  It's not a ground for objection.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

MADGden6                     Bicks - Direct

1    BY MS. KUSHNER:

2    Q.  Mr. Bicks, when you saw this email, how did it make you

3    feel?

4    A.  Confused.  I guess a little disturbed why Willie would be

5    sending me a message about a mass shooting and quoting a

6    violent biblical verse, so concerned and confused.

7    Q.  Was this the only email you saw around that time that the

8    defendant addressed to you?

9    A.  No.

10   Q.  Did you see or receive any emails that the defendant sent

11   or tried to send to you in 2019 while you were physically in

12   the New York office?

13   A.  Can you ask the question again.

14   Q.  Do you recall if you saw any emails that the defendant

15   addressed to you after May of 2019 while you were physically in

16   the New York office?

17   A.  Yes, I do.

18   Q.  And did you?

19   A.  Yes.  I do recall seeing emails from the defendant in 2019

20   that I viewed while I was in the office.

21   Q.  I want to turn your attention to 2020.  Did there come a

22   time when you began receiving text messages from the defendant?

23   A.  Yes.

24   Q.  Approximately when do you first recall receiving text

25   messages from the defendant?

1    A.  It was during May of 2020.

2    Q.  And did you continue to receive texts from the defendant

3    throughout the rest of that year?

4    A.  I did.

5    Q.  I'm showing you what's been marked for identification

6    purposes as Government Exhibit 801.

7         Do you recognize what's shown here?

8    A.  I do.

9    Q.  How do you recognize it?

10   A.  This is a text message that I received from Willie.

11   Q.  Is it just one text message?

12   A.  I don't know how you refer to it.  It's a string of text

13   messages that I would have received in a row.  I don't know how

14   you refer to these things.

15   Q.  Who did you receive them all from?

16   A.  From Willie.

17   Q.  Are these true and accurate text messages you received from

18   the defendant?

19   A.  These appear to be copies of the messages I received, yes.

20   Q.  I'm sorry, can you repeat that.

21   A.  Yes, these appear to be the messages that I received.

22           MS. KUSHNER:  The government offers Government

23   Exhibit 801 into evidence.

24           THE COURT:  Any objection?

25           MR. DENNIS:  No objections, your Honor.

MADGden6                          Bicks - Direct

1        THE COURT:  Received.

2        (Government Exhibit 801 received in evidence)

3   BY MS. KUSHNER:

4   Q.  Mr. Bicks, can you please read all the messages in

5   Government Exhibit 801 aloud for the jury.

6        MR. DENNIS:  Objections, your Honor.  Objection.

7        THE COURT:  Overruled.

8   A.  Also, please send me your home number so I can come by to

9   water the plants.  Of course I will find a time when you are

10  not there.  A new gardener awakens flowers long dormant.  Can

11  you capture the image in your mind.  It will be exhausting but

12  fun.  Your sons can help me.  You must agree -- I'm sorry, I

13  want to make sure I didn't miss -- I'm afraid I may have missed

14  one.

15       MR. DENNIS:  Objection, your Honor.  Objection as to I

16  am not being allowed to admit into evidence the text message

17  sent to John Bicks on -- to provide the --

18       THE COURT:  We went through this at great length at

19  the sidebar.  The objection is overruled.

20       Please put another question.

21       THE WITNESS:  I apologize, I just wanted to make sure

22  I hadn't skipped over one of the text messages.

23       THE COURT:  I'm sorry.  So why don't you read from

24  where you left off, including what you think you might have

25  missed.

MADGden6                          Bicks - Direct

1                THE WITNESS:  I will, your Honor.

2                Can you capture the image in your mind.  It will be

3       exhausting but fun.  Your sons can help me.  You must agree,

4       watering the plants is a fair deal, everyone lives.  Maybe I

5       will ask my sons to help.  Really everyone including the

6       flowers will like.  Come home at 8:00 p.m.

7                MS. KUSHNER:  Thank you.

8                That's all, Ms. Geier.

9       BY MS. KUSHNER:

10      Q.  Do you recall receiving those messages?

11      A.  I do.

12      Q.  Who were they from?

13      A.  From Willie Dennis.

14      Q.  What did you understand the defendant to be talking about?

15      A.  I understood that he was talking about thinking about

16      coming to visit me in my home and visit my children.

17               MR. DENNIS:  Objection.  That's out of context.

18      Q.  And how did that make you feel --

19               THE COURT:  Overruled.

20               Put another question.

21      Q.  Did you respond to any of these text messages, Mr. Bicks?

22      A.  Never.

23      Q.  How did these text messages make you feel?

24      A.  These made me terrified.  For the first time, I was really

25      concerned that Mr. Dennis was going to try and come to my

MADGden6                         Bicks - Direct

1    house.

2              MR. DENNIS:  Objection.

3    A.  And interact with my children.

4              MR. DENNIS:  Out of context, no basis.

5              THE COURT:  Mr. Dennis, you are free to put questions

6    to the witness as to what his basis was for these feelings that

7    he had, but it's not a ground for objecting to his testimony.

8    I tried to explain this to you before, but let me try one last

9    time.

10             When a witness is called, then they can give the

11   testimony, as long as it's relevant and meets the rules of

12   evidence.  And if you think the witness is saying something

13   that is wrong or that you disagree with or that you think is

14   inaccurate or that you think is out of context or whatever,

15   that's what you can then ask him about on cross-examination.

16   That's why we have cross-examination, so that both sides can

17   put questions to the witness and the jury can then decide

18   whether they accept what the witness is saying, whether they

19   don't accept what he's saying, what weight to give it, what

20   weight not to give it.  These are all questions for the jury.

21             This is called the adversary system.  It has existed

22   for 500 years or more in all the courts of England and the

23   United States.  So you need to confine your objections to

24   matters other than just simply you disagree with his testimony

25   because that is something that you can try to handle on

MADGden6                        Bicks - Direct

1   cross-examination, but it's not a ground for objection.  So the

2   objection is overruled.

3           Put another question.

4   BY MS. KUSHNER:

5   Q.  Were these the only text messages you received from the

6   defendant in which the defendant referenced your children?

7   A.  No.

8   Q.  And how did these text messages make you feel?

9   A.  Terrified.

10  Q.  Why?

11  A.  I was afraid he was actually going to come to my house and

12  try to interact with members of my family.

13  Q.  Did you have a relationship with the defendant outside your

14  professional relationship with him at the firm?

15  A.  No.

16  Q.  Showing you what's been marked as Government Exhibit 104 --

17  sorry -- what's in evidence as Government Exhibit 104-1.

18          What is this?

19  A.  It's another text message that -- or a series of text

20  messages I received from Willie.

21  Q.  And who else was a recipient on these text messages?

22  A.  I'm going to have to ask you to blow them up a little bit.

23          MS. KUSHNER:  Can we blow the top one up.

24  A.  Thank you.  This is sent from Willie to me and to another

25  partner in the New York office, Rob Matlin.

MADGden6                        Bicks - Direct

1    Q.  And focusing on the --

2              MR. DENNIS:  Your Honor, excuse me, can we have a

3    sidebar.

4              THE COURT:  All right.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MADGden6                          Bicks – Direct

1              (At sidebar)

2              MR. DENNIS:  There are certain portions blocked out.

3              MS. KUSHNER:  The first six digits of the number is

4    blocked out.

5              MR. DENNIS:  And there's no date.

6              MS. KUSHNER:  There is a date on the bottom right-hand

7    side.  I was about to ask him about it.

8              MR. DENNIS:  Okay.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MADGden6                    Bicks - Direct

1   BY MS. KUSHNER:

2   Q.  Mr. Bicks, I know it's hard to see, can you see the day

3   they were sent if we blow them up a little bit?

4   A.  Yes.

5   Q.  What's the date?

6   A.  May 27th of 2020.

7   Q.  Were the other texts on this page also sent on that same

8   day?

9   A.  Yes.

10  Q.  Do you see the timezone here is UTC time?

11  A.  I do.

12  Q.  Do you know what timezone you would have been in when you

13  received these messages?

14  A.  Eastern, in the eastern time zone.

15  Q.  So approximately what time of day would you have received

16  these text messages?

17  A.  At this time of year, that would have been about four hours

18  earlier, so 10:00 o'clock, 9:30, 10:00 o'clock p.m.

19  Q.  And turning your attention to page 1, can you please read

20  the bottom two text messages out loud.

21  A.  The top message says, can't face reality, right, punk.  You

22  piece of shit.

23      The bottom message, you gutter rat piece of shit.

24  Q.  Do you recall receiving these messages?

25  A.  I do.

MADGden6                          Bicks - Direct

1   Q.   And just blowing those two messages back up again, who are
2   they from?
3   A.   They're from Willie.
4   Q.   What number is in the from line?
5   A.   The number that I recognize to be his cell phone.
6   Q.   Can you please read it.
7   A.   (646)418-3329.
8   Q.   And were these two text messages sent within approximately
9   one minute of each other?
10  A.   Yes, that appears to be the case.
11  Q.   Do you recall receiving these text messages?
12  A.   I do.
13  Q.   What did you understand them to mean?
14  A.   All I understood them to mean was he was angry with me and
15  seemed to be obsessed with communicating that to me.
16  Q.   When you say "he," who are you referring to?
17  A.   Mr. Dennis.
18  Q.   Is this the only time the defendant called you names like
19  punk or piece of shit or gutter rat?
20  A.   No.
21  Q.   Turning your attention to what's already in evidence as
22  Government Exhibit 104-2.
23       Do you recognize these messages?
24  A.   I'm going to need you to expand them a little bit for me.
25  I'm sorry.

MADGden6                          Bicks - Direct

1    Q.  Sure.

2    A.  They're just very hard to read when they're green.

3        I recognize these messages.

4    Q.  What are they?

5    A.  These were additional messages that were sent from Willie

6    to me and also addressed to my partner, Mr. Matlin.

7    Q.  And these, in the text in Government Exhibit 104-1, which

8    we just looked at, were these all on the same text thread, to

9    you and to Rob Matlin?

10   A.  Yes.

11   Q.  Did you create this text thread with the defendant and Rob

12   Matlin?

13   A.  I did not.

14   Q.  And focusing on the text messages shown here, what was the

15   date of these two messages?

16   A.  May 30th of 2020.

17   Q.  It's in UTC time, so approximately when would you have

18   received these messages, what time of day?

19   A.  Approximately 10:30 at night.

20   Q.  The day before?

21   A.  Correct.

22   Q.  I'm going to read these two messages aloud from the

23   defendant.  And what is John the dirty prosecutor saying?  They

24   are terrible.  You hypocritical bitch.  You are going to get

25   yours.

1            MR. DENNIS:  Objection, your Honor.

2            And this is going to be the basis for my objection,

3       yes, I decided -- I agreed to the introduction of these text

4       messages because I thought they included all the text messages

5       that had been sent to John Bicks, including the exonerating

6       text messages, which were incurred during the same period of

7       time.  So this has only been cherry-picked, and so it doesn't

8       have the text messages that give a context to what was actually

9       going on during the period in which I was sending John Bicks

10      these.  So at this point, I object to the continued review of

11      this unless the email -- the text messages that were also put

12      on the phone during the same time and sent to John are included

13      in this deck as well.

14           THE COURT:  So there are two points relevant to what

15      you just said.  One is that if there are text messages that you

16      want to introduce, you can only do that one of two ways; one is

17      by showing them to a witness with knowledge of them.  And then

18      if he or she then says, yes, I received that message or I

19      recognize that message, then it comes in as evidence.

20           But the second way is, of course, if you yourself

21      choose to take the stand -- which you're not required to do,

22      which you are free not to do and it cannot be held against you

23      if you don't take the stand -- but if you do, then you can put

24      in other messages that way.

25           But you are raising now what I take it to be what is

1    referred to in the federal rules of evidence is the rule of

2    completeness, and that applies to a very different situation.

3    The rule of completeness applies when one party offers half of

4    a sentence and doesn't offer the other half of the sentence.

5            But what you want to do is introduce some alleged

6    other emails and if this witness can identify those other

7    emails, they may well come in, assuming they're relevant.  If

8    he can't, then there are other ways I have already indicated

9    you may be able to put them in.  But it's not a basis for

10   objection to the government putting in.

11           And I should mention to you, ladies and gentlemen of

12   the jury, that long before the start of this trial, as in every

13   trial, the government turns over to the defense, whoever the

14   defense may be, all the emails, all the text messages, the

15   whole thing.  That doesn't mean that they have to put in all

16   3,000 or whatever.  They can choose to put in some.  And then

17   the other side, if they can establish a witness, can put in the

18   rest.  That's the way the system works.

19           So in this case, the government has repeatedly assured

20   me that they have, well before the start of this trial, turned

21   over to Mr. Dennis a hundred percent of all the emails and text

22   messages that they have gotten from K&L Gates or wherever.

23           MR. DENNIS:  Objection, your Honor.

24           THE COURT:  No.

25           MR. DENNIS:  Your Honor --

1             THE COURT:  Let me finish what I'm saying.

2             And that, of course, is not only what happens in this

3    case, that's what happens in every case.  So just to review,

4    the government is required to turn over to the defense all the

5    text messages, emails and so forth.  They have repeatedly

6    represented to me that they did that in this case.

7             They are not required to put in all umpteen text

8    messages.  They can put in the ones that they think are

9    relevant.  And the defense then, if it can establish the

10   authenticity, can put in the ones that they think are relevant.

11   So that's what we call the adversary system.  Both sides get a

12   chance to put whatever they think is important to you, and then

13   you decide.

14            So now, what is it you wanted to say?

15            MR. DENNIS:  My objection, which is very relevant at

16   this point, is that, from the beginning of this action until

17   June of 2022, I was represented by counsel, who this --

18            THE COURT:  Who you fired.

19            MR. DENNIS:  Who this material was presented to, who

20   never submitted any of this into evidence at this point.  So

21   they -- they had it for over seven, eight months, as the Court

22   pointed out, and they didn't submit a single exhibit.  So

23   that's why I did fire them.

24            So there's nothing in there, even though they had this

25   material.  They're trained to do this.  They should have been

MADGden6                          Bicks - Direct

1    able to siphon through it; this is what you need to include.

2    There's nothing in there.  So that's why I fired them, because

3    they were not doing their job, despite the fact, as the Court

4    pointed out, they have had all this information since December.

5    So why am I sitting here having to do this myself?

6              THE COURT:  I'm sorry --

7              MR. DENNIS:  The other point that I will make, which

8    is really, really important, this case went along for nine

9    months.  I finally got involved.  There had not been issued any

10   subpoenas by my prior counsel.  They had not made any requests

11   for discovery.  So that's why I took over the matter, not that

12   I wanted to, but it wasn't going anywhere.  And I am being

13   faulted, and I feel unfairly, because of what they had from the

14   very beginning and they did nothing.  And that's why I'm

15   sitting here at this table right now doing this.

16             THE COURT:  Ladies and gentlemen, there's two points.

17             First of all, what you just heard is inaccurate in the

18   following respect:  Mr. Dennis was given counsel from the

19   Federal Defenders of New York, a very highly regarded group.

20   He chose to fire them and proceed by himself.  He could have

21   asked for appointment of new counsel, but he said no, I want to

22   represent myself, which is his right.

23             Then, Judge Schofield, who originally had this case

24   appointed a lawyer, a very highly respected lawyer, to assist

25   him so that even though he was representing himself, he would

1   know the rules of evidence, he would know what things to ask

2   for and so forth.  And he fired that person.

3          And then when the case was reassigned to me, he asked

4   me to appoint a third person to be standby counsel, and I did.

5   And I appointed a lawyer who, as I explained at the time, was

6   exceptionally qualified to be of service to Mr. Dennis.  And

7   Mr. Dennis fired him.  Now, he had a right to do that and

8   proceed all by himself, but he can't complain when he was given

9   all those opportunities.

10         Furthermore -- and this is the most important thing --

11  this is all irrelevant.  Here, we have Mr. Dennis playing

12  witness again and making assertions which are, you may well

13  find, less than the whole story.

14         MR. DENNIS:  I object.

15         THE COURT:  I know you object.  Duly noted.

16         But the point is, it's irrelevant.  What's relevant

17  for you is whether or not the government has established by

18  proof beyond a reasonable doubt that emails were intentionally

19  sent to harass or threaten one or more other persons and

20  whether it caused those persons substantial emotional distress.

21  I have told you that several times now, but let me say it once

22  again.  That's the only issue in this case.  It has nothing to

23  do with whether or not he liked his previous lawyers.  It has

24  nothing to do with his claim that his previous lawyers didn't

25  do what he wanted them to do.  It has nothing to do with the

MADGden6                          Bicks - Direct

1  fact that he fired not one, but three lawyers.  None of that is

2  relevant.  So please disregard that.

3             And please, Mr. Dennis --

4             MR. DENNIS:  Objection.

5             This needs to be on the public record, your Honor.

6             THE COURT:  No, no.  You have had your say and --

7             MR. DENNIS:  You talked about my decisions in terms of

8  counsel --

9             THE COURT:  You have had your say and more than you

10  should have said.

11            MR. DENNIS:  We have had --

12            THE COURT:  Ladies and gentlemen, why don't you take

13  your afternoon break right now, 15-minute break.

14            MR. DENNIS:  He just joined the case two months ago.

15            (Jury excused)

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

MADGden6

```
 1              (Jury not present)

 2              THE WITNESS:  Should I step down.

 3              THE COURT:  Yes.  Please be back in 15 minutes.

 4              Mr. Dennis, despite my not only directing you but

 5      pleading with you to just ask questions and not make statements

 6      to the jury, you just insisted right now on making a lengthy

 7      statement that was also, in the Court's view, a total

 8      distortion.  But whether it was true or false is irrelevant

 9      because it was improper for you to do that.  And you left me

10      with no choice, since these were matters within the knowledge

11      of the Court, to have to instruct the jury both as to what the

12      facts were, but more importantly as to the irrelevancy of their

13      consideration.

14              You insist on trying to inject into this jury trial

15      matters that are completely irrelevant to the jury's role and

16      duty.  And I have warned you.  Again, as you go down this path,

17      you will in the end leave me no choice but to hold you in

18      contempt.  I really don't want to do that.  But the order of

19      this court is that you only ask questions.

20              If you have some matter that you think needs to be

21      raised that is different from a question, like making a record,

22      you do so at the sidebar.  You know how to do that.  But you do

23      not make factual assertions in front of the jury, whether

24      relevant or irrelevant.

25              In this case, it was blatantly irrelevant.  But even
```

MADGden6

1    if it was relevant, it's still improper.  And I don't seem to

2    be able to get you to abide by that fundamental basic rule of

3    law.  And I would hate to have to go down the road of holding

4    you in contempt.  But if you leave me no choice, I will.

5               We will take a ten-minute break.

6               (Recess)

7               (Continued on next page)

MadWden7                        Bicks - Direct

 1                  (Jury present)

 2                  THE COURT:  Please be seated.

 3                  Counsel.

 4     BY MS. KUSHNER:

 5     Q.  Mr. Bicks, I want to briefly go back a moment.  Earlier you

 6     testified that you were physically in the New York office when

 7     you started to receive or see emails that were sent to you by

 8     the defendant after his termination in May of 2019.  Is that

 9     right?

10     A.  Yes.

11     Q.  I'm showing you what's already in evidence as Government

12     Exhibit 523.

13     A.  I see.

14     Q.  Do you recognize this email?

15     A.  I do.

16     Q.  Was it shown to you?

17     A.  It was.

18     Q.  And who is it from?

19     A.  From Willie to me.  It's also copied to our director of

20     administration in the New York office, Greg Vasilakis.

21     Q.  Starting with the first email at the bottom of the chain,

22     can you please read that aloud.

23     A.  Reading from the bottom up:  "Endless unnecessary violence

24     and death.  Gun control now," exclamation point.  "At least

25     nine dead, 16 injured in mass shooting in downtown Dayton,

1    police say.  The shooting took place in the city's Oregon

2    district," and then they link to an ABC News story.

3         And above that, a message saying, "heading to service now

4    and will pray on this as well as our issues."

5    Q.  And the date of this message?

6    A.  August 4 of 2019, Sunday.

7    Q.  And returning briefly to Government Exhibit 524, which you

8    already testified about, is this the same -- sorry.

9         The date of this message, what is it?

10   A.  I believe this is August -- August 6 -- I'm sorry -- which

11   actually would have been August 5 when I received it.

12   Q.  So shortly after the email in Government Exhibit 523?

13   A.  Correct.

14   Q.  And then turning your attention to what's in evidence as

15   Government Exhibit 525, do you recognize these emails?

16   A.  I do.

17   Q.  Who are they from?

18   A.  Again, from Willie to me and copied to Greg Vasilakis, our

19   director of administration.

20   Q.  And what is the date these emails were sent to you?

21   A.  August 8 of 2019.

22   Q.  And starting at the bottom of the chain, can you please

23   read up, until the link, the substance of the email?

24   A.  Starting at the bottom:  "See article, the suspect's motive

25   appears to be robbery, anger and hate.  At least four dead, two

1  injured in southern California stabbing rampage.  Suspect

2  arrested.  A series of stabbings and robberies in southern

3  California Wednesday night killed and injured multiple people,

4  police said."

5      Above that the message:  "John, this is not good for the

6  country.  Do you love our nation?  There have been 253 mass

7  shootings in 2019 as of Wednesday, according to the

8  not-for-profit gun violence archive."

9  Q.  And the top email?

10 A.  "And I assure you this is not quote/unquote fake news.

11 Those people did die."

12 Q.  And you remember seeing those emails?

13 A.  I do.

14 Q.  And what's already in evidence as Government Exhibit 526,

15 do you recognize this email chain?

16 A.  I recall seeing this, yes.

17 Q.  What's the date of the top email of the chain?

18 A.  September 1 of 2019.

19 Q.  And the date at the bottom, in the first email shown on

20 this page?

21 A.  August 31 of 2019.

22 Q.  And can you read the bottom message up until the news link?

23 A.  "John, you have to speak up.  Substantive legislation to

24 stop the killing.  Five dead, 21 injured in the shooting in

25 western Texas, suspect killed.  Police said the active shooter

MadWden7                        Bicks - Direct

1  was shot and killed at the Synergy in Odessa."

2  Q.  Email above that?

3  A.  And John, what do you think all these mass shootings have

4  increased -- I'm sorry.  "And John, why do you think all these

5  mass shootings have increased dramatically over the past two

6  years?"

7  Q.  And above that?

8  A.  "I know you never changed your mind, but really how many

9  more people have to die before you act?"

10 Q.  And above that?

11 A.  "And I know you know more than all of them, but all the law

12 enforcement agencies believe things would be safer if there

13 were less arms, particularly automatic, in the hands of

14 citizens.  Think a law enforcement officer lost his life today.

15 Don't you care?  Act."

16 Q.  And finally, the message at the top?

17 A.  "Death toll just increased to seven."

18 Q.  Were there additional emails around this time, in 2019,

19 that the defendant attempted to send you that you ultimately

20 saw?

21 A.  Yes.

22 Q.  And did those, at least the emails that we just saw in

23 Government Exhibits 523 through 526, how did those emails make

24 you feel?

25 A.  These were -- A, they were confusing; B, they were

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MadWden7                         Bicks - Direct

1    upsetting in the sense that I don't -- I couldn't figure out

2    why he felt compelled to communicate to me about mass shootings

3    and describing them in detail and somehow suggesting that I had

4    something to do with it or that I had the ability to stop it.

5    So I would say upsetting mixed in with a little confusion as to

6    why he would send them to me.

7    Q.  Going back to where we left off right before the break,

8    which was Government Exhibit 104-2, I'm just going to read

9    these three text messages aloud:  And what is John the dirty

10   prosecutor saying?  They are terrible.  You hypocritical bitch.

11   You are going to get yours."  And then the third text message:

12   Bitch.

13        Who were these text messages from?

14   A.  From Willie.

15   Q.  And who were they sent to?

16   A.  They were sent to me and also my partner, Rob Matlin.

17   Q.  And what is the date of these messages?

18   A.  May 30 of 2020.

19   Q.  And approximately what time of day would you have received

20   these messages?

21   A.  About 11 o'clock at night.

22   Q.  And how did these messages make you feel?

23   A.  I was concerned and confused as to why he would be calling

24   me -- referring to me as a dirty prosecutor.  I was a

25   prosecutor for six years after I got out of school, as we

1    talked about.  I had no idea why he would be calling me a dirty

2    prosecutor.  I never was.  So I was a little concerned that now

3    he's sort of trying to get out in the public record and talk

4    about things that are not true that impact on my integrity.  So

5    that worried me.  It concerned me a lot.

6    Q.  And when he said "you are going to get yours," what did you

7    understand that to mean?

8    A.  I took that to be an overt threat of some kind, either that

9    he was going to attack my integrity or spread -- spread this

10   false information.  That was how I perceived it.

11   Q.  And you said you received these approximately 11 or --

12   received them approximately at night on May 29, 2020.  Is that

13   right?

14   A.  Yes.

15   Q.  Were these messages all sent within a minute of each other?

16   A.  It appears that they were, yes.

17   Q.  Was this the only time the defendant sent you back-to-back

18   messages?

19   A.  No.

20   Q.  And was it the only time the defendant messaged you at

21   night?

22   A.  No.

23   Q.  In 2020, how often, approximately, was the defendant

24   texting you at night?

25   A.  I would say multiple times a week.  Not every day but

1    plenty of days.

2    Q.  Were they disruptive to you?

3    A.  Yes.  They were coming in often in the middle of the night,

4    often later than this.  Often at one, two, three, 4 o'clock in

5    the morning these messages would come.

6    Q.  During this time -- I'll come back to that in a moment.

7        Turning your attention to what's in evidence as Government

8    Exhibit 105-11, what is this?

9    A.  It's another -- a text message from Willie, sent to me and

10   to three of my other partners, Cally Bostick, Rob Matlin and

11   Whitney Smith.

12   Q.  And what date was this message sent?

13   A.  May 27 -- I'm sorry.  June 27 of 2020.

14   Q.  Can you please read this message out loud?

15   A.  It says:  "John, is your Klan meeting this weekend?"

16   Q.  What's your understanding of what the defendant was

17   referring to when he said Klan?

18   A.  I assume that was a reference to the Ku Klux Klan.

19   Q.  What is the Ku Klux Klan?

20   A.  A white supremacist organization.

21   Q.  So what was your understanding of --

22            MR. DENNIS:  Objection, your Honor.  I don't know that

23   the expert is a witness to --

24            THE COURT:  I'm sorry.  I can't hear you.

25            MR. DENNIS:  I'm sorry.  The expert isn't a witness on

MadWden7                        Bicks - Direct

1    what the Ku Klux Klan is.  I don't know if he's offering

2    testimony as to how he can testify.

3                THE COURT:  All right.  Sustained.

4    BY MS. KUSHNER:

5    Q.  What was your understanding of what the Klan was referring

6    to?

7    A.  My general understanding -- withdrawn.

8         The only reference to the word "clan," particularly spelled

9    with a K, that I'm aware of would be to the Ku Klux Klan.

10   Q.  And so to you, what did you understand the defendant to be

11   saying to you?

12   A.  I understood him to be asking whether I was going to a KKK

13   meeting.

14   Q.  Do you have any involvement in a white supremacist --

15   sorry.

16        Do you have any involvement in the Ku Klux Klan?

17   A.  I do not.

18   Q.  How did it feel to you to be asked this question?

19   A.  Pretty terrible.

20   Q.  Why?

21   A.  Coming right out and accusing me of being a racist and

22   being affiliated with one of the more terrible racist

23   organizations that that this country's ever seen.

24   Q.  And turning your attention to Government Exhibit 105-13,

25   which is in evidence, and zooming in on this text message, who

MadWden7                        Bicks - Direct

1  is this text message from?

2  A.  From Willie to -- addressed to me and to my three other

3  partners, Cally Bostick, Rob Matlin and Whitney Smith.

4  Q.  I'm going to read the text message aloud:  "Rob, so just

5  march the kids into the ovens.  Oh, I mean schools, and you sit

6  in John's office and you say OK, now let's get back to Willie,

7  that Black rascal."

8       Do you recall receiving this message?

9  A.  I do.

10  Q.  What's the date?

11  A.  August 25 of 2020.

12  Q.  What was your understanding of who the defendant was

13  referring to when he said Rob?

14  A.  The message is addressed to Rob Matlin.  I understood it to

15  be directed to Rob.

16  Q.  And turning your attention now to Government Exhibit

17  105-14, do you recognize this text message?

18       MS. KUSHNER:  If we could blow it up.

19  A.  Yes.  It's another message from Willie to Cally Bostick,

20  myself, Rob Matlin and Whitney Smith.

21  Q.  Can you please read that?

22  A.  "Kids into ovens and I am the bad guy.  And is that the

23  first bad thing John did?  Tell me I am full of..."

24  Q.  And the date of this text message?

25  A.  August 25 of 2020.

MadWden7                          Bicks - Direct

1   Q.  Same day as the text message you just read directed to Rob?

2   A.  I believe so, yes.

3   Q.  And turning your attention to what's in evidence as

4   Government Exhibit 105-16.

5         MS. KUSHNER:  And zooming in on this.

6   Q.  What is this?

7   A.  Another message from Willie to Cally Bostick, myself, Rob

8   Matlin and Whitney Smith.

9   Q.  Can you read it aloud?

10  A.  "John, do you have the ovens going this morning?"

11  Q.  And the date of this message?

12  A.  August 28, 2020.

13  Q.  With respect to Government Exhibits 105-13, 105-14, and

14  this one, 105-16, what was your understanding of what the

15  defendant was referring to when he said, he sent you a message

16  about marching kids into ovens or asking if you have the ovens

17  going?

18  A.  I interpreted this as a reference to the ovens that were

19  used as part of the genocide of Jews during the Holocaust as

20  part of World War II.

21        MR. DENNIS:  Your Honor, can we have a sidebar,

22  please?

23        THE COURT:  All right.

24        (Continued on next page)

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          (At sidebar)

2          MR. DENNIS:  I'm trying to understand the relevancy of

3    these, reading all these text messages to the jury.  How many

4    more are we going to do?  I mean I don't know what -- what the

5    government is trying to accomplish at this point.  I'm not sure

6    about relevancy right now.

7          THE COURT:  Yes.  The relevance is, under the

8    cyberstalking statute, they have to show beyond a reasonable

9    doubt, among other things, that one or more messages were sent

10   that were designed to harass or intimidate and thereby caused

11   substantial emotional distress.  So, for example, whereas the

12   emails that were interpreted by the witness to relate to

13   potential physical harm to his sons would fall into one

14   category, another possible category is harassment in the sense

15   of making improper allegations against someone that were

16   calculated to cause substantial emotional distress.  That's why

17   it's relevant.

18         Of course, I understand that you don't agree with

19   those interpretations.  That's why you're going to have your

20   cross, but I think the relevance is clearly there.

21         But let me ask the government.  Roughly how much more

22   do you have?

23         MS. KUSHNER:  Your Honor, we're just starting the

24   beginning of -- we've already significantly culled down the

25   number of text messages the defendant sent this victim so that

MadWden7                          Bicks - Direct

1    the jury would only hear what is minimally necessary.

2               THE COURT:  Yes.  That's not my question.  Maybe I'll

3    rephrase the question.  How much longer, in terms of time, do

4    you estimate?  That's the question I'm asking.

5               MS. KUSHNER:  Under an hour.  Maybe 40 minutes.

6               THE COURT:  All right.

7               It sounds like, Mr. Dennis, we'll finish the direct

8    today, and if you want to at that time end for today and have

9    the whole evening to prepare your cross, I will allow it.

10              MR. DENNIS:  I mean that's one point.

11              Two points I'd like to make.  I don't know how long

12   we've been at this in terms of the -- timewise, but it's so --

13   to my mind, at least in my impression, so overwhelming to the

14   jury, that I will need a significant amount of time with this

15   witness tomorrow.

16              THE COURT:  OK.  That's why I think it's useful -- if

17   you want to start today, you can.

18              MR. DENNIS:  No.

19              THE COURT:  I just thought you would prefer to wait.

20              MR. DENNIS:  Yes.

21              THE COURT:  OK.

22              (Continued on next page)

23

24

25

MadWden7                    Bicks - Direct

1             (In open court)

2    BY MS. KUSHNER:

3    Q.  Mr. Bicks, you just testified that several of the messages

4    the defendant sent you referencing ovens you understood to be a

5    reference to the genocide.  What genocide are you talking

6    about?

7    A.  The mass murder of Jewish people during the Holocaust in

8    connection with the second world war.

9    Q.  And going back briefly to Government Exhibit 105-13, this

10   message referencing ovens that's directed to who you understood

11   to be Rob Matlin, was your understanding -- what was your

12   understanding of Rob's religion?

13   A.  Rob's Jewish.

14   Q.  So by asking if you have the ovens running, what did you

15   feel -- did you feel the defendant was implying anything about

16   you?

17   A.  Sure.  That the nicest way to put it would be to imply that

18   I was an anti-Semite.  That's the nicest way to put it.

19   Q.  How did that make you feel?

20   A.  Terrible.

21   Q.  Why?

22   A.  Lousy thing to say.  He has no idea how down that makes me

23   feel personally.  I doubt he knows my father's Jewish.  So it

24   made me feel terrible.

25   Q.  Turning your attention to --

1          MR. DENNIS:  Objection.  Your Honor, sidebar?

2          THE COURT:  All right.

3          (Continued on next page)

MadWden7                          Bicks - Direct

1                (At sidebar)

2                MR. DENNIS:  Maybe this is on cross-examination, maybe

3     I thought about it this is on cross-examination.  He just made

4     a statement that I knew his father was Jewish, but he said we

5     never talked about religion at all.  That's a cross-examination

6     point?

7                THE COURT:  Yes.

8                MR. DENNIS:  OK.

9                (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MadWden7                         Bicks - Direct

1                  (In open court)

2     BY MS. KUSHNER:

3     Q.  And turning your attention to Government Exhibit 105-32,

4     page 2, can you please -- what is this?

5     A.  Another message sent from Willie to my partners, Cally

6     Bostick, Rob Matlin, Whitney Smith and myself.

7     Q.  And the date?

8     A.  September 1 of 2020.

9     Q.  Can you please read it?

10    A.  "Rob, of the six million Jews remaining, how many do you

11    think you endangered?  Or it was your fault Willie.  John and

12    Jack told me, now, look, I have to heat the ovens for them this

13    morning.  Can we talk later?  John and Jack, I am."

14    Q.  What was your understanding of this text message?

15    A.  Beyond the, you know, nonveiled references to heating ovens

16    for people to walk into, which, as I said, I see only as a

17    reference to the Holocaust, genocide that went on and accusing

18    me, I guess, of being the one lighting ovens and asking people

19    to walk into them; that's what I took from it.

20    Q.  And in the second text message on this page, can you please

21    read this aloud?

22    A.  "John, Jack, ovens are ready.  OK, Rob.  Just step inside

23    and check the temperature.  Rob.  OK.  And then they came for

24    me."

25    Q.  Who was that from?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    A.  From Willie to, again, to my partners Cally Bostick,

2    myself, Rob Matlin and Whitney Smith.

3    Q.  And the date of this message?

4    A.  September 1 of 2020.

5    Q.  What was your understanding of who Rob was referring to

6    here?

7    A.  By -- the John, I expect, was referring to me.  The Jack I

8    don't know.  I'd be speculating.

9    Q.  And the Rob?

10   A.  I would assume that's Rob Matlin.

11   Q.  And turning your attention to Government Exhibit 102-1,

12   page 6 of that exhibit, what is this?

13   A.  An email from Willie sent just to me.

14   Q.  And what is the date?

15   A.  October 9 of 2020.

16   Q.  Can you please read it?

17   A.  "John, as we move towards a more public forum, I think I

18   have your stage name.  John 'Bigot' Bicks."

19   Q.  Do you recall receiving that text message?

20   A.  I do.

21   Q.  And what was your understanding of that message?

22   A.  Two things, I guess:  One, that he was talking about

23   wanting to take these lies and stories out and spread them more

24   broadly, I guess, to try to defame me.  Calling me a bigot,

25   maybe that's just sticks and stones.

MadWden7                          Bicks - Direct

1    Q.   What was your understanding of that word?

2    A.   Calling me a bigot, a racist.

3    Q.   And the message right after that, it says:  I will play

4    with it some" -- sorry.  Read those two text messages together,

5    it says:  John, as we move towards a more public forum, I think

6    I have your stage name, John 'Bigot' Bicks.  I will play with

7    it some."

8         What did you understand both these messages to be referring

9    to?

10   A.   In the context of the many hundreds and hundreds and

11   hundreds of messages that I received from Willie, he liked to

12   give people nicknames and spent a lot of time playing with

13   their nicknames and trying to improve their nicknames.  So I

14   understood that he was going to keep working on mine.

15            MR. DENNIS:  Objection, your Honor.

16            THE COURT:  Hold on.

17            MR. DENNIS:  I think this witness --

18            THE COURT:  Hold on.

19        Given the many sidebars regarding objections versus

20   cross-examination, what's the nature of the objection?

21            MR. DENNIS:  Can you read back the witness's last

22   response?

23            THE COURT:  "A.  In the context of the many hundreds

24   and hundreds of messages that I received from Willie, he liked

25   to give people nicknames and spent a lot of time playing with

MadWden7                          Bicks - Direct

1  their nicknames and trying to improve their nicknames.  So I

2  understood he was going to keep working on mine."

3          MR. DENNIS:  I think the witness can testify with

4  respect to himself.  I don't know how he can testify with

5  respect to others that he's referring to unless he identifies

6  them.

7          THE COURT:  OK.  That's a fair objection.  But the

8  jury understands that this is just the witness's testimony

9  about what he understood this message to be saying, and his

10 assertions of what may have been the case with respect to other

11 lawyers in the firm is not being offered for its truth, but

12 just to show you what his understanding was.

13          Thank you for that amendment.

14          Go ahead, counsel.

15 BY MS. KUSHNER:

16 Q.  And drawing your attention to Government Exhibit 105-46,

17 what is this?

18 A.  Again, a text message from Willie to my partners, Cally

19 Bostick, Rob Matlin, Whitney Smith and myself.

20 Q.  When was it sent?

21 A.  September 5 of 2020 at about 11 p.m.

22 Q.  Would it have been 11 p.m. that day?

23 A.  No.  I apologize.  It would have been 11 p.m. on September

24 4, the day before.

25 Q.  Can you please read this message?

MadWden7                         Bicks - Direct

1    A.  "This is a quote/unquote biblical moment.  Anyone who

2    refuses to see, acknowledge and change will be answerable to

3    God."

4    Q.  And turning your attention to Government Exhibit 105-47,

5    what does this message say?

6    A.  "What do you think God is telling me to do?"

7    Q.  Who sent this message?

8    A.  From Willie, again, to my partners, Cally Bostick, Rob

9    Matlin, Whitney Smith and myself.

10   Q.  And approximately when was this message sent?

11   A.  About 11 -- 11 p.m. on September 4, 2020.

12   Q.  What was your understanding of this message and the prior

13   message that said "this is a biblical moment, anyone who

14   refuses to see, acknowledge and change will be answerable to

15   God"?

16   A.  I'm sorry.  What was the question?

17   Q.  What was your understanding of the message on the screen

18   and the message I just repeated?

19   A.  That Willie is communicating to me that he's now

20   functioning as a messenger of God.

21            MR. DENNIS:  Objection.

22            THE COURT:  Overruled.

23   BY MS. KUSHNER:

24   Q.  How did these messages make you feel?

25   A.  Scared.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MadWden7                          Bicks - Direct

1    Q.   Why?

2    A.   In the context of all the messages that I was receiving,

3    the frequency with which they were coming in, coming in in the

4    middle of the night, very angry, clearly very focused on me,

5    that he was clearly angry with me, and that he's now invoking

6    biblical -- violent biblical scripture, telling me that he's

7    acting at God's command, this scared me because at this point,

8    frankly, I thought he was just completely off the rails.  And I

9    was afraid that I did not know what he would do next.

10   Q.   You said violent biblical scripture.  Why do you say that?

11   A.   Again, in the context of other messages that you will have

12   seen and that Willie sent -- we looked at one of them earlier

13   today -- talking about the reeking of sort of biblical justice

14   against evildoers, that was what I understood him to be

15   channeling my way.

16   Q.   And these two messages and the evildoer message you just

17   referred to, were these the only times the defendant invoked

18   God or referenced the Bible in messages to you?

19   A.   No.  He did that frequently.

20   Q.   And how did that make you feel?

21   A.   Alarmed.  Scared.

22   Q.   And turning your attention to Government Exhibit 102-8, who

23   is this from?

24   A.   From Willie to me.

25   Q.   When was it sent?

1    A.  The morning of October 9, 2020.

2    Q.  Is that the same date as the other two messages we just

3    discussed?

4    A.  I believe it is.

5    Q.  Can you please read it?

6    A.  "And you still want to...you are a bad person that deserves

7    to be severely punished (figuratively, we both know what a liar

8    you are)."

9    Q.  Do you recall seeing that text message?

10   A.  I do.

11   Q.  And what was your understanding of it?

12   A.  Again, in the context of the messages that surrounded it,

13   that Willie was now acting as a, as a messenger of God and was

14   going to make sure that I was going to get punished.

15   Q.  How did that make you feel?

16   A.  Scared.

17   Q.  Why?

18   A.  Again, at this point, I -- I don't have the right clinical

19   training to render a diagnosis, but I would just say it

20   appeared to me he was so off the rails that I had no idea what

21   he would be capable of at this point.  And that scared me.

22   Q.  And turning your attention to Government Exhibit 107-60,

23   starting with the first text message on page 1, I'm going to

24   read the messages on page 1 through page 7 of this text chain:

25   "And lying traitor, assaulter of women John Bicks, what say

1    thee?

2         "An empty suit and mind with a big mouth.

3         "You have done to the New York office what the president

4    did to our nation."

5         Exclamation:  "Really, share it with Cally.

6         "I cannot sleep.  Every night you two are up to more

7    mischief.  Mister and Miss -- who, us?

8         "Lying John Bicks, have you told your wife?"

9              MR. DENNIS:  (inaudible) email.  What was the dates on

10   that email?  I can't see.  That was omitted into evidence.  I

11   don't see a date on it.  So I'm able to ask.

12   BY MS. KUSHNER:

13   Q.  I'm going to continue reading and then I'm going to ask you

14   about the date right after this.  This exhibit is in evidence:

15   "Lying John Bicks, have you told your wife?"  And there's a

16   link to -- there's a link right below that text message.

17        On page 5:  "You both are becoming biblical symbols.

18        "Cally becoming a biblical symbol.  Run down and thank

19   John.

20        "Lying traitorous John Bicks.  You have been living in hog

21   heaven the past four years, haven't you?  Spitting out any lie

22   you wanted with impunity, assaulting whomever you wanted with

23   impunity, and you did not miss one meal.

24        "We are lucky there is a God and there will be

25   deliverance."

1        Do you recall receiving these text messages?

2   A.   I do.

3   Q.   What day were they sent?

4   A.   November 19 of 2021.

5   Q.   And going back to the first message on page 1 -- I'm sorry.

6   What day did you say?

7   A.   November 19 of 2021.

8   Q.   Can you --

9   A.   I'm sorry.  I apologize.  January 19 of 2021.  My bad.

10  Q.   And what is -- on page 1, what is the time stamp of the

11  first text message?

12  A.   That's going to be about noon Eastern Time.

13  Q.   And just what's the time stamp right here?

14  A.   3:54:51 p.m.

15  Q.   And after that, up through page 5, can you read the time

16  stamps for each of those?

17  A.   I'll do my best.  So, 3:45:22, 3:47:04, 3:47:30, 3:49:56,

18  3:50:40, 3:52:28.

19  Q.   Is this another example of when the defendant sent you

20  back-to-back text messages?

21  A.   Yes.  Sometimes they came in even more frequently than

22  that.

23            (Continued on next page)

24

25

1  BY MS. KUSHNER:

2  Q.  And turning to page 4, where it says, lying John Bicks,

3  have you told your wife.

4      And do you see the link right under that or the attachment,

5  rather?

6  A.  I do.

7  Q.  What did you think that -- what's your understanding of

8  what that attachment was?

9  A.  The only thing I can take from this -- and it's, again, in

10  the context of other emails, other text messages that he has

11  sent -- he would from time to time make suggestions that I had

12  an inappropriate relationship with Cally, perhaps with other

13  people at the firm.  Those were allegations that he made on a

14  regular basis about not just me, but others in the other

15  messages that I saw.

16  Q.  Just focusing on you, why is this a message to you a

17  reference about or an accusation about you having a

18  relationship with Cally?

19  A.  That's how I interpreted it.

20  Q.  What's the attachment on this text message?

21  A.  I'm sorry.  It's a link to the webpage bio for my partner,

22  Cally Bostick.

23  Q.  How did this string of text messages make you feel?

24  A.  For starters, this is addressed now to a much larger group

25  of people, a number of my other partners who we haven't spoken

1   about today; Mary O'Day, Mike Zanic, Nick Hodge.  So now he's

2   just out spreading this kind of -- these lies and really

3   despicable lies to a larger group of people.  So that made me

4   feel bad.  It made me feel concerned, again, that he was just

5   out trying to attack me and attack my integrity with these

6   lies.

7   Q.  On page 7 where it says, we are lucky there is a god and

8   there will be deliverance, what was your understanding of that?

9   A.  That in Willie's mind, this would only end when biblical

10  deliverance was visited on -- certainly on me.

11  Q.  And how did that make you feel?

12  A.  Scared.

13  Q.  Why?

14  A.  Not scared of god; scared of Willie and scared of what he

15  might do.  Because I realized at that point, I couldn't predict

16  what he might do next.

17  Q.  Turning your attention to page 3 of Government Exhibit

18  104-1, who are these messages from?

19  A.  They're from Willie to me and to my partner, Rob Matlin.

20  Q.  Can you please read each of these text messages aloud.

21  A.  And John, what is your wife's name.  Save me some research

22  time.

23       Do you want me to continue reading?

24  Q.  Yes, please.

25  A.  I'm sorry.

1      Again, another message from Willie to Rob Matlin and me.

2  The first message is, good morning Vietnam, exclamation point.

3  Q.  Please just read the content aloud.

4  A.  John --

5  Q.  Sorry, I will read this message aloud.

6      John, you and the family going out hunting for "N" word

7  this morning.

8      Do you recall receiving these three text messages?

9  A.  I sure do.

10  Q.  What date were they sent?

11  A.  May 27th of 2020.

12  Q.  And turning to the first text message again.  Approximately

13  what time would you have received that message?

14  A.  Right around midnight.

15  Q.  How did this message make you feel?

16  A.  Terrified.

17  Q.  Why?

18  A.  Because he's indicating that he wants to get in touch with

19  my wife, and I have no idea how his interaction with her is

20  going to go, but that terrified me.

21  Q.  Does he know your wife?

22  A.  He has met my wife.

23  Q.  What did you understand why he was asking for your wife's

24  name?

25  A.  I don't have the vaguest idea.

MADGden8                      Bicks - Direct

1            MR. DENNIS:  Your Honor, sidebar, please.

2            THE COURT:  All right.

3            (Continued on next page)

MADGden8                          Bicks - Direct

1              (At sidebar)

2              MR. DENNIS:  I'd like to go on the record again for

3      relevancy of the -- these texts that are being put up were sent

4      after the district attorney had decided not to pursue charges

5      for me, against me.

6              THE COURT:  So what?

7              MR. DENNIS:  So that's a part of the context which I

8      need to be able to develop.

9              THE COURT:  It's not part of the context.

10             MR. DENNIS:  He's saying he doesn't know why.

11             THE COURT:  The point is that -- the decision by the

12     district attorney's office, as I've already ruled, is

13     irrelevant.

14             MR. DENNIS:  He's lying.  He's lying on the stand.

15             THE COURT:  Well --

16             MR. DENNIS:  He's saying that, oh, he had no -- he

17     knew I was angry that the district attorney decided not to

18     pursue charges that they filed falsely against me.  He knows

19     that.

20             THE COURT:  But I don't understand.

21             MR. DENNIS:  He said, I don't know where this is

22     coming from.  He's lying.

23             THE COURT:  So if I now understand your point, you

24     think that when he said right now he had no idea, no

25     understanding of what you meant that he really did have an

MADGden8                         Bicks – Direct

1    understanding based on these other events.

2         So the problem with that is it's what's called a rule

3    403 problem.  Whatever benefit there would be from questioning

4    him about his understanding in this single email would be

5    outweighed by the prejudice of admitting into evidence before

6    the jury what this court has strenuously attempted to keep out

7    because it is irrelevant.

8         So I appreciate your asking for a sidebar, that was

9    very appropriate on your part.  But I still think it's not

10   something that you'll be able to get into on cross.

11        However, if you want to argue further about it at the

12   end of the day after we have excused the jury, that's fine.

13   But I think we need to move on now.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

MADGden8                         Bicks - Direct

1    BY MS. KUSHNER:

2    Q.   And how did the last text message on this page where the

3    defendant asks if you and your family are going out hunting for

4    people make you feel?

5    A.   Well, to be clear, he doesn't ask if I'm going out and

6    hunting people.  He's asking if I'm going out and hunting

7    African-Americans.

8    Q.   How did it make you feel?

9    A.   Pretty terrible.

10   Q.   Why?

11   A.   It's about the most hateful thing I could imagine someone

12   saying.

13   Q.   Turning your attention to Government Exhibit 105-17 and

14   turning your attention specifically to page 2.

15        Who is this from?

16   A.   It's from Willie to my partners; Cally Bostick, Rob Matlin,

17   Whitney Smith and myself.

18   Q.   What is the date of this message?

19   A.   August 28th, 2020.

20   Q.   What does it say?

21   A.   Kids are in.

22   Q.   What was your understanding of that message?

23   A.   In the context of messages that came in either immediately

24   before or immediately after it, I understood this to mean that

25   Mr. Dennis was ready to engage not only with his former

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    partners but with the children of his former partners.

2    Q.  How did that make you feel?

3    A.  Terrified.

4    Q.  Why?

5    A.  Because given how angry he apparently was at me, no good

6    would come from his interacting with my children.  And I was

7    scared to death that he would.

8    Q.  Turning your attention to Government Exhibit 102-1, page 3.

9    What date was this message sent?

10    A.  September 7th of 2020.

11    Q.  I'm going to read -- and the text message in the middle,

12    the second text message on this page, what date was that sent?

13    A.  September 7th, 2020.

14    Q.  And who was it from?

15    A.  From Willie to me.

16    Q.  I'm going to read it.  During this biblical moment, god is

17    going to test Allen Stevenson like it has never been tested

18    before.  Its survival will depend on its values.  People will

19    be dying daily for the next year and the Allen Stevenson school

20    is going to watch it daily along with me.

21        Do you recall receiving that message?

22    A.  I do.

23    Q.  What was your understanding of what Allen Stevenson was

24    referring to?

25    A.  Allen Stevenson is a boy's school in Manhattan that I

1    attended and that Willie's boys also attended.

2    Q.  Did any of your children attend the school?

3    A.  Yes.

4    Q.  Do you have any other connection to the school?

5    A.  Yes.  My family has a long affiliation with the school.  My

6    mother continues to serve on the board.  My brother went to the

7    school as well.

8    Q.  What was your understanding of this text message?

9    A.  That he was now going to take this roadshow of lies and

10   talk to the folks at Allen Stevenson who --

11          MR. DENNIS:  Your Honor, can we have a sidebar,

12   please.

13          THE COURT:  All right.  I think we need to keep in

14   mind that we're getting near the end of the day.  And as you

15   can see from the full courtroom, I have several other matters I

16   have to take up today, but we'll have a brief sidebar.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1          (At sidebar)

2          MR. DENNIS:  Once again, as Mr. Bicks sits there and

3    he's testifying, the relevance that I see is that he's saying,

4    I'm talking about hunting people, and where he used the New

5    York City Police Department to come -- I'm the only one in this

6    whole matter who was surrounded by guns on multiple occasions.

7    Everyone else is talking about emails.  And the whole police

8    force was surrounding me.  He sent guns to my house.  And he's

9    sitting there saying, I don't know why or Mr. Dennis was

10   hunting me.  When I was the one actually scared of him.  No one

11   else is in danger.

12         THE COURT:  I'm not sure what the objection is.

13         MR. DENNIS:  Once again, the relevancy is they filed

14   claims against me that caused police to come to my home, which

15   was -- so his emails he's referring to and he's saying there

16   needs to be justice, there needs to be deliverance, is based on

17   you did something that could have killed my family for money.

18         THE COURT:  Here's what I don't understand.  So first

19   of all, I don't know if any evidence that has yet come in that

20   he or even the firm directed the police to come to you.  I

21   think that's extremely unlikely.  But if you can establish that

22   through independent evidence, that's a separate question.

23         But secondly, there's no doubt that you were mad and

24   let's assume for the sake of argument that you were

25   legitimately mad, which is the point that you are making now,

MADGden8                        Bicks - Direct

1  as I've tried to explain so many times, but I'll try it again,

2  that's not a defense to the particular charge here.

3           MR. DENNIS:  I'm not saying it's a defense, your

4  Honor.  I'm saying it proves that the witness is lying, when he

5  says, I don't know why I got these emails.

6           THE COURT:  He didn't say that here.  He was giving a

7  specific understanding of his connections, both himself and his

8  family, to this particular school and that's why he thought

9  this was a threatening email because it invoked that school,

10 and that's his interpretation.  And you can question him about

11 that, but not in the respect of why you were upset.  That's a

12 different issue.

13           So anyway, let's see if we can finish this today.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

MADGden8                    Bicks - Direct

1   BY MS. KUSHNER:

2   Q.   We were talking about this text message referencing Allen

3   Stevenson, a school you are connected to, and you were

4   explaining how you felt when you received this text message.

5        Can you explain.

6   A.   Sure.  As I testified previously, Allen Stevenson is an

7   institution that I have a long connection with and tremendous

8   respect for.  My family has a deep connection with the school.

9        When I see Willie talking about planning to go to Allen

10  Stevenson and talk to them about his views on me, I'm now

11  concerned that he's going to go start telling the same tales

12  that he's been telling to my partners and now to a broader

13  audience, as just part of a further effort to undermine my

14  integrity or hurt me in some other way.

15  Q.   Where it says, people will be dying daily for the next

16  year, how did that make you feel?

17  A.   I don't really understand what he meant by that, other than

18  that this was in the depths of COVID and, as we all know, many

19  people were dying every day in New York.

20  Q.   And putting that in the same breath as the Allen Stevenson

21  school, how did that make you feel?

22  A.   Just eerie, I guess, as though the school or I were somehow

23  responsible for it.

24  Q.   Turning your attention to Government Exhibit 105-65.

25       What day was this message sent?

MADGden8                          Bicks - Direct

1    A.   September 8th of 2020.

2    Q.   And who is it from?

3    A.   From Willie to my partners; Cally Bostick, Rob Matlin,

4    Whitney Smith and myself.

5    Q.   I'm going to read it aloud.  And John shut the fuck up.

6         And then turning to page 5 of this exhibit.  Just going to

7    the bottom text message.  Who was this message from?

8    A.   Again, from Willie to Cally Bostick, Rob Matlin, Whitney

9    Smith and myself.

10   Q.   And when was it sent?

11   A.   About 11:00 p.m. on September 7th, 2020.

12   Q.   What does it say?

13   A.   You need to pay the most.

14   Q.   What was your understanding of who "you" was that the

15   defendant was referring to?

16   A.   Again, in the context of the messages that came immediately

17   before it, I understood that the you was me.

18             MR. DENNIS:  Objection.

19             There's four other people on there.

20             THE COURT:  No, no, no.  That's his understanding.

21   You may have cross-examination on that tomorrow.

22             Overruled.

23   BY MS. KUSHNER:

24   Q.   What did you understand this text to mean?

25   A.   That the biggest dose of revenge was going to be coming my

MADGden8                          Bicks - Direct

1    way.

2    Q.  And how did that make you feel?

3    A.  Scared.

4           MR. DENNIS:  Objection.

5           Where's the word revenge?  There's no word of revenge

6    there.

7           THE COURT:  Counsel, Mr. Dennis, this is his

8    interpretation.  You will have a full opportunity tomorrow.  We

9    have already set aside you beginning with your

10   cross-examination first thing tomorrow to question him as to

11   whether his interpretation is a fair one or not.

12          Overruled.

13   BY MS. KUSHNER:

14   Q.  Turning to page 6 of this exhibit.  What do both of these

15   text messages say?

16   A.  The first one, again, addressed to my partners; Cally

17   Bostick, Rob Matlin and Whitney Smith, addressing me.  John, if

18   Allen Stevenson... would that hurt you?

19   Q.  And the other message to the left.

20   A.  From Willie to the same group, it reads, the unnecessary

21   damage you have caused, fucking incredible.

22   Q.  And what is the date and timestamp at the bottom of that

23   text message?

24   A.  This would have been sent on September 7th of 2020 at

25   11:00 o'clock at night.

MADGden8                         Bicks - Direct

1    Q.  What is the timestamp shown here, though?

2    A.  The timestamp shows 3:01:58 UTC.

3    Q.  3:01 a.m. or p.m.?

4    A.  3:01:58 a.m. universal time.

5    Q.  And the message to the right, right after that?

6    A.  Four minutes later.

7    Q.  Do you remember receiving both of these texts?

8    A.  I do.

9    Q.  What was your understanding of them?

10   A.  As with the other texts that we just looked at regarding

11   Allen Stevenson, I understood that his plan was to go and tell

12   tales about me at Allen Stevenson as an effort to hurt me.

13   Q.  And how did that make you feel?

14   A.  Dismayed, upset, concerned.

15   Q.  What were you concerned about?

16   A.  Reputation is everything, particularly in the business that

17   I am in.  But I think most people would feel the same way.  If

18   someone were to say they're going to go out and try to damage

19   my reputation in front of people and institutions I care about

20   by telling lies, that concerns me a lot.

21   Q.  Turning your attention to Government Exhibit 102-2.

22       Who are these messages from?

23   A.  From Willie just to me.

24   Q.  And what is the date and timestamp on the first message?

25   A.  October 26th of 2020 at 9:14 UTC.

MADGden8                       Bicks - Direct

1   Q.  And then the message right below that, what is the date and

2   timestamp?

3   A.  Same date, about two minutes later.

4   Q.  And what time would you have received these messages?

5   A.  About 5:00 o'clock in the morning.

6   Q.  Can you please read these two messages -- actually, I'll

7   read those two messages aloud.

8       John, I have been preoccupied.  I have not forgotten about

9   you.  When we are done, you are going to wish you had never met

10  me.  I need your kids contact information.  Can I get some

11  through Allen Stevenson?  It is going to be a long winter...

12  bitch.

13      And the message right on page 2 right after this.  I am

14  going to chase them down and inflict such... and the sins of

15  the father is real.  Ask Pete and Paul or, even better, their

16  sons, Michael and Kevin.  Have your kids talk to them now.

17      Do you recall receiving these messages?

18  A.  I do.

19  Q.  Were they all sent within approximately five minutes of

20  each other?

21  A.  Yes.

22  Q.  What was your understanding, going back to page 1 of the

23  messages, where he says, I have been preoccupied, I've not

24  forgotten about you, when we are done, you are going to wish

25  you had never met me?

1    A.  I view it as nothing more than threatening or intimidating

2    or certainly that was, I assume, the intent because that was

3    the impact it had on me.  I felt threatened and intimidated and

4    scared.

5    Q.  Right below that when he said, I need your kids contact

6    information, how did that make you feel?

7    A.  Terrified.

8    Q.  Why?

9    A.  Given how angry he was at me, the last thing I wanted was

10   him interacting with members of my family.

11   Q.  And turning to page 2.  What was your understanding of who

12   Pete, Paul, Michael and Kevin were in the bottom text message?

13   A.  My understanding is that Pete is a reference to Peter

14   Kalis.  He was formerly the chairman and managing partner of

15   K&L Gates.  My understanding is that Paul is a reference to

16   Paul Sweeney.  Paul is another partner of the firm in the Los

17   Angeles office, previously on the management committee.  And my

18   understanding is that the reference to Michael is Michael

19   Kalis, who is Peter Kalis' son.  And Kevin is a reference to

20   Kevin Sweeney, who is Paul Sweeney's son.

21   Q.  How did it make you feel that the defendant, to your

22   understanding, was referring to other people's sons right after

23   asking you for your kids contact information?

24   A.  I assume he's trying to -- I assumed that he was trying to

25   show me that he was very serious and that he absolutely would

MADGden8                          Bicks - Direct

1    get in touch with my children.

2    Q.  And how did that make you feel?

3    A.  Terrified.

4    Q.  Are the text messages we have discussed today referencing

5    your wife and sons the only messages the defendant sent you

6    about your family?

7    A.  No.

8    Q.  And is the message shown here about Pete and Paul the only

9    message you received in which the defendant referenced other

10   people's families?

11   A.  No.

12   Q.  Turning your attention to Government Exhibit 105-41, going

13   to the second text on this page.

14       Who is this from?

15   A.  From Willie, sent to my partners; Cally Bostick, Rob

16   Matlin, Whitney Smith and myself.

17   Q.  When was it sent?

18   A.  September 1st, 2020 in the afternoon.

19   Q.  And what does it say?

20   A.  Rob, kill you and/or your kids.

21   Q.  Do you recall receiving that text message?

22   A.  I do.

23   Q.  What was your understanding of it?

24   A.  I didn't think it required a lot of interpretation.  That

25   he was threatening to actually kill Rob Matlin's kids.

1          MR. DENNIS:  Objection.

2          Your Honor, could we have a sidebar.

3          THE COURT:  No.

4          MR. DENNIS:  Okay, fine.

5   BY MS. KUSHNER:

6   Q.  And turning your attention to Government Exhibit 107-5,

7   page 1.

8          Do you recognize these text messages?

9   A.  Yes.

10  Q.  Who are they from?

11  A.  From Willie to a larger group of my partners and former

12  partners; Mary O'Day, Rob Matlin, Cally Bostick, Nick Hodge and

13  Whitney Smith.

14  Q.  And looking at the second message on this page, is this

15  also from the defendant to those people?

16  A.  Yes.

17  Q.  What date was this message sent?

18  A.  September 29th of 2020 in the afternoon.

19  Q.  I'm going to read it out loud.  Bob, since we are including

20  family members in this conversation, I have asked everyone to

21  provide me with contact information so I do not have to spend

22  time locating people.  Please provide.

23         Do you remember receiving that message?

24  A.  I do.

25  Q.  What was your understanding of it?

1  A.  The last number that this text message is addressed to

2  belongs to my partner Bob Zinn.  My understanding is that he

3  was addressing Bob Zinn, asking Bob to send contact information

4  for his children as well.

5  Q.  You mentioned earlier that the defendant accused you of

6  having an affair with Calvina Bostick.  Was the message we saw

7  about that the only message he sent you about that?

8  A.  No.  That was a recurring theme.

9          MR. DENNIS:  Objection.

10          THE COURT:  Overruled.

11  Q.  Are the text messages we've discussed that the defendant

12  sent you in May, August, September and October of 2020 the only

13  text messages the defendant sent you during those months?

14  A.  No, I'm sure they are not.

15  Q.  How frequently was the defendant texting you during those

16  months?

17  A.  Multiple times a week.  Sometimes a day would go by when I

18  didn't get any.  But there would be, then, a day when I would

19  get 30.  So I would say, if not daily, at least several times a

20  week.

21  Q.  Were these messages disruptive?

22  A.  Yes.

23  Q.  How so?

24  A.  They frequently came in in the middle of the night when I

25  was trying to be asleep.  That alone made them disruptive.

MADGden8                        Bicks - Direct

1   Q.  Did you ever block the defendant's text messages?

2   A.  I did not.

3   Q.  Why not?

4   A.  I made a decision that I was so concerned that he might

5   actually be planning harm for me or my kids or my family that I

6   at least wanted to know, if he was going to come, I wanted to

7   know when he was coming.

8   Q.  Did you ever silence your phone at night?

9   A.  I can't.

10  Q.  Why not?

11  A.  I run an office with almost a hundred lawyers.  I have

12  clients in timezones far outside of New York.  I have four

13  children.  I don't have the luxury of turning my phone off,

14  even at night.

15  Q.  Did you ever respond to the defendant's text messages that

16  he sent you in May, August, September and October of 2020?

17  A.  I did not.

18  Q.  Did the defendant continue to send you text messages in

19  November of 2020?

20  A.  Yes.

21  Q.  Did you respond to any of those?

22  A.  No.

23  Q.  I'm showing you what's in evidence as Government

24  Exhibit 102-6.

25      What is this?

MADGden8                        Bicks - Direct

1    A.   A message from Willie addressed to me.

2    Q.   And what is the date of this message?

3    A.   November 16th, 2020.

4    Q.   Approximately --

5    A.   I apologize, it actually would have come in shortly before

6    midnight on November 15th, 2020.

7    Q.   Based on where your were at the time?

8    A.   Correct, Eastern time.

9    Q.   I'm going to read it aloud.  Come on traitor, explain

10   yourself.  You are a selfish piece of garbage who only cares

11   about himself and his needs.

12        Do you recall receiving that message?

13   A.   I do.

14   Q.   Did you respond to this message?

15   A.   I did not.

16   Q.   Is this the only message the defendant sent you in November

17   of 2020?

18   A.   No.

19   Q.   Did the defendant continue to send you text messages in

20   December of 2020?

21   A.   Yes.

22   Q.   Did you respond to any of those messages?

23   A.   Never.

24   Q.   Showing you what's in evidence as Government Exhibit

25   107-51 --

1              THE COURT:  Counsel, how much more do you have?

2              MS. KUSHNER:  Ten minutes.

3              THE COURT:  Well, I think we're going to have to let

4      the jury go.  So we'll give you ten minutes first thing

5      tomorrow before we turn to cross-examination.

6              Ladies and gentlemen, I don't want to keep you past

7      4:30.  You have been terrific in being here at 9:30.  Keep it

8      up.  And we will see you tomorrow at 9:30.

9              (Jury excused)

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MADGden8

1          (Jury not present)

2          THE COURT:  We will convene tomorrow in the courtroom

3    at 9:15 so I can take up some matters that I would normally

4    have taken up with you today, but if they can all wait until

5    first thing tomorrow.  The government should give me at that

6    point their best estimate -- this is not binding -- but a

7    ballpark figure of how much more they think the rest of their

8    case will take.

9          And what I will do is I'll give you now and have my

10   law clerk hand out to each side a draft of my jury charge.

11   This is very much a first draft, just to give you a sort of

12   starting point.  I'll give you probably a more refined draft

13   later tomorrow.  And then we'll have the charging conference,

14   my guess is, at the end of the day Friday.

15         So we will see you all tomorrow at 9:15.  And I'll ask

16   you to vacate the premises quickly because there are a bunch of

17   lawyers here whose billing rates are astronomical, and we don't

18   want to force their clients to pay more than they need to.

19              (Adjourned to October 14, 2022, at 9:15 a.m.)

20

21

22

23

24

25

```
1                         INDEX OF EXAMINATION

2    Examination of:                              Page

3     JEFFREY MALETTA

4    Cross By Mr. Dennis  . . . . . . . . . . . . 279

5     DENISE SMITH

6    Direct By Ms. Simon  . . . . . . . . . . . . 308

7    Cross By Mr. Dennis  . . . . . . . . . . . . 319

8    CHRISTIAN ISOLDA

9    Direct By Ms. Kushner  . . . . . . . . . . . 322

10   Cross By Mr. Dennis  . . . . . . . . . . . . 330

11    STEPHEN FLATLEY

12   Direct By Ms. Kushner  . . . . . . . . . . . 339

13   Redirect Q.  . . . . . . . . . . . . .410 123450

14   Recross Q. . . . . . . . . . . . . . . . . . 412

15   Redirect By Ms. Kushner  . . . . . . . . . . 413

16    JOHN BICKS

17   Direct By Ms. Kushner  . . . . . . . . . . . 415

18

19

20

21

22

23

24

25
```

```
 1                        GOVERNMENT EXHIBITS

 2    Exhibit No.                                    Received

 3    301, 302, 303, and 304  . . . . . . . . . . 312

 4    231  . . . . . . . . . . . . . . . . . . . 318

 5    159  . . . . . . . . . . . . . . . . . . . 327

 6    106  . . . . . . . . . . . . . . . . . . . 328

 7    113-1  . . . . . . . . . . . . . . . . . . 353

 8    102-1 to 102-8, 103-1 to 103-4, 103-6 . . . . 359

 9              to 103-35, 103-37 to 103-46,

10              104-1 to 104-9, 104-11 to

11              104-13, 105-1 to 105-11,

12              105-13 to 105-18, 105-20 to

13              105-30, 105-32 to 105-41,

14              105-43, 105-45 to 105-53,

15              105-57 to 105-59, 105-61 to

16              105-68, 105-70 to 105-72,

17              106-1 to 106-5, 107-1 to

18              107-13, 107-15 to 107-26,

19              107-29 to 107-40, 107-42 to

20              107-49, 107-51 to 107-64,

21              108-1 to 108-4 and 109-1

22    120-1 to 120-7 and 120-9 to 120-10  . . . . . 365

23    901-905  . . . . . . . . . . . . . . . . . 377

24    112-2  . . . . . . . . . . . . . . . . . . 380

25    112-1  . . . . . . . . . . . . . . . . . . 382
```

801    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  426