MAEGDEN1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4            v.                         20 Cr. 623 (JSR)

5  WILLIE DENNIS,

6                                       Trial
            Defendant.
7  ------------------------------x

8                                       New York, N.Y.
9                                       October 14, 2022
                                        9:15 a.m.

10

11 Before:

12                 HON. JED S. RAKOFF,

13                                      District Judge
                                         and a Jury

14                      APPEARANCES

15
   DAMIAN WILLIAMS
16      United States Attorney for the
        Southern District of New York
17 SARAH KUSHNER
   STEPHANIE SIMON
18 KIMBERLY RAVENER
        Assistant United States Attorney
19
   WILLIE DENNIS, Pro Se
20
   Also Present:
21
   Joseph Magliocco, Paralegal
22 Elisabeth Wheeler, FBI

23

24

25

1          (In open court; jury not present)

2          THE COURT:  Good morning.  Please be seated.  I'm

3    trying to work out the schedule so I can advise the jury at the

4    end of the day, because I think it's fair to let them know how

5    we're going to proceed next week.

6          So the government has ten more minutes, if I recall

7    correctly, for the direct of the witness.  And Mr. Dennis, you

8    said would have substantial cross-examination, and that makes

9    sense.  But can you give me an estimate of about how long you

10    think that will go.

11          MR. DENNIS:  Your Honor, I would expect that I want to

12    be able to cross-examine Mr. Bicks on every subject within the

13    scope of his direct examination.  So I would expect I would

14    need about 90 minutes.

15          THE COURT:  I will give you, if necessary, a full two

16    hours, so 120 minutes, if you need it.  So that will take us,

17    then, with the mid-morning break probably to about noon or so.

18    And then who is the next government witness.

19          MS. KUSHNER:  Your Honor, the next government witness

20    is Calvina Bostick.  She is an extremely vulnerable victim.

21    She has a personal obligation on Monday.  She's been here

22    pretty much every day this week ready to testify.  We would

23    really appreciate the ability to have her full testimony be

24    today and not have to hang over the weekend for her return back

25    on Monday.  And we can put her out of order.

MAEGDEN1

1      THE COURT:  I appreciate that, and we will do our

2    best.  But Mr. Dennis' right to cross-examine is more important

3    than the issues you just raised.  You could have of course

4    called her earlier in the week.  But I understand, as a matter

5    of your strategy, you prefer to put her later, that's fine.

6    But balancing all of those things together, if we can get her

7    done today, great.  But let's assume that there might be,

8    again, as much as two hours of cross.

9      MS. KUSHNER:  Absolutely.  I think the only thing the

10   government would propose is to put Ms. Bostick on the stand and

11   have Mr. Bicks return afterwards.

12      THE COURT:  No.  No.  We're going to finish the

13   witness.  I'm sorry.

14      So how long do you think you will be on her direct?

15      MS. KUSHNER:  I would say, excluding sidebars, about

16   90 minutes.

17      THE COURT:  Sidebars, do we have sidebars?

18      So it is conceivable we might finish with her today,

19   but certainly, there's no guarantee.

20      Is that the last government witness?

21      MS. KUSHNER:  Then there's one more brief witness

22   after that, we expect his direct will be about 30 minutes.

23      THE COURT:  Who is that?

24      MR. DENNIS:  It's Gary Cobb.  He's an FBI agent.  And

25   he'll be testifying as a summary witness.

MAEGDEN1

```
 1          THE COURT:  So clearly, the government will not rest
 2    until Monday, but it sounds like you'll rest Monday morning.
 3    So, Mr. Dennis, at that point, you need to decide and you need
 4    to decide right then whether you want to take the stand or not.
 5    So you will think about that over the weekend.  But when you
 6    have to let me know is just when they rest; not before, but not
 7    after either.
 8          Now, was there any other witness, Mr. Dennis, that you
 9    wanted to call?  I have ruled on a number of them, as you have
10    pointed out.  But I don't know if there's someone else who you
11    had in mind that you wanted to call.
12          MR. DENNIS:  I reached out to Gloria Garcia and Laurie
13    Robinson.
14          THE COURT:  And tell me who they are and what you
15    would expect them to say.
16          MR. DENNIS:  Laurie Robinson is the founder of the
17    Corporate Counsel Women of Color.
18          THE COURT:  And what do you expect her to say?
19          MR. DENNIS:  She will testify as to certain incidents
20    that occurred between me and some of the witnesses that have
21    been on the stand that would contradict some of the statements
22    that they have made, among other things.
23          THE COURT:  You want to give me an example.
24          MR. DENNIS:  Well, just generally, the fact that they
25    had a fear of me and that they felt intimidated by me.  I think
```

MAEGDEN1

1    there's examples of the fact that they -- that in fact they did

2    not.

3            THE COURT:  Now, keep in mind that she cannot give her

4    opinion as to whether they were scared of you or not, just as I

5    cut off the government when they tried to bring that out.  But

6    she can describe specific incidents, I take it, where you were

7    interacting with one or more of the victims and it appeared to

8    be totally pleasant or whatever.

9            MR. DENNIS:  Yes.

10           THE COURT:  Now, have you subpoenaed her or is she

11   available?  What's the story?

12           MR. DENNIS:  I sent a message to her finding out her

13   availability.

14           THE COURT:  Well, it's going to have to be Monday.

15           MR. DENNIS:  Now I can tell her.  I didn't know when.

16           THE COURT:  So you should have her in the witness room

17   when we convene on Monday, even though we may not reach her

18   until later in the morning.

19           MR. DENNIS:  On Monday, your Honor, would you expect

20   us to do -- if there's no further witnesses, would it be

21   expected that we would do summations?

22           THE COURT:  Well, you are anticipating my next thing.

23   But I just want to -- before we get to that -- the other one is

24   Gloria --

25           MR. DENNIS:  Gloria Garcia.

MAEGDEN1

1          THE COURT:  I'm sorry.  Who is she and what is she
2     going to say?
3          MR. DENNIS:  She is with the district attorney's
4     office of the City of New York.  And she has information
5     regarding interactions that I have had with some of the
6     witnesses.
7          THE COURT:  That she was present at?
8          MR. DENNIS:  No, she was not present.
9          THE COURT:  So that sounds like hearsay.  If she is
10    saying, I heard or I learned that you met with so and so and
11    such and such occurred, that would be classic hearsay.
12         MR. DENNIS:  Yeah, not hearsay.  She also has copies
13    of complaints that were filed relating to some of the
14    individuals -- relating to some of the individuals who are
15    testifying here.
16         THE COURT:  Complaints that were filed?
17         MR. DENNIS:  Filed with the New York City Police
18    Department.
19         THE COURT:  By who?
20         MR. DENNIS:  By, presumably, Mr. Bicks, Mr. Maletta.
21         THE COURT:  I'm a little more skeptical about her
22    testimony.  But have you contacted her to be available?
23         MR. DENNIS:  Yes, I have reached out to her, and I
24    will let her know.
25         THE COURT:  Again, she needs to be here at the start

MAEGDEN1

1    of business Monday.  But I will probably want to do a brief

2    voir dire of her outside the presence of the jury, because I'm

3    a little skeptical that she has anything that's not hearsay.

4    The fact that she has complaints, it depends who they are from

5    and what they say, but they're still a form of hearsay.

6    They're a form of hearsay as an out-of-court statement that is

7    being offered for its truth.  But we'll -- I'm not precluding

8    it yet.  I just want to put you on notice that that one sounds

9    a little more dicey than the first one you mentioned.

10               MS. KUSHNER:  Your Honor, can we briefly address the

11   first witness, Laurie Robinson.

12               THE COURT:  Yes.

13               MS. KUSHNER:  Early on, we acquired search warrants

14   for the defendant's emails.  Because he is a lawyer, we

15   conducted a privilege team review of those returns.  We

16   requested from the defendant's counsel for a list of any

17   individuals the defendant would assert his communications with

18   would be potentially privileged.  Laurie was one of the names

19   on that list.

20               For that reason, we have never reviewed any

21   communications between the defendant and Laurie Robinson.  We

22   believe that she has been involved in providing him with

23   advice, including in connection with this trial.  We are

24   unaware of any direct knowledge that she would have regarding

25   the matters --

MAEGDEN1

```
1        THE COURT:  I think here is a sensible way to proceed
2   with both those witnesses.  The government sounds like you will
3   rest sometime mid-morning on Monday.  I will then excuse the
4   jury for a half hour and separately question and allow counsel
5   for both sides to question the proposed witnesses to see if
6   what they have to say is admissible.  And then I'll make a
7   determination.  And then they will either testify or not or
8   they will testify in part and maybe not in other parts.  We'll
9   just have to see.
10       So the answer to your question, Mr. Dennis, about
11  summation is it turns in part on whether you are planning to
12  take the stand or not.  If you are not planning to take the
13  stand, then we could have summations on Monday afternoon.  If
14  you didn't take the stand, summations would clearly be on
15  Tuesday.  So it's really in your hands in that regard.
16      How long does the government want for its combined two
17  summations?
18       MS. KUSHNER:  Your Honor, 90 minutes.
19       MR. DENNIS:  When you say "combined" --
20       THE COURT:  Yes, so the way it works is they get an
21  opening summation and then they get a rebuttal.  Whatever
22  amount of time they get combined, I'm going to give you the
23  same amount for yours, but you only get to speak once.
24       Now, you may say, how come they get to speak twice and
25  I only get to speak once.  Well, that didn't used to be the
```

MAEGDEN1

1    case.  When I was a young criminal defense lawyer, it was one

2    speech for both sides.  But then they changed the law and the

3    law is the law.  So the law of the United States is that -- and

4    the theory is because the government has the burden of proof.

5    So they go.  If they're asking for 90 minutes, typically, that

6    would be about 60 minutes on their opening summation, you would

7    then go for up to 90 minutes, if you want that much time, and

8    then they would get 30 minutes of rebuttal.  I don't control

9    that.  It's totally the law.

10           MR. DENNIS:  Your Honor, one process question.  In

11   terms of preparing for my summation over the weekend, I want to

12   take my binders with me.  I was trying to find out what time

13   the courtroom closes because I have a cane and I have to figure

14   out how to get them in a box and get them out of here.

15           THE COURT:  I think that makes a lot of sense.  I

16   think the person to work that out with is Ms. Kotowski.

17           THE DEPUTY CLERK:  I can tell him right away that I

18   don't control that.  I am very happy to leave the courtroom

19   open.  But security comes by at an unpredictable time, sometime

20   around 6:00, I think, to lock up the courtroom.

21           And if it's locked when you get here, may I suggest

22   that you just go down to the CSO office, and I'll send them an

23   email and say you were supposed to be able to get in before

24   6:00.

25           THE COURT:  I will be through in the courtroom today

MAEGDEN1

1    by 5:00.  So you can come in any time between 5:00 and 6:00.

2              MR. DENNIS:  I won't leave.  I'll just stay here.

3              THE COURT:  That's perfect.

4              So let's get the witness on the stand.

5              THE DEPUTY CLERK:  And the jury is here.

6              MR. DENNIS:  Mr. Kern, can you call my parents.

7              LAW CLERK:  Yes, I can.

8              MR. DENNIS:  Your Honor, before the jurors come in.

9              THE COURT:  Go ahead.

10             MR. DENNIS:  I would like to have a comment.  I have

11    been having consistent issues with communicating with my family

12    throughout this whole case and my -- anyone providing me with

13    legal advice.  And this is a number that we have been dialing,

14    I have been dialing for years now.  This morning, I have dialed

15    that number three times and every time I dialed it, I was sent

16    to some sort of answering call service.

17             THE COURT:  You're talking something completely

18    outside my control.  I hear what you're saying, but I don't

19    know whether it has to do with problems that they're having in

20    Florida or whatever.  But anyway, I can't control it.  We have

21    done everything we can at our end to accommodate your request

22    to have your parents listen in.

23             Let's try one more time.

24             We will have to start without that.  But at the next

25    break, we'll try again.

MAEGDEN1

1              Let's bring in the jury.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MAEGden1                         Bicks - Direct

1          (Jury present)

2          THE COURT:  Good morning, ladies and gentlemen, thank

3    you once again for your promptness.  I was really worried, I

4    figured you would stay home and go to the Yankees game this

5    afternoon, but thank god you are here so we can continue.

6    JOHN BICKS, resumed.

7          THE COURT:  Counsel, go ahead.

8    DIRECT EXAMINATION CONTINUED

9    BY MS. KUSHNER:

10   Q.  Good morning, Mr. Bicks.

11   A.  Good morning.

12   Q.  Just briefly, do you recall the emails we discussed

13   yesterday from 2019, Government Exhibits 523 through 526, which

14   were all sent in approximately August of 2019.

15        Do you recall those emails?

16   A.  I recall discussing those emails, yes.  And I recall those

17   emails.

18        MS. KUSHNER:  Mr. Magliocco, can you please pull up

19   Government Exhibit 523.

20   Q.  Mr. Bicks, the email at the bottom of the chain,

21   approximately what time was this email sent to you?

22   A.  A few minutes after 6:00, at 6:05 a.m.

23   Q.  And this is in UTC time?

24   A.  I'm sorry, I was looking at the timestamp below.  11:25.

25   Q.  You can see the email; right?

MAEGden1                          Bicks - Direct

1    A.  I can.

2    Q.  What time was the first email in this chain sent in Eastern

3    Standard Time?

4    A.  It would have been about 7:25 in the morning, Eastern time.

5    Q.  And the email right below that on August 4th.

6    A.  6:05 a.m. Eastern time.

7    Q.  That's in UTC time, so what time would you have received it

8    or what time would it have been sent to you?

9    A.  It would have been about 2:00 o'clock in the morning.

10   Q.  So these aren't the only two emails you received around

11   this time in August that were sent in the early morning hours;

12   right?

13   A.  Correct.

14   Q.  And when you received these emails about mass shootings,

15   how did they make you feel?

16   A.  Distressed, but as much confused, because this was early on

17   in the development of the circumstance, and I just didn't

18   understand why he would be sending them to me.  But the fact

19   that he was choosing to send emails about mass shoots was at

20   least disconcerting, I would say.

21   Q.  Did you see other similar emails around this time frame

22   that were addressed to you from defendant?

23   A.  I did.

24   Q.  And did the emails in Government Exhibits 523 through 526

25   and the other similar emails you received, were some of those

1    shown to you while you were in the New York office?

2    A.  Yes.

3    Q.  Thank you.

4        Now, turning to what's in evidence as Government Exhibit

5    107-5 107-51.

6            MS. KUSHNER:  And I want to make sure the jury can see

7    these.

8    Q.  Mr. Bicks, just generally, do you recognize what are those

9    two messages?

10   A.  I'm going to have to ask you to zoom in on them a little.

11           MS. KUSHNER:  You can zoom in on the top one.

12   A.  I recognize this message.

13   Q.  What is it?

14   A.  It's a text message that was sent by Willie to me and a

15   fair number of my other partners.

16   Q.  And what is the date of this message?

17   A.  December 20th of 2020.

18   Q.  And approximately what time of day would you have received

19   this message?

20   A.  Around 11:30 at night.

21   Q.  Can you please read it.

22   A.  We are at the end.  So no need to lie any longer.  God is

23   truly reading all our minds during this biblical moment?

24   Q.  And the text message immediately after that, can you please

25   look at that?

MAEGden1                         Bicks - Direct

1                 MS. KUSHNER:  Mr. Magliocco.

2     Q.  What is this message?

3     A.  Another email from Willie to a number of my partners sent

4     shortly before midnight on September 19th of 2020.

5     Q.  Are you one of the recipients of this text message?

6     A.  I am.

7     Q.  Can you please read it?

8     A.  Jim Segerdahl, I have been laying off of you.  Everything

9     is intentional.  Go ahead and make a comment and join Mike in

10    the boat.

11    Q.  Do you recall receiving that text message?

12    A.  I do.

13    Q.  Who is Jim Segerdahl?

14    A.  Jim Segerdahl is the general managing partner of K&L Gates.

15    Q.  Are these two text messages the only text messages you

16    received from the defendant in December of 2020?

17    A.  No.

18    Q.  Are you aware whether the defendant was engaged in similar

19    conduct against other people around the same time as you?

20                 THE COURT:  Sustained.

21    Q.  Mr. Bicks, did you receive text messages from the defendant

22    that were also addressed to other people?

23    A.  Frequently.

24    Q.  Turning your attention to Government Exhibit 105-35.

25         What is this?

MAEGden1                         Bicks - Direct

1   A.   A message from Willie to myself and three of my partners;

2   Cally Bostick, Rob Matlin and Whitney Smith.

3   Q.   What's the date of this message?

4   A.   September 1st of 2020.

5   Q.   I'm going to read it aloud.

6        Sat next to many meatheads like David at Columbia Law

7   School.  I always knew he just got lucky and got the Wuhan

8   bounce.  It went to his small little head.

9        What is your understanding of who David is?

10  A.   From the context of this messages and the context of other

11  messages that I received beforehand and afterwards, I

12  understood this to be a reference to David Tang, who is also

13  one of my partners.  David is the regional manager of the

14  firm's Asia offices.  David Tang went to Columbia Law School as

15  well.

16  Q.   What ethnicity is David Tang?

17  A.   David is -- I would say David is Chinese-American.

18  Q.   And what did you understand the reference to Wuhan bounce

19  here to mean?

20            MR. DENNIS:  Objection.

21            THE COURT:  Overruled.

22            You may answer.

23            THE WITNESS:  Thank you.

24            As we talked about yesterday, Willie was fond in these

25  text messages of giving everybody a nickname.  And he would

MAEGden1                        Bicks - Direct

1   regularly refer to David as Wuhan -- with this, I would call it
2   a slur of, you know, Wuhan, which I took as a reference to --
3   it was widely believed to be the source of the COVID-19 virus.
4   He would refer to David as David Wuhan Tang.
5   Q.  Are you referring to names like Wuhan and bigot as
6   nicknames?
7   A.  He would call me John big head Bicks.  He had some colorful
8   nicknames for Cally Bostick, for Mike Caccese, perhaps for Rob
9   Matlin.  I can't recall certainly for others in many thousands
10  of messages.
11  Q.  Did there come a time, Mr. Bicks, when you took any actions
12  as a result of the messages you were receiving from the
13  defendant?
14  A.  Yes.
15  Q.  What did you do?
16  A.  At some point, I sat with my children and I showed them
17  pictures of Willie so that they understood that if they ever
18  saw him around our home that they should call the police.  I
19  had a conversation with my parents, 89 and 88 years old,
20  principally because of my mother's involvement with Allen
21  Stevenson and knowing it was apparent that Willie was going to
22  be talking to the folks at Allen Stevenson spreading these
23  tales about me.  I didn't want that to come as a surprise to
24  her, so I had to talk to them about that.  I relocated my -- I
25  drive to work, and I moved my parking garage that I use to a

1    garage immediately across the street from the office, just to

2    minimize the amount of time that I had to spend walking out on

3    the sidewalk, because I'm often coming into the office when

4    it's dark and leaving when it's dark and I had no interest in

5    running into Willie on the street.

6        We lived in our house in Ridgewood for 17 years, never

7    turned on the alarm, and I started putting the alarm on every

8    night.  We had to upgrade the security system.  I had to -- I

9    made the decision to upgrade the security system to add cameras

10   so we would be aware of what was going on when I was not there.

11   I am not necessarily proud of saying it, but it's true, there

12   were nights when Willie was being particularly active and after

13   days when I would receive 10, 20, 30 text messages in a day,

14   when I would sleep with a loaded gun next to my bed, not

15   something I've ever done before.  Those are certainly the

16   things that I recall.

17   Q.  And just briefly, you said you often came into the office

18   when it was dark.  Why was that?

19   A.  I'm an early bird.  I get up early.  It's easier to get in

20   early in the morning.  So for probably fully half of the year,

21   I'm arriving at the office before it's light out.

22   Q.  Was it common for other attorneys at your law firm to get

23   to the office around the time that you did?

24   A.  It's certainly not common in the New York office.

25   Q.  Was it your understanding that the defendant would have

MAEGden1                          Bicks - Direct

 1   known the time of your morning commute?

 2           THE COURT:  Sustained.

 3   Q.  Were you ever with the defendant in the office in the early

 4   morning at the time of your commute?

 5   A.  I was often with Mr. Dennis early in the morning at the

 6   office, he would sometimes get in early as well.

 7           MS. KUSHNER:  May I have a brief sidebar.

 8           THE COURT:  All right, if you must.

 9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MAEGden1                          Bicks – Direct

1          (At sidebar)

2          MS. KUSHNER:  I just want to make sure I'm abiding by

3    the Court's ruling.  I was going to ask the witness about when

4    he saw the defendant, long after the defendant had been fired,

5    outside the office around 6:30 in the morning.

6          THE COURT:  I think that, at this point, that would be

7    more prejudicial than probative, so I think that I will exclude

8    it.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MAEGden1                          Bicks - Direct

1          (Jury present)

2     BY MS. KUSHNER:

3     Q.  Mr. Bicks, you said one of the steps you took to respond to

4     the defendant's messages was to sometimes sleep with a loaded

5     gun next to your bed.  Why did you do that?

6     A.  He had sent messages indicating that he was thinking about

7     coming to visit me at my home.  I live on a quiet and dark

8     street in a very quiet town, and I was concerned that he might

9     do just that.

10         MS. KUSHNER:  One moment, your Honor.

11         THE COURT:  Yes.

12         (Conferring)

13    BY MS. KUSHNER:

14    Q.  Mr. Bicks, sitting here today, what, if any, impact do you

15    continue to feel as a result of the defendant's conduct?

16    A.  I'm scared.

17    Q.  Why?

18    A.  I'm not scared that he's going to jump me in the courtroom

19    today.  I'm scared that after we're -- after I leave here today

20    and after he leaves here today that he's going to continue

21    doing what he's been doing for the last couple of years, which

22    is going out, spreading vile, awful lies that are designed to

23    impact my integrity, my reputation, potentially endanger my

24    family, my kids.  I'm concerned that he's going to continue to

25    do that.  I'm scared about that.

MAEGden1                          Bicks - Direct

1    Q.  Mr. Bicks, you testified earlier one of the themes of the

2    defendant's messages was accusing you of having sexual affairs

3    with some of your partners.  Did you in fact have any --

4              MR. DENNIS:  Objection.

5              Sidebar, please.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MAEGden1                        Bicks - Direct

1                    (At sidebar)

2                    MR. DENNIS:  I don't remember ever seeing any evidence

3     that --

4                    THE COURT:  I'm sorry, you have to talk to me.  I

5     can't hear you.

6                    MR. DENNIS:  I don't remember ever seeing any evidence

7     admitted --

8                    THE COURT:  It came in yesterday that he --

9                    MR. DENNIS:  It was an interpret- --

10                   THE COURT:  He said that you had accused him of having

11    one or more affairs with another --

12                   MR. DENNIS:  Okay, all right.

13                   (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2    BY MS. KUSHNER:

3    Q.  Mr. Bicks, did you have any affairs with any of your

4    partners at work?

5    A.  No, nor with any of my colleagues at work or with anybody

6    else.

7    Q.  Did you have to have discussions with your wife as a result

8    of the accusations made against you?

9    A.  I shared with my wife the text messages that Willie sent

10   around things like that.  I shared them with my children as

11   well.  I wanted them to understand what he was saying.

12              MS. KUSHNER:  No further questions.

13              THE COURT:  Cross-examination.

14   CROSS-EXAMINATION

15   BY MR. DENNIS:

16   Q.  Good morning, ladies and gentlemen of the jury.  Good

17   morning, John.

18   A.  Good morning, Willie.

19   Q.  John, what year did you join K&L Gates?

20   A.  2011.

21   Q.  And I left in 2019, so we worked approximately together for

22   how many years?

23   A.  About eight years.

24   Q.  About eight years we worked together, okay.

25              Yesterday, I guess during your testimony, despite my

MAEGden1                              Bicks - Cross

1    belief, fear, love and fear of god, you stated that we had
2    never had religious conversations and, as a result, my texts
3    from the Bible caused great fear and anxiety; is that correct?
4    Yes or no?
5    A.   I generally recall testifying to that, yes.
6    Q.   Later in your testimony yesterday, you testified that you
7    had shared with me that your mother is Jewish?
8    A.   That misstates my testimony.  I did not say that.
9    Q.   Can you please state what your testimony was then.
10   A.   Yes.  My father is Jewish.  My mother is Protestant.
11   Q.   You stated that you had shared with me that your father was
12   Jewish?
13   A.   No, I did not say that I shared with you that my father was
14   Jewish.  I believe my testimony was that I was not even sure
15   that you knew that my father was Jewish.
16   Q.   John, you knew and you know that I visited the Dominican
17   Republic frequently with my family during spring breaks and
18   summer vacations; is that correct?
19   A.   That's not correct.  I didn't know that.
20   Q.   No?  Okay.  The answer is no.
21        John, do you recall me sharing with you that I travel to a
22   town called Sosua?
23   A.   I do not recall ever talking about that.
24   Q.   John, do you recall me sharing with you that Sosua was a
25   town where roughly 800 German Jews fled to in 1940 to avoid

MAEGden1                              Bicks - Cross

1    persecution by the Nazis?

2    A.  As I told you, I don't recall ever discussing the town of

3    Sosua or anything.

4    Q.  John, just to finish, you do not recall me sharing with you

5    that I'm friends with some of the children of some of the

6    original settlers who went to Sosua; you do not recall that?

7    A.  That is correct, I do not recall that.

8    Q.  John, do you recall me sending you, Michael Caccese,

9    Rosemary Alito and others a text message on December 28th of

10   2019 expressing my horror and anger --

11          MS. KUSHNER:  Objection, your Honor.

12   Q.  -- expressing my horror and anger at a random stranger who

13   barged into a Rabbi's home and started attacking people with a

14   machete for no apparent reason?

15          THE COURT:  Sustained.

16   Q.  John, do you recall on December 24th, 2019 me sending you,

17   Rosemary Alito, Michael Caccese a text message stating that

18   Rudy Giuliani's statement that he was more Jewish than George

19   Soros would only enflame anger and violence in people of Jewish

20   decent?

21          THE COURT:  Sustained.

22          Ladies and gentlemen, I want to remind you that

23   nothing that counsel says is evidence.  And there may be such

24   emails, there may not be such emails, but they're not part of

25   the evidence in this case, so they're not part of your concern.

1    BY MR. DENNIS:

2    Q.  John, do you recall upon your arrival at the firm learning

3    that Andy Gespass and I had created on behalf of the firm a pro

4    bono project with MetLife referred to as "Wills?"

5    A.  I certainly recall knowing about that program.  I do not

6    recall that I knew who had created it.

7    Q.  John, can you please describe to the jury what the Wills

8    pro bono project was?

9    A.  The project that I'm --

10               THE COURT:  I'm sorry, this would seem to be precluded

11   by my order of October 10th, item 9.

12               MR. DENNIS:  I'm just sort of -- John, yesterday was

13   ruminating at length about my thoughts, my beliefs, far

14   ranging.  I'm trying to now give the jury a context in terms of

15   what was our professional relationship.

16               THE COURT:  I don't --

17               MR. DENNIS:  Things that he has absolute factual

18   knowledge about.

19               THE COURT:  Why don't you come to the sidebar.

20               (Continued on next page)

21

22

23

24

25

MAEGden1                      Bicks - Cross

                    (At sidebar)

              THE COURT:  So after the hearing we held on

October 7th, the pretrial hearing where I made a number of

rulings, I embodied those rulings in a written order so that

everyone would know exactly what those rulings were.  And the

ninth item on page 2 of that order, the written order, which

was issued on October 10th reads, quote, ninth, the

government's motion *in limine* to preclude evidence and argument

at trial concerning Mr. Dennis' prior commission of good acts

and failure to commit other bad acts is hereby granted except

insofar as the government opens the door to the introduction of

such evidence at trial.

              Now, I didn't hear anything yesterday, Mr. Dennis,

along the lines that you just stated, that the defendant had

ruminated, generally, I think was your words, about your

character or other things.  He answered questions about

specific emails that were sent to him and how it impacted him.

              What is your basis for saying that the door is open?

              MR. DENNIS:  Well, my basis is, I mean, he's made --

he's made statements without any proof saying that I accused

him of having an affair, which there's no proof behind that.

              THE COURT:  You are questioning about that, but that

has nothing to do with some good acts that you took.

              MR. DENNIS:  Not good acts.  Our working relationship,

which goes to the basis of whether or not he should have --

MAEGden1                          Bicks - Cross

1          THE COURT:  Was he involved --

2          MR. DENNIS:  Yes, he was, he was the managing partner.

3          THE COURT:  I know that.  Was he involved.

4          MR. DENNIS:  Yes.

5          THE COURT:  He was responsible for this specific

6     project, he worked with you on the specific project?

7          MR. DENNIS:  Yes, he did.  He had to approve it.

8          THE COURT:  On that representation --

9          MR. DENNIS:  Yes.

10          THE COURT:  -- I will allow that question.

11    BY MR. DENNIS:

12    Q.  Can you provide the jury with a brief description of what

13    the wills program is?

14    A.  The program, as I recall it, was called wills for heros.

15    And my recollection is we would send lawyers from the firm as a

16    public service, pro bono project out to firehouses, I think, to

17    meet with the first responders, firefighters, their families,

18    who needed help preparing wills and things of that nature.

19    Q.  And John, does the firm still participate in that project?

20    A.  We do not.

21    Q.  What year did the firm discontinue its relationship with

22    that project?

23    A.  I think it was only formally discontinued last year.

24    Although I don't believe that it happened either the two years

25    before that as a result of COVID.

MAEGden1                    Bicks - Cross

1    Q.  John on your arrival at the firm and us working together,

2    you obviously provided funding for, in part, an organization

3    called the Corporate Counsel Women of Color, yes or no?  Yes,

4    you recall that, do you not?

5    A.  There are four questions there.

6    Q.  I'm going to go back to one.  You're a great lawyer.

7        Do you recall us working together with issues related to

8    the Corporate Counsel Women of Color?

9    A.  You and I were partners at the same law firm.  We never

10   worked together on a matter, number one.

11   Q.  John, please stop.  That was a yes or no.  So you do not.

12       Do you recall ever approving any budget money for

13   activities related to the Corporate Counsel Women of Color?

14   A.  Wouldn't have been for me to approve, so the answer is no.

15   Q.  Thank you, John.

16       Are you familiar with the organization, John?

17   A.  With the organization Corporate Counsel Women of Color?

18   Q.  Yes, the firm's relationship with the Corporate Counsel

19   Women of Color.

20   A.  I am.  And willie, if you will let me finish my answer --

21   Q.  John --

22           THE COURT:  Excuse me, counsel.  The determination of

23   whether the witness can or cannot finish his answer is for the

24   Court to make, not for you to make.

25           You may finish your answer.

MAEGden1                          Bicks - Cross

1            THE WITNESS:  Thank you, your Honor.

2            I do recall the organization Corporate Counsel Women

3  of Color, Willie.  You asked me if I approved the funding.  It

4  wouldn't have been to me to approve the funding because the

5  funding for that organization that the firm provided was

6  substantially above my approval level, so it didn't run through

7  me.

8  BY MR. DENNIS:

9  Q.  John, you never approved any travel expenses related to the

10 Corporate Counsel Women of Color?

11 A.  I'm sure that I would have approved your travel expenses

12 because those --

13 Q.  Thank you, John.

14 A.  -- were within --

15            MR. DENNIS:  Your Honor, can we have a sidebar,

16 please.

17            THE COURT:  Yes.  I think we need a sidebar, counsel.

18            (Continued on next page)

19

20

21

22

23

24

25

MAEGden1                        Bicks - Cross

1          (At sidebar)

2          MR. DENNIS:  I am trying to get through my questions

3    and answering, and I'm trying to limit my questions to yes or

4    no.  I don't need him to elaborate and try to change the --

5          THE COURT:  So here is the law, since you are

6    apparently unaware of it.  If a question can be answered fairly

7    yes or no, then you can require him to answer it yes or no.

8          If it can't be fairly answered yes or no, then he's

9    allowed to elaborate.  If he starts to elaborate and you think

10   that it's a question that could be answered yes or no, then

11   your sole remedy is not to start making statements, but just

12   simply say, your Honor, I think that question could be answered

13   yes or no.

14         MR. DENNIS:  Okay.

15         THE COURT:  And if I think it can be, I will direct

16   him to answer it yes or no.  So those are the rules.

17         MR. DENNIS:  Okay.  One thing I would like to go on

18   the record right now is that, as part of his testimony, he just

19   stated he knew nothing about the organization.  But later, he

20   says, yes, I approve funding.  From a factual reality basis,

21   there's no way that a managing partner is going to approve

22   funding without knowing what an organization is.  That just

23   doesn't happen.

24         THE COURT:  That's an argument you can make during

25   summation.  That's neither here nor there for the purposes of

MAEGden1                          Bicks – Cross

1    this.

2              MR. DENNIS:  Okay.

3              (Continued on next page)

MAEGden1                          Bicks - Cross

1          (Jury present)

2          THE COURT:  Ladies and gentlemen, just so you know the

3   rules of cross-examination, if a question can fairly be

4   answered yes or no and the questioner says, please answer yes

5   or no, then the witness can give a yes-or-no answer.  However,

6   many questions can't be answered yes or no because the answer

7   is somewhere in between.  So in that case, the witness can give

8   a more full answer pointing out which is the yes part and which

9   is the no part.  But I will, just to move things along,

10  instruct the witness that, to the extent Mr. Dennis' questions

11  can be answered yes or no, please just answer yes or no.

12          THE WITNESS:  I will.

13          THE COURT:  Very good.

14          MR. DENNIS:  Thank you, your Honor.

15  BY MR. DENNIS:

16  Q.  John, as the managing partner of the New York office, would

17  you ever approve a budget request, even for travel, without

18  understanding the background or what the -- what the event was

19  that someone was participating in?

20  A.  No.

21  Q.  So once again, what was the Corporate Counsel Women of

22  Color?  What is the Corporate Counsel Women of Color?

23  A.  The corporate -- to my understanding, never having

24  participated in any of the events or having been invited to

25  them, my understanding is that the Corporate Counsel Women of

1    Color is a support and development organization geared

2    particularly towards in-house African-American women attorneys.

3    That's really all I can tell you about it.

4    Q.  John, from a marketing standpoint, how significant was the

5    money the firm spent with respect to that sponsorship?

6    A.  I don't know how to answer that question, how significant.

7    Q.  Was it one of the firm's largest sponsorships that the firm

8    had?

9    A.  I don't know the answer to that question.  I'm sorry.

10   Q.  You sit on the -- do you sit on the management committee of

11   the firm?

12   A.  At this time, I do.  Yes.

13   Q.  Do you see budget items and allocations and financial

14   information about revenues and expenses of the firm?

15   A.  I do.  I don't see them down to a granular level that would

16   show me where every single dollar is going for every conference

17   or every organization that the firm supports.  I assume it

18   would be available to me, but I don't typically see it.

19   Q.  If it were a sponsorship that was over -- that cost the

20   firm over $500,000 a year annually, would you see that?

21   A.  I don't know that I would.

22   Q.  Thank you, John.

23       So did you know, John, that one of the missions of the

24   Corporate Counsel Women of Color was to provide women of

25   African-American, Asian-American and Latino decent with the

MAEGden1                           Bicks - Cross

1    ability to network with senior corporate executives and legal

2    officials like yourself that they would not normally get access

3    to in order to build their careers?

4    A.  I don't know that.  And I have no reason to disbelieve it.

5    Q.  John, is the firm still a big sponsor of the Corporate

6    Counsel Women of Color?

7    A.  Not to my knowledge.

8    Q.  What year did the firm and Corporate Counsel Women of Color

9    end their relationship?

10            THE COURT:  Counsel, this is not the representation

11   you made at the sidebar about this area of inquiry.  You said

12   that you were going to inquire about the witness' involvement

13   with you in this particular activity, but your questions have

14   been far removed from that.

15            Sustained.

16            MR. DENNIS:  Your Honor, just to -- and that was my

17   intention.

18            THE COURT:  Well, then do that.

19            MR. DENNIS:  The witness obviously -- the witness is

20   saying --

21            THE COURT:  Limit it to your interaction with this

22   witness and that organization or activities related to that

23   organization.

24            MR. DENNIS:  Okay.

25   BY MR. DENNIS:

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Q.  John, do you recall the conversation we had where I

2    expressed the idea that to be the most profitable at the law

3    firm we needed to incorporate the biblical principle of do unto

4    others as you would have them do unto you?

5    A.  I do not ever recall having a conversation like that with

6    you.

7    Q.  John, do you recall when I joined the firm, I came to you

8    and I shared with you that both you and my son Grant were both

9    alumni of the Allen Stevenson school?

10   A.  So you joined the firm six years before --

11   Q.  When I joined the firm -- John, I'll repeat the question.

12       Do you recall, when I joined the firm, I came to you and

13   shared with you that both you and my son were both alumni of

14   the Allen Stevenson school?  Do you recall that conversation?

15   A.  The problem, Willie, is you joined the firm six years

16   before I did.  So we didn't have a discussion when you arrived

17   at the firm.

18   Q.  Do you recall when you joined the firm, I came to you --

19   John, how did you find out that my son and you were both alumni

20   of the Allen Stevenson school?

21   A.  I am sure at some point after I arrived at the firm you

22   must have shared that with me.

23   Q.  Thank you, John.

24       And John, how did that make you feel?

25   A.  I had no feeling as a result of that, either positive or

MAEGden1                          Bicks - Cross

1    negative.

2    Q.  You had no -- both alumni and same -- no feeling

3    whatsoever?

4    A.  We were not there at the same time.  We did not interact.

5    And I have never met your boys.

6    Q.  That's fine.

7          MR. DENNIS:  Will you please call up Government

8    Exhibit 502, please.

9    Q.  John, on January 30th at 1:44 a.m., when you, along with

10   two members of K&L Gates' executive committee decided that I

11   had been suspended, you knew that action was contrary to the

12   firm's partnership agreement, did you not?

13   A.  I can't answer that question yes or no.  Would you like me

14   to answer it?

15   Q.  Mr. Maletta testified yesterday --

16          THE COURT:  No, no, no.  You can't refer to any other

17   witness' testimony.

18   Q.  John, were you part of the team that made the decision to

19   suspend me from the firm?

20   A.  Again, I can't answer yes or no, unless I understand

21   whether you are talking about the decision to expel you from

22   the partnership.

23          THE COURT:  No, no, no.  Let me just move this along.

24          The exhibit we're looking at refers to a suspension,

25   and I think the evidence was the termination occurred some

MAEGden1                        Bicks - Cross

1    months later.

2              So the question that Mr. Dennis is putting to you is:

3    Were you part of the decision to suspend him?

4              THE WITNESS:  To suspend his access at the end of

5    January 2019?

6              THE COURT:  To do what led to this letter.

7              THE WITNESS:  I was not part of that decision, no.

8              MR. DENNIS:  Your Honor, may we have a sidebar?

9              THE COURT:  Sure.

10             MR. DENNIS:  Because there's obviously a discrepancy

11   between his testimony and Mr. Maletta's testimony.

12             THE COURT:  So what?  That's for your summation

13   argument.

14             MR. DENNIS:  Okay.

15             THE COURT:  Ladies and gentlemen, you will receive an

16   instruction from me as part of the final instructions that, of

17   course, you have to determine whether any given witness is

18   accurate or inaccurate in their testimony.  And one of the

19   things you'll look at is whether the testimony of one witness

20   is consistent with the testimony of another witness or

21   inconsistent.  And counsel for both sides will give you

22   arguments in their final summations to the jury about what they

23   think is consistent or inconsistent.

24             So it's not a need for a sidebar.  It's for summation.

25             MR. DENNIS:  Thank you, your Honor, for making that

MAEGden1                           Bicks - Cross

1    clear to the jury, that inconsistency.

2    BY MR. DENNIS:

3    Q.  John, when did you learn that I had been suspended from the

4    firm and lost all my resources?

5    A.  I was aware that this decision was in the works.  I was --

6              MR. DENNIS:  Your Honor, may we have a side --

7    Q.  I asked when, a date.  When did you learn?

8              THE COURT:  Now, counsel, that is the --

9              MR. DENNIS:  Your Honor, may I -- I was suspended at

10   1:44 a.m.  I'm just asking the managing partner, when did he

11   learn.  I was suspended at 1:44 a.m. in the morning.  Did they

12   inform him beforehand, did they inform him afterwards, that's

13   all.  I'm just trying to get a timeline of when did he actually

14   learn.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

MaeWden2                          Bicks - Cross

1          THE COURT:  The question you asked was:  "John, when

2    did you learn that I had been suspended from the firm and had

3    lost all my resources?"

4          That was your question.  It was a compound question,

5    but there was no objection, so I did not intervene.  But it's

6    really two different questions.  That's the problem you had.

7          Now, do you want to put a new question?

8    BY MR. DENNIS:

9    Q.  John, when did you learn of my suspension?

10   A.  Within a day or two before this email went out to you, I

11   was aware that this action was going to be taken.

12   Q.  Within a day or two before the email went out?

13   A.  Yes.

14   Q.  OK.  And what actions did you take upon learning -- oh, who

15   informed you that I was going to be suspended?

16   A.  I believe it was Mr. Maletta.

17   Q.  Was there -- did you talk to anyone else prior to that?

18   A.  Not regarding this.

19   Q.  OK.  And what were the reasons Mr. Maletta -- that Jeff

20   gave you?

21   A.  That despite having been warned numerous times in writing

22   by the firm's inside and outside counsel, you had continued to

23   relentlessly harass numerous partners of the firm by email, by

24   voice mail, perhaps by text message, and you had refused to

25   stop despite numerous warnings.

MaeWden2                          Bicks - Cross

1    Q.  And in the days prior to or in the days after this email

2    was sent, who did you discuss this issue with; which partners

3    within the firm?

4    A.  Are you asking in the days before?

5    Q.  In the days after, the days after.

6    A.  In the days after I had several discussions about this.  I

7    had a discussion with -- a brief discussion with all of the

8    partners in the New York office, so they were aware of the

9    action that had been taken so that they would be aware.  I

10   spoke with others.  I also had to speak with a small number of

11   others outside of the firm.  I don't know if that was your

12   question.

13   Q.  John, when Mr. Maletta told you that this was going to --

14   that this suspension was coming a day or two beforehand, did

15   you ask him what the -- who was authorizing it?

16   A.  I don't believe I asked him that.

17   Q.  John, as a general counsel of K&L Gates, Mr. Maletta does

18   not have the authority to do this unilaterally, is that

19   correct?

20   A.  I don't know that that is correct or not correct.  And I

21   don't know that he decided it unilaterally, so I can't really

22   answer your question.

23   Q.  I didn't ask you -- I said does he have the authority of

24   his own -- so your response is that under the partnership

25   agreement, Mr. Maletta may have had the authority to

MaeWden2                        Bicks - Cross

1    unilaterally suspend another partner in the firm?

2    A.  I don't know that this is a matter that is governed, that

3    the partnership agreement even speaks to or whether this was a

4    decision made by the management committee or endorsed by the

5    management committee.

6    Q.  OK.  All right.  That's fine.

7        John, were you aware or did you know that no partner had

8    ever been suspended in the way that I was suspended?  Did you

9    know that?

10   A.  I did not.  I did not and I do not as I sit here know

11   whether that has ever happened before.

12   Q.  OK.

13   A.  Actually, I'm sorry.  Can I correct my answer?

14           THE COURT:  Go ahead.

15           THE WITNESS:  I am aware in the 11 years I've been at

16   the firm of possibly one other partner in another office, not

17   New York, who was -- whose access was restricted and shortly

18   thereafter that partner left the firm.  So I'm aware of one

19   other instance.

20   Q.  Did you ever have a conversation with Jeff Maletta

21   regarding whether any other partner had been suspended in this

22   way?

23   A.  I don't recall having that discussion with Mr. Maletta, no.

24   Q.  John, you knew that by suspending me and cutting me off

25   from the firm's email and locking me out of my computer files,

MaeWden2                          Bicks - Cross

1    that you were making it impossible for me to service my

2    clients, didn't you?

3    A.   You weren't servicing any clients, Willie, so I can't

4    really answer that question.

5              MR. DENNIS:  Sidebar for a second, your Honor?

6              THE COURT:  Yes.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MaeWden2                          Bicks - Cross

```
1                (At sidebar)

2                THE COURT:  Go ahead.

3                MR. DENNIS:  That's just a flat-out lie.  He can't say

4     I wasn't servicing a single client.

5                THE COURT:  Then how do you deal with this one?

6                MR. DENNIS:  He's a liar.

7                THE COURT:  No.  Here are the rules.  On

8     cross-examination you can put the question, "Are you saying

9     that I wasn't in any way servicing any client at this time?"

10    Let's say he says yes.  Then your follow-up question would be,

11    "Well, what's your basis for saying that?"  He'll say whatever

12    it was.  Then you'll say, "Didn't I submit time sheets for

13    clients during this period?

14                I assume you did.

15                MR. DENNIS:  Yeah.

16                THE COURT:  That's the way you handle it, through

17    questions, not just by saying at the sidebar that you think

18    he's lying.

19                MR. DENNIS:  No, I didn't --

20                THE COURT:  I've given you now some help.

21                MR. DENNIS:  Yes.  Thank you.

22                THE COURT:  So we'll see what we can do.

23                (Continued on next page)

24

25
```

MaeWden2                         Bicks - Cross

1          (In open court)

2          MR. DENNIS:  I'm going to ask the court reporter, can

3     you read back the last statement that John just made?

4          THE COURT:  Go ahead.

5          (Record read)

6     BY MR. DENNIS:

7     Q.  John, had I been submitting time sheets relating to clients

8     that I was servicing prior to the receipt of this?

9     A.  What period of time are we talking about, Willie?

10         THE COURT:  Well, just a minute.  In, let's say, the

11    three months prior, do you know whether or not Mr. Dennis was

12    submitting time sheets for work for any client in the firm.

13         THE WITNESS:  I can't recall whether you were or

14    weren't.  Certainly nothing stands out to me as I sit here now.

15    BY MR. DENNIS:

16    Q.  So you cannot --

17         THE COURT:  Excuse me.

18         If he was submitting time sheets, then he was at least

19    to some extent servicing clients; yes?

20         THE WITNESS:  Theoretically.

21         THE COURT:  OK.

22         Go ahead, counsel.

23    BY MR. DENNIS:

24    Q.  John, can we go to the second paragraph of the letter from

25    1/30/20 that's on the screen, and can you read the second

MaeWden2                          Bicks - Cross

1   sentence of that paragraph?

2   A.   The second sentence of the second paragraph?

3   Q.   Yes.

4   A.   "Your key card access to" --

5   Q.   I'm sorry.  The third sentence.

6   A.   The third sentence:  "We will make arrangements to monitor

7   your inbox and will forward any client-related matters to the

8   appropriate lawyers in the firm."

9   Q.   Thank you.

10      John, you also knew that by locking me out of my offices,

11  not allowing me to use my emails, that this was going to send

12  disruption and chaos into the life of my children, including

13  Grant, didn't you?

14  A.   I don't have any knowledge, Willie, whether that is correct

15  or not correct.

16  Q.   OK.  John, after my suspension by the firm, the firm

17  communicated with my wife's divorce lawyer, didn't it?

18  A.   Not to my knowledge.

19  Q.   Have you ever spoken to Jeff Maletta about whether the firm

20  communicated with my wife's attorney?

21  A.   I have spoken to Mr. Maletta about whether the firm

22  communicated with your divorce attorney.

23  Q.   And what did Mr. Maletta tell you?

24  A.   That we have not.

25  Q.   John, where do you live?

MaeWden2                          Bicks - Cross

A.  I live in Ridgewood, New Jersey.

Q.  And have I ever been to your house?

A.  I don't know.  Not that I'm aware of.

Q.  John, because I live in the city, you know I don't have --
never had a car, right?

A.  I don't know that.

Q.  You don't know?  OK.

    John, since January 30 of 2019, have I ever returned to the
New York office?

A.  Are you referring to the inside of the space or to the New
York office building?

Q.  Yes.  Have I ever returned -- have I returned to the New
York office?  You can give whatever interpretation you like.
Have I ever returned to the New York office, John?

A.  It's not an interpretation.  I'll answer your question.  I
observed you outside the New York City office in the very early
morning hours one day in January or February, might even have
been March of 2019.  You were outside of the building entrance
at the corner of 53rd and Lexington Avenue.  I have not seen
you since your suspension inside of the office, and you
wouldn't have access to the inside of the office following
January of 2019.

Q.  OK.  John, do you have any evidence that you saw me in
January?  January 30 was the day I got suspended.  So that
month was over.  Do you have any evidence that you saw me?

MaeWden2                         Bicks - Cross

1    A.  I don't.

2    Q.  OK.  Thank you, John.

3    A.  Only my own recollection.

4    Q.  Oh, OK.  John, you know -- you knew that I've never owned a

5    gun in my life, didn't you?

6    A.  I have no idea whether you've owned a gun in your life.

7    Q.  OK.  Thank you, John.

8         John, yesterday you talked a lot about your thoughts in

9    terms of -- your feelings in terms of the way that I, my

10   emails.  Do you -- and you said you didn't understand why.  Do

11   you think, John, that any of my emails could have somehow been

12   related to my suspension of the firm and -- to my suspension of

13   the firm, some of my text messages?

14   A.  You sent me about 4,000 text messages.  I don't --

15   Q.  John, I asked --

16   A.  I don't know what was on your mind at the time that you

17   sent them.

18   Q.  John, I asked you, do you think that it was possible, yes

19   or no, that some of my text messages could have been related to

20   my suspension?

21   A.  I can't answer that yes or no.

22   Q.  OK.  Do you think any of my text messages could have

23   somehow been related to the impact that it was going to have on

24   my children?

25   A.  I can't answer that question yes or no.

MaeWden2                    Bicks - Cross

1    Q.  OK.  Let me move on from there then.  OK.

2         You're --

3              THE WITNESS:  Your Honor -- and I'm sorry, Willie, to

4    interrupt you.  At some appropriate moment, I need to clarify

5    an answer that I think I gave earlier.

6              You had asked me a question about my conversation --

7    BY MR. DENNIS:

8    Q.  John --

9              THE COURT:  Excuse me.  The witness has a right to

10   clarify his earlier answer.

11             Go ahead.

12             THE WITNESS:  You had asked me a question, Willie,

13   earlier about whether I had discussed with Mr. Maletta whether

14   the firm had had conversations with your divorce attorney.  As

15   I reflect on it, and I just want to be very clear and correct

16   in my testimony, I recall -- I think I recall that Mr. Maletta

17   may have told me that at your request certain information was

18   provided by the firm.  Some financial information, I believe,

19   was requested by you to be provided by the firm to your divorce

20   attorney.  That would be the only clarification of my answer.

21   BY MR. DENNIS:

22   Q.  Did Mr. Maletta ever show you any written -- a written

23   request from me asking the firm to provide my ex-wife's

24   attorney, which is actually -- which would be my ex-wife as

25   well, with any financial information, any information?

MaeWden2                          Bicks - Cross

1  A.  I don't recall seeing that request.

2  Q.  John, did my text messages to you and other members of the

3  firm occur after there had been contact between the firm and my

4  ex-wife's divorce attorney and my ex-wife?

5  A.  I don't know when any contact might have occurred between

6  the firm and your divorce attorney or your ex-wife's.  So I

7  can't really answer that question.

8  Q.  John, did Mr. Maletta inform you that I made the request

9  and asked for an explanation on February 14 of 2019?

10 A.  I'm sorry.  I --

11 Q.  Did Mr. Maletta, when you discussed --

12          THE COURT:  Sustained.

13          MR. DENNIS:  Repeat that, your Honor?  Sustained?

14          THE COURT:  Yes, because he's just said he doesn't

15 know about any such communication, so how could he possibly

16 know the date?

17          MR. DENNIS:  Well, I --

18          THE COURT:  It's really just a way of your trying to

19 put into the record what you believe is the date.

20          MR. DENNIS:  I think he clarified -- in his

21 clarification, he said oh, he did remember that Mr. Maletta had

22 come to him.

23          THE COURT:  Yes.  And you then asked him about whether

24 he had seen any written communications, and he said no.  But if

25 you want to put some more questions --

MaeWden2                          Bicks - Cross

1          MR. DENNIS:  OK.

2          THE COURT:  Here's the point.

3          MR. DENNIS:  That's fine.  That's fine.  I'll move on.

4          THE COURT:  OK.

5   BY MR. DENNIS:

6   Q.  John, just, we're going to -- I want to take a brief segue

7   for a second.  You're a bankruptcy lawyer, is that correct?

8   A.  My practice is insolvency, restructuring and distress

9   transactions.

10  Q.  Do you often represent companies?

11  A.  Yes.

12  Q.  Do you represent companies -- when you are representing

13  companies and their creditors that are owed funds by the

14  company, is that -- would you advise the company on how to deal

15  with the creditors?

16  A.  Yes.

17  Q.  Most of the time in a bankruptcy, do creditors end up with

18  less than what they owed, substantially less than what they're

19  owed by the company?

20  A.  There's no general answer to that.  It's as wide as the

21  variety of cases.

22  Q.  On occasion, do they end up with less, significantly less?

23  A.  Less than?

24  Q.  What they're owed by the company.

25  A.  Yes, absolutely.

MaeWden2                        Bicks - Cross

1   Q.  And are you the lawyer that has to inform the creditors on

2   occasion that they're going to get less than -- less than what

3   they've actually invested in the company?

4   A.  Sure.  In some circumstances I may be that person.

5   Q.  OK.  John, beginning from November 18 until today, did you

6   ever send me a text message stating that you felt threatened or

7   intimidated by emails to me?

8   A.  I've never sent you a text message in my life.

9   Q.  Or did you ever send an email saying you felt threatened

10  and intimidated by me?

11  A.  I did not send you that email.

12  Q.  OK.  So you send letters on a regular basis to creditors,

13  telling them that, giving them really harsh news that you're

14  not going to be able to get all your money back, correct?

15  A.  Not correct.

16  Q.  Not correct?

17  A.  I don't send letters to creditors on a regular basis

18  advising them that they're not going to get their money back.

19  Q.  Do you ever -- you do it on occasion?

20  A.  I don't know that I've ever sent a letter like that in 37

21  years of practice.

22  Q.  OK.  But you never -- we've known each other for eight

23  years.  You said, I think, I want to correct your testimony.

24  You said we would both arrive in the office early in the

25  morning.  Is that correct, we would both be in the office early

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MaeWden2                        Bicks - Cross

1    in the morning?

2    A.  Often you and I were both in early in the morning, yes.

3    Q.  Would we sometimes have coffee and talk?

4    A.  We would.

5    Q.  OK.  So -- yet you never sent me a text message stating

6    that you felt intimidated or threatened?

7    A.  At the time we were sitting having coffee in my office,

8    Willie, which would have been before January of 2019, you and I

9    had never had an unkind word.

10   Q.  Even after my first text message -- what was the first

11   message where you felt intimidated and threatened?  What was

12   the date of the first message?

13   A.  The first text message that I recall receiving, I won't

14   have the exact date, but I want to say it was in May of 2020

15   was the first text message.  I was seeing emails that you were

16   sending to me before that time.

17   Q.  All right.  When was the first email that you saw that you

18   felt threatened and intimidated by?

19   A.  It would have been an email that Ms. Kushner showed me

20   yesterday, I believe, dated in 2019, where they -- with a photo

21   of some biblical verse regarding cutting down evildoers like

22   the green herb.

23   Q.  When you got that email, given our relationship, you felt

24   no inclination to send me an email or text to say:  Willie,

25   this is really intimidating; I'm really concerned about this;

MaeWden2                    Bicks - Cross

1  can we talk?

2      You never sent one of those, is that correct?

3  A.  I was very concerned, so I had the firm's lawyers send you

4  that communication.

5  Q.  After the first one.  OK, John.

6  A.  And Willie, I want to clarify.  I don't recall if your

7  first communication from the firm's lawyer was after that first

8  communication, but if you're asking did I ever ask you to stop,

9  you were asked to stop numerous times on my behalf by the

10  firm's lawyer, who was appearing for me and for the other

11  partners.

12  Q.  I love your embellishment of the question, John.  The

13  question was upon me sending you an email or text message where

14  you felt intimidated or harassed, the very first -- did you

15  ever send me a response?

16  A.  I did not.

17  Q.  OK.  That's -- all right.

18      So, John, when did you -- when were you notified by the

19  Department of Justice that -- about this matter that's before

20  this Court right now?

21  A.  I think I was first approached by the FBI in the summer

22  of -- I want to say in the summer of 2020 or in the late spring

23  of 2020.  I might be a little off, but not much.

24  Q.  And can you give us the -- what was the communication?  Can

25  you give us a sense of what the communication was?

MaeWden2                          Bicks - Cross

A.   They wanted to meet with me and to speak with me about what
had happened.  They wanted to -- they wanted me to provide my
cell phone so that they could download the text messages that
they had understood I'd received, and they wanted to talk to me
about the circumstances surrounding your departure from the
firm and the messages that you had sent to me after that time.
Q.   Why had they identified you?  Had you given them -- I mean
had you given them emails before?  How did they identify you?
A.   I can't tell you.  I don't know.
Q.   So just to go back, because we have a timeline that we're
working off, did they contact you -- approximately when?
A.   My best recollection is that it was in the spring or
summer, sometime in the middle of 2020.
Q.   OK.  And at that point, what information did you provide to
them?
A.   I'm sorry.  Can I have a moment?  I'm actually -- I'm just
trying to refresh my recollection as to exactly when it was
that I first was contacted.  A little bit of Covid fog.  I
apologize.
     Willie, I apologize.  As I sit here now, I cannot remember
whether it was -- I cannot remember exactly when I was first
contacted by them.  It may have been later than 2020 that I'm
recalling.  I apologize.  I just don't recall.  And I imagine
that you have that information, but I just don't recall.
Q.   I'm *pro se*.  I'm just trying to stay organized, you know.

MaeWden2                          Bicks - Cross

1          OK.  And so what information did you provide them once they
2     contacted you?
3     A.  I sat with them.  They asked me questions about the
4     circumstances of your departure from the firm, what had
5     happened before your departure from the firm, what had happened
6     after your departure from the firm.  They asked me about
7     messages that I had received from you.  They asked me to take
8     custody of my cell phone so they could download all the
9     messages that you had sent me, and I gave it to them so that
10    they could do that.  I don't recall what else we might have
11    discussed.  Those were the main things.
12              THE COURT:  When they first interviewed you, they were
13    taking notes?
14              THE WITNESS:  They were.
15              THE COURT:  And would seeing those notes possibly
16    refresh your recollection as to the date?
17              THE WITNESS:  I'm sure it would.
18              THE COURT:  Would the government please show the
19    witness those notes.
20              MR. DENNIS:  Your Honor, while they -- can I proceed
21    with the -- so we don't --
22              THE COURT:  I'm sorry?
23              MR. DENNIS:  Can we proceed with -- I have other
24    questions.
25              THE COURT:  Yes.  Go ahead.

MaeWden2                        Bicks - Cross

1    BY MR. DENNIS:

2    Q.  So John, just to reinforce for the jury again, you're the

3    managing partner of the New York office.  When did you first

4    learn that Eric Cottle was also being recognized as a victim by

5    the FBI?

6    A.  Probably the same time that they were scheduling a sit-down

7    with me; I think they visited with Eric Cottle and Rob Matlin

8    either on the same day, the day before or the day after.

9    Q.  Just to clarify, you said the FBI sat down with Rob Matlin

10   as well?

11   A.  Yes.

12   Q.  OK.  Do you know if Eric Cottle was a person who initiated

13   the communication with the FBI?

14   A.  I don't know.

15   Q.  OK.  Cally Bostick.  Cally Bostick is also listed as a

16   victim.  When did you learn of Cally Bostick's involvement in

17   this matter?

18   A.  Sometime after the FBI had interviewed me.

19   Q.  Was it weeks, or was it days?  Was it -- how --

20   A.  Actually, I'm sorry.  I should correct that answer.

21       Long before I sat down with the FBI, I was aware that Cally

22   was among the group of partners at the firm that you were

23   sending some really harassing, tough and vile messages to.  So

24   I was aware of that long before I sat with the FBI.

25   Q.  I understand your awareness of that.  What we're focusing

MaeWden2                              Bicks - Cross

1    on our timeline right now is when the FBI got involved, became

2    involved.  You have a fuzzy recollection -- maybe spring,

3    summer; you're going to be able to figure that out.  You're

4    testifying, correct me if I'm wrong, that Cally Bostick was

5    somewhere around the same time.  Did you, each one of you know

6    that you were a target or that you were considered a victim of

7    the FBI -- victim in this case?

8        Or let me rephrase that.

9        Once you, Cally and Eric realized that you were -- how did

10   you -- once you all sat down and you realized, who initiated

11   the contact with the FBI for them to begin this probe?

12   A.  You asked me that before, and I told you I don't know.

13   Q.  OK.  You don't know.  OK.  All right.

14       Do you know if Eric Cottle knows?

15            THE COURT:  No, no, no.

16            MR. DENNIS:  Withdrawn.

17            THE COURT:  Yes, but I think we have that document now

18   if you want to just put it -- and identify the number for the

19   record.

20            MS. KUSHNER:  Sure.  It's been marked as 3505-162.

21            MR. DENNIS:  Can I see it?

22            THE COURT:  The sole question is whether this

23   refreshes his recollection as to the date.

24            No, no, no.  You can look at it, but then we need to

25   put it in front of the witness.

MaeWden2                         Bicks - Cross

1              MR. DENNIS:  Yeah, I was just going to look at it

2      before.

3              THE COURT:  Yes.  Go ahead.

4              THE WITNESS:  Thank you.

5              THE COURT:  The sole question is whether, after you

6      look at this, it refreshes your own recollection of when you

7      first met with the FBI.

8              THE WITNESS:  It does.

9              THE COURT:  OK.  What's the date?

10             THE WITNESS:  I was closer than I thought.  October of

11     2020.

12             THE COURT:  OK.  You can hand that back, or the

13     government can take it back.

14             OK.  Mr. Dennis, go ahead.

15     BY MR. DENNIS:

16     Q.  Now that that document's refreshed your memory, hopefully,

17     when did you -- did you ever discover who initiated the contact

18     with the FBI to commence this action, which led to this action

19     being commenced?

20     A.  Once again, no.

21     Q.  OK.  I just -- I didn't know if looking at the document

22     (inaudible).

23         So since this, since you were initially contacted by the

24     FBI, have you spoken to Cally Bostick about this matter?

25     A.  I've never had any substantive discussion with Cally

MaeWden2                          Bicks - Cross

1    Bostick or any of my other partners about the matter.

2    Q.  Have you ever had a conversation with Eric Cottle about

3    this matter?

4    A.  No, I've never had a substantive discussion with Mr. Cottle

5    about this matter.

6    Q.  So to make -- everyone was terrified, everyone was

7    traumatized about the emails and texts that I was sending them,

8    and now the FBI is involved and you never had a single

9    substantive conversation with all these people, with these

10   other individuals who were traumatized and scared?  And you

11   never had a substantive conversation with them?

12   A.  I've never had a substantive conversation with them about

13   this criminal proceeding against you.

14            THE COURT:  So let me ask you, as a lawyer, is it

15   routine for witnesses and potential witnesses in criminal

16   investigations to not discuss the matter with other witnesses

17   because that would otherwise raise questions of getting your

18   stories together, which would not be fair and appropriate?  Do

19   I have that right?

20            THE WITNESS:  Yes.

21   BY MR. DENNIS:

22   Q.  And, John, as the managing partner of the New York office,

23   would it not be prudent if you're looking at people being

24   physically injured to talk to them and try to assist them and

25   protect them?

MaeWden2                        Bicks - Cross

1    I don't -- I understand what your Honor's saying, that in

2    preparation for litigation, sure, it's a strategy.  But if the

3    real thing is everyone is scared and we're here now, one would

4    think there would be real substantive conversations going on.

5        Wouldn't you, John, ordinarily, in your course of business,

6    if a partner told you they felt threatened and intimidated,

7    wouldn't you talk to them regularly?

8    A.  The only substantive conversations that I had, Willie, were

9    with the New York partners to advise them of security measures

10   that we were putting in place at, around, and after the time of

11   your suspension from the firm.

12   Q.  OK.  So, John, you were -- tell us about the security

13   measures that you put in place.

14   A.  At the office?

15   Q.  You said security measures, but tell us about all security

16   measures you put in place.

17   A.  With respect to the New York office, immediately after

18   your, your -- your being, I'll say locked out from the office

19   and locked out from the IT platform, we had security personnel

20   in the office.  Later on, not much later on, but when it became

21   evident that you were hanging around outside of the building

22   and apparently willing to engage K&L personnel outside, we

23   hired security to be outside of the building so that we would

24   know when you were there.

25       MR. DENNIS:  Your Honor, I have a question for the --

MaeWden2                           Bicks - Cross

1    because I want the jury to follow.  I don't want --

2    Q.  You said earlier that you had no evidence that you could

3    offer showing that you had ever witnessed me outside the

4    building?

5              THE COURT:  Well, he had his own observation.

6              MR. DENNIS:  His own.

7              THE COURT:  Yes, his own recollection.

8    BY MR. DENNIS:

9    Q.  Now you're saying about others, so before the jury has an

10   impression that I was -- do you have any proof that others --

11   you said others have told you.  Do you have proof?

12             THE COURT:  That's a fair point.  But the reason he

13   had to answer it the way he did is because you asked him to

14   describe all security measures.

15             Confine your answer just to what the security measures

16   were, not what you had learned from other partners that may or

17   may not have prompted the security measures.

18             THE WITNESS:  I understand.

19             Just to be clear, I haven't finished my answer.  Do

20   you want me to finish my answer?

21   BY MR. DENNIS:

22   Q.  Yeah, John, you can, as the Court requests, just describe

23   the security measures only.

24   A.  I'll finish doing that.

25   Q.  OK.

MaeWden2                         Bicks - Cross

A.   So, in addition to having security inside the office,
having security outside of the office, we had also provided
building security with -- I believe with your photograph and
with an instruction that you were not permitted to enter the
office.

     That was all I recall doing.
Q.   John, do you recall, and I'd like to give you a copy of
this, during your in-person meeting with the Southern District,
do you recall that you mentioned that the firm was also in
touch with the police department?

          MS. KUSHNER:  Objection, your Honor.

          THE COURT:  Well, as phrased, the objection is
sustained, but I think there might be a question there that
could be properly put.  But I think, coincidentally, we've come
to the time for the jury's midmorning break, so we'll give them
a 15-minute break now and we'll take this up in the absence of
the jury.

          MR. DENNIS:  Can I go to the restroom, your Honor?
Is.

          THE COURT:  Yes.

          (Continued on next page)

MaeWden2                           Bicks - Cross

1                    (Jury not present)

2                    THE COURT:  You may step down.  We'll see you in 15

3       minutes.

4                    THE WITNESS:  Thank you, your Honor.

5                    (Witness not present)

6                    THE COURT:  I'll give you folks a ten-minute break,

7       and then we'll take up this pending question.

8                    I want to flag for the government, certain of the

9       questions that have been put to the witness by Mr. Dennis have

10      not been objected to, which, of course, is the government's

11      prerogative.  But of course, in making that determination, you

12      may be opening doors to questions about matters that I have

13      otherwise excluded at your request earlier.  So that's your

14      choice.

15                   See you in ten minutes.

16                   (Recess)

17                   THE COURT:  Mr. Dennis, there was a question that you

18      were seeking to ask regarding reporting to the police, or

19      something like that.

20                   MR. DENNIS:  I think, your Honor, I asked Mr. Bicks to

21      talk about all the security measures that he had taken.

22                   THE COURT:  Right.

23                   I'm sorry.  The witness should remain outside for a

24      minute.

25                   (Witness not present)

MaeWden2                    Bicks - Cross

1          THE COURT:  The question, as phrased, was very

2    convoluted, which is why I interrupted, but let's figure it

3    out.

4          I'm not sure that that falls within the category of

5    what you previously asked him, which was all security measures

6    taken by the firm.  But just as you were able to ask the

7    witness who first reported it to the FBI, which he didn't know

8    the answer to -- but that was a fair question, and no objection

9    was made by the government to that question -- I would allow

10   you to ask -- he may not know the answer, but I would allow you

11   to ask whether he or, to his knowledge, any other member of the

12   firm also reported this matter to the New York City police.

13         What I am not going to allow, as we've gone through a

14   hundred times already, is whether the police arrested you, what

15   they did, all like that, which I've already ruled is not part

16   of this case.  But let me hear if the government has -- if the

17   question you wish to put, first, is "did you contact the police

18   about this," the answer to that is no, then, "in your capacity

19   as managing partner, were you made aware that anyone in the

20   firm had contacted the police," and if the answer to that is

21   yes, then you can ask him who.

22         I take it those are the immediate questions, Mr.

23   Dennis, that you want to ask, right?

24         MR. DENNIS:  Yes, your Honor.  As I'm reviewing this

25   report, I'm just reviewing this discussion that -- Mr. Bicks

MaeWden2                          Bicks - Cross

1    stood up here and talked to this jury about how fearful he was.

2    He sensationalized it, how he sat his kids down and told them

3    if you see Mr. Dennis in Ridgewood, New Jersey, you know, go,

4    run; how he told his mother; how he sleeps with a loaded gun.

5    He has sensationalized this.  That is beyond -- so if he has --

6    if he's done all those things, he should be able to answer, did

7    you take, did you take any official action.

8            THE COURT:  Did you take any?

9            MR. DENNIS:  Official.  Did you go through -- were you

10   being Charles Bronson.

11           THE COURT:  No, no.

12           MR. DENNIS:  I'm not going to say that, but I mean --

13           THE COURT:  But I just said you can ask him if he

14   reported it to the police and, to his knowledge, did anyone at

15   the firm report it to the police.  That's the question you

16   wanted to ask, right?

17           MR. DENNIS:  That's the question I wanted to ask, but

18   as I'm reading this, your Honor, or what he said in his

19   statement, or what the statement he's made is the New York PD

20   went to tell Willie to stop what he's doing.  He stated this.

21           THE COURT:  OK.  So if he answers the questions that I

22   just suggested you can put with "no," then you can say "do you

23   recall whether or not you told the FBI," and then you can,

24   without making it clear to the jury that you're reading from

25   the report, just say "you told the FBI that the firm had

MaeWden2                        Bicks - Cross

1    reported it to the police," or whatever.  And then if he says

2    "no, I don't recall that," then you can show him the 3500

3    material to refresh his recollection.  So that's all fair game.

4              What I wanted to make sure -- I want to hear from the

5    government as well, but I want to make sure that you weren't

6    going to view this as opening the door to things about your

7    being arrested, etc., etc.

8              Anything from the government?

9              MS. KUSHNER:  The government agrees with your Honor.

10   The question whether or not something was reported to the

11   police, we think, is a fair question.  We do not think it opens

12   the door to other -- the police then showed up and then did

13   arrest Mr. Dennis or whether they showed up allegedly with

14   firearms and anything that goes into suggestions of police

15   brutality or something inappropriate that's not relevant to

16   this case.

17             THE COURT:  Oh.  All right.  I think we've reached a

18   consensus, so let's get the witness back on the stand.

19             I'm sorry.

20             MS. KUSHNER:  Your Honor, just to the extent that the

21   defendant is going to show the witness anything else, can he

22   please ask the Court for permission to approach the victim.

23             THE COURT:  I'm sorry?

24             MS. KUSHNER:  To the extent the defendant is going to

25   put anything else before the victim, can he please ask the

MaeWden2                         Bicks - Cross

1    Court for permission to approach the victim so the victim's

2    aware that the defendant's going to be walking up to him?

3            THE COURT:  Somehow I'm having trouble with my

4    hearing.  I heard the first part.  You request permission to?

5            MS. KUSHNER:  Ask that the defendant request

6    permission from the Court to approach the victim.

7            THE COURT:  Oh, I see.  All right.  I think we're

8    proceeding reasonably well.

9            Mr. Dennis, you've used an hour.  You've asked for 90

10   minutes, but I'm giving you 120 minutes.  So you have a full

11   hour still to go.

12           All right.  Let's bring in the jury, and let's get the

13   witness.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

MaeWden2                          Bicks - Cross

1           (Jury present)

2           THE COURT:  Please be seated.

3           OK.  Mr. Dennis.

4     BY MR. DENNIS:

5     Q.  So, to pick up where we left off, I think, John, correct me

6     if I'm wrong, we were discussing security measures that --

7     security steps that you had taken in order to protect yourself

8     and the other alleged victims.  And I guess the question I was

9     raising before you left, had you or anyone at the firm reported

10    this to the New York City Police Department?

11    A.  At what period of time?

12    Q.  I think the period of time, I think in your record you said

13    you've -- when was the first -- I go by when you first felt --

14          THE COURT:  Mr. Dennis, get a little closer to the

15    microphone.

16    BY MR. DENNIS:

17    Q.  Oh.

18        I'm basing it off the date when you first felt intimidated

19    or threatened.  You can tell me.

20    A.  The first interaction that I recall with the police

21    department would have been -- it would -- I can't recall,

22    again, if it would have been late in 2019 or sometime early in

23    2020 that the firm made a report to the local precinct for --

24    that covers 599 Lexington Avenue.  I do recall that we ended up

25    meeting in the office with a squad detective and a senior

MaeWden2                              Bicks - Cross

1   officer from that precinct.  I apologize.  I just don't recall

2   the date.  It was a single meeting.

3   Q.  OK.  And this date was prior to the initiation of the

4   action by the Department of Justice, correct?

5   A.  I just said I don't recall the date.

6           MR. DENNIS:  Your Honor, may I have a brief sidebar?

7   May we have a sidebar?

8           THE COURT:  All right.

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MaeWden2                              Bicks - Cross

                    (At sidebar)

                    MR. DENNIS:  I want to be really careful about staying

within the parameters or the guidelines that you gave me, so

he's indicated it was in --

                    THE COURT:  Let me see it.

                    What is being referred to is he told the FBI that the

firm had made a report to the precinct, which he's just

testified to.

                    MR. DENNIS:  Right.

                    THE COURT:  And then he goes on to say "which

precipitated squad detective visiting Mr. Dennis at his house."

Now, the fact that he said that to the FBI doesn't, I think,

open the door to what is evidence in this case.

                    The reason I've been excluding this is both on 402 and

403 grounds.  For Mr. Dennis's benefit, that means it's hard

for me to see the relevance.  Mr. Dennis wants to argue that

the firm treated him badly and caused him all sorts of anguish,

but as we discussed several times at sidebar yesterday, that's

irrelevant to whether or not he intentionally sent harassing

messages.  And I gave the example of the bank robber.  But even

assuming that there's lurking there an argument, the only

argument that I think Mr. Dennis can make, and he's made it

through his questions several times now, is the notion that the

firm was overreacting and that this shows that they weren't

really so upset that they were bringing to play other

1    characteristics of their thought processes, and so that the

2    jury should not take literally how scared they were,

3    purportedly, or the like.

4            So that goes to admitting that the firm reported it to

5    the police, but it doesn't go to what the police then did.  The

6    short of it is that you cannot ask him about that part.

7            MR. DENNIS:  I'd like to add something to the record.

8    It's that my request and my desire is based on the fact that

9    Mr. Bicks just sat there and sensationalized this whole process

10   and talked about things that were -- he talked to his mother

11   about protecting her, whom I've never met.  He said this in

12   front of the jury.  He talked about he sleeps with a loaded

13   gun.

14           So his credibility goes to his being questioned here,

15   because if he did all those things, which are really implying

16   he was acting as a vigilante, and you did not receive, as a

17   professional would be --

18           THE COURT:  That's argument you may or may not be able

19   to make on summation, but the only thing we have at the sidebar

20   is could you ask him about whether he told the FBI that the

21   firm's report to the precinct precipitated a visit to you from

22   the detective, and the answer is no, you cannot ask him.

23           MR. DENNIS:  I wasn't going to ask him that last part.

24           THE COURT:  OK.

25           MR. DENNIS:  I was just going to --

1             THE COURT:  All right.

2                 (Continued on next page)

MaeWden2                           Bicks - Cross

1                (In open court)

2      BY MR. DENNIS:

3      Q.  So, John, just so everyone's clear as to what we've been

4      discussing, so your earlier testimony was essentially that

5      you -- correct me if I'm wrong, you had warned your kids about

6      me and that if they saw me coming to run away; you had warned

7      your mother about me, and if she saw me coming -- I don't know

8      if she could run away; and you sleep with a loaded gun.  Those

9      are some of the things that, as the managing partner of the New

10     York office of an international law firm has done,

11     understanding that not only in his mind is his life in danger,

12     but the lives of some of his associates.  So what we were --

13     where we left off was what other -- did you -- we mentioned

14     that you said a report was made to the police precinct.  Who

15     made that report?  You said it was one located next to the

16     office, correct?

17     A.  As I told you before the break, Mr. Maletta and I met with

18     representatives of the precinct who came to our office.

19     Q.  OK.  And my records show that this was sometime in 2019.

20              THE COURT:  No, no.  Counsel, you can't testify.

21              MR. DENNIS:  Oh.

22     Q.  When was the date when you met?

23     A.  We've talked about this, and I told you I just don't recall

24     clearly when the date was.

25     Q.  Oh, OK.

MaeWden2                    Bicks - Cross

1          THE COURT:  But it's before you first met with the

2   FBI; yes?

3          THE WITNESS:  Yes.

4          THE COURT:  All right.

5   BY MR. DENNIS:

6   Q.  OK.  And do you know if after meeting with the New York

7   City Police Department -- did they take any action, do you

8   know?

9          MS. KUSHNER:  Objection, your Honor.

10          THE COURT:  Sustained.

11  BY MR. DENNIS:

12  Q.  After meeting with the New York City Police Department, did

13  you follow up with them, and was there -- was there a

14  subsequent meeting?  Was there subsequent -- was there any

15  subsequent meeting or any sort of subsequent communication?

16  A.  Not by me between, not with me and the New York City Police

17  Department.  It was just a single meeting.

18  Q.  Between the New York City Police Department and anyone else

19  in the firm?

20  A.  I wouldn't be aware of that.  Only once with me and

21  Mr. Maletta, who was with me at the time.

22  Q.  OK.  Just so we wrap this up, the three partners in the New

23  York office all are terrified, you know, that I'm going to

24  come.  There's a meeting with the New York City Police

25  Department and there's only one meeting, and no one ever

MaeWden2                          Bicks - Cross

1     followed up again; no one ever talks to them again?

2                MS. KUSHNER:  Objection.

3                MR. DENNIS:  We can move on.

4                THE COURT:  That is clearly just argumentative and not

5     really a question.  Sustained.

6     BY MR. DENNIS:

7     Q.  Is that correct?  Is that correct?

8                THE COURT:  No.  It's defective in form.  You can't

9     make an elaborate argument on a question and then say, oh, is

10    that correct?  You have to put simple, straightforward

11    questions, please.

12               THE WITNESS:  Your Honor, I don't know how to address

13    this, but one of Mr. Dennis's --

14               THE COURT:  No, no.  I sustained the objection, so you

15    don't have to answer.

16               THE WITNESS:  I only had a concern about something

17    else he said stated --

18               (Indiscernible overlap)

19               THE WITNESS:  -- my prior testimony, but --

20               THE COURT:  Well, let's hear another question.

21    BY MR. DENNIS:

22    Q.  In your meeting with the New York City Police Department,

23    did you provide them with information about your own claims of

24    harassment and intimidation by me?

25    A.  I don't understand the question.

MaeWden2                        Bicks - Cross

1   Q.  When you sat down with the New York City Police Department,

2   did you say to them, Mr. Dennis has been harassing and

3   intimidating me?

4   A.  Yes, I believe we talked about that.

5   Q.  Did you provide them with any substantive documentation?

6   A.  I think what we had at that time were just the emails.  You

7   had not started texting me at that point.

8   Q.  OK.  The emails that you gave to the New York City Police

9   Department, were they also the same -- are they some of the

10  same emails you gave to the Department of Justice?

11  A.  I didn't --

12          MS. KUSHNER:  Objection, your Honor.

13          THE COURT:  Sustained.

14          MR. DENNIS:  Your Honor, I had assumed --

15  Q.  I thought, Mr. Bicks, and you can correct your, that you

16  had testified earlier that the Justice Department contacted you

17  and asked you to provide them with information relating to your

18  claim.  Is that correct?

19  A.  It is.

20  Q.  And so my question was, is the information -- is any of the

21  information you provided to the Department of Justice the same

22  information, any of it, that you provided to the New York

23  Police Department?

24          THE COURT:  Well, there are still objections to that.

25  I see the government rising to object.  The first is it's been

MaeWden2                          Bicks - Cross

1    asked and answered to the extent he said that they were some of

2    the emails but that you had not yet begun texting.

3             Secondly, however, it's irrelevant.  Sustained.

4    BY MR. DENNIS:

5    Q.  John, as the managing partner of the New York office, are

6    you aware that in March, on March 3 of 2020, I filed an EEOC

7    discrimination charge against the firm?

8    A.  I believe I'm aware of that, not necessarily in my capacity

9    as managing partner of the office.  But I believe I'm aware

10   that you filed that complaint.  I do not recall the date.

11   Q.  Are you aware that that claim was filed, based on a

12   timeline that you've outlined, prior to you being contacted by

13   the FBI?

14   A.  I just told you I don't know when the claim was filed, so I

15   can't answer the question.

16   Q.  OK.  All right.

17       John, do you recall me sending you lengthy emails with

18   multiple parties on there, multiple parties, regarding putting

19   best practices in place at the firm for sexual harassment

20   allegations against women?

21             MS. KUSHNER:  Objection, your Honor.

22             THE COURT:  Well, it's defective in form, but I will

23   allow it just to move things along.

24             You may answer.

25   A.  I recall only a single email that you sent, Willie, that

MaeWden2                        Bicks - Cross

1   I'm going to recall was sent to, maybe, 200 or more partners of

2   the firm, where you broadly spoke about your views on gender

3   equality, promoting women, promoting and protecting diverse

4   lawyers.  I'm just recalling a single sort of, I would say --

5   with apologies -- rambling email that you sent to a couple of

6   hundred partners, which I seem to recall would have been at

7   sometime in 2018 probably, before you were terminated.

8   Q.  John, so as you used the word "rambling," do you remember

9   an email I sent you regarding an article in the American Lawyer

10  that claimed --

11          THE COURT:  No.  We've been through this repeatedly.

12  It is not in evidence.  It has not been introduced, and

13  therefore, to refer to the alleged contents of this alleged

14  article is completely improper.

15          MR. DENNIS:  OK, your Honor.

16  Q.  John, would you base -- or when you were talking about the

17  emails where you said I referred to threesomes, were you basing

18  that on some of the emails that I sent around or regarding

19  women and harassment?

20          MS. KUSHNER:  Objection.

21          MR. DENNIS:  Withdrawn.

22  Q.  John, are you aware that the firm has halted the civil

23  action in this matter until this case, has requested the civil

24  matter be halted?

25          MS. KUSHNER:  Objection.

MaeWden2                          Bicks - Cross

1          MR. DENNIS:  Withdrawn.

2          THE COURT:  There may be a question that could be

3    properly phrased, but this is a matter of public record and

4    legal determinations.

5          You heard there was a civil lawsuit filed by Mr.

6    Dennis and that it was put on hold after this criminal action

7    was brought.  The only person who can do that is not K&L Gates

8    or anyone else; it's the judge.  In this case, it was the judge

9    in the civil case, and she made a determination that she wanted

10   to hold off that case and pause that case while this criminal

11   case was proceeding.  And as I also previously advised you,

12   that's routine.  It happens all the time.

13         So the objection is sustained.

14   BY MR. DENNIS:

15   Q.  John, I have a -- I know you said you received -- I have

16   two text -- I have a text message that I sent to you on

17   Saturday, September 4, 2019, which I'd like for you to

18   identify, if the Court permits.

19         THE COURT:  Show it to him.

20         MR. DENNIS:  Show it to you first?

21         MS. KUSHNER:  Yes.

22         Your Honor, the government has an objection to the

23   substance of the message, but I'm happy to show it to the

24   witness.

25         THE COURT:  Let me see it.

MaeWden2                         Bicks - Cross

1            We may need a sidebar, but just so that, hopefully, we

2       can avoid it, the person to whom this was sent has been

3       redacted.

4            Are the parties agreed to whom it was sent?

5            MS. KUSHNER:  Your Honor, I just want to double-check

6       the stamp on that document.  It may have -- there's different

7       versions of it, and this might be redacted as an attachment to

8       something else.

9            THE COURT:  All right.

10           MS. KUSHNER:  Your Honor, again, we don't object to

11      this document being shown to the witness.  This is how the

12      government received the document.  It is not the government's

13      redaction.

14           THE COURT:  All right.  Let me have the document, and

15      we'll see if there's a basis.

16           Let me show you for identification something that for

17      the moment we will identify -- do you want to call this Defense

18      Exhibit A?

19           MR. DENNIS:  Yes.

20           (Continued on next page)

21

22

23

24

25

1              THE COURT:  So have you ever seen that before?

2              THE WITNESS:  Yes, I recall seeing it.

3              THE COURT:  Now, was that sent to you?

4              THE WITNESS:  I just can't recall.  But I recall

5    having seen this message.

6              THE COURT:  On that representation, Mr. Dennis, you

7    can put some questions.

8    BY MR. DENNIS:

9    Q.  John, was the individual named on here -- was the

10   individual named on here one of the individuals you met with,

11   who came to your offices?

12   A.  Yes, it --

13             MS. KUSHNER:  Objection, your Honor.

14             THE COURT:  I will allow that.

15             I think -- and this is not yet in evidence -- but I

16   think he's referring to the individual whose identification is

17   in the middle of the exhibit.  So with that clarification, is

18   that one of the individuals you met with, who came to your

19   office?

20             THE WITNESS:  Yes, it was.

21             THE COURT:  All right.  Go on.

22             MR. DENNIS:  Are we able to show this to the jury?

23   Will we be able to, your Honor?

24             THE COURT:  Well, you haven't offered it yet.  So the

25   way to proceed is, if you think you have done sufficient work

MAEGden3                        Bicks - Cross

1    to offer it into evidence, then you should offer it, and then

2    we'll see if the government has any objection.

3                MR. DENNIS:  Okay.

4                THE COURT:  All you have to say is the words, I offer

5    Defense Exhibit A.

6                Would you like to say those words?

7                MR. DENNIS:  I offer Defense Exhibit A.

8                MS. KUSHNER:  Objection.

9                THE COURT:  Any objection?

10               MS. KUSHNER:  Objection.

11               THE COURT:  Ground?

12               MS. KUSHNER:  It's the defendant's own statements.

13   And based on the Court's prior rulings, it also goes into

14   substantive matters the Court has ruled on.

15               THE COURT:  Let me see it again.

16               MR. DENNIS:  Can I respond to the objection?

17               THE COURT:  Yes, but just let me see it for a second.

18               Objection is overruled.  The exhibit is received.

19               (Defendant's Exhibit A received in evidence)

20               MR. DENNIS:  What's the next step, your Honor?

21               THE COURT:  So I think that the problem with this

22   exhibit -- which you may want to address in your questions --

23   is it doesn't show to whom this email was sent.

24   BY MR. DENNIS:

25   Q.  John, do you recall receiving this message?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

MAEGden3                        Bicks - Cross

1    A.  So I recall seeing it.  But I have to say, among the

2    literally thousands of messages that I've seen, I don't recall

3    if this one was addressed to me or addressed to someone else.

4    I do recall seeing it.

5            THE COURT:  And notwithstanding that, was it your

6    understanding that it had been sent by Mr. Dennis?

7            THE WITNESS:  Yes, I recognize the email address that

8    it's sent from.

9    BY MR. DENNIS:

10   Q.  John, can you read the text that's right below external

11   sent.

12   A.  Yes.  The text says, are your kids safe at home?

13   Q.  And just to confirm, this was the detective that you met

14   with --

15           THE COURT:  I think we need to -- maybe the government

16   can assist Mr. Dennis to put this on the Elmo, or if you have

17   it otherwise, so the jury can see what we're talking about.

18           There it is.

19   BY MR. DENNIS:

20   Q.  John, do you recall an email I sent to you telling you how

21   I came into possession of this card?

22           MS. KUSHNER:  Objection.

23           THE COURT:  Sustained.

24   BY MR. DENNIS:

25   Q.  John, you testified earlier yesterday that you had no idea

MAEGden3                          Bicks - Cross

1    why I was sending you certain emails, that they were out of the

2    blue and you had no context.  Does this help provide you with

3    any context?

4                MS. KUSHNER:  Objection, your Honor.

5                THE COURT:  Sustained.

6    BY MR. DENNIS:

7    Q.  John, are you familiar with this quote by Abraham Lincoln:

8    You can fool all the people some of the time and some of the

9    people all the time, but you can't fool all the people all the

10   time?

11   A.  I have heard that quote before.

12               MR. DENNIS:  No further questions, your Honor.

13               THE COURT:  Redirect?

14               MS. KUSHNER:  No, your Honor.  No further questions.

15               THE COURT:  Thank you very much.  You may step down.

16               THE WITNESS:  Thank you.

17               THE COURT:  Please call your next witness.

18               MS. KUSHNER:  The government calls Calvina Bostick.

19   CALVINA BOSTICK,

20        called as a witness by the Government,

21        having been duly sworn, testified as follows:

22               THE DEPUTY CLERK:  Please state your name and spell it

23   slowly for the record.

24               THE WITNESS:  Calvina Bostick, C-A-L-V-I-N-A,

25   B-O-S-T-I-C-K.

1        THE DEPUTY CLERK:  Thank you.

2    DIRECT EXAMINATION

3    BY MS. KUSHNER:

4    Q.  Good afternoon, Ms. Bostick.

5        What do you do for a living?

6    A.  I'm an attorney.

7    Q.  And where do you work?

8    A.  K&L Gates.

9    Q.  What is K&L Gates?

10   A.  A law firm.

11   Q.  And what's your title at K&L Gates?

12   A.  Partner.

13   Q.  I'll come back to your job at K&L Gates in a moment.

14       Approximately how long have you been a lawyer for?

15   A.  Sixteen years.

16   Q.  And what degrees do you hold?

17   A.  Bachelor of science and juris doctor.

18   Q.  And where did you get each of those degrees?

19   A.  Undergraduate, bachelor of science, at University of

20   Florida and juris doctor from Georgetown.

21   Q.  After law school, what did you do?

22   A.  I started working at K&L Gates.

23   Q.  How long have you worked there for?

24   A.  Sixteen years.

25   Q.  And when you joined, what was your title?

MAEGden3                    Bostick – Direct

1    A.  I started off as a summer associate, so an intern.  And

2    then I returned as a full-time associate.

3    Q.  And when did you become a partner?

4    A.  2015.

5    Q.  Do you work in a particular practice area?

6    A.  Corporate with a focus on mergers and acquisitions.

7    Q.  Approximately how many associates at your firm become

8    partner each year?

9    A.  I don't know.  Not many.  It's a small promotion to

10   partnership.

11   Q.  From your class, how many individuals?

12   A.  My class, two were ultimately promoted to partner.

13   Q.  And were you one of them?

14   A.  Yes.

15   Q.  Have you received any awards or recognition for your work

16   in the corporate area?

17   A.  Yes.

18   Q.  What have you received?

19   A.  I received several awards from different bar associations

20   and legal publications.

21   Q.  And does K&L Gates have multiple offices?

22   A.  Yes.

23   Q.  Which office do you work in?

24   A.  New York.

25   Q.  Where is that office located?

```
 1              THE COURT:  Take your time.
 2   A.  New York.
 3   Q.  Where exactly?
 4   A.  Midtown East.
 5   Q.  What borough is that in?
 6   A.  Manhattan.
 7   Q.  Ms. Bostick, are you familiar with an individual named
 8   Willie Dennis?
 9   A.  Yes.
10   Q.  How do you know him?
11   A.  We are former colleagues.
12   Q.  Where were you former colleagues?
13   A.  K&L Gates.
14   Q.  And approximately how many years were the two of you former
15   colleagues?
16   A.  Thirteen.
17   Q.  Is Mr. Dennis still at the firm?
18   A.  No.
19   Q.  And do you see Willie Dennis here in the courtroom today?
20   A.  Yes, I do.  He's right there.
21              THE COURT:  The witness has identified the defendant.
22   Q.  Before 2019, what was the nature of your relationship with
23   the defendant?
24   A.  We were colleagues.
25   Q.  What type of interactions did the two of you have?
```

MAEGden3                    Bostick - Direct

1    A.  We were cordial.  When I started, I was a first year

2    associate, and he was a senior partner, so we would work

3    together on discrete matters he asked me to help out with.  And

4    then maybe once or twice a year, we collaborated on different

5    diversity initiatives, particularly an annual women's

6    conference.  We would work together on client dinners and who

7    we wanted to meet at the conference.

8    Q.  I'm sorry if you have said this, does the defendant still

9    work at K&L Gates?

10   A.  No.

11   Q.  Approximately when did he stop working there?

12   A.  May 2019.

13   Q.  And did he stop working there voluntarily?

14   A.  No.

15   Q.  Why did he stop working there?

16   A.  He was expelled from the partnership.

17   Q.  Did you have any role in that expulsion?

18   A.  No.

19   Q.  What, if any, interaction did you have with the defendant

20   after he stopped working at K&L Gates in May of 2019?

21   A.  He text -- that's when he started texting me more, and I

22   saw him twice.

23   Q.  When you said he started texting you, what types of texts

24   was he sending you initially?

25   A.  Well, he first started texting me in March, right around

MAEGden3                         Bostick - Direct

1    the time he was having issues with the firm; friendly, benign

2    texts.   Three.   He sent me a text of him seeing a violinist in

3    Grand Central.   He sent me a text of a selfie of himself with

4    the text, I see leadership in your future.   And then he sent me

5    a text of a motorcycle, a video of a motorcycle when he was on

6    vacation.   So that was in March.

7         And then, in May, he started texting me things about his

8    expulsion saying did I see his -- a summary of his -- a memo he

9    sent summarizing his case against the expulsion, and then I

10   should reply yes or no to his text.   And then I think that was

11   it until later in the year.

12   Q.   And at a certain point, did you stop responding to the

13   defendant's text messages?

14   A.   I never responded to his text messages ever.

15   Q.   Sorry, I want to clarify.   I misunderstood your earlier

16   answer.

17        Did you say earlier that he asked you to respond yes or no?

18   A.   Yes.

19   Q.   And did you respond to that message?

20   A.   No.

21   Q.   I'm showing you what's been marked for identification

22   purposes as Government Exhibit 703.

23        Do you recognize this?

24   A.   Yes.

25   Q.   How do you recognize it?

MAEGden3                          Bostick - Direct

1    A.  It's one of the text messages that he sent to me.

2    Q.  Who is "he?"

3    A.  Willie Dennis.

4    Q.  And is it a true and accurate copy of a text message he

5    sent you?

6    A.  Yeah.

7            MS. KUSHNER:  The government offers Government

8    Exhibit 703 into evidence.

9            THE COURT:  Any objection?

10           MR. DENNIS:  No.  No objections, your Honor.

11           THE COURT:  Received.

12           (Government Exhibit 703 received in evidence)

13           MS. KUSHNER:  Please publish for the jury,

14   Mr. Magliocco.

15   BY MS. KUSHNER:

16   Q.  Ms. Bostick, what is the date of this message?

17   A.  June 24th, 2019.

18   Q.  Can you please read this text message aloud.

19   A.  Great to see you.  Watch the movie Captive State and John

20   Goodman at the end and you will know what I am doing.  As he

21   told Gabriel, you are in charge now.  Delete this text now.

22   Q.  First, what did you understand the defendant to mean great

23   to see you?

24   A.  Referencing that he saw me at a deli close to our office in

25   New York.

MAEGden3                    Bostick - Direct

1    Q.  Can you please describe that interaction.

2    A.  Yes.  It was morning before I went to the office, went to

3    grab some breakfast.  I saw him as I was walking out.  He was

4    walking in.  I was, you know, a little bit nervous.  Because at

5    that time, I knew that he was on bad terms with the firm, he

6    had been sending some texts to other people at the firm that

7    were of a concerning nature.  So I didn't know what his

8    intentions were by being around the office, given that he

9    didn't live around there and didn't work there.  So I was on

10   edge.

11        So I walked past him and I tried to be calm and polite and

12   said, hey, good to see you.  And he like gently touched my arm

13   and said, hey, well, don't run, wait a minute.  And so I turned

14   around and I was like, yeah, hey, how you doing.  And he said,

15   well, good.  I have been texting you, have you received my

16   texts.  And I said, no, are you sure you have the right number.

17   And he kind of looked at me like he didn't believe that

18   response because I had been receiving his texts.  And he said,

19   well, I don't know if you know what happened to me, I was

20   expelled from the firm and, you know, basically that it was a

21   wrongful termination, he was discriminated against.  And I

22   said, well, you know, I had nothing to do with that, that vote.

23   I'm not an equity partner, I don't vote in those decisions.

24   But I hope it works out for you.  He said, well, they were

25   wrong for what they did, and I'm going to expose them, I'm

MAEGden3                        Bostick - Direct

1   going to make them pay.  And I said something to the effect of,

2   well, you know, if they really did wrong you, wrongfully

3   terminate you, then the right course of action is to initiate a

4   legal action and not take other actions.  As I mentioned, he

5   had been texting people and saying some concerning things to

6   them, so I was just trying to, you know, veer a situation to a

7   better direction.

8            MR. DENNIS:  Objection, your Honor.

9            THE COURT:  I think you had answered the question, so

10  we'll let it go at that.

11           Put another question.

12  BY MS. KUSHNER:

13  Q.  What, if anything, did the defendant say to you before you

14  left the deli?

15  A.  He said, no, he's going to handle things his way.

16  Q.  And what did you understand that to mean?

17  A.  A way that wasn't legal.  I don't know.

18  Q.  And turning back to the text message on the screen,

19  Government Exhibit 703, what was your understanding of what

20  watch the movie Captive State meant?

21  A.  Well, I didn't know what it meant, and I -- I figured,

22  since he told me to delete the text now, that it probably

23  wasn't something that was a positive movie.  So I -- I'm pretty

24  sensitive to horror films and films involving violence,

25  particularly in this context, so I didn't watch it, I couldn't

MAEGden3                          Bostick - Direct

1     bring myself to watch it, I still haven't watched it.  But I

2     understand that it was a battle between humans and aliens for

3     control of the planet.  And to get control, the humans plan a

4     suicide mission that is unsuccessful, but they still carry it

5     out.  And there are some other killings involved in that

6     mission.  So I was totally freaked out by that.  And so I --

7     you know, after understanding what it was about, I couldn't

8     watch it.

9     Q.  And you just referenced the part at the end where it says

10    delete this text now.  Was that the only time the defendant

11    sent you a message that he told you to delete?

12    A.  No.

13    Q.  And is it the only time he referenced the movie Captive

14    State?

15    A.  No.

16    Q.  Showing you what's been marked for identification purposes

17    as Government Exhibit 702.

18         Do you recognize this?

19    A.  Yes.

20    Q.  How do you recognize it?

21    A.  It is one of the texts he sent to me.

22    Q.  Who is he?

23    A.  Willie Dennis.

24    Q.  And is this a true and accurate copy of one of the texts

25    the defendant sent to you?

MAEGden3                        Bostick - Direct

1    A.  Yes.

2              MS. KUSHNER:  The government offers Government

3    Exhibit 702 into evidence.

4              THE COURT:  Any objection?

5              MR. DENNIS:  Objection, your Honor.

6              THE COURT:  Ground?

7              MR. DENNIS:  I don't think that we can continue -- I

8    can continue -- that it is right to continue to enter evidence

9    in November of -- in September of 2019 and not to be able to

10   fully discuss the event that occurred on September 4th, 2019

11   because that provides a whole -- a different context.

12             THE COURT:  That's for cross-examination, if at all.

13             The objection is overruled.  The exhibit is received.

14             (Government Exhibit 702 received in evidence)

15   BY MS. KUSHNER:

16   Q.  Ms. Bostick, what was the date of this text message?

17   A.  September 15th, 2019.

18   Q.  And can you please read what it says.

19   A.  Captive State.  Did you ever watch the end?

20   Q.  Do you recall receiving that text message?

21   A.  Yes.

22   Q.  What was your understanding of it?

23   A.  That he was referencing the violence that took place in the

24   movie, including the suicide mission and the --

25             MR. DENNIS:  Objection, your Honor.

MAEGden3                        Bostick - Direct

1           THE COURT:  Overruled.

2    A.  That's it.  That was my understanding.

3    Q.  How did that text make you feel?

4    A.  I felt threatened, vulnerable.  I thought he was trying to

5    send me a message and, you know, a little scared.

6    Q.  In 2019, how often were you going into the New York office?

7    A.  2019, every day, every weekday.

8    Q.  And at the time you started receiving text messages from

9    the defendant after his termination, what, if any, concerns did

10   you have about going into the office?

11   A.  I still went to the office, but I was concerned about

12   workplace violence in light of, you know, these texts and other

13   texts I know he was sending, and that he clearly was very angry

14   and felt wronged by the firm and was hanging around the firm or

15   at least that one time I saw him.  I understand that he had

16   been around the firm at other times, so --

17           MR. DENNIS:  Objection, your Honor.

18           The witness can testify as to what she saw.  I don't

19   think she can testify as to what others -- what she heard from

20   others, unless there's evidence.

21           THE COURT:  We'll strike the last sentence, but the

22   rest of the answer was responsive.

23   BY MS. KUSHNER:

24   Q.  Did you take any steps -- what, if any, steps did you think

25   the firm should take around that time?

MAEGden3                    Bostick - Direct

1    A.  Well, I know the firm --

2    Q.  Sorry.  Just what did you think about any steps the firm

3    should take, setting aside what the firm did?

4    A.  Oh, I thought we should have security, which I know we did.

5    And I was concerned about workplace violence.  I thought that

6    maybe we should do some drills in case there was a situation at

7    work involving violence.

8    Q.  What kind of drills?

9    A.  Active shooter drills.

10   Q.  And turning your attention to what's in evidence as

11   Government Exhibit 103-42.  And turning your attention to

12   the -- well, I'll ask you to read each of these three text

13   messages aloud.

14   A.  Right now?

15   Q.  Sure.

16   A.  I was standing in front of you the whole time and you never

17   saw me.

18       And I just watched and waited till we ran out of time.

19       Remember that day in the deli when we accidently ran into

20   each other.  You could not speak with me but you could not wait

21   once you got be to the office to tell others and then allege I

22   threatened you.

23       And I just shook my head and waited some more.

24   Q.  Do you recall receiving these messages?

25   A.  Yes.

MAEGden3                        Bostick - Direct

1   Q.   Who were they from?

2   A.   Willie Dennis.

3   Q.   And who were they sent to?

4   A.   Me.

5   Q.   And what was the date of these messages?

6   A.   November 13th, 2020.

7   Q.   Turning your attention to what's in evidence as Government

8   Exhibit 103-1.

9        What is this?

10  A.   A text that Mr. Dennis sent to me.

11  Q.   What date was it sent?

12  A.   May 14th, 2020.

13  Q.   Can you please read the message.

14  A.   Hi, Cally.  Are you still listening?  The lord is now

15  speaking on all matters.  God save us.  Amen.

16  Q.   Do you recall receiving this text?

17  A.   Yes.

18  Q.   What was your understanding of it?

19  A.   You know, it -- it wasn't clear.  But based on this text

20  and other texts that I received in 2019 and texts that he had

21  sent to other text groups that he added me to, he seemed to

22  have a fixation on god and carrying out god's actions and

23  making people a biblical --

24          MR. DENNIS:  Objection, your Honor.

25  A.   -- symbol.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MAEGden3                    Bostick - Direct

1            MR. DENNIS:  I see nothing in here where I -- it says

2    I --

3            THE COURT:  No, this is --

4            MR. DENNIS:  Objection to the --

5            THE COURT:  I think we will strike everything after

6    "it wasn't clear."

7            Objection sustained.

8    BY MS. KUSHNER:

9    Q.  Was this the only message in which the defendant invoked

10   god, the only message you received from the defendant in which

11   the defendant invoked god?

12   A.  No.

13   Q.  Did you receive messages in which he invoked the Bible?

14   A.  Yes.

15   Q.  Turning your attention to Government Exhibit 103-11 and

16   directing your attention to page 3, the top message on that

17   page.

18           What is this?

19   A.  A text that Mr. Dennis sent to me.

20   Q.  What is the date of it?

21   A.  August 31st, 2020.

22   Q.  Can you please read it aloud.

23   A.  Never said anything before.  God has now commanded me to

24   call out you actions which are so offensive in his eyes.

25           MR. DENNIS:  Your Honor, can we have a sidebar.

MAEGden3                        Bostick – Direct

1             THE COURT:  I'm sorry?

2             MR. DENNIS:  A sidebar.

3             THE COURT:  Yes.

4             (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MAEGden3                          Bostick - Direct

1              (At sidebar)

2              MR. DENNIS:  As with Mr. Bicks, it appears that we're

3    going to go through another session where we're going to show

4    emails and she's going to be allowed to ruminate about whatever

5    she thinks was the interpretation of the emails where there's

6    no basis to it and there's no context around it.

7              THE COURT:  So?

8              MR. DENNIS:  So...

9              THE COURT:  I'm sorry, if an email is sent from you to

10   her, it is admissible.  She can give her understanding of what

11   she thought it meant because that's relevant to the portion of

12   the case that relates to emotional distress.

13             What she can't do is go on and sort of give a more

14   global theory.  So that's why I sustained your objection to her

15   comment earlier about having a fixation on god and so forth and

16   struck that from the record.  But this is all perfectly proper.

17             MR. DENNIS:  Okay.  So the only thing I -- I don't

18   know how I'm going to get this in, if I look at an email on

19   May 14th, 2020, bodies were dropping in New York left and

20   right, so when I'm talking about god --

21             THE COURT:  This is --

22             MR. DENNIS:  Okay.

23             THE COURT:  To the extent that you want to

24   cross-examine about other events she had knowledge of, you can

25   do that on your cross.

MAEGden3                         Bostick - Direct

1                MR. DENNIS:  Okay.

2                (Continued on next page)

MAEGden3                        Bostick - Direct

1          (Jury present)

2    BY MS. KUSHNER:

3    Q.  Focusing back on the message in front of you, Ms. Bostick,

4    what was your understanding of this message from the defendant?

5    A.  That what he was doing was out of his control and he was

6    acting through god, he was commissioned by god to retaliate.

7    Q.  And how did this text message make you feel?

8    A.  Well, he -- it was sent in August, late August.  And that's

9    when he really ramped up the texts towards me.  So this text,

10   in conjunction with the other ones, made me feel in danger.

11   Q.  Just make sure to speak into the microphone so everyone can

12   hear you.

13   A.  Yeah.

14   Q.  Turning you now to Government Exhibit 103-17, which is also

15   already in evidence, and turning your attention to the bottom

16   of page 1, the bottom text message.

17        What is this?

18   A.  A text message sent by Mr. Dennis to me.

19   Q.  What is the date of this message?

20   A.  September 1st, 2020.

21   Q.  And approximately what time would you have received this

22   text message, understanding that the timestamp is in UTC?

23   A.  Midnight.

24   Q.  I'm going to read it aloud.

25        You don't have to respect a black man.  Right.  Okay.  What

MAEGden3                         Bostick - Direct

1    about fear him?  Better?

2        Do you recall receiving that message?

3    A.  Yes.

4    Q.  And turning your attention to the next page, on page 2, I'm

5    going to read it aloud.  You are going to be a biblical symbol

6    during this time of injustice and hatred of what happens when

7    you are offensive in the eyes of the lord.  Oh, lord, first

8    time hearing that word.  Book called the old testament.  Check

9    it out some time.  Interesting read.  Be right back...

10       What was the date of this message?

11   A.  September 1st, 2020.

12   Q.  And approximately what time would you have received this

13   message?

14   A.  Midnight, 12:49.

15   Q.  And who was this message from?

16   A.  Mr. Dennis.

17   Q.  Who was it sent to?

18   A.  Me.

19   Q.  Do you recall receiving this message and the other message

20   I just read asking about fearing a black man?

21   A.  Yes.

22   Q.  What was your understanding of those two text messages?

23   A.  Those two, meaning this one and the last one?

24   Q.  Yes.

25   A.  Again, he was fixated on god and some sort of retribution

MAEGden3                        Bostick - Direct

1    that god was commanding him to take out.  And the fear a black

2    man, so that, I just thought he was just doubling down on

3    trying to intimidate me, letting me know that I should fear him

4    and he wanted me to fear him.  He actually wanted me to be

5    afraid.

6    Q.  And what was your understanding of when he said, you are

7    going to be a biblical symbol?

8    A.  In conjunction with other texts about how god is commanding

9    him to act, I took it to mean that I was going to suffer some

10   kind of harm.

11       What came to mind with the biblical symbol was the

12   crucifixion of Christ, honestly, and how he died on the cross

13   as a sacrifice.  So like is he saying that I have to die for

14   not -- that's what -- that's where my mind went with it.

15   Q.  Was it the only time he told you you were going to become a

16   biblical symbol?

17   A.  No.  Probably hundreds of times.

18   Q.  And you said you received these text messages around

19   midnight.  Are these the only texts the defendant sent you in

20   the middle of the night?

21   A.  No.  I mean, over a period of two years, he texted me all

22   times of the day and night.  So maybe five texts a day, maybe a

23   hundred texts a day, but all times.

24   Q.  And you referenced texts, chats that the defendant added

25   you to.  What were you referring to there?

MAEGden3                        Bostick - Direct

1   A.  So he would text me directly via like regular text

2   messages, but also like WhatsApp and other -- I guess just

3   WhatsApp and regular texts.  But then he also added me to five

4   or six text groups at different times with different members of

5   management, different partners in different offices, all

6   partners, but different groups of partners with some overlap.

7   Q.  In 2020, did you ever block the defendant's text messages

8   to you?

9   A.  In 20 -- I never did.

10  Q.  Why not?

11  A.  Because I wanted to know what he was thinking, what he was

12  planning.  Because when he first started texting me in 2019,

13  they were friendly texts.  And I saw them change tone and

14  escalate and become more threatening.

15      And because I thought he lived in Harlem at the time, I

16  wanted to know what he thought and if I needed to take any

17  extra measures to protect myself, which I ultimately did.  But

18  ultimately, I thought it would be better to know -- even though

19  it was hard -- I came close to blocking him several times, but

20  I also thought it was better.  Sometimes I would just like look

21  at the texts and see if he was still texting me without like

22  thinking about it too much.  But I just wanted to know like,

23  one, was he still texting me, was I still a target; and two,

24  was it escalating.

25          MR. DENNIS:  Your Honor, I don't want to -- I would

MAEGden3                        Bostick – Direct

1   like to have a sidebar, because I don't want to say anything

2   that the jury can hear.

3                THE COURT:  All right.

4                (Continued on next page)

MAEGden3                        Bostick - Direct

1          (At sidebar)

2          MR. DENNIS:  I just want the record to be clear, this

3    is the third K&L Gates partner testifying under oath, a member

4    of the bar, who is discussing vigilante sort of tactics; I had

5    to take care of myself.  It's a rightful question to ask them

6    later, what official, what proper action did you take if you

7    had this much fear.  If she sat there and said, I had to take

8    care of myself, what is this?

9          THE COURT:  This all seems to me to be very

10   straightforward testimony about what was her state of mind and

11   reaction to your --

12         MR. DENNIS:  And actions that she's taken.  She's

13   discussing actions.

14         THE COURT:  I'm sorry?

15         MR. DENNIS:  And actions that she's taken.  I better

16   protect myself.

17         THE COURT:  Actions that she took, which the jury, if

18   they wish, could support her claim and the government's claim

19   that she was in substantial emotional distress and that's why

20   she took these actions.  So it's corroborative, first, of her

21   state of mind.

22         Overruled.

23         (Continued on next page)

24

25

MAEGden3                        Bostick - Direct

1    (Jury present)

2    BY MS. KUSHNER:

3    Q.  Ms. Bostick, in 2019 and up until September 1st, 2020,

4    where were you living?

5    A.  My apartment in Harlem.

6    Q.  And what was your understanding of where the defendant

7    lived at that time?

8    A.  He had a brownstone in Harlem.

9    Q.  Ms. Bostick, directing your attention to what's in evidence

10   as Government Exhibit 103-21, and looking at the text message

11   at the top of this chain.

12       Who is this message from?

13   A.  Mr. Dennis.

14   Q.  Who is it to?

15   A.  Me.

16   Q.  What is the date of this message?

17   A.  September 6th, 2020.

18   Q.  And do you recall receiving this message?

19   A.  I received it, I received a lot.

20   Q.  I'll read this message aloud.

21       You did receive it, though; right?

22   A.  Yes.

23   Q.  Cally, this week I will begin to make you a biblical symbol

24   during this biblical moment.  Black lives matter.  As you know

25   I have been reflecting on this for over a year, so it is being

1    done with much regret.  Having traveled a similar road, I also

2    know it will be very painful personally and professionally.

3    For this reason, I think you deserve to know why.  Such

4    information may be helpful to you to navigate the storm which

5    is descending.  During the course of this Sunday, I will try

6    and complete this obligation that I do owe you.  Why...

7         What is your understanding of this text message?

8    A.  What is my understanding of it?

9    Q.  Yes.

10   A.  What do you mean?

11   Q.  What did you take this to mean when he said, this week I

12   will begin to make you a biblical symbol during this biblical

13   moment?

14   A.  That he was going to start exacting whatever revenge he was

15   alluding to earlier texts, like now is the time.

16   Q.  The text messages we have discussed are -- including this

17   one -- are these the only text messages he sent you in which he

18   said you were going to become a biblical symbol?

19   A.  No.  He said it many times, probably hundreds.

20   Q.  In early September 2020, what, if any, steps did you take

21   in response to the messages -- well, withdrawn.

22        The text messages we just saw in August and the first week

23   of September 2020, are those the only text messages you

24   received from the defendant in August and the first week of

25   September 2020?

MAEGden3                          Bostick - Direct

1  A.  No.  In August, late August is when he really started to

2  focus on me and started to send me a barrage -- I mean, I was

3  already getting texts from May, but not like -- to the volume

4  it started in late August and early September, throughout the

5  next year.

6  Q.  Around this time in early September 2020, did you take any

7  steps in response to the defendant's text messages to you?

8  A.  Yeah.  Once the texts became more directed towards me

9  personally, in late August, I got security on my apartment

10  because, again, I thought he lived in Harlem.  First, the

11  security was only at night.  But then as the texts, in my view,

12  became more threatening, I had security during some daytime

13  hours as well.

14  Q.  Where was the security?

15  A.  Outside my apartment.  And then if I left, they would

16  follow me.

17  Q.  And what --

18        MR. DENNIS:  I didn't hear.  What was the -- I didn't

19  hear.  Withdrawn.  Sorry.

20  Q.  Did you take any other steps in early September in response

21  to the defendant's text messages to you?

22  A.  Yeah.  Well, in late August, he sent texts telling me he

23  was going to follow me until I answered him and, you know, more

24  of this biblical symbol stuff and sending me texts with the

25  word death and skull.  Skull followed by death, but like

MAEGden3                          Bostick - Direct

several times in one text.  Sending me pictures of myself,

which shows he's like finding a picture on the internet and

sending it back to me.  So I really was afraid.

   And so I stopped leaving my apartment as frequently.  I

normally went for a morning jog.  I did it every now and then,

but I was so afraid, I stopped doing it as much.  Then I got

security.  So those were the steps I took.

Q.  And around this time, was this during the time of COVID?

A.  Yes.

Q.  When you were outside -- well, why did you stop going for

your morning jogs as frequently as you had been?

A.  Well, because he said he was going to follow me, and he was

sending me texts that were clearly intended to intimidate and

were threatening.  And so I didn't know if he was following me,

and I didn't feel safe.

   And then, it was exacerbated by the fact that we were in a

pandemic and everyone was wearing a mask, and I couldn't tell

who was who, so I was like extra paranoid.  Standing in line

outside the grocery store wearing a mask, not knowing who was

behind me.  Running and not knowing if I was running past his

brownstone.  Even though I knew he had a brownstone in Harlem,

I didn't know what street it was on.  So I just was very

paranoid and very anxious, so I just kind of became more of a

recluse.

Q.  How, if at all, did the messages you were receiving in late

MAEGden3                    Bostick - Direct

1   August and early September -- withdrawn.

2        Turning your attention to Government Exhibit 103-4, and

3   turning your attention to page 2.

4        Do you recognize the first text message on this page?

5   A.  Yeah.

6   Q.  Who was it from?

7   A.  Mr. Dennis.

8   Q.  Who was it to?

9   A.  Me.

10  Q.  What's the date of this message?

11  A.  August 29th, 2020.

12  Q.  Please read it aloud.

13  A.  You cannot be trusted and the world needs to know.

14  Q.  And on page 3 of this text chain, can you please read the

15  bottom two text messages.

16  A.  Let's fill up your evil files.  Did not fool me.  Was

17  hoping you would change but gutter to the end.

18       So let's send you back there.

19  Q.  And what was the date of these two messages?

20  A.  August 29th, 2020.

21  Q.  Do you recall receiving these messages?

22  A.  Yes.

23  Q.  What was your understanding of the message on page 2 where

24  the defendant said, you cannot be trusted and the world needs

25  to know?

MAEGden3                         Bostick – Direct

1    A.  That he was going to start some kind of smear campaign

2    about me and spread false statements in retaliation for me not

3    responding to him and supporting him in whatever issue he had

4    with the firm.

5    Q.  And how did a text message like that make you feel?

6    A.  I got a lot of texts of that nature, and so it felt like he

7    was trying to threaten my career, because my reputation is very

8    important.  And he called me in several texts the it girl.  And

9    so I had a good reputation, he was like making it known that he

10   was going to ruin that by spreading the kind of statements that

11   could ruin somebody that are totally false.  It also made me

12   feel hurt that he would threaten me in that way, given -- we

13   weren't like close, but he was a senior partner when I was a

14   junior associate, and he saw me go up through the ranks.  So I

15   think I was more hurt by that, and also afraid that he would

16   start a smear campaign and try to ruin me professionally.

17   Q.  Turning your attention to Government Exhibit 103-14 and

18   your attention to the message on this page.

19       Who is this text message from?

20   A.  Mr. Dennis.

21   Q.  Who is it sent to?

22   A.  Me.

23   Q.  What was the date of this message?

24   A.  August 31st, 2020.

25   Q.  I'm going to read this message out loud.

1    You need to practice outside of New York.  Because if you

2    stay in New York, I am going to follow you till you answer my

3    questions cotton head.  Easier I think for you to practice

4    elsewhere.  But your call.  Cotton head.

5    Do you recall receiving that text message?

6    A.  Yes.

7    Q.  What was your understanding of when the defendant said you

8    need to practice outside of New York?

9    A.  That I need to leave, that I needed to quit working at the

10   firm, generally, because he had issues there.  And even beyond

11   that, leave New York, like he said.  It was like a threat.  If

12   you don't, then I'm going to follow you.  That's what he said,

13   and that's how I interpreted it.

14   Q.  And how did that make you feel?

15   A.  Vulnerable, threatened.  That's when I started -- this text

16   is really what made me very, very nervous and scared because he

17   said, I'm going to follow you.  And then, you know, I seen him

18   in the deli, so I knew he could be around.  And I thought he

19   lived in the neighborhood, so yeah, I was -- I was frightened.

20   Q.  Do you see where the defendant calls you cotton head in

21   this message?

22   A.  Yes.

23   Q.  Has anyone other than the defendant ever called you that

24   before?

25   A.  Not to my knowledge.

1    Q.  Sitting here today, what is your understanding of being
2    called cotton head?
3    A.  What is my understanding of being called it?
4    Q.  Sitting here today, yes.
5    A.  It's a derogatory term.
6    Q.  Why?
7    A.  It's calling me a name.
8    Q.  Does the word cotton have any connotation to you?
9            MR. DENNIS:  Objection, your Honor.
10           She's answered the question.
11           THE COURT:  Overruled.
12   A.  So I understand that it could mean idiot, stupid, but that
13   it has origins as a racial slur, could be interpreted to be a
14   racial slur because African-Americans were enslaved and picked
15   cotton, and that's a term used to refer to them in a derogatory
16   manner.
17           MR. DENNIS:  Your Honor, I would suggest we just get
18   out Webster's dictionary and look up the definition.
19           THE COURT:  Overruled.
20   BY MS. KUSHNER:
21   Q.  How did it make you feel to be called a name like that?
22   A.  Again, I think it was more just like hurtful.  I knew he
23   was trying to hurt me.  Particularly from a man who was a
24   senior partner, who, you know -- calling me those kind of names
25   was hurtful.  And that's probably the -- the part of the text

1    that really bothered me was the get out of New York, I am going

2    to follow you.  The cotton head, it was more like, why would

3    you call me that.  It kind of went to like the extent to which

4    he wanted to demean me and in how little regard he held me.  It

5    was more so when he used that term in the group text -- because

6    he called me that a lot -- that I felt really embarrassed and

7    that he was trying to really strip me of my dignity in front of

8    my colleagues and demean me to a mean name.

9    Q.  Is that the only mean name he called you?

10   A.  No.

11   Q.  What are some of the other names you recall that he called

12   you in text messages to you?

13   A.  I would prefer not to repeat them, because in his texts to

14   me, he said I will have to say this stuff in court, and I would

15   prefer not.

16   Q.  Did you receive a text message in which he called you

17   biscuit head?

18   A.  Yes.

19   Q.  Did you receive a text message in which he called you

20   murderer?

21   A.  Yes.

22   Q.  Did you receive a text message in which he called you

23   gutter rat?

24   A.  Yes.

25   Q.  Did you receive a text message in which he called you

MAEGden3                    Bostick - Direct

1    wench?

2    A.  That one I don't remember, but I could believe it.

3    Q.  Did you receive a text message from him in which he called

4    you trash?

5    A.  Yes.

6    Q.  Going back to Government Exhibit 103-14 and turning your

7    attention to page 3.

8        What does the first text message on this page say?

9    A.  You packing yet.

10   Q.  And who was this message from?

11   A.  Mr. Dennis.

12   Q.  Who was it sent to?

13   A.  Me.

14   Q.  What was the date of this message?

15   A.  August 31st, 2020.

16   Q.  Was this the same day as the text he sent you telling you

17   to practice outside of New York that we were just discussing?

18   A.  Yes.

19   Q.  And what's your understanding of this text message?

20   A.  Again, telling me that I need to leave or else, really.

21   Q.  And do you see the text message the defendant sent you

22   immediately after that right on the bottom of this page?  Do

23   you see that message?

24   A.  Yes.

25   Q.  I'm going to read it aloud.  They like to make examples.  I

1  am going to make one of you.  Echoing in the background.

2      What was the date of this message?

3  A.  August 31st, 2020.

4  Q.  Do you recall receiving this message?

5  A.  Yes.

6  Q.  How did it make you feel?

7  A.  Well, all these texts are coming at the same time.  So

8  second after second, I was getting these texts around

9  August 13th.  So I really felt attacked.  I felt like I was in

10  danger.  And I felt like he was telling me he was going to make

11  good on what he was saying to me, including the whole biblical

12  symbol thing, I felt that he was -- it became more clear to me

13  what he was saying, make an example of me.

14      But the U, U, U, U, echoing in the background was kind of

15  like spooky.  And he did that a few times in texts, like

16  nothing to lose, lose, lose.  Like he wanted to scare me, he

17  wanted to intimidate me.  So that just added to the fear that

18  it brought on.

19  Q.  Directing your attention to Government Exhibit 103-16 and

20  turning your attention to the first text message on this page.

21      What is this?

22  A.  A text that Mr. Dennis sent to me.

23  Q.  What is the date of this message?

24  A.  September 1st, 2020.

25  Q.  Can you please read this message aloud.

1    A.  You know every time I send a text to the big room and you

2    do not respond it makes me even more annoyed at you.  You can

3    discuss my reasonableness won't respect to my family publicly

4    and then back to the no backbone Cally I have always known.

5    Others have stated it but again I was silent.  You really need

6    to leave the New York office soon, like in a week or so or you

7    will become part of the public conversation.

8                MR. DENNIS:  Your Honor, can we have a sidebar on

9    this, this text message.

10                THE COURT:  All right.

11                (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MAEGden3                          Bostick – Direct

1           (At sidebar)

2           MR. DENNIS:  This precise text relates to the witness

3     that I want on Monday, relates to the witness that I want on

4     Monday, Laurie Robinson because she puts context around the use

5     of the word reasonableness and how it actually fits.  And it's

6     not being said in the context in which it was delivered.

7     Laurie Robinson -- so I wanted to spot this before we went on.

8           THE COURT:  Overruled.

9           By the way, while we're at the sidebar, just out of

10    curiosity, since the witness identified cotton head as being a

11    derogatory term and a slang term, just for my own curiosity, I

12    looked it up in a classic slang dictionary, which defined it as

13    moron, idiot and other derogatory terms very similar to what

14    the witness had testified.  I just mention that because

15    Mr. Dennis had wanted the Webster dictionary definition, but a

16    slang term is not something you go to Webster's for.  You go to

17    a slang dictionary.

18          Now, we're probably going to want to give the jury a

19    lunch break in a few minutes, so find a good place to.

20          MS. KUSHNER:  Okay.

21          (Continued on next page)

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          (Jury present)

2    BY MS. KUSHNER:

3    Q.  Ms. Bostick, what did you understand the defendant to be

4    referring to when he said the big room in this text message?

5    A.  The text message that he added me to with members of firm

6    management.

7    Q.  And how did it make you feel when the defendant said, you

8    really need to leave the New York office soon?

9    A.  So this is on September 1st, after he had already been

10   sending me those kind of text messages, so just, you know, that

11   he was fixated on the fact that I needed to leave.  It was an

12   ultimatum, like you need to leave or else I'm going to do all

13   these things I've been saying; follow you, make you a biblical

14   symbol, add you to a civil lawsuit, make you testify about the

15   things that I'm texting to you which aren't true, all those

16   things.

17          MS. KUSHNER:  I think this is a fine place to stop.

18          THE COURT:  Ladies and gentlemen, we will take our

19   lunch break.  And we will resume at five minutes before 2:00.

20          (Jury excused)

21          (Continued on next page)

22

23

24

25

MAEGden3

```
 1                (Jury not present)
 2                THE COURT:  You may step down.  We'll see you in about
 3    an hour.
 4                We will see you in an hour.
 5                (Luncheon recess)
 6                (Continued on next page)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

MAEGden3

```
 1                          AFTERNOON SESSION

 2                              1:55 p.m.

 3              THE COURT:  Please be seated.

 4              We're still waiting for a couple of jurors.  Let me

 5     ask the government, how much longer on direct do you expect?

 6              MS. KUSHNER:  Approximately 30 minutes.

 7              THE COURT:  OK.

 8              How long, Mr. Dennis, do you want for cross?

 9              MR. DENNIS:  Approximately 60 minutes.

10              THE COURT:  I'm sorry?

11              MR. DENNIS:  Approximately 60 minutes.

12              THE COURT:  60 minutes.  Yes, that's fine.  I think we

13     will be able to finish this witness today.

14              Let's get the witness.  And then let's bring in the

15     jury.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25
```

MaeWden4                    Bostick - Direct

1          (Jury present)

2          THE COURT:  Please be seated.

3          OK.  Go ahead.

4    BY MS. KUSHNER:

5    Q.  Hi, Ms. Bostick.

6          Turning your attention to Government Exhibit 103-18, which

7    is in evidence, and turning your attention to page 1, are these

8    additional text messages you received from the defendant?

9    A.  Yes.

10   Q.  What was the date these messages were sent?

11   A.  September 1, 2020.

12   Q.  I'm going to read them aloud:  "Cally, double agent

13   Bostick.  Girl a long way from little old Jacksonville.  Get up

14   and start packing."

15         Approximately when did you receive the first two text

16   messages in this chain?

17   A.  1:30 in the morning.

18   Q.  And turning your attention to --

19         MS. KUSHNER:  Sorry.  The next, next page, actually.

20         It says, "Get up and start packing."  And then the

21   text right after that says "little girl."

22   Q.  And turning your attention to Government Exhibit 103-20,

23   are these additional texts you received from the defendant on

24   September 1, 2020?

25   A.  Yes.

MaeWden4                     Bostick - Direct

1    Q.  I'm going to read these three aloud.  I'm going to read the
2    first and the third message aloud.  Sorry:  "Are you packing?
3    Get out."  Do you recall receiving those messages?
4    A.  Yes.
5    Q.  And turning to page 2 of this exhibit, who are these
6    messages from?
7    A.  Mr. Dennis.
8    Q.  And who were they sent to?
9    A.  Me.
10   Q.  Also on September 1, 2020?
11   A.  Yes.
12   Q.  I'm going to read them aloud:  "Speak, biscuit head.  Am I
13   wrong?  Right?  Don't let me have to find out again from a
14   public audience, or you'll be practicing in another country.
15   What is Cally's cell phone number?  Even now I'm considering
16   disbarment action against you.  Miss who me?"
17       What was your understanding or how did this and the other
18   text messages that we've just discussed from September 1, 2020,
19   make you feel?
20   A.  Well, at this time I was also being bombarded with texts,
21   so it was one of hundreds I was receiving at times.  So again,
22   as mentioned before, he's telling me to leave and he's doubling
23   down on that and he's continuing to repeat that I need to
24   leave.  He's continuing to call me names, so it really just
25   made me feel like I was a target and he was really focused on

MaeWden4                          Bostick - Direct

1    me.  And he even said that in other texts, that he -- I was --
2    you know, he was paying special attention to me now.  So I, you
3    know, I felt like I was in harm's way potentially.
4    Q.  And turning your attention to Government Exhibit 105-39,
5    page 2 of that exhibit, do you see the text message at the
6    bottom?
7    A.  Yes.
8    Q.  Who is that from?
9    A.  Mr. Dennis.
10   Q.  And who was it sent to?
11   A.  Me and three other senior partners in the New York office.
12   Q.  What date was it sent?
13   A.  September 1, 2020.
14   Q.  Can you please read it aloud?
15   A.  "Cally, you are toast."
16   Q.  What was your understanding of that text message?
17   A.  I'm done.
18   Q.  And turning your attention to the next page, page 3, of
19   this exhibit, I'm going to read the top two text messages
20   aloud.
21       Were these messages sent in the same chain you just
22   mentioned?
23   A.  Yes.
24   Q.  What day?
25   A.  September 1, 2020.

Q.  "Cally, I really don't know why I did not listen to others
and roasted you long ago, but your moment is here.  During this
biblical moment, you will be a biblical example.  You are not
at the very top of the list, but I can hardly wait to get to
you."

     Do you recall receiving those messages?

A.  Yes.

Q.  What was your understanding of them?

A.  That now was the time when he was going to retaliate
against me for not responding to him and supporting him.  And
again, with the obsession with God and acting through God and
making me a biblical example seemed like a very direct threat.

Q.  And how did it make you feel?

A.  Fearful.  This is about the time we spoke about where I got
security, stopped leaving my apartment as much, and just was
paranoid because these texts were coming in all day and night,
more threats.  And he stated that, you know, he was about to
follow God's command.  So I -- I just took it as, like, he
could hurt me at any time.

Q.  Did the messages that you were receiving, did these
messages and the others you say you were receiving around the
same time from the defendant, have any impact on your mental
health?

A.  Yes.

Q.  What impact?

1    A.  Anxiety.  Paranoid.  Inability to concentrate.  Inability

2    to sleep.  Inability to work.

3    Q.  Why did you have an inability to work?

4    A.  Because I was trying to manage this and figuring out what

5    to do and reading these texts and being concerned if he was

6    really going to act on what he was saying he was going to do.

7    Was he outside?  Was I really following me?  Was he going to

8    stop?  When was this going to stop?  You know, so it was hard

9    to really focus on anything else.

10   Q.  Was this also -- withdrawn.

11       Ms. Bostick, what borough were you living in between May

12   2020 to September 2020?

13   A.  Manhattan.

14   Q.  And did you receive at least some of the text messages

15   we've been discussing here today while you were at your

16   apartment in Manhattan?

17   A.  All of them.

18   Q.  Did there come a time later in September of 2020 when you

19   took additional steps in response to the defendant's messages

20   to you?

21   A.  Yes.  I ultimately decided it would be best for me to leave

22   the state for a bit until I got more clarity on the situation,

23   where he was, if he was indeed following me, because although I

24   had security, I felt like a stalker knows your security's

25   habits, and they know when they're there and not there and

MaeWden4                          Bostick - Direct

1   where they are, and if I'm ever out of their sight, be a

2   target.  And I wasn't able to get comfortable, even with them

3   there.  I was just always on edge.  So I moved.

4   Q.  And where did you move to?  Without a specific address,

5   where did you move to?

6   A.  Midwest.

7   Q.  So you left the state?

8   A.  Yeah.

9   Q.  After you moved, did you continue to receive text messages

10  from the defendant?

11  A.  Yes, many.

12  Q.  Turning your attention to Government Exhibit 103-24, which

13  is in evidence, and do you see this text message from the

14  defendant?

15  A.  Yes.

16  Q.  When was it sent?

17  A.  October 5, 2020.

18  Q.  Can you please read this message aloud?

19  A.  "You just did not know that God intends for you to be a

20  biblical symbol through these unholy times, at this point

21  beyond either of our control."

22  Q.  And the text message on the next page, can you read that

23  one as well?

24  A.  "Did I not advise you to be careful?  Just another Black

25  man's advice, right?"

MaeWden4                          Bostick - Direct

1    Q.   How did these text messages make you feel?

2    A.   For the -- the first one, the biblical symbol, those always

3    creep me out the most because it just felt like he thought he

4    was acting through God and it was out of his control.  So you

5    feel like God is telling you to do something, to hurt someone,

6    then nothing can stop you because you, the universe -- he feels

7    justified, because a higher purpose -- I always got that kind

8    of sense from the biblical symbol text, and he just said that a

9    lot.  So that's what I got from that text.

10       This one, the "Black man's advice, right," I didn't -- that

11   didn't affect me, but "did I not advise you to be careful,"

12   just another threat that I need to be cautious, need to be

13   vigilant, yeah.

14   Q.   And turning your attention to Government Exhibit 103-25,

15   what day was this text message sent?

16   A.   October 5, 2020.

17   Q.   I'm going to read it aloud:  "You bring the truth and I

18   will bring my God's truth.  Let's see what happens."

19       Was this another text message you received on the same day

20   as the other two you just discussed?

21   A.   Yeah -- yes.

22   Q.   And how -- what was your understanding of this text

23   message?

24   A.   This one seemed more directed towards the smear campaign,

25   potentially, maybe the civil -- he sent several texts about

MaeWden4                        Bostick - Direct

1   suing me and making me testify in court, and saying all these

2   things about me that weren't true.  So I -- I interpreted it to

3   reference that.

4           MR. DENNIS:  Your Honor, can we have the witness --

5   she just said -- identify what is the smear that she's

6   referring to or tarnishing of -- what exact -- I've heard it

7   many times, but what exactly was this smear?

8           THE COURT:  All right.  What did you mean by the smear

9   campaign?

10          THE WITNESS:  Well, you say I didn't really graduate

11  from Georgetown Law School.  You accused me of having

12  inappropriate relationships with colleagues.  You said I

13  committed malpractice.  You called me -- you said that all the

14  women at the women's conference would disown me once they knew

15  all the terrible things I did to you.  You accused me of trying

16  to murder you.  You accused me of sending police to your home.

17  Yeah -- over and over again.

18          MR. DENNIS:  Your Honor, could I please -- could I

19  please -- would you please ask the court reporter to retain

20  that statement for cross-examination so she would be able to

21  read it back during the cross-examination?

22          THE COURT:  Everything is retained.

23          MR. DENNIS:  OK.

24          THE COURT:  The record is there, but if what you mean

25  is that you'll ask the reporter to read back that answer at

MaeWden4                          Bostick - Direct

1    some point during your cross --

2              MR. DENNIS:  Yes.

3              THE COURT:  -- I think that can be arranged.

4              MR. DENNIS:  Thank you, your Honor.

5    BY MS. KUSHNER:

6    Q.  Ms. Bostick, talking about this smear campaign, how are you

7    impacted by the threat of the defendant ruining your

8    professional reputation?

9    A.  Well, it was very concerning because I've been -- I was a

10   model colleague to him.  Whatever he asked me to do I helped

11   him with.  I had to be perfect in my career to advance.  There

12   was no room to make mistakes, and I -- you know, I treated him

13   nicely.  So I didn't -- I didn't understand why he would want

14   to make threats to take that away from me based on baseless and

15   false claims.  And when I -- and when I know the impact of

16   that, because one false statement no one knows is true, and so

17   I was concerned that to retaliate against me he would try to

18   publicly -- publicly spread lies.

19   Q.  Why was there no room for you, in your view, to make

20   mistakes in your career?

21   A.  No room?  I mean I'm a woman.  I'm a Black woman.  I'm

22   younger.  I work in a very male-dominated profession, where,

23   you know, I have a small stature, so there are always going to

24   be people who don't think I belong there, and that I did

25   something to get there; that, you know, it's not because of my

MaeWden4                          Bostick - Direct

1    hard work and intelligence and grit.  And so I think he knew --
2    well, he knows that.  He's a Black man.  He understands.  And
3    so for him to play that card with me, it was painful.  And I --
4    I didn't know if he would act on it because he definitely
5    threatened me a lot.  I know he was going to sue the firm.
6    Yeah, he alluded to suing the firm.  So I was just, you know --
7    it was a concern.
8              MR. DENNIS:  Objection to the words "play that card
9    with me," unless the witness would like to explain that a
10   little further.
11             THE WITNESS:  Sure.
12             THE COURT:  Just a minute.  Overruled.
13             Put another question.
14   BY MS. KUSHNER:
15   Q.  Ms. Bostick, turning your attention to Government Exhibit
16   103-31, what is this?
17   A.  "And 12 months to develop a biblical symbol."
18   Q.  Who sent that message?
19   A.  Mr. Dennis.
20   Q.  To who?
21   A.  Me.
22   Q.  And what was the date of that message?
23   A.  October 8, 2020.
24   Q.  And what was your understanding of this text message?
25   A.  That it had been about 12 months that he first started

MaeWden4                              Bostick - Direct

1   texting me, asking me to, you know, respond and support him in

2   whatever issue he was facing.  And 12 months, I had to respond,

3   so now it's going to be a biblical symbol.

4   Q.  And turning your attention to Government Exhibit 103-34,

5   page 1, the first text message.  Who is it from?

6   A.  Mr. Dennis.

7   Q.  Who is it to?

8   A.  Me.

9   Q.  And what date was it sent?

10  A.  October 9, 2020.

11  Q.  I'm going to read that aloud:  "Do you still take the

12  train, LOL, to work?"  What was your understanding of that

13  message?

14  A.  Well, interpreting it along with other texts he sent, a few

15  days before saying he was going to follow me, indicate that he

16  knew my habits.  And that he will follow me on the train.

17          MR. DENNIS:  Objection.  I don't think -- was there

18  ever any introduction that I knew Ms. Bostick's address?

19          Did you put up the text earlier?

20          THE COURT:  Overruled.

21  BY MS. KUSHNER:

22  Q.  Ms. Bostick, how did you commute to the office when you

23  were going in to the office?

24  A.  Train.

25  Q.  Turning your attention to Government Exhibit 103-37, did

MaeWden4                    Bostick - Direct

1   the defendant send any of these text messages?

2   A.  Yes.

3   Q.  When?

4   A.  October 10, 2020.

5   Q.  I'm going to read them:  "A biblical symbol and did not

6   even know it while I was watching you being set up.  Well, now,

7   come to papa."

8       Do you recall receiving those messages?

9   A.  Yes.

10  Q.  Approximately what time of day would you have received

11  these messages?

12  A.  At night, nine, 9 p.m., almost 10.

13  Q.  And turning your attention to Government Exhibit 103-40,

14  page 1, just the first message, actually, who sent this

15  message?

16  A.  Mr. Dennis.

17  Q.  And when was it sent?

18  A.  October 12, 2020.

19  Q.  I'm going to read it aloud:  "You better speak.  I'm

20  getting annoyed with you today."

21      What did you understand this text message to mean?

22  A.  This -- he sent several texts commanding me to speak, so I

23  just grouped it with that, you know.  Trying to exert some

24  power or control over me, demanding that I speak.  So I didn't

25  think about it further than that.

MaeWden4                    Bostick - Direct

1        And then September, October, I was just getting so, so, so

2    many texts that it was just the series of texts that made it,

3    together, very harassing and intimidating.

4    Q.  And turning your attention to Government Exhibit 105-72,

5    focusing on this text message, is this also from the defendant?

6    A.  Yes.

7    Q.  And who was it sent to?

8    A.  Me and three other partners in the New York office.

9    Q.  I'm going to read this message the defendant sent on

10   October 14, 2020:  "Come on.  We have at least another 12

11   months of this.  You have to have a sense of humor to get

12   through it, right, cotton head?  LOL."

13       Do you remember that text?

14   A.  Yes.

15   Q.  What was your understanding of it?

16   A.  That he wasn't going to stop this harassment anytime soon,

17   saying at least another 12 months of him doing this to me.

18   Q.  Were there also times when you understood the defendant to

19   be insulting your intelligence?

20   A.  Yes.

21   Q.  Turning your attention to Government Exhibit 107-4, the

22   text message at the bottom of the page, who is this sent from?

23   A.  Mr. Dennis.

24   Q.  Who was it sent to?

25   A.  Me.

MaeWden4                         Bostick - Direct

1    Q.  Anyone else?

2    A.  And I think seven other partners.

3                MR. DENNIS:  Well, there are names there, but there's

4    no -- there's no numbers, so we don't know who it actually went

5    to.

6                Objection.  Objection, your Honor.

7                THE COURT:  I'll sustain that objection.

8                It was sent to you.  Go on from there.

9    BY MS. KUSHNER:

10   Q.  Who did you understand the defendant to be referring to as

11   cotton head?

12   A.  Me.

13   Q.  I'm going to read the message:  "Cotton head, you do not

14   have to read too many big words, not enough pictures.  It will

15   be tough going for you."

16       Do you remember receiving that message?

17   A.  Yes.

18   Q.  Is was it your understanding that this message was also

19   sent to other people at the law firm?

20   A.  Yes.

21   Q.  What was the date of this message?

22   A.  September 28, 2020.

23   Q.  Turning your attention to Government Exhibit 107-6, which

24   is a message the defendant sent on September 30, 2020,

25   approximately what time of -- actually, withdrawn.

Approximately what time of day, Ms. Bostick, would you have received this message?

A. 9 p.m., 9:30.

Q. And were you the only recipient on this text message?

A. No.

Q. I'm going to read it aloud: "Cally, let's see who ends up in prison first, you or me."

MR. DENNIS: Your Honor, can we have a sidebar on this particular --

THE COURT: All right.

(Continued on next page)

MaeWden4                        Bostick - Direct

1            (At sidebar)

2            MR. DENNIS:  This is another text message where the

3   witness is aware that police were sent to my home and they

4   threatened to arrest me.  So the context of that is who was

5   going to prison first, because the firm had already attempted

6   to send me.

7            THE COURT:  If the question you're raising is does

8   this open the door to stuff that I previously excluded, I will

9   take that up during your cross.  When you're ready to put a

10  question to that effect, come to the sidebar.  At the moment,

11  though, I don't think we should be interrupting for something

12  that's related to cross.

13           MR. DENNIS:  OK.  OK.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1                    (In open court)

2     BY MS. KUSHNER:

3     Q.  Do you recall receiving the text message on the screen in

4     front of you, which is Government Exhibit 107-6?

5     A.  Yes.

6     Q.  And how did this text message make you feel?

7     A.  Just going back to this threat of smear campaign, because I

8     knew there was nothing I did that could land me in prison, the

9     only thing I thought he'd be getting at is that he would try to

10    make false statements about me that would make me end up in

11    prison.  So this just went to kind of overall harassment and

12    was trying to intimidate me with falsehoods.

13    Q.  And turning your attention to Government Exhibit 103-34,

14    are these two text messages the defendant sent you on October

15    9, 2020?

16    A.  Yes.

17    Q.  Approximately what time of day would you have received

18    these messages?

19    A.  Four, 4 a.m.

20    Q.  I'm going to read the bottom text message:  "As I shared

21    with you earlier, as you go through experience people -- as I

22    shared with you earlier, as you go through experience, people

23    will think the worst about you.  Look at how you view me.  But

24    if you keep your head up, the two years go by quickly and make

25    you tougher."

MaeWden4                          Bostick - Direct

1       And turning your attention to page 2, the first message,

2   "unless I am successful getting you incarcerated the maybe

3   three to four years."

4       Do you recall receiving these two text messages?

5   A.  Yes.

6   Q.  And who sent them to you?

7   A.  Mr. Dennis.

8   Q.  How did they make you feel?

9   A.  The first text was concerning because he mentioned two

10  years, two more years of it.  So I would just hope by this time

11  that he would tire of sending me this barrage of texts, but he

12  let me know that he was planning to keep this up for the next

13  two years, so that was -- that was concerning.

14  Q.  And then --

15  A.  Uh-huh.

16  Q.  Go ahead.

17  A.  This incarceration text goes to the last text, like he's

18  threatening to send me to prison for something I know I didn't

19  do, so it must have been because he thought he could make up

20  some lies about me.  So I -- I took it as a threat for some

21  kind of smear campaign or some kind of negative publicity.

22  Q.  And zooming back out on this exhibit, looking at the first

23  text message on the first page, the time stamp being UTC, the

24  first message is sent at 7:08 a.m.  Second message was sent at

25  7:10 a.m.  And the third message on the second page -- sorry.

1    I'm sorry.  The first message on the third page was sent at
2    7:11 a.m. UTC time.  So approximately what times were those for
3    you?
4    A.  4 a.m.
5    Q.  And was this the only time the defendant sent you text
6    messages within minutes of each other?
7    A.  No.  He did it often.  It was always back to back when he
8    was on it.  It would be between five and hundreds of texts a
9    day.  Maybe he would take a day or so off.  But whenever he
10   was, like, fired up on texts, it was always like back to back
11   to back.
12   Q.  And Ms. Bostick, did you ever respond to any text messages
13   from the defendant in 2020?
14   A.  At no time.
15   Q.  Turning your attention to Government Exhibit 103-35, page
16   2, are these text messages the defendant sent you?
17   A.  Yes.
18   Q.  What day?
19   A.  October 9, 2020.
20   Q.  I'm going to read portions of the top two text messages
21   aloud:  "At least we have time to discuss while I'm drafting my
22   complaint.  Thanks for that as well.  I will make sure you get
23   a prominent role.  For the younger women attorneys, you will be
24   a biblical lesson."
25        Do you recall receiving those messages?

MaeWden4                        Bostick - Direct

1    A.  Yes.

2    Q.  What was your understanding of them?

3    A.  He was just continuing to, to state that he's going to

4    include me in a complaint, must have been baseless claims, so

5    kind of negative publicity for me.  And then the biblical

6    lesson, you know, same as I discussed, going back to making an

7    example out of me through some command of God.

8    Q.  And turning your attention to Government Exhibit 103-38,

9    are these more text messages the defendant sent you?

10   A.  Yes.

11   Q.  What date did he send them?

12   A.  October 10, 2020.

13   Q.  I'm going to read them both aloud:  "Wait until I take your

14   deposition.  Trash."

15       What was your understanding of these messages?

16   A.  That because I, you know, wasn't supporting him or

17   responding to him, he was going to make me a subject of the

18   lawsuit, the one, I guess the one he had against the firm.

19       And then the trash was, you know, just intended to demean

20   me and -- yeah.  Just intending to belittle me and demean me.

21           MS. KUSHNER:  Mr. Magliocco, you can take this down.

22   Q.  Ms. Bostick, did there come a time when you moved back to

23   Manhattan?

24   A.  Yes.

25   Q.  And approximately when was that?

MaeWden4                        Bostick - Direct

1   A.  November 2020.

2   Q.  And without referencing any discussions you may have had

3   with other people, why did you move back?

4   A.  Because I understood that Mr. Dennis was not in Harlem and

5   not in the state.

6   Q.  And turning your attention -- did the defendant continue to

7   send you text messages in November of 2020?

8   A.  Yes.

9   Q.  Turning your attention to Government Exhibit 107-32, the

10  first text message at the top of this page, who is this from?

11  A.  Mr. Dennis.

12  Q.  And were you one of the recipients of this text message?

13  A.  Yes.

14  Q.  Were you the only recipient?

15  A.  No.

16  Q.  What's the date of this message?

17  A.  November 25, 2020.

18  Q.  I'm going to read it.  "Cally, we are coming for you."

19      Remember receiving that message?

20  A.  Yeah.

21  Q.  How did that make you feel?

22  A.  That he was after me, that he could hurt me.

23  Q.  Ms. Bostick, I think you alluded to this earlier, but did

24  the defendant ever send you text messages accusing you of

25  things in your personal life?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MaeWden4                          Bostick - Direct

1    A.  Yes.

2              MR. DENNIS:  Objection, your Honor.

3              THE COURT:  Overruled.

4    BY MS. KUSHNER:

5    Q.  What types of things did he accuse you of?

6    A.  Said a lot of derogatory texts about sleeping with guys;

7    being on patrol for guys to have sex with them -- in more

8    explicit terms; sleeping with guys at the firm.

9              MR. DENNIS:  Objection.

10             THE COURT:  Overruled.

11   A.  That's about the nature of the texts.

12   Q.  And Ms. Bostick, did the defendant continue to text you in

13   early 2021?

14   A.  Yes.

15   Q.  Showing you what's been marked as Government Exhibit

16   107-56, page 2, do you see the text message at the bottom?

17   A.  Yes.

18   Q.  Who is it from?

19   A.  Mr. Dennis.

20   Q.  Who is it to?

21   A.  Me and others.

22   Q.  And when was it sent?

23   A.  January 13, 2021.

24   Q.  I'm going to read it aloud:  "But Cally, sleep with one eye

25   open."

1        Do you remember receiving that text message?

2    A.  Yes.

3    Q.  How did it make you feel?

4    A.  Made me feel like he wanted to intimidate me.  He wanted me

5    to be scared, because this is -- he's telling me to be cautious

6    and be vigilant because I could be in danger, and that's --

7    that's how I took it.

8    Q.  And did you do anything in January of 2021 as a result of

9    the text messages you were receiving from the defendant?

10   A.  Yes, I moved from Harlem.

11   Q.  Without saying where -- well, withdrawn.

12       Why did you move?

13   A.  Because he clearly still had me -- he still was fixated on

14   me, obsessed with seeking out some retaliation against me.  And

15   I didn't know when and if he was going to come back to Harlem,

16   so I still felt in danger.  And even if he didn't move back to

17   Harlem, I felt like I'd been in that apartment for 13, 14 years

18   at that point, so I knew my address was probably public.  So I

19   wanted to go someplace where he couldn't easily find my address

20   and where I wouldn't, you know, maybe run into him as easily on

21   the street.  But, you know, I was still very -- I was back in

22   the city, but I was still very afraid.

23   Q.  Did you want to move?

24   A.  No.  I loved that apartment.

25   Q.  You said you lived there for 13 or 14 years?

MaeWden4                    Bostick - Direct

1    A.  No, I did not want to move.  I loved that apartment.

2    Q.  Would you have moved but for the messages you were getting

3    from the defendant?

4    A.  No.

5    Q.  Do you currently own your place, or do you rent?

6    A.  Rent.

7    Q.  Why do you rent?

8    A.  Because my return to New York was temporary.  I wanted to

9    see what happened with this situation and if I remained

10   vulnerable to him and the focus of him, in danger.  So renting

11   to see if I need to move.

12   Q.  Ms. Bostick, to this day, what, if any, impact do the

13   defendant's messages continue to have on you?

14   A.  Made me very distrustful of people, because we weren't

15   close friends, but we had a personal relationship, so for him

16   to just turn on me that way hurt.  And when I get texts from

17   people that I didn't authorize to text me, I get really

18   anxious.

19        Our clients love to text.  If you call them from your cell

20   phone number, they'll just go ahead and text you, and I'm very

21   uncomfortable with that, particularly if it's a man.  And just,

22   you know, certainly anxious, but -- yeah.

23             MS. KUSHNER:  One moment, your Honor?

24             THE COURT:  Cross-examination.

25             MS. KUSHNER:  Just one moment.

```
 1              THE COURT:  Oh, I'm sorry.
 2              MS. KUSHNER:  No further questions.
 3              THE COURT:  Cross-examination.
 4    CROSS-EXAMINATION
 5    BY MR. DENNIS:
 6    Q.  Good afternoon, Cally.
 7    A.  Hello.
 8    Q.  Cally, you work at an international, global law firm?
 9    A.  I do.
10    Q.  And in that law firm you have access to a tremendous amount
11    of resources and information, correct?  You have access to a
12    tremendous amount of resources and information, correct?
13    A.  Legal resources?
14    Q.  Legal resources, investigative resources.  Resources.
15    Well, you can define it however you want.
16    A.  Yeah, legal resources, I guess.
17    Q.  OK.  So I take it that you were not aware -- or I'm asking,
18    were you aware that I fled the United States in March of 2020
19    and did not return until November 16, when I was arrested by a
20    department of Dominican police officers?
21              MS. KUSHNER:  Objection.
22    Q.  Were you aware --
23              MS. KUSHNER:  Objection.
24              THE COURT:  Well, the problem with the question, aside
25    from possible other problems, is it's a compound question, and
```

MaeWden4                          Bostick – Direct

1   you're introducing many subparts, including certain things that
2   are close to you testifying.  So if you want to ask a simple
3   question, such as were you aware that I fled the United States
4   in March of 2020, that question I would allow.
5   BY MR. DENNIS:
6   Q.  Were you aware that I fled the United States in March of
7   2020?
8   A.  No, I was not.
9   Q.  Were you aware that I did not return to the United States
10  until November 16 of 2021?
11  A.  No, I was not.
12  Q.  All right.  All right.
13       Cally, what year did you start at the firm?
14  A.  Two thousand -- summer associate 2005; full-time associate
15  2006.
16  Q.  And when you arrived at the firm as a summer associate, was
17  I a partner at the firm?
18  A.  You were not there at the time.
19  Q.  So when you returned as a junior associate, as a first-year
20  associate, was I a partner?
21  A.  You lateraled over as a partner.
22  Q.  And so, I came over as a partner, and what year did you
23  make partner?
24  A.  2015.
25  Q.  So you came to the firm -- let's get the dates right --

MaeWden4                        Bostick – Direct

1   2006, and you became a partner in 2015, so nine years later,
2   correct?
3   A.  Yup.
4   Q.  OK.  During those years, did I take you to breakfasts,
5   lunches, and dinners with clients of mine and other
6   professionals?
7   A.  We went to lunch.  We went to lunch.  We went to dinners.
8   I do not recall breakfast.  That does not mean it didn't
9   happen, but perhaps.
10  Q.  OK.  So you recall that we went to dinners and we went to
11  lunches?
12  A.  Yes.
13  Q.  And during those dinners and during those lunches, did I
14  introduce you to existing clients of the firm?
15  A.  Some existing, but mostly potential.
16  Q.  So that's the next question.  Did I introduce you to
17  potential clients as well?
18  A.  You did.
19  Q.  How important is having clients to a partner of a firm?
20  A.  It's an element of making partner, not dispositive.
21  Q.  OK.  That's fine.  OK.
22      When you became a partner, did I provide you with any
23  clients?  Did I introduce you to clients for yourself?
24  A.  You made introductions, yes.
25  Q.  OK.  Did John George's wife become a client of yours?

MaeWden4                    Bostick - Direct

1    A.   She -- you brought her in.   I got some credit for very,

2    very small matters.

3    Q.   OK.

4    A.   Yes.

5    Q.   OK.   So there were some small matters in which you got

6    small, small credit?

7    A.   Correct.

8    Q.   OK.   OK.   Were there any people that I introduced you to

9    who helped expand your visibility within the legal community?

10   A.   Yes.

11   Q.   Could you name -- could you name someone?

12   A.   I don't know if they want to be named in this trial, but AT

13   the conference we went to every year, you made introductions

14   there, particularly the organizer of the conference.   I met her

15   through you.   And there were other people.

16   Q.   OK.   What was the name of the conference?

17   A.   CCWC.

18   Q.   Which stands for?

19   A.   Corporate Counsel Women of Color.

20   Q.   And can you describe for the jury what that organization

21   is?

22   A.   It's an organization of diverse female attorneys that

23   attempts to help them have a network and get the resources they

24   need to succeed in big law and in-house.

25   Q.   And how large is that organization?

MaeWden4                          Bostick - Direct

1    A.  I don't know.  Probably a thousand members.

2    Q.  Can you describe the firm's commitment to the organization?

3    A.  I cannot.

4    Q.  Can you describe how many attorneys went to the conference

5    every year?

6    A.  I don't have that data.  I would -- I can speculate.

7    Q.  Yeah, please speculate.

8          MS. KUSHNER:  Objection, your Honor.

9          THE COURT:  Sustained.

10   BY MR. DENNIS:

11   Q.  Can you name -- so did you go every year to the conference?

12   A.  I did.

13   Q.  Did any other partner -- were there any other women

14   partners who went every year?

15   A.  Were there any other women partners?

16   Q.  Women partners who went to the conference every year.

17   A.  And to clarify, I went every year for a portion of my

18   career.  I didn't go my entire career, but there were other

19   women partners that went every year as well.

20   Q.  OK.  And what was the firm's investment in the conference?

21   A.  In terms of dollars?

22   Q.  Yeah.

23   A.  I don't know.

24   Q.  When you would go to the conference, how would you -- what

25   would be the process you would have to go through in order to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MaeWden4                     Bostick - Direct

1  attend in terms of getting your expenses paid?

2  A.  Could you explain that question?

3  Q.  How would you get your expenses paid for by the firm?  What

4  would be the process?

5  A.  I would ask my personal assistant to submit it for

6  reimbursement.

7  Q.  Who would she submit it to?

8  A.  I have no idea.

9  Q.  You have no idea who your personal --

10 A.  No.  I guess the executive committee, the office itself.  I

11 don't know.

12 Q.  Did you ever talk to John Bicks about the conference?

13       MS. KUSHNER:  Objection.

14 A.  I'm sure I did.  Of course.

15       THE COURT:  When there's an objection, you need to

16 wait for me to rule.

17       THE WITNESS:  OK.

18       THE COURT:  Anyway, we'll let it go.

19 BY MR. DENNIS:

20 Q.  OK.  What would be the -- what would you -- what did you

21 share with John about the conference?

22 A.  In general, when it was, what our plan was when we got

23 there, who we met once we got back.

24 Q.  Just to repeat, so with John, you would share who you met

25 with and you'd give him a report when you returned?

MaeWden4                    Bostick - Direct

1  A.  We were encouraged to do that because we wanted to show it

2  was a good investment for the firm.  So he would encourage me

3  to send emails to office management, explaining to them exactly

4  what we did, how we benefitted from going.

5  Q.  Did John have an interest in understanding?

6           MS. KUSHNER:  Objection.

7  A.  I have no idea.

8  Q.  You have no idea.  OK.

9           THE COURT:  Sustained.  Put a new question.

10  BY MR. DENNIS:

11  Q.  On your web -- can you name some of the companies that were

12  there, that would be at the conference?

13           MS. KUSHNER:  Objection.

14           THE COURT:  Sustained.

15  BY MR. DENNIS:

16  Q.  I'm looking at your web bio here.  And did you speak at the

17  conference on -- did you speak at the conference on four

18  different occasions?

19  A.  I did, because it's a women's conference, and the firm

20  wanted to, being you, wanted to make sure that a Black woman

21  spoke at the conference we were sponsoring, so I did.

22  Q.  Is that part of me trying to encourage you to have

23  visibility in the legal community?

24  A.  Or trying to bring in business through me.  I'm not sure.

25  Q.  Not sure.  OK.  I just want to make sure that these were

1    the -- these were the different things that you spoke at; I

2    want to confirm it:  CCWC career strategy; elements of mergers

3    and acquisitions transactions; CCWC career strategy

4    conferences; strategy for surviving a merger and acquisition;

5    CCWC career strategy conference, M&A lessons, in-house counsel

6    and outside counsel perspective; CCWC career strategies

7    conference, M&A trends.  Sounds like a really impressive -- it

8    must've been -- was it -- was the group of attorneys listening

9    to you an impressive group of attorneys?

10              MS. KUSHNER:  Objection.

11   BY MR. DENNIS:

12   Q.  Or can you describe the audience that heard you speak at

13   these conferences?

14              MS. KUSHNER:  Objection.

15              THE COURT:  Sustained.

16              MR. DENNIS:  Your Honor, can we have a sidebar?

17              THE COURT:  All right.

18              (Continued on next page)

19

20

21

22

23

24

25

MaeWden4                    Bostick - Direct

1              (At sidebar)

2              THE COURT:  For starters, you're reading from

3    something not in evidence, which I've tried to explain to you

4    is not proper.  And then you're putting a question to the

5    witness about something that was said and something not in

6    evidence.  So I don't even have to reach the issues of

7    relevancy or anything else.  It's improper on its face.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MaeWden4                          Bostick – Direct

1                (In open court)

2     BY MR. DENNIS:

3     Q.  So, Cally, were you aware or are you aware that I was

4     suspended from the firm on January 30, 2019?

5     A.  No.  I heard about it later.  Probably was, like, May.

6     Q.  You heard about it in May?

7     A.  Yeah.

8     Q.  Cally, how many attorneys are in the New York office?

9     A.  I'm not sure.  I would say around -- between 70 and 80.

10    Q.  70 and 80.  Comprised over how many floors?

11    A.  Three.

12    Q.  Three floors.  Did you see me in the office after January

13    30?

14    A.  I don't remember.

15    Q.  So you did not realize that I had been suspended until May

16    30?

17    A.  Yeah.  Actually, as a matter of fact, I think you were

18    still sending emails.

19    Q.  No, we're not -- I asked you if you knew I had been

20    suspended.

21    A.  I did not.

22    Q.  Had you seen me in the office between January --

23    A.  I didn't see you hardly ever in the office.  We were on

24    different floors, and I just didn't see you often, so not

25    seeing you wasn't abnormal.

MaeWden4                          Bostick - Direct

1   Q.  So I'm going to repeat the question again.

2       Cally, did you see me in the office in January -- in

3   February of 2019?

4   A.  I don't remember.

5   Q.  Did you see me in the office in March of 2019?

6   A.  I don't remember.

7   Q.  Did you see me in the office in April of 2019?

8   A.  Not that I know of.  I did not.

9   Q.  OK.  How did you find out that I was suspended?  So when --

10  what's the date that you first recognized I was suspended?

11  A.  I don't know the exact date.  I believe it was around May,

12  though.

13  Q.  May.  How did you find out?  How did you find out I was

14  suspended in May?

15          MS. KUSHNER:  Objection.

16          THE COURT:  I'll allow that.

17  A.  Because prior to that, a few months before, you had been

18  sending a barrage of emails, making, you know --

19  Q.  No.  How did you find out -- when did -- who told you I was

20  suspended in May?  Let's correct --

21  A.  I believe -- I'm actually not sure who exactly told me, but

22  the office in general knew something was happening based on the

23  emails you sent.

24  Q.  I'm not --

25  A.  Someone -- maybe one of my friends in the office.  I cannot

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MaeWden4                    Bostick - Direct

tell you which attorney said to me, by the way, Mr. Dennis was

voted out of the partnership.  It was just people in the office

knew based on the emails that were going around, that you were

sending around to all of us.  We knew something was happening.

Q.  Cally, as a partner of an international, global law firm,

would you -- are you aware of the fact that there's a

partnership agreement that governs how that organization

operates?

A.  Yes, but I'm not party to it.

Q.  OK.  So would you, in your professional experience,

understand that there had to be official action taken?

A.  Yes, a vote.

Q.  So with respect to a suspension, based on your professional

knowledge, would there have been official action taken?

            MS. KUSHNER:  Objection.

            THE COURT:  Hang on.

            I think it is ambiguous.  Sustained.  You can rephrase

it, if you wish.

BY MR. DENNIS:

Q.  I'd like to just -- we'll return to the period when you,

when you indicated you became aware that I was no longer

physically in the office.  That was in May.  Oh, can you tell

us what date that was?

A.  I don't know the dates.

Q.  Approximately.

MaeWden4                         Bostick - Direct

A.  I know I found out about the expulsion sometime in May.  I
did not know about the suspension.  This is actually the first
time I'm hearing about it.  I did not know that you were
suspended prior to being expelled.

Q.  OK.  So -- and you don't remember how you -- and you don't
know who -- well, when did you first talk to somebody about
my -- who did you first talk to about my, let's say, expulsion?

A.  I don't know who I first talked to.  I would imagine one of
my close friends in the office.  Maybe a colleague named Tara.
I don't remember, but I know that we were generally talking
about it once you started sending the emails.  We knew
something was happening, so it was just a conversation that was
being had, like, what's happening here.

Q.  That's great.  I'm actually looking for -- this is a court
of law.  I'm looking for actually not general knowledge, but if
you have no real knowledge, that's fine as well.  Let's just
move on from that.

    So after I was expelled from the firm, did you talk to
anyone in management about that?

A.  After you were expelled -- about your expulsion?

Q.  Yes.

A.  I don't -- I can't see why I would have.  No, I don't
believe so.

Q.  OK.  Cally, the current matter that you're testifying for,
how did you find out about this matter?  How did this matter

1    begin, with your involvement?

2    A.  Which?  The harassment?

3    Q.  This current, this current, this legal action that's going

4    on right now.  This court proceeding.  How -- when did you

5    become involved with this?

6            THE COURT:  It's unclear to me whether you're asking

7    when did she first have contact with the FBI, or someone like

8    that, or whether you're asking when did she first learn she

9    would be called as a witness.  I wasn't clear what you were

10   asking.

11           MR. DENNIS:  When was she first -- I didn't want to

12   lead her and say did she  =was she contacted by the FBI.

13           THE COURT:  You can lead on cross.

14   BY MR. DENNIS:

15   Q.  When did you contact the FBI about my threats?

16   A.  I never directly contacted the FBI.

17   Q.  OK.  When did they contact you?

18   A.  So, I got a lawyer, and my lawyer was looking to remedies

19   to protect me, and she may have contacted the FBI.  If so, it

20   would have been when your threats to me escalated in late

21   August and September.  That's likely when that happened.

22   Q.  Would your lawyer have contacted the FBI without your

23   permission and -- without your permission and knowledge?

24           MS. KUSHNER:  Objection.

25           THE COURT:  Overruled.

MaeWden4                        Bostick - Direct

1    A.  No.

2    Q.  So when did you give your lawyer the instructions to

3    contact the FBI?

4    A.  I never instructed her to contact the FBI.  I asked her to

5    help protect me in a situation that felt very precarious and

6    unsafe and threatening, and she relayed to me my remedies, what

7    I could possibly do, and asked me for consent to reach out to

8    the FBI to see if they can look into what was going on.  And I

9    said sure.

10   Q.  So --

11   A.  I had -- and that was after a year of being harassed.  I

12   did not --

13            MR. DENNIS:  Your Honor, the witness has answered the

14   question.

15            THE COURT:  No.  I think that was directly responsive

16   to your question, so --

17            MR. DENNIS:  Your Honor, what we're not getting is the

18   specificity.

19            THE COURT:  No, no.  Excuse me.  To the contrary.

20   BY MR. DENNIS:

21   Q.  What date did you --

22            THE COURT:  You asked her whether she gave

23   instructions to her lawyer, and she gave you a very specific

24   response.  She said she didn't instruct her lawyer to contact

25   the FBI *per se*, but she instructed her lawyer to help her

MaeWden4                        Bostick - Direct

1  because of your threats, and then the lawyer asked her for

2  consent to contact the FBI and she said sure.  That was a very

3  specific response.

4          MR. DENNIS:  Thank you.

5          THE COURT:  Directly responsive to your question.

6          MR. DENNIS:  Thank you, your Honor.

7  Q.  What date did you give your consent to the FBI, to your

8  lawyer to contact the FBI?

9  A.  I cannot give you an exact date, but I know that it was in,

10  sometime in late August, early September, when you started

11  saying you were going to follow me and make me a biblical

12  symbol and --

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

MAEGden5                          Bostick - Cross

1          MR. DENNIS:  Okay.  Thank you.  I was just asking you

2    for a date.

3          Your Honor, can we have a sidebar, for a second.

4          THE COURT:  I tell you what, I think this is probably

5    a good moment to give the jury their mid-afternoon break.

6          So ladies and gentlemen, we'll take a 15-minute break

7    at this time.

8          (Jury excused)

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MAEGden5

1          (Jury not present)

2          THE COURT:  You can step down.  We will see you in 15

3   minutes.

4          Mr. Dennis, what is it that you wanted a sidebar

5   about?

6          MR. DENNIS:  Is --

7          THE COURT:  The witness is gone.  If you want it in

8   private, we can go to the sidebar.

9          MR. DENNIS:  Yes.

10          THE COURT:  Come to the sidebar.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MAEGden5

1              (At sidebar)

2              MR. DENNIS:  The witness is now -- I see a pattern

3    now, every time we ask a question -- maybe we need to have the

4    reporter read it -- all I know is you started harassing me.

5    When I ask her for a date, all I know is when you started

6    harassing me.  It's a tactic.  She's been coached.  And I'm

7    trying to work my way through it.

8              THE COURT:  There's no indication she's been coached.

9    But you cut her off and I thought correctly cut her off when

10   she went past the date and started staying some more.  And I

11   had no problem with your cutting her off at that point, so I

12   didn't object.

13             MR. DENNIS:  All right.

14             THE COURT:  Okay.

15             We'll see you all in 15 minutes.

16             (Recess)

17             (Continued on next page)

18

19

20

21

22

23

24

25

MAEGden5

```
 1                (In open court; jury not present)
 2                THE COURT:  Mr. Dennis, you have 35 minutes more.
 3                Let me ask the government, assuming, which is clear,
 4      that we'll finish in another 45 minutes or so, is your other
 5      witness available?
 6                MS. KUSHNER:  Yes, your Honor.
 7                THE COURT:  We may be able to get to him.
 8                (Continued on next page)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

MAEGden5                        Bostick - Cross

1          (Jury present)

2          THE COURT:  Go ahead.

3    BY MR. DENNIS:

4    Q.  I think we left off, Cally, where we were discussing when

5    you gave your attorney consent to contact the FBI.  And could

6    you just repeat what your answer is so we're -- what your

7    answer to that question was.

8    A.  I don't recall the exact date, but I know it was late

9    August, early September.

10   Q.  Of which year, Cally?

11   A.  2020.

12   Q.  Thank you.

13        And once you contacted the FBI, did you provide them with

14   any information or materials?

15   A.  Copies of the thousand texts you had sent me.

16   Q.  So in your instance -- and this is more -- you actually

17   contacted the FBI or your attorney contacted the FBI, I just

18   want to confirm that that's the testimony.

19   A.  My attorney did, yes.

20   Q.  And did your attorney provide information to the FBI, any

21   materials to the FBI?

22            MS. KUSHNER:  Objection, asked and answered.

23            THE COURT:  No, I'll allow that.

24            If you know.

25            THE WITNESS:  I wasn't on the calls or meetings she

MAEGden5                    Bostick - Cross

may have had with the FBI.  I know -- I only know what I showed

the FBI.

BY MR. DENNIS:

Q.  You only know what -- did you give information to -- we're

going to do this in two pieces -- did you give information to

your attorney that she may have given to the FBI without your

knowledge?

A.  She had all the texts, copies of the texts you sent me.

Q.  Did she give that to the FBI?

A.  I don't know.  I know that I gave them texts.  I don't know

if she did.

Q.  Did you give them the same texts that you gave your

attorney or did you give them different -- did you give them

the same texts you gave your attorney?

A.  Yeah, they were the same texts.

Q.  Did you give them emails?  Did you provide the FBI with any

emails?

A.  No, no.

Q.  Once you were contacted by the FBI in, I guess we should

roughly say, August of 2020, who did you discuss this matter

with within K&L Gates?

A.  Once I was contacted by the FBI, who did I discuss it with?

Well, I -- I spoke with the FBI in September.  At that time, I

was communicating about this solely with the firm's general

counsel, who was overseeing security for the various lawyers

MAEGden5                    Bostick - Cross

1    impacted by this harassment.

2    Q.  So you were -- I just need to understand this to make

3    sure -- prior to the FBI contacting you, had you spoken to

4    anyone in the office about the intimidation and harassment and

5    the threats that you felt?

6    A.  Yes.

7    Q.  Who did you speak to?

8    A.  I first alerted our -- the office managing partner, he told

9    me to speak about it exclusively with the general counsel

10   because it was attorney-client privilege and I should just

11   address it that way.

12   Q.  We're going to go back again.

13        You spoke to the office managing partner -- in your

14   answers, can you give names.  Who is the office managing

15   partner?

16   A.  John Bicks.

17   Q.  So you spoke with John Bicks about it.  When was it you

18   spoke with John?

19   A.  I believe June 2019 when you started telling me to watch

20   that movie and to delete texts.  I think I alerted to him that

21   I was concerned about the texts you were sending.

22   Q.  So you started talking to John about it in June of 2019?

23   A.  Yes.

24   Q.  And how many conversations did you and John have about this

25   situation?

MAEGden5                          Bostick - Cross

1   A.  Not many.  I -- I saw it as a personnel issue that --

2   Q.  Excuse me, I'm actually asking for a number.

3   A.  Yeah.

4   Q.  Was it two, three, four, five?

5   A.  About that interaction in June?

6   Q.  When you first felt threatened and you felt your life was

7   in danger, whenever you first felt that, what date was that,

8   when you first initiate --

9   A.  That's a tricky question because, initially, in June, I

10  felt the office as a whole was in danger.  I --

11  Q.  I'm really -- Ms. Bostick, I'm asking when did -- you are

12  the victim here.

13  A.  I am.

14  Q.  So I know you are speaking for -- when did you first feel

15  intimidated and threatened is what I'm asking, not everyone

16  else.

17  A.  At first I felt intimidated at our meeting in the deli, so

18  June.

19  Q.  June of what year?

20  A.  2019.

21  Q.  Did you alert Mr. Bicks at that time?

22  A.  Yes.  Which is about the same time in June --

23  Q.  Thank you, thank you.

24      How many conversations did you have -- I just want to --

25  how many conversations did you have with Mr. Bicks since June

MAEGden5                          Bostick - Cross

1    of 2019 about this issue?

2    A.   About the harassment, he was on many texts --

3    Q.   Ms. Bostick, I'm just looking for, was it five, ten?

4    A.   More.

5    Q.   It was many, many times?

6    A.   To express my concerns about my safety.

7    Q.   Okay.  Thank you.  I'm just trying to get -- because as the

8    jury may know, I'll be quite frank, Mr. Bicks has testified as

9    to how many conversations --

10             THE COURT:  No.  You do not comment on what any other

11   witness has said, as I have pointed out to you many times.

12             MR. DENNIS:  Okay.

13   BY MR. DENNIS:

14   Q.   Ms. Bostick, if we could just stick to -- we don't have a

15   lot of time.  The judge has given us -- so I'm trying to be

16   really specific in terms of the information I'm trying to

17   elicit at this point.

18        So my question was --

19             THE COURT:  I gave you the time you asked for.

20             MR. DENNIS:  Right, but if she's not being --

21             THE COURT:  No, no, no, I think.

22   BY MR. DENNIS:

23   Q.   How many times --

24             THE COURT:  I think we're moving along.  Put another

25   question.

MAEGden5                      Bostick - Cross

1   Q.  How many times -- because we're -- how many times did you

2   state -- this is my freedom at stake -- how many times did you

3   talk to John Bicks about this?

4   A.  So I cannot give you a number.  I will tell you that for

5   the past --

6   Q.  That's okay.

7   A.  I cannot give you a number.

8          MR. DENNIS:  Then withdraw the question, your Honor.

9          THE WITNESS:  Okay.

10  BY MR. DENNIS:

11  Q.  When did you first find out that Eric Cottle had also

12  been -- is also an alleged victim?

13         MS. KUSHNER:  Objection.

14         THE COURT:  I'll allow that.

15         But just so we're all on the same wavelength, if you

16  don't remember a specific date, give your best estimate of

17  approximately when.

18         THE WITNESS:  Okay.  Sometime between June in 2019 --

19  June and September of 2019.

20  BY MR. DENNIS:

21  Q.  How many conversations have you had with Eric Cottle about

22  this matter?

23  A.  Very few.

24  Q.  Very few.  Can you --

25  A.  Maybe two.

MAEGden5                          Bostick - Cross

1   Q.   Maybe two conversations?

2   A.   I don't -- yeah, few.

3   Q.   Okay.

4   A.   We don't talk very often.

5   Q.   So you feel intimidated, you feel harassed, you feel

6   threatened, and you understand there's another person who feels

7   the same way, and yet, just to confirm, you guys have only

8   talked about it twice?

9   A.   And so when you say this matter, I'm assuming you are

10  talking about the harassment that I felt.  So I talked to

11  people that was in charge of security for the firm about it.

12  Q.   That's okay.  I don't -- I'm going to move it along --

13  A.   Okay.

14  Q.   -- because that's not information.  I'm really -- I'm

15  trying to understand the conversations that you had with John

16  Bicks and Eric Cottle, and what you testified to is that you

17  have had two conversations --

18          THE COURT:  Just put a question if you want to move it

19  along.

20          MR. DENNIS:  You're right, your Honor.  Let's move

21  this.

22  BY MR. DENNIS:

23  Q.   The next question is:  Did you talk to anyone else in the

24  firm about this matter?

25  A.   So I talked to members of management.

MAEGden5                        Bostick - Cross

1   Q.  I'm just looking for -- can you name --

2   A.  Yes.

3   Q.  I'm sorry, can you name the persons who you talked to?

4   A.  So I talked to the general counsel, Jeff Maletta.

5   Q.  How many times did you talk to Jeff Maletta?

6   A.  About concerns for my safety, many times.  Especially when

7   it was escalating.  I wanted the firm to get ahold of it,

8   control of it.

9   Q.  So you spoke to Jeff Maletta many, many, many times?

10  A.  Yes.

11  Q.  Okay.  Who else?

12  A.  John Bicks, initially.  But again, I was advised to only

13  speak to Jeff Maletta about it, which is what I did.  I spoke

14  to people at the firm that are -- not just colleagues, but

15  friends of mine.

16  Q.  That's fine.  I'm just looking for people at K&L Gates, so

17  we'll move that along.

18      With respect to -- did John Bicks, in your conversations

19  with John Bicks, did he offer any solutions or any sort of

20  actions that he could take in order to ensure your protection?

21  A.  Actions that John Bicks could take?

22  Q.  As the office managing partner of the New York office, yes.

23  A.  No.  I knew that the office had security.  But no, he

24  didn't offer any other solutions.  Again, he directed me to

25  work through my issues with Jeff, my concerns with Jeff.

MAEGden5                         Bostick - Cross

1   Q.  So let me understand this right.  You felt threatened, you

2   felt like your life was in danger, and he directed you to work

3   with Jeff Maletta who is in Washington, DC?

4   A.  Yes.

5   Q.  With respect to your testimony today, have you spoken to --

6   did you speak to Jeff Maletta prior to testifying today?

7   A.  No.

8   Q.  Have you spoken to Eric Cottle?

9   A.  No.

10  Q.  Have you spoken to John Bicks?

11  A.  About my testimony?

12  Q.  That you were going to testify here?

13  A.  No.

14  Q.  Now, let's just confirm, what floor are you on in the New

15  York office?

16  A.  I'm on the 32nd floor.

17  Q.  What floor is John Bicks on?

18  A.  31st floor.

19  Q.  What floor is Eric Cottle on?

20  A.  33rd floor.

21  Q.  So are you aware of any actions that the firm may have

22  taken in order to protect your security and make sure that you

23  were safe?

24  A.  Yes.

25  Q.  Tell me official actions, any official actions that they

MAEGden5                        Bostick - Cross

1    have taken.

2    A.   With security at my apartment, with --

3    Q.   So you have -- just to make it clear, they hired security

4    for your apartment?

5    A.   Yes.

6    Q.   What else?

7    A.   They helped me with my move.

8    Q.   Okay.

9    A.   They helped me with my move from Harlem.

10   Q.   Did they ever suggest reporting this to the New York City

11   Police Department?

12   A.   No.

13   Q.   You testified earlier how you were getting ready in case --

14   allegedly, I was coming for you, so I want to --

15            THE COURT:  Just put a question.

16            MR. DENNIS:  Okay, I got it.  Okay, your Honor.  We'll

17   move on.

18   BY MR. DENNIS:

19   Q.   Just to clarify, they never suggested there should be any

20   sort of contact with any law enforcement agency by you with

21   regard to your threats?

22   A.   So I hired a lawyer when I felt threatened, so I got my

23   legal advice from my lawyer.

24   Q.   Thank you.

25       But I'm talking about, you are a partner of K&L Gates, so

1    I'm really talking about the firm itself.  So there was no

2    recommendation from them that you go to the New York City

3    Police Department, for example?

4    A.  No, they never recommended -- referred me to the New York

5    police department.

6    Q.  Cally, are you aware or did you know that K&L Gates hired a

7    security team to attend the corporate counsel of women

8    conference in September of 2019?

9              MS. KUSHNER:  Objection.

10             MR. DENNIS:  Your Honor, I have with me, which was in

11   the file --

12             THE COURT:  No, no, no.  I'm sorry.  I'm just looking

13   at the question.

14             I'll allow that.

15             THE WITNESS:  Yes, I knew the firm hired security for

16   the attorneys.

17   BY MR. DENNIS:

18   Q.  I'm sorry?

19   A.  I knew the firm hired security for the attorneys at the

20   conference.

21   Q.  Were you one of the attorneys at the conference?

22   A.  Yes.

23   Q.  So this was another action that the firm took to protect

24   you?

25   A.  Yes.

MAEGden5                        Bostick - Cross

1  Q.  Thank you.

2      And at this conference, how many women attorneys were

3  there, approximately?

4  A.  Maybe a thousand.  I don't know.

5  Q.  Maybe a thousand, okay.

6      These women attorneys, were they made aware that there were

7  armed men walking amongst them during the conference?

8              MS. KUSHNER:  Objection.

9              THE COURT:  Sustained.

10             Irrelevant.

11             MR. DENNIS:  Okay.  Let's see if I can --

12  BY MR. DENNIS:

13  Q.  So you were aware that there were armed men walking among

14  the conference to protect you?

15             MS. KUSHNER:  Objection.

16             THE COURT:  I'll allow that.

17  A.  I don't -- I was not aware if they were armed or not.

18             MR. DENNIS:  Your Honor, can I have the government

19  take a look at this email that was sent that I'd like to have

20  Ms. Bostick review.

21             MS. KUSHNER:  Your Honor, no objection to the witness

22  seeing it, but we have a hearsay objection.

23             THE COURT:  Well, let me see.

24             So Mr. Dennis, are you seeking to offer this document?

25             MR. DENNIS:  Yes, I am, your Honor.

MAEGden5                          Bostick – Cross

1              THE COURT:  I need a one or two word statement,

2    because otherwise we'll have to have a sidebar.  Are you

3    offering it as potential impeachment, are you offering it as,

4    in your view, relevant to one of the substantive issues, which

5    is it?

6              MR. DENNIS:  I think on both, at this point, your

7    Honor.

8              THE COURT:  Well, then, I'm sorry, we'll meet at

9    sidebar.

10             (Continued on next page)

1              (At sidebar)

2              THE COURT:  So most of this is, just for the record,

3      an email from Laurie Robinson, who you may be calling --

4              MR. DENNIS:  Mm-hmm.

5              THE COURT:  -- to a variety of people, including

6      Ms. Bostick.  And it's about the K&L Gates security team being

7      sent to the conference and Ms. Robinson's response, which goes

8      on for several pages.  This is all hearsay.  It may or may not

9      be hearsay coming from Ms. Robinson, if she testifies.  But as

10     to this witness, it's hearsay.  It's an out-of-court statement

11     made by someone else being offered for its truth.  That's why I

12     asked you what the purpose was.

13             MR. DENNIS:  Well, I was actually --

14             THE COURT:  So it's not going to be allowed as an

15     exhibit.  However, arguably, there could be a question put to

16     this witness as to whether this refreshes her recollection

17     about what she understood at the time about the security, that

18     would be arguably impeachment.  So what I will allow you to do

19     is if you want to show this document to the witness and then

20     without reading from the document, put some more questions

21     about the conference.

22             MR. DENNIS:  Okay.

23             THE COURT:  That I will allow.

24             MR. DENNIS:  Okay.

25             (Continued on next page)

MAEGden5                          Bostick - Cross

1          (Jury present)

2          THE COURT:  Take a look at this exhibit, which is not

3     in evidence, but is being shown to you to see if it generates

4     any further reflection, any further recollection on what you

5     may have known or understood at the time of this conference

6     that the last few questions have been about.  So after you have

7     read it to yourself, put it aside and then we'll have questions

8     from counsel.

9          Okay.

10         THE WITNESS:  Yes.

11         THE COURT:  You can take it back.

12         MR. DENNIS:  Can I approach the bench.

13    BY MR. DENNIS:

14    Q.  So, Cally, I think we had left off about a security

15    measure, any security measures that K&L Gates had taken to

16    protect you.  Can you describe -- will you describe the

17    security measures taken in September of 2019 at the Corporate

18    Counsel Women of Color conference?

19    A.  The firm hired security to protect the women lawyers at K&L

20    Gates that were attending the conference.

21    Q.  And where was the conference located?

22    A.  Chicago, I believe.

23    Q.  Do you know the name of the security company?

24    A.  I don't.

25    Q.  What information did Mr. Maletta provide you about the

MAEGden5                         Bostick - Cross

1   security that he was hiring?

2   A.   Just that he was looking to get permission to have security

3   for us because many of us did not feel safe attending.  So that

4   was a measure to make us feel more comfortable going.

5   Q.   Did Mr. Maletta come to Chicago?

6   A.   You know, I don't remember.

7   Q.   You don't remember?

8   A.   I don't remember.

9   Q.   Okay.  In your prior years, had the firm ever hired

10  security for the conference?

11  A.   Not to my knowledge.

12          MR. DENNIS:  Your Honor, I would like to have the

13  government review this.

14          MS. KUSHNER:  The government has the same hearsay

15  objection.

16          THE COURT:  You want to offer this?

17          MR. DENNIS:  Yes.

18          THE COURT:  It's hearsay.

19          MR. DENNIS:  No, I would like the witness to review it

20  so I can just --

21          THE WITNESS:  Do I review it?

22          THE COURT:  I'm sorry, is this a different one?

23          MR. DENNIS:  Yes.

24          THE COURT:  I'm sorry, I thought it was the same one.

25  Let me see it, then.

MAEGden5                    Bostick - Cross

1          This, again, is hearsay.  But the witness may review

2     it to see if it refreshes her recollection as to any further

3     elements of what you've been asking her about.

4          THE WITNESS:  This is the same -- these are the same

5     emails from the last one, yeah.  Okay.  Okay.

6          MR. DENNIS:  May I -- should I come to the --

7          THE COURT:  Okay.

8     BY MR. DENNIS:

9     Q.  I want to ask, again, to your knowledge or -- did Jeff

10    Maletta expect to -- did he inform you that he expected to be

11    in Chicago for this conference and to work with the security,

12    to be in Chicago?

13    A.  Yes.

14    Q.  And his purpose for being in Chicago was to --

15    A.  Was to meet with security.

16    Q.  So the general counsel of an international global law firm

17    had flown to Chicago, where there were 800 women, to meet with

18    security --

19    A.  Yes.

20    Q.  -- for the conference?

21    A.  Yes.

22    Q.  Question:  Did you inform any of the other attendees that

23    additional security was being hired for the conference?

24         MS. KUSHNER:  Objection.

25         THE COURT:  Sustained.

MAEGden5                    Bostick - Cross

1              MR. DENNIS:  Your Honor, for this particular question,

2    the question is relevance.  And the relevance is Ms. Bostick

3    has testified repeatedly as to her not understanding certain of

4    my texts and biblical references.  And this piece of evidence

5    or this conversation relates to the fact that these women, 800

6    women, had given her a tremendous amount of business and

7    attention, and she let armed guards walk around them and not

8    tell them.

9              THE COURT:  This is all stuff you have indicated

10   previously, so I took it into account.  And I still believe

11   that this document and the questions -- the question you just

12   most recently put is totally irrelevant to any issue in this

13   case.  So please go on.

14             MR. DENNIS:  I'd just like to call to the Court's

15   attention that this email is dated the same time in which the

16   government --

17             THE COURT:  No, this email is not in evidence.  Don't

18   talk about what it's dated.  It's not in evidence.

19             MR. DENNIS:  This incident occurred, this incident,

20   which we all agree -- I guess Ms. -- she was at the

21   conference -- occurred in September of 2019.  And she has,

22   through testimony, said she knew --

23             THE COURT:  Look, I've ruled.  If you have a further

24   proffer, you can make it at the sidebar.  I'm happy to hear

25   you.

MAEGden5                    Bostick - Cross

1           MR. DENNIS:  Thank you, your Honor.

2           THE COURT:  Otherwise, please bear in mind that you

3    have seven more minutes.

4           MR. DENNIS:  Okay, your Honor.

5           Can we call up -- I think it was the text message from

6    May of 2020 that we showed earlier.  It was a reference to god.

7    It's the reference where it says god is speaking to the world.

8    BY MR. DENNIS:

9    Q.  Ms. Bostick, were you aware when I sent you this text

10   message that COVID was rampant in New York at the time?

11   A.  Yes.

12   Q.  Could that have been the context in which that message

13   was --

14        Okay.

15        MR. DENNIS:  I'm not going to go through, your Honor,

16   because I know we don't have -- I am not going to go through

17   each and every text and show alternative interpretations.

18   BY MR. DENNIS:

19   Q.  So, Cally, were you -- in addition to the surveillance team

20   that was hired to go to Chicago, are you aware of any other --

21   at this point, any other activities that were carried on by the

22   firm to protect you?

23   A.  There was security at our office building, at least before

24   the pandemic.  And then just the other matters that I told you

25   about before by getting me security, helping me get security,

1    the lawyer and the moves.

2    Q.  Okay.  And Cally, just to sort of cover a few more issues,

3    have you ever met my sons?  Have you ever met my children?

4    A.  Ever met your children?

5    Q.  Yeah.

6    A.  I don't recall meeting them.  But it's very possible that

7    one day you had them in the office.  But I've never had a

8    conversation or I don't recall meeting your children.

9             MR. DENNIS:  Your Honor, no more questions.

10            THE COURT:  Any redirect?

11            MS. KUSHNER:  No, your Honor.

12            THE COURT:  Thank you so much.  You may step down.

13            Please call your next witness.

14            MS. SIMON:  The government calls Gary Cobb.

15   GARY COBB,

16        called as a witness by the Government,

17        having been duly sworn, testified as follows:

18            THE DEPUTY CLERK:  State your name and spell it slowly

19   for the record.

20            THE WITNESS:  Gary Cobb, g-A-R-Y, C-O-B-B.

21   DIRECT EXAMINATION

22   BY MS. SIMON:

23   Q.  Good afternoon.

24   A.  Good afternoon.

25   Q.  Where do you work?

MAEGden5                        Cobb - Direct

1    A.  At the Federal Bureau of Investigation.

2    Q.  Is that sometimes known as the FBI?

3    A.  Yes.

4    Q.  What is your title at the FBI?

5    A.  I am a special agent.

6    Q.  How long have you been a special agent with the FBI?

7    A.  For about three and a half years.

8    Q.  Prior to joining the FBI, what did you do?

9    A.  I was in the United States Marine Corps.

10   Q.  How long did you serve in the United States Marine Corps?

11   A.  Eight years.

12   Q.  Turning to your current position, what are your duties as a

13   special agent with the FBI?

14   A.  My duties are to investigate violations of federal law.

15   Q.  Are you on a particular squad?

16   A.  Yes.

17   Q.  What squad is that?

18   A.  The violent crimes task force, C19.

19   Q.  What kind of crimes do you investigate?

20   A.  We investigate violent criminal acts.  That includes adult

21   kidnappings, armed bank robberies, Hobbs Act robberies,

22   assassinations and murder for hire.

23   Q.  Do the crimes that you investigate sometimes involve

24   threats?

25   A.  Yes.

MAEGden5                         Cobb - Direct

1   Q.  Generally, what techniques do you use in the course of your
2   investigations?
3   A.  We sometimes conduct surveillance.  We interview witnesses
4   and victims.  And we also serve subpoenas.
5   Q.  Have you received any specialized training in your capacity
6   as an FBI special agent?
7   A.  Yes.
8   Q.  Can you describe that training?
9   A.  Yes.  I attended the FBI academy at Quantico, also received
10  training on surveillance and on-the-job training through a
11  training agent.
12  Q.  I want to turn now to your work on this case.
13      What role, if any, have you had in preparation for this
14  trial?
15  A.  I just reviewed documents.
16  Q.  What kind of documents did you review?
17  A.  I reviewed text messages and a search history report.
18  Q.  Were you involved in the investigation of Willie Dennis
19  specifically?
20  A.  No.
21  Q.  Did you review the records and other evidence you
22  mentioned -- excuse me, strike that.
23      Did you review all of the records and all of the evidence
24  collected during the course of the investigation of Mr. Dennis?
25  A.  No.

MAEGden5                    Cobb - Direct

1    Q.   What did you review?

2    A.   Just the text messages and the search report provided by

3    the case team.

4    Q.   Let me direct you to Government Exhibit 113-1, which is

5    already in evidence.

6         I'll direct you to the timezone field.

7              MS. SIMON:  Zoom in on that, please.

8    Q.   Agent Cobb, can you read what's in the timezone field?

9    A.   Yes.  UTC minus 4:00, Santo Domingo (America.)

10   Q.   Agent Cobb, have you identified a city by the name of Santo

11   Domingo in the timezone UTC minus 4:00?

12   A.   Yes.

13   Q.   What country is that city in?

14   A.   The Dominican Republic.

15   Q.   Turning your attention to Government Exhibit 112-1, which

16   is also in evidence.

17        Agent Cobb, you have a binder sitting in front of you.

18   Government Exhibit 112-1 is the last document in that binder.

19   I would like to draw your attention to it.

20   A.   Okay.

21   Q.   Agent Cobb, what does it say at the top of Government

22   Exhibit 112-1?

23   A.   It says, searched items 519.

24   Q.   What is this document?

25   A.   This is a search history report for an electronic device.

MAEGden5                        Cobb - Direct

1   Q.  What time period does this search history cover?

2   A.  It covers July, October and November of 2020.

3   Q.  Have you reviewed this document in preparation for your

4   testimony here today?

5   A.  Yes.

6   Q.  During the time period you just identified, approximately

7   how many web searches were performed for K&L Gates or some

8   version of that term?

9   A.  Most of them.

10  Q.  Approximately how many would you say?

11  A.  I'd say approximately 500.

12  Q.  Turning your attention to page 5, lines 135 to 138.

13  A.  Yes.

14  Q.  Can you please read the items -- strike that.

15          MS. SIMON:  Actually, could you go back to the first

16  page for a moment.  I apologize.

17  Q.  What is the title of the fourth column, from the left to

18  the right, the fourth column?

19  A.  I'm sorry, can you repeat the question.

20  Q.  What is the title of the fourth column?

21  A.  Value.

22  Q.  Thank you.

23      Now, turning back to page 5, lines 135 to 138.  Can you

24  please read the entries in the value column aloud.

25  A.  Melissa Tea K&L Gates home phone number.  136, Melissa Tea

MAEGden5                      Cobb - Direct

1    K&L Gates home phone number.  137, Melissa Tea K&L Gates home

2    phone number.  138, Melissa Tea K&L Gates home phone number.

3    Q.  And in the second column, what dates were those searches

4    on?

5    A.  November 5th, 2020.

6    Q.  And during what time period?

7    A.  4:56:16 a.m. to 4:41:16 a.m.

8    Q.  Turning to page 11, line 304.

9        Can you please read the entry in the value column aloud.

10   A.  Finding someone's home phone number.

11   Q.  And can you please do the same for line 307.

12   A.  Finding someone's home phone number.

13   Q.  And what were the dates of both of those searches?

14   A.  October 23rd, 2020, 6:17:48 a.m.

15   Q.  Turning your attention to page 12, lines 318 to 325.

16       Can you please read the entries in the value column aloud.

17   A.  Yes.  318, Jeff Maletta K&L Gates.  319, Jeff Maletta.

18   320, Jeff Maletta KL Gates.  321, Jeff Maletta.  322 Jeff

19   Maletta KL Gates.  323, Jeff Maletta.  324, Jeff Maletta KL

20   Gates.  325, Jeff Maletta.

21   Q.  What dates were those searches performed on?

22   A.  October 27th, 2020.

23   Q.  What time period?

24   A.  12:10:31 p.m. UTC plus 0 to 12:23:31 p.m. UTC plus 0.

25   Q.  Turning your attention to the bottom of page 16 and the top

MAEGden5                              Cobb - Direct

1    of page 17.  Turning your attention to lines 453 to 459.

2        Can you plead read the entries in the value column aloud.

3    A.  Yes.  453, KL Gates New York.  454, KL Gates new.  455, KL

4    Gates New York.  456, KL Gates new.  457, KL Gates New York,

5    458, KL Gates new.  459, KL Gates New York.

6    Q.  What is the date for those searches in the date column?

7    A.  October 7, 2020.

8    Q.  And the time range?

9    A.  From 9:56:16 p.m. UTC plus 0 to 9:58:38 p.m. UTC plus 0.

10   Q.  Thank you.

11       Turning your attention to Government Exhibit 103-2.

12       Can you please read the name in the from line.

13   A.  Willie Dennis.

14   Q.  Can you please read the name in the to line.

15   A.  Cally.

16            MR. DENNIS:  Your Honor, objection.  I'd like to bring

17   Cally back as a witness if he's going to be testifying through

18   text mails and she's not in the room.  Because I have plenty of

19   other questions that I wanted to put to her.  I consider this

20   testimony by her not being present --

21            THE COURT:  No, this is an exhibit already in

22   evidence.

23            MR. DENNIS:  I don't get a chance to question Cally --

24            THE COURT:  So you could have inquired if you wished.

25            Overruled.

MAEGden5                    Cobb - Direct

1    BY MS. SIMON:

2    Q.  Can you please read the timestamp in the bottom right

3    corner and then the body of the message.

4    A.  Yes.  May 27th, 2020, 3:38:49 a.m. UTC plus 0.  Just sent

5    this to that racist punk ass John Bicks.  No worries, John.

6    Many more black people are going to die as your punk ass

7    planned.  So there will be a lot more material we can discuss

8    over the next year.

9              MR. DENNIS:  Objection.

10             I think the prosecution is taking advantage of me.

11   They knew they were going to show this after Cally left the

12   witness stand and that you would deny me bringing her back

13   again.  This is testimony that they set me up on.

14             THE COURT:  I'm sorry that you feel that way, but this

15   was an exhibit that was entered in evidence before Ms. Bostick

16   took the stand, and so each side was free to question her or

17   not question her about this particular exhibit.  And you chose

18   not to, and they chose not to.

19             MR. DENNIS:  I would have asked her more about the

20   police incidents at my home if I had known that she was going

21   to be testifying as to this.  The police coming to my home, I

22   would have raised that.

23             (Continued on next page)

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MaeWden6                          Cobb - Direct

1          THE COURT:  We had numerous sidebars about that, and I

2     even suggested to you that if you wanted to question her about

3     it, you ask for a sidebar on that, and you, in the end, chose

4     not to.

5          The objection is overruled.  Please continue.

6     Q.  Agent Cobb, can you please pick up reading where you left

7     off?

8     A.  Yes.  "What did you say to me by the elevator bank?

9     Willie, are you OK?  Like your racist ass really gave a shit.

10    The answer, no, John, I am not" --

11         MR. DENNIS:  Objection.  I'd like to object to the

12    qualifications of this gentleman as to whether or not he's

13    actually qualified to read these emails and whether he's

14    actually qualified to --

15         Can you go through your qualifications and give a

16    basis on how --

17         THE COURT:  No.  You're not in a position to direct

18    him.

19         MR. DENNIS:  Would you, your Honor, please direct him?

20         THE COURT:  I have a feeling that Mr. Dennis may not

21    understand the procedure that's going on right now, so let me

22    explain it to you, ladies and gentlemen.

23         This is, as I understand, the government's last

24    witness, and the final witness in many, many, many, many, many,

25    many, many, many, many, many, many, many cases, is what's

MaeWden6                        Cobb - Direct

1    called a summary witness who kind of says, ladies and

2    gentlemen, I want to bring to your attention some things that

3    have been entered into evidence previously that you may

4    consider before you start your deliberations.  And the defense

5    can say, well, you pointed out this, this, and this, but you

6    didn't point out this, this, and this, and they can have

7    cross-examination.  So this is a standard procedure, and it's

8    what's called a summary witness.

9            Now, I have a feeling that Mr. Dennis may not have

10   fully recognized that normal procedure, so what I'll do, Mr.

11   Dennis, is this.  Even though I was hoping to finish the

12   government's case today, I will allow this witness to finish

13   his direct, and then we will break for today and you can have

14   your cross-examination of this witness on Monday morning and

15   can prepare as much as you want to question him about.  But we

16   need to finish at least his direct testimony.

17           MR. DENNIS:  Thank you, your Honor.

18           THE COURT:  Go ahead.

19   BY MS. SIMON:

20   Q.  Agent Cobb, if you could pick up reading where you left

21   off.

22   A.  Yes.  "No, John, I am not fucking OK.  You are killing us

23   and trying to tell us it is all in our minds.  Got that punk

24   ass?"

25           MS. SIMON:  Turning your attention to Government

MaeWden6                         Cobb - Direct

1  Exhibit 103-9, specifically to the fifth page, can you zoom in

2  on those messages.  Thank you.

3  Q.  Agent Cobb, can you read the name in the "from" line?

4  A.  Willie Dennis.

5  Q.  Can you please read the name in the "to" line?

6  A.  Cally.

7  Q.  And are the names in the "from" and "to" line in this

8  exhibit the same, all the same as you just read?

9  A.  Yes.

10 Q.  Starting with the first message, can you please read the

11 time stamp in the bottom right-hand corner and then read the

12 body of the message?

13 A.  Yes.  August 29, 2020, 9:59:27 p.m. UTC plus zero.  "I know

14 you like married men, but in the office."

15       MR. DENNIS:  Yes, this is totally prejudicial.  I'm

16 not going to get a chance to call -- to cross-examine the

17 actual witnesses that he's speaking for.

18       THE COURT:  Mr. Dennis, please come to the sidebar.

19       (Continued on next page)

20

21

22

23

24

25

MaeWden6                         Cobb - Direct

1              (At sidebar)

2              THE COURT:  I tried to explain a few minutes ago, but

3    I'll explain it again, all these exhibits were in evidence long

4    before any substantive witness testified.  They came in very

5    early in the trial and, as was pointed out at the time, they

6    were what the government was presenting as the text messages

7    and emails supporting its case.  Now, when we came to

8    substantive witnesses, the government, as it made repeatedly

9    clear, just picked out a few of those and said "did you receive

10   this from Mr. Dennis?  Yes.  Did you receive other, similar

11   messages from Mr. Dennis?  Yes," and chose not to go into the

12   others.

13             Then you chose not to go into the others, and indeed,

14   you very largely didn't even go into the ones that the

15   government did present.  And I can understand that, because

16   your defense really, as I understand it, is more about what was

17   in your head at the time and other events going on that may

18   have affected your state of intent.  But in any event, you

19   didn't question about any of this or virtually any of this, and

20   now, the government, as is its right, has a right to point out

21   through a classic summary witness some of the evidence in

22   question.  The statute, particularly as it's been interpreted

23   by several courts is, in part, about course of conduct.  So

24   they need to make clear to the jury why they think you were

25   engaged in a particular course of conduct.

MaeWden6                          Cobb - Direct

1            Now, you're not being prejudiced.  This is standard

2    fashion.  I understand and I've tried to accommodate the fact

3    that you're not a trial lawyer.  That's why I'm going to give

4    you until Monday to cross-examine this witness, but all the

5    witness is doing is reading something that's in evidence.  And

6    I don't know what you mean about qualifications.  Are you

7    suggesting he doesn't know how to read?  That would be an

8    extraordinary suggestion.

9            So the objection is overruled.

10           MR. DENNIS:  I was not suggesting, your Honor, that he

11   did not know how to read.  What I'm -- as you mentioned, I am

12   representing myself *pro se*.  I did not know -- and you're

13   absolutely right; this is a risk that I took.  I did not know

14   that at the end of the trial, after witnesses testified, that

15   there would be a summation, which would include some of the

16   nastiest and vilest things that have not been proven, and these

17   witnesses, I'm not allowed to cross-examine any of these

18   witnesses about any of these statements and provide a context

19   to them.

20           THE COURT:  Actually, some of these were the subject

21   of testimony, so it's not even totally correct that they

22   weren't the subject of testimony.  Some may not have been.

23   Indeed, the government, even if there was no summary witness,

24   the government on summation could read any document in

25   evidence, regardless of whether a witness had testified about

MaeWden6                         Cobb - Direct

1    it or not.

2              I've tried my best to accommodate the fact that you're

3    not a trial lawyer, but the rules are the rules, and they're

4    allowed to do this.

5              MR. DENNIS:  I would just add to the record, then, in

6    the event that I'm convicted, that I do believe that the

7    glaring thing that I was not able to pursue, given the fact

8    that you had all these witnesses who discussed how fearful they

9    were of me and they discussed various tactics, but I wasn't

10   able to fully pursue with any of them the fact that they had

11   sent police to my home.

12             THE COURT:  If this is of any help to you, one of the

13   things that you're allowed to do on your summation is if

14   there's any email or text message that he's reading now that

15   was not the subject of examination by the relevant witness when

16   the substantive witness was on the stand, you can point that

17   out to the jury.  And you can say, ladies and gentlemen, look,

18   if this was such an important email, how come the government

19   didn't question so-and-so about it?

20             So that is a fair argument.  In fact, as I say, my

21   recollection is that some of these were questioned about, but

22   to the extent that there are ones that weren't questioned

23   about, you can make that kind of argument.  That would be a

24   standard argument in this situation.

25             MR. DENNIS:  OK.  Can I just ask -- can I get a copy

MaeWden6                           Cobb - Direct

1    of each one of these that you're --

2              MS. SIMON:  Every exhibit that has been marked by the

3    government is in the binders sitting at your table.

4              THE COURT:  Why don't we do this.  You wanted some

5    time at the end of today anyway, right, to go through it?

6              MR. DENNIS:  Uh-huh.

7              THE COURT:  Would you like me to end his examination

8    now and pick it up again on Monday, or do you want to hear his

9    whole direct before we end for the day?

10             MR. DENNIS:  Maybe we just finish and hear his direct.

11    Let's just give it to me.

12             THE COURT:  I'm giving you a choice, and it's your

13   choice.

14             MS. SIMON:  The government's prepared to go forward,

15   whatever the Court prefers.

16             THE COURT:  OK.  So why don't we do this.

17             This is, as you would say, Mr. Dennis, a yes-or-no

18   question.  Do you want to postpone the rest of his testimony

19   until Monday?

20             MR. DENNIS:  No.

21             THE COURT:  No.  OK.

22             MR. DENNIS:  No.

23             THE COURT:  OK.  Let's finish the direct.

24             (Continued on next page)

25

MaeWden6                          Cobb - Direct

1                    (In open court)

2    BY MS. SIMON:

3    Q.  Agent Cobb, when we left off, you were reading messages

4    from Government Exhibit 103-9.  Can you please remind the jury

5    who is in the "from" field of these messages?

6    A.  Willie Dennis.

7    Q.  And who is in the "to" field?

8    A.  Cally.

9    Q.  Can you please pick up at the beginning, reading both --

10   the beginning of this selection of messages here on page 5,

11   starting with the time stamp in the bottom right-hand corner

12   and then reading the body of the message?

13   A.  Yes.  August 29, 2020, 9:59:27 p.m. UTC plus zero.  "I know

14   you like married men, but in the office."

15        August 29, 2020, 10:07 p.m. UTC plus zero.  "Is your Tinder

16   account still active?"

17        August 29, 10:01:47 p.m. UTC plus zero.  "How many hookups

18   did you get on Tinder?"

19        August 29, 2020, 10:02:23 p.m. UTC plus zero.  "Does John

20   know about your Tinder account?"

21   Q.  Agent Cobb, what is Tinder?

22   A.  Tinder is an online dating application.

23        MS. SIMON:  Turning your attention to Government

24   Exhibit 103-10, can you please enlarge the first two messages.

25   Q.  Agent Cobb, who is in the "from" field of these two

MaeWden6                          Cobb - Direct

1    messages?

2    A.  Willie Dennis.

3    Q.  And who is in the "to" field of these two messages?

4    A.  Cally.

5    Q.  Can you please read them, starting with the time stamp in

6    the bottom right-hand corner, and then the body of the message?

7    A.  Yes.  August 30, 2020, 1:41:28 a.m. UTC plus zero.  "Is

8    John Bicks coming over tonight to comfort you?"

9        August 30, 2020, 2:20:50 a.m. UTC plus zero.  "Well, just

10   in case he cannot make it over, this may help."

11           MR. DENNIS:  Objection.  In reading these emails,

12   standalone, I don't know -- I don't think that what is coming

13   across is that the jury -- that I believe John Bicks and Cally

14   Bostick were working together, and this is -- this is,

15   essentially, I think they were working together to help convict

16   me.  And that's what this -- it was always an undertone.  It

17   wasn't that they were physically -- are you able to --

18   objection.  I don't know what that objection is, but that's --

19           THE COURT:  Well --

20           MR. DENNIS:  That was really --

21           THE COURT:  -- first of all, that's not a legal basis

22   for an objection.  Second of all, your beliefs are neither here

23   nor there except to the extent that they are reasonable

24   inferences from the evidence.  And third, the time when you get

25   to present what you believe are the inferences to be drawn from

MaeWden6                        Cobb - Direct

1    the evidence is on your summation, which will come on Monday.

2              The objection is overruled.

3    BY MS. SIMON:

4    Q.  I'm sorry.  Agent Cobb, had you read both of these messages

5    that are on the screen?  I'm sorry.  I lost my place.

6    A.  Yes, I did.

7              MS. SIMON:  Turning your attention to Government

8    Exhibit 103-11, and to the second page, and can you zoom in on

9    the first message.

10   Q.  Agent Cobb, can you please read the name in the "from"

11   field?

12   A.  Willie Dennis.

13   Q.  Can you please read the name in the "to" field?

14   A.  Cally.

15   Q.  Are the names in the "from" and "to" field the same in

16   every message in this exhibit?

17   A.  Yes.

18   Q.  Going to the last message on page 1, can you please read it

19   aloud, including the time stamp?

20   A.  Yes.  August 31, 2020, 1:05:21 p.m. UTC plus zero.  "Speak,

21   gutter rat."

22             MS. SIMON:  Turning to page 2, can you please enlarge

23   the bottom two messages.

24   Q.  Can you please read both of those messages aloud, starting

25   with the time stamp in the bottom right-hand corner, and then

MaeWden6                          Cobb - Direct

1    the body of the message?

2    A.  August 31, 2020, 1:07:29 p.m. UTC plus zero.  "Speak as to

3    reasonableness now or I will begin to add others to our

4    conversation.  Sick of your crap."

5        August 31, 2020, 1:09:59 p.m. UTC plus zero.  "Did you take

6    down your Tinder (let's do a quickie) account?"

7            MR. DENNIS:  Objection, objection, objection.

8            THE COURT:  Overruled.

9    BY MS. SIMON:

10   Q.  Agent Cobb, just to be clear, who was in the sender field

11   of all the messages you just read aloud?

12   A.  Willie Dennis.

13   Q.  Turning your attention to Government Exhibit 103-12,

14   zooming in on the first message, agent Cobb, can you please

15   read the name in the "from" line?

16   A.  Willie Dennis.

17   Q.  Can you please read the name in the "to" line?

18   A.  Cally.

19   Q.  Are all the messages in this exhibit from the same name and

20   to the same name that you just read aloud?

21   A.  Yes.

22   Q.  Can you please read the messages aloud on page 1, starting

23   with the second message --

24   A.  Yes.

25   Q.  -- reading the time stamp in the bottom right-hand corner,

MaeWden6                    Cobb - Direct

```
1   and then the body of the message?
2   A.  I'm sorry.  Do you want me to read all of them, or just --
3   Q.  No, no.  Just the bottom two.
4   A.  OK.  August 31, 2020, 2:36:46 p.m. UTC plus zero.  "Speak,
5   gutter rat."
6        August 31, 2020, 2:38:17 p.m. UTC plus zero.  "And no
7   Tinder booty calls for you this week.  You are on lockdown."
8   Q.  Turning your attention to page 2, can you please read the
9   bottom three messages, starting with the time stamp in the
10  bottom right corner, and then the body of the message?
11  A.  August 31, 2020, 2:39:32 p.m. UTC plus zero.  "How many
12  dudes did you find on Tinder?"
13       August 31, 2020, 2:40"09 p.m. UTC plus zero.  "What was the
14  quality of the D?"
15       August 31, 2020, 2:41:58 p.m. UTC plus zero --
16            MR. DENNIS:  Objection.  I tried to end my examination
17  with a little bit of dignity, and once she said she didn't know
18  my kids, I just said forget it.  We're not -- this is just
19  smearing her, and it's not necessary.
20            THE COURT:  Overruled.
21  BY MS. SIMON:
22  Q.  I'm sorry.  Agent Cobb, can you please pick up where you
23  left off?
24  A.  Yes.  August 31, 2020, 2:41:58 p.m. UTC plus zero.  "I
25  always knew this was more your type of conversation."
```

MaeWden6                          Cobb - Direct

1  Q.  And turning to page 3.

2  A.  August 31, 2020, 2:42:10 p.m. UTC plus zero.  "Always the

3  quiet ones."

4  Q.  Agent Cobb, who was in the "from" field of every message

5  you just read in Government Exhibit 103-12?

6  A.  Willie Dennis.

7  Q.  And who was in the "to" field of every message you just

8  read in Government Exhibit 103-12?

9  A.  Cally.

10         MS. SIMON:  Turning to Government Exhibit 103-33,

11  turning to page 2, could you please zoom in on the first

12  message.

13  Q.  Agent Cobb, who is in the "from" field of this message?

14  A.  Willie Dennis.

15  Q.  Who is in the "to" field of this message?

16  A.  Cally.

17  Q.  Are the "from" field and "to" field of all of the messages

18  in this exhibit the same as those you just read aloud?

19  A.  Yes.

20  Q.  Can you please start reading the messages on this page,

21  starting with this message, making sure to read the time stamp

22  in the bottom right-hand corner, and then the body of the

23  message?

24  A.  Yes.

25         October 9, 2020, 2:15:37 a.m. UTC plus zero.  "You feel

MaeWden6                    Cobb - Direct

1   like an idiot, don't you?"

2       October 9, 2020, 6:51:54 a.m. UTC plus zero.  "Or maybe

3   Jeff is with you.  D patrol, LOL."

4           MR. DENNIS:  She was in Chicago.

5   Q.  October 9, 2020, 6:52:19 a.m. UTC plus zero.  "Yes?"

6       October 9, 2020, 6:53:13 a.m. UTC plus zero.  "John, David

7   Tang, Jeff.  Who else?  LOL."

8   Q.  Turning to page 3 of the same exhibit, can you please read

9   the first three messages aloud, again starting with the time

10  stamp in the bottom right-hand corner, and then the body of the

11  message?

12  A.  Yes.

13      October 9, 2020, 6:53:29 a.m. UTC plus zero.  "Service."

14      October 9, 2020, 6:54:22 a.m. UTC plus zero.  "BTW, are you

15  still on Tinder?"

16      October 9, 2020, 6:54:31 a.m. UTC plus zero.  "I mean

17  Tinder."

18  Q.  Agent --

19          MS. SIMON:  Can you please leave that message up for a

20  moment.

21          THE COURT:  Counsel, keep in mind we only have about

22  two more minutes.

23  BY MS. SIMON:

24  Q.  Agent Cobb, approximately what time in Eastern Time is 6:54

25  a.m. UTC plus zero?

MaeWden6                          Cobb - Direct

1    A.  I'm sorry.  Can you repeat the question?

2    Q.  Yes.  What -- in Eastern Time, how does 6:54 a.m. UTC plus

3    zero translate?

4    A.  I believe it to be 2:54:31 a.m.

5    Q.  Turning to Government Exhibit 103-39, zooming in on the

6    first message, who is in the "from" field?

7    A.  Willie Dennis.

8    Q.  Who is in the "to" field?

9    A.  Cally.

10   Q.  Can you please read this message aloud?

11   A.  October 10, 2020, 7:10:43 p.m. UTC plus zero.  "Hey, stupid

12   slanderer.  Speak."

13   Q.  Agent Cobb, do all the other messages in this exhibit have

14   the same "from" field and "to" field as this message?

15   A.  Yes.

16   Q.  Turning to page 2, can you read the substance of all the

17   messages?  No need to read the time stamps.

18   A.  "You are so smart, it girl.  Speak, you idiot.  Slanderer,

19   speak.  You can speak publicly against me.  Speak, clown.  Let

20   us see your brilliance, it girl."

21   Q.  Turning to page 3.

22   A.  "Do you see how someone feels when you try to get them

23   incarcerated, rat?  Are you hungry, rat?  Are you hungry?

24   Bring this one to deposition and court.  Liar, speak."

25   Q.  And on to the next page.

MaeWden6                          Cobb - Direct

A.   "Is John around?  Is your mouth wide open?  Don't go

anywhere.  I will be back.  I am sure the conversation

regarding national security issues our firm faces right now

bores you.  Getting ready for D patrol.  BTW, how long have you

been on Tinder?"

Q.   Turning to Government Exhibit --

          THE COURT:  I think, counsel, unfortunately, we'll

have to finish this witness first thing Monday because my

policy with juries is to never keep them beyond 4:30, and

particularly on a Friday afternoon.

          We have had a full day, but as you can see, ladies and

gentlemen, we are on schedule.  This is the last government

witness.  After the government completes its case, the defense

has a choice.  They don't have to present any case.  They can

present a case if they wish, but the reason they don't have to

present any case is because the burden is always on the

government to prove its case beyond a reasonable doubt, as

you've heard me say so many times.

          So the defendant will consider all that over the

weekend, and after the close of all the evidence, we'll have

the final arguments from counsel, then my instructions of law,

and then the case will be yours to decide.

          I don't think you should spend any time thinking about

this case over the weekend.  My definite suggestion is that you

have a great weekend and forget about the case.  And we'll see

MaeWden6

1    you all at 9:30 on Monday morning.

2             (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MaeWden6

```
 1                  (Jury not present)
 2                  THE COURT:  You can step down.  We'll see you on
 3       Monday morning.
 4                  THE WITNESS:  Thank you, your Honor.
 5                  (Witness not present)
 6                  THE COURT:  Please be seated.
 7                  Just very quickly, because I need to meet my wife in
 8       midtown, and that takes precedence over anything else, but I
 9       think at least one representative of the government should stay
10       here with Mr. Dennis in case he needs help finding anything.
11       He can stay until 6:00, and so we'll have someone to be with
12       him to be of help to him if he needs it.
13                  MR. DENNIS:  Thank you, your Honor.
14                  THE COURT:  I think we ought to get together at 9
15       o'clock on Monday, because that will give me a chance to hear
16       from Mr. Dennis's witnesses if they are available.
17                  Mr. Dennis, tell your witnesses to be here at 9
18       o'clock rather than 9:30.
19                  MR. DENNIS:  Thank you, your Honor.
20                  THE COURT:  Very good.  Thanks a lot.
21                  (Adjourned to October 17, 2022, at 9 o'clock a.m.)
22
23
24
25
```

INDEX OF EXAMINATION

Examination of:                                    Page

JOHN BICKS

Direct By Ms. Kushner . . . . . . . . . . . 504

Cross By Mr. Dennis . . . . . . . . . . . . 516

CALVINA BOSTICK

Direct By Ms. Kushner . . . . . . . . . . . 579

Cross By Mr. Dennis . . . . . . . . . . . . 642

GARY COBB

Direct By Ms. Simon . . . . . . . . . . . . 681

                   GOVERNMENT EXHIBITS

Exhibit No.                                  Received

 703    . . . . . . . . . . . . . . . . . . 584

 702    . . . . . . . . . . . . . . . . . . 588

                   DEFENDANT EXHIBITS

Exhibit No.                                  Received

 A    . . . . . . . . . . . . . . . . . . . 576