N2AZZDENS-DC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          20 Cr. 623 (JSR)

5    WILLIE DENNIS,

6                                          Sentence
               Defendant.
7    ------------------------------x

8
                                          New York, N.Y.
9                                          February 10, 2023
                                           3:40 p.m.
10

11   Before:

12                    HON. JED S. RAKOFF,

13                                         District Judge

14                         APPEARANCES

15
     DAMIAN WILLIAMS
16        United States Attorney for the
          Southern District of New York
17   SARAH KUSHNER
     STEPHANIE SIMON
18   KIMBERLY RAVENER
          Assistant United States Attorneys
19
     COHEN & FORMAN, LLP
20        Attorneys for Defendant
     BY:  DAVID J. COHEN
21

22

23

24

25

N2AZZDENS-DC

1          (Case called)

2          THE COURT:  Good afternoon.  Please be seated.

3          So we're here for sentencing, and the first item of

4    business is to calculate the guideline range, which of course

5    is not binding on the Court but to be considered.  The

6    probation office has a calculation of total offense level of

7    23, criminal history category of I, and therefore a guideline

8    range of 46 to 57 months in prison.

9          Now, it was not clear to me from defense counsel's

10   generally very excellent sentencing memorandum, which was very

11   helpful to the Court, whether you were still challenging that

12   calculation amount.

13         MR. COHEN:  We were, your Honor.

14         THE COURT:  Okay.  And I think, if I understood your

15   sentencing memo, you think that there should be a reduction for

16   acceptance of responsibility?

17         MR. COHEN:  That is one of the ways I'm challenging,

18   your Honor, correct.

19         THE COURT:  Now, although an argument could be made

20   that only in the most extraordinary circumstances is that

21   available to someone who went to trial and where that has come

22   up before in front of this Court, I have on at least one

23   occasion granted such a reduction but only after inquiring of

24   the defendant under oath.  Now, the defendant, of course,

25   doesn't have to make any statement here.  He retains his Fifth

N2AZZDENS-DC

1    Amendment rights throughout sentencing, but I don't see how I

2    could grant that motion without hearing from him and asking him

3    questions.  So if that's something you want to consider, you

4    may want to talk to him.

5              MR. COHEN:  Thank you, your Honor.

6              I've discussed that with Mr. Dennis, and he's prepared

7    to go forward, and he's prepared to be put under oath and

8    answer your Honor's questions.

9              THE COURT:  All right.  Very good.  We will swear him

10   in.

11             (Defendant sworn)

12             THE COURT:  So, Mr. Dennis, from sometime in 2018 to

13   sometime 2020, you sent hundreds, if not thousands, of emails

14   to the three persons who are considered the victims in this

15   case, yes?

16             THE DEFENDANT:  Yes, your Honor.

17             THE COURT:  And those emails were intended to at least

18   frighten them, yes?

19             THE DEFENDANT:  Yes, your Honor.

20             THE COURT:  And they contain not only nasty

21   accusations but also suggestions that you would retaliate

22   against them in some manner, yes?

23             THE DEFENDANT:  A question for my attorney.

24             THE COURT:  Yes.

25             (Defendant conferred with counsel)

N2AZZDENS-DC

1          THE DEFENDANT:  I was just asking my -- I never

2     intended to physically do anything against them.

3          THE COURT:  Well, that's not my question.

4          THE DEFENDANT:  Okay.

5          THE COURT:  My question is, the reason you were going

6     after these three people is you felt they had not supported you

7     in your fight with the firm; right?

8          THE DEFENDANT:  Yes, your Honor.

9          THE COURT:  And you wanted to get back at them through

10    this barrage of emails, yes?

11         THE DEFENDANT:  Yes, your Honor.

12         THE COURT:  And some of those emails, regardless of

13    what was in the back of your mind, a reasonable person could

14    read as being threatening, yes?

15         THE DEFENDANT:  Yes, your Honor.

16         THE COURT:  All right.  And you knew when you did that

17    that what you were doing was wrong?

18         THE DEFENDANT:  At the time I was emotional.  I did

19    not think about right or wrong.  I do know now that it was

20    wrong.

21         THE COURT:  And you now recognize, if I understand

22    your position, that these people, whether you intended it or

23    not, were deeply disturbed and frightened by your emails, yes?

24         THE DEFENDANT:  Yes, your Honor.

25         THE COURT:  All right.  So let me ask the government.

N2AZZDENS-DC

1         That seems to be at least prima facie acceptance of

2    responsibility.  Are there any questions you would like me to

3    put to Mr. Dennis on that subject?

4         MS. KUSHNER:  There are no questions, your Honor, but

5    I don't believe that what the defendant just provided is

6    reflective of a sense of remorse or true acceptance of

7    responsibility.  In fact, the statute requires an intent to

8    harass or intimidate.  He's disclaiming any intent.

9         THE COURT:  No.  I think he's admitting intent to

10   harass and intimidate.  He's just not accepting that at the

11   time he intended physical harm.

12        Is that right, Mr. Dennis?

13        THE DEFENDANT:  That's correct, your Honor.

14        THE COURT:  Okay.  That's outside -- I read his

15   response, and he's admitted that nevertheless a reasonable

16   person in the victim's position would have interpreted what he

17   said as threatening physical harm.

18        So what he is saying is I was out of control.  I did

19   this terrible thing.  At the time I didn't think it was

20   intended to cause physical harm, but I certainly meant to

21   harass and otherwise intimidate these folks.  And I did so

22   because I was so angry with the firm and them and the world,

23   but now I fully realize how wrong I was.

24        Do I have that right, Mr. Dennis?

25        THE DEFENDANT:  Yes, your Honor, you do.

1          THE COURT:  Okay.  So why doesn't that qualify for

2    acceptance of responsibility?

3          MS. KUSHNER:  Well, first of all, I think the physical

4    harm is a little bit of a stretch and as your Honor

5    acknowledges, of course, physical harm is not required under

6    the statute, but there were text messages where he was

7    threatening to follow Ms. Bostick, where he was telling her to

8    sleep with one eye open.

9          THE COURT:  I mean, don't be misunderstanding.  The

10   victims had every reason to believe that he would physically

11   harm them, and indeed they so testified, and I credit their

12   testimony.  But that doesn't mean that that's what was in his

13   heart and mind at the time, and it's not an essential element

14   of the charge.

15         Okay.  I will reduce by two points the score.

16         Now, there are some other matters that you wanted to

17   ask.

18         MR. COHEN:  Thank you, your Honor.

19         There was quite a problem.  Probation in the PSR gave

20   a two-level increase pursuant to 2A6.2(b)(1).  And I'll read --

21         THE COURT:  Yes, the guidelines are wonderful.

22         MR. COHEN:  Because the offense involved a pattern of

23   activity involving stalking, threatening, harassing, or

24   assaulting.  The definition of the crime itself requires --

25         THE COURT:  So you think it's double counting?

1            MR. COHEN:  Correct, your Honor.

2            THE COURT:  So, of course, the guidelines, which one

3     might reasonably argue are filled with double countings,

4     inconsistencies, and irrationalities, nevertheless, they do

5     impose double counting in numerous contexts.  What's your

6     authority for saying that I shouldn't double count, so to

7     speak, in this situation?

8            MR. COHEN:  Well, we did a significant amount of

9     research, your Honor, and I don't find anyplace where this was

10    addressed.  There's a different subsection that allows for

11    threatening one person at one point.  In which case a series of

12    events or a series of communications, even to the extent of

13    what Mr. Dennis did, would reasonably call for an additional

14    enhancement.  An enhancement, by its very nature, is something

15    that makes the crime worse than if you just committed the crime

16    in its infancy.  And it's --

17            THE COURT:  That's why it's a double count.

18            Unfortunately, well, I want to hear from the

19    government, but I do think this is a problem that is not

20    limited to this situation so far as the guidelines are

21    concerned, but let me hear from the government.

22            MS. KUSHNER:  I agree with the Court that this is not

23    necessarily unusual to the extent that this is double counting,

24    but I think, just based on the plain language of the guideline

25    here, this enhancement couldn't be more applicable.  It's a

1    pattern of activity involving stalking, threatening, harassing,

2    or assaulting the same victim.  If you want to pierce apart the

3    defendant's conduct in this case, he did these things multiple

4    times to multiple of the same victims.  And even if you want to

5    look beyond the strict timeline of the indictment, for example,

6    which I believe charges up through November of 2020, the

7    government introduced into evidence at trial the defendant's

8    threatening, harassing communications continued up until, I

9    think for our evidence -- at least our evidence included text

10   messages from January of 2021, and that was all part of the

11   exact same pattern.

12           So this is in an enhancement that's intended to apply

13   not to just someone who sent two separate messages, which under

14   the law could be a statutory violation of the cyberstalking

15   statute, this is someone who went far and above that, and for

16   that reason you have that enhancement which should be applied

17   here.

18           THE COURT:  Yes.  So unlike the reduction of two

19   points for acceptance of responsibility, which is important to

20   the Court, to be frank, this issue is more academic than

21   meaningful in terms of how the Court will arrive at its

22   sentence.  To put it another way, whether he get two points off

23   for this or doesn't get two points off for this will not affect

24   my sentence, because it's the underlying facts that are here,

25   but I will give him the two-point reduction.

1    So we're now down to total offense level of 19,

2    criminal history category of I.  And let me pull out my copy of

3    the guideline manual for 2018, which is the relevant one here.

4    A modest 597 pages, and of course, every judge here has

5    mastered it completely.

6          But if it's an offense level of 19 and criminal

7    history of I, the guideline range is 30 to 37 months if I have

8    that right.  Is that what counsel has as well?

9          THE DEFENDANT:  Yes, your Honor.

10         MR. COHEN:  No objection from the defense, your Honor.

11         THE COURT:  Okay.  So I will adopt that, and I will in

12    all other respects adopt the presentence report.

13         Now, the Court would be less than candid if it did not

14    say, as I've said at many sentencings, that I pay no more

15    attention to the guidelines than the law minimally requires,

16    because I do think they are inherently irrational.

17    Nevertheless, I will consider them.  But what is of great

18    importance to the Court is Section 3553 of Title 18, the

19    statute that I think very fairly sets out all the relevant

20    factors a court should consider for sentencing.  So though I've

21    already received excellent memoranda from both sides, let me

22    hear from defense counsel, then from government counsel, and

23    then from the defendant if he wishes to be heard.

24         You might want to go over.  It might be easier to

25    speak from there.

N2AZZDENS-DC

 1    MR. COHEN:  Thank you, your Honor.  I will.

 2    Your Honor, Mr. Dennis -- as the Court knows, I was

 3    not here for the trial.  I came on post-verdict, but I've had

 4    an opportunity to go through the transcripts and most of the

 5    discovery.  Mr. Dennis sent bizarre, harassing, intimidating,

 6    and, quite candidly, downright scary emails, text messages, and

 7    electronic communications to former colleagues.  They were not

 8    just colleagues or coworkers, they were actually his friends.

 9    Mr. Dennis didn't have a separation between work and home.  His

10    colleagues were his friends.  His lawyers, friends,

11    colleagues -- they were interchangeable for Mr. Dennis.  At

12    first --

13    THE COURT:  Well, if those were the emails he sends

14    his friends, God forbid one should be one of his enemies.

15    Anyway, go ahead.

16    MR. COHEN:  At first Mr. Dennis was asking for certain

17    things to take place.  After a certain period of time, he then

18    got to cajoling.  At some point he wound up demanding that they

19    do certain things, and then, as the Court noted in some of the

20    discussions during trial, then he crossed the line.  He, what I

21    would say, lost it.  I think in my sentencing submission I said

22    he went off the rails.  A colloquialism, no doubt, but I think

23    one that is appropriate.

24    THE COURT:  Yes.  And just to set the stage a little,

25    I have considerable sympathy for Mr. Dennis because so much of

N2AZZDENS-DC

1    his life, until this period that led to his conviction, was so

2    admirable and worthy of respect, but then he began exhibiting

3    this bizarre behavior.  And that was why I ordered a

4    psychiatric evaluation, because I thought maybe he was

5    suffering from some mental illness.  But both the psychiatrist

6    that I appointed and the other psychiatrist who examined him

7    said no.  He's a compulsive personality.  He is very stressful,

8    and this was a period of great stress because of his divorce,

9    and so forth, but he was not, in any sense, suffering from a

10   mental illness.

11           So I guess what I infer from that is that he

12   consciously lost his balance; that he knowingly engaged in

13   behavior that, however stressful the circumstances were, was

14   voluntary behavior -- voluntary and painful to those who were

15   its victims.  So I just throw that out for your comments.

16           MR. COHEN:  Well, he knowingly pressed send, and I

17   don't mean to be -- he knowingly wrote the emails and typed

18   them with his own hand, and of his own volition, and from his

19   own desire.  I know from meeting with Mr. Dennis several times

20   now, and as he just testified to your Honor in front of this

21   courtroom, he didn't knowingly intend to create intimidation.

22           THE COURT:  No, no, I thought he just told me that he

23   knew this would have that effect.  He didn't intend violence.

24   That was the distinction he was making, and I accept that.  If

25   he is saying contrary to -- if he is saying what you're saying,

1    that he didn't intend intimidation, then I'm not going to give

2    him acceptance of responsibility credit under the guidelines or

3    anywhere else, but I don't think that's what he told me.

4          MR. COHEN:  He wanted to effectuate change.  And dare

5    I say, without discounting anything that happened, when he

6    started off on this sojourn, his causes were noble.  His

7    position was admirable.  Obviously, it became criminal.  His

8    actions became criminal.  I don't doubt that whatsoever.  I

9    have a hard time when we say he -- I think you said he

10   consciously engaged in this, and I have a hard time with the

11   word "consciously" here.

12         THE COURT:  Well, it's a distinction the law has drawn

13   for about a thousand years.  It's one thing to say, and I may

14   well accept, that he was operating under considerable emotional

15   stress.  I think that's what he just told me a minute ago.

16   It's another thing to say that he didn't know that what he was

17   doing was wrong; that he didn't know that what he was doing

18   would likely have an intimidation effect.  If you want to

19   portray that as a noble cause, go ahead.  But I think the law

20   of the United States and England going back to common law times

21   are rather against you in that respect.

22         MR. COHEN:  Those were his means.  Those were not his

23   goals, respectfully, your Honor.  His goals were to effectuate

24   change consistent with what he was told would happen at his

25   firm.  The means were criminal, and Mr. Dennis acknowledges

1  that.

2              THE COURT:  Okay.

3              MR. COHEN:  So I don't want to argue with the Court.

4              THE COURT:  Okay.  We're back on the same page.

5              MR. COHEN:  Okay.  And we know what he did.  He

6   mentioned his colleagues' families.  He quoted biblical verse,

7   referenced mass shootings.  He called racist names to people of

8   his own race.  He lost it.  His actions went from benign to

9   scary to criminal.  He placed real fear in the people that he

10  had come to admire, respect, and love, and his emails were

11  degrading.  They were relentless, oftentimes coming in

12  rapid-fire succession in the middle of the night, and they were

13  challenging, challenging the people who was receiving them.

14  And his colleagues reported that Mr. Dennis's actions and

15  communication caused them to live in fear.

16              And, look, to get to the point where we are here right

17  now for a man who your Honor understands and acknowledges led a

18  very admirable life for the first 57 years of his life, his

19  actions had to be pretty darn bad to wind up where he is now,

20  facing these sanctions.  And Mr. Dennis had many opportunities

21  to save himself from himself.  As the Court no doubt knows, the

22  Court actually participated in trying to help Mr. Dennis save

23  himself from himself.  He had good advice from very capable and

24  able counsel.  I've spoken to prior counsel.  He could not and

25  did not hear what they were saying.

1          In essence, your Honor, when I get down to the

2     nitty-gritty with Mr. Dennis sitting in a jail cell in an open

3     room at the MDC -- and, really, I don't see this -- what I see

4     is the Willie Dennis who existed for the first 57 years of his

5     life, and the one who existed post his conviction.  So it

6     boggles my mind to see how in the world one would have acted

7     the way he did prior to his trial and even during his trial.

8          Willie Dennis brought down Willie Dennis.  That's just

9     the reality of this.  And as he told you before, and as he will

10    make a statement, he will tell you again that he knows it was

11    him.  There is no blame to be placed anyplace else.  He knows

12    he placed his former colleagues in fear.  He knows that they

13    feel threatened, that his words made them feel threatened.  And

14    he knows as a consequence of what he does, they felt

15    intimidated -- what he did, excuse me.  And Mr. Dennis is

16    beyond remorseful -- devastated, ashamed, disgusted, humbled,

17    shocked.  I mean, he's come back to reality, so to speak.

18         You spoke about the psychiatrist who wrote the

19    psychological report, and you said that they found -- and

20    you're correct, obviously -- that there was no, they said,

21    major mental illness.  For the Willie Dennis that your Honor

22    and I and everyone else in court and probably even the

23    government knew prior to these actions, I'm not a psychologist

24    or a psychiatrist, but there was a mental illness in effect

25    there.  Whether it was temporary -- I'm not saying temporary

1    insanity, no legal definitions here.  You don't do what he did

2    and not do what he did unless there is some mental/emotional

3    breakdown, psychological breakdown.

4         I mean, he is a very successful lawyer.  He is a smart

5    man.  I know the Court knows that already.  And he turned down

6    every opportunity to be helped.  Who in the world comes into

7    the Southern District of New York, in front of your Honor

8    especially, and thinks that they can come in here and do what

9    you do, even what I do, who doesn't have the same bona fides as

10   your Honor, right?  I mean, he knows better.

11        You've never met the Willie Dennis that I have met.

12   You've read about him, and I think you have a good sense of who

13   he was, and I know that you've been in that position prior to

14   your present position.  So you know people like that, and you

15   know that they are good hearted and well-intended.  But

16   something happened to him.  So I don't easily say that there

17   was no mental illness.  I don't know what that term exactly

18   means, but I know that there was an emotional, psychological,

19   and mental breakdown that caused Mr. Dennis not only to do

20   those actions, but then to refuse help at every turn.

21        And he said to me, he says if I could do this again,

22   there's so many places I would have made different decisions.

23   Of course, all the emails or at least the subsequent thousands

24   of them, maybe the first dozen or so were okay, but he would

25   have made different decisions then.  And, of course, once he

N2AZZDENS-DC

1  got here, the decisions would have been substantially

2  different.

3          Your Honor mentioned you were interested in the

4  3553(a)(5), and I think we went pretty exhaustive, but I thank

5  you for the comments, on the sentencing submission.  But just

6  to expound upon them a little bit, Mr. Dennis is the son of a

7  sanitation worker.  His father, a black man who picked up

8  strangers' garbage so his son and -- his two sons and his

9  daughter could go on and have a better life than he did, the

10  man worked two jobs, at least, at all times.  His son was

11  arguably a meteor -- a meteoric, I can't say that word, quick

12  rise --

13          THE COURT:  Meritocratic.

14          MR. COHEN:  He attended some of the finest

15  universities in this country, as you probably know.  He went to

16  Choate High School, which is perennially one of the number one,

17  two, or three private high schools in the country.

18          THE COURT:  I don't mind you repeating this, but it is

19  all in your report, and it's very impressive.  He went to

20  Columbia undergrad.  The record should reflect the Court's view

21  that a bachelor's degree from Columbia is serious stuff, real

22  education in a way that not all famous universities are.  And

23  of course Columbia Law School was a further achievement.

24          MR. COHEN:  He rose quickly in a time still to this

25  day, even a time when it was, and dare I say as a white Jewish

1    lawyer, much more difficult for a black man.  He became, as you

2    know, a partner in an international law firm, an equity partner

3    at that.  And he fulfilled his parents' dream, his father's

4    dream, his own dream.

5         And then he had his dreams of a more inclusive

6    community, a more inclusive legal community.  And that was what

7    I was referring to when I spoke about noble causes, obviously,

8    not the actions that he engaged in.  And female and male

9    lawyers were treated similarly.  And black females, as

10   Mr. Dennis stated to me, were promoted with the same regularity

11   as their white female counterparts.

12        But the reality for Mr. Dennis is those dreams are

13   gone.  He sits here now in shackles.  The promise of a better

14   tomorrow washed away by the sins of his yesterday.  And for

15   what?  For what did this all happen?  What good was gotten out

16   of this?  Not a gosh darn thing.  Nothing, not anything.

17        Mr. Dennis comes from, as the psychologist noted, a

18   family with a significant history of mental illness.  And

19   Mr. Dennis threw away his father's and his own legacy.  As he

20   said to me many times, I ruined my father's name.

21        And then I go back to that, your Honor.  Who in their

22   right mind would have done such a thing?  And that's why I say

23   that there was some mental illness at work.  And I think both

24   of us can at least agree that was out of character,

25   aberrational.  And maybe when with you hear Mr. Dennis's

1    statement later you will form your own conclusions, obviously.

2           The truth is Willie Dennis sent these emails when he

3    was off the rails.  When Mr. Dennis goes or went off the rails,

4    we see what happens.  He sends these emails.  And he did so

5    with a cold compulsivity that made them seem far worse than

6    they were intended to.

7           But what is so important to me, your Honor -- and I

8    know you've been on this bench a long time, and I've been

9    practicing criminal law for decades myself -- what's very, very

10   important here to me, and I humbly suggest it should be,

11   respectfully suggest it should to the Court, Mr. Willie Dennis

12   has never owned a gun.  He's never applied for a permit.  He's

13   never been to a gun range, never expressed interest in a gun.

14   He's never fired a gun.  He's never been convicted, arrested,

15   or charged with a violent crime, nor any crime prior to the

16   present one.  He's never belonged to a hate group, a militia, a

17   paramilitary group, any organization that formally or

18   informally associated with supported and advocated or even

19   discussed violence for nothing.  Nothing.

20          He's never expressed in conversation or online

21   searches, professionally or personally, anything of a violent

22   nature.  He's never expressed a hatred for people of color,

23   white people, Latino, Asians, or any ethnic, sociopolitical, or

24   religious group.  Mr. Dennis never put his hands on another

25   human being, never had a fist fight, never put his hands on

1    Mr. Bicks and Mr. Cottle and Ms. Bostick, their family members,

2    any members of the firm.  He never went to the victims' homes,

3    their children's schools.  He's never placed letters in their

4    mailboxes.  He never directly threatened to harm any member of

5    his prior firm or their families.

6            Now, I bring up all those things obviously because, as

7    the Court no doubt knows, case law is replete with people

8    who've done each and every one of those things, and those were

9    aggravating factors.  And I also bring that up because absence

10   of all of those suggest that this was as bad as it was going to

11   ever get.  That doesn't mean the people who were affected by it

12   were not rightly scared, and I by no means want to discount

13   their fear.  They felt that.  It was reasonable, as I

14   acknowledged, the Court acknowledged, and Mr. Dennis

15   acknowledges.  But in a world that doesn't exist, which is one

16   with absolute omniscience, there was never going to be any harm

17   that came to them.  Never, never in this lifetime or a thousand

18   lifetimes going forward, not for Mr. Dennis.

19           Again, that does not -- of course it doesn't make it

20   okay, and of course it doesn't mean that they were wrong for

21   feeling that way.  But, obviously, that's one of the things the

22   Court must consider in terms of future consequences to

23   Mr. Dennis.

24           What Mr. Dennis did do, as the Court knows from

25   sitting through the trial, is he scared the living daylights

1    out of his former friends and colleagues.  He made them feel

2    like he may visit violence upon them.  His emails were read as

3    threatening.  His words certainly were incendiary.  And each of

4    his former colleagues felt very, very, very real fear.

5         Mr. Dennis for his whole legal career was a man like a

6    lot of lawyers.  He spent ten hours a day behind a computer and

7    the next three or four hours each day socializing and trying to

8    drum up business for the firm.  He's always been 5 foot 6,

9    maybe 170 pounds soaking wet.  He's lost a lot of that weight

10   since he's been in prison.

11        THE COURT:  Well, I'm 5 foot 6, but I won't hold that

12   against him.

13        MR. COHEN:  You know, I wish that I could say that the

14   lost weight was his worst or only physical issue, and I have

15   detailed in the sentencing submission and all of the medical

16   records for support, so I won't go into detail, but I'll just

17   highlight it.  As the Court probably knows, he's got two

18   hernias, an umbilical hernia and an inguinal hernia.  He's got

19   three arteries to his heart at least 80 percent blocked each,

20   including his femoral artery to his right leg.  And he comes

21   from a family with a history of cardiac episodes and heart

22   attacks, right?  His sister died in her 50s from that in the

23   same year that Mr. Dennis had his own cardiac episode.

24        He can't walk more than 50 feet.  He has a cane now,

25   mandated by the doctors there.  He walks very haltingly.  He

doesn't get 20 or 30 feet without having to stop, take a
breath.  As I'm sure your Honor knows, the blood doesn't get to
his leg, so he needs to stop.  Not to mention it doesn't get to
his heart the way it should.

I hesitate because I don't want to feel that I am
exaggerating, so I say my words very carefully, and I don't by
any stretch think there's an exaggeration when Mr. Dennis tells
me he fears every day for the potential of a heart attack.  I
read the medical records.  Your Honor's presided over hundreds
of thousands of matters of people at MDC.  You don't get sent
out of MDC for a stay at the hospital unless something is
falling off your body or somebody with black robes on orders
that.

The moment he left here and was sent to the hospital,
he was at MDC for less than 24 hours.  He spent the next 30
days in a hospital, told to have immediate heart surgery, but
then told by other physicians, maybe we should do your hernia,
or then maybe we shouldn't do anything because your heart may
not be able to withstand the surgery.

And excuse me for the graphics, but in the last two
weeks, one testicle has grown by 30 percent.  It's almost the
size of a tennis ball as we speak, and it grows daily.  Four
weeks ago he had one extra tooth.  The next time I saw him he
was missing a tooth.  What happened?  Well, it was wiggling,
and it fell out.  What does the dentist say?  For four weeks

1    he's put in multiple requests to see a dentist.  He's got a

2    hole in his mouth.  They didn't take him to see a dentist at

3    all yet.

4              THE COURT:  Well, they're two different points,

5    though.  There's no question he has substantial health

6    problems.  There is no question that the MDC is not as good a

7    place to deal with that, though I was glad to see that they did

8    send him to a hospital.  But if I do impose a prison term, the

9    likelihood is high that the Bureau of Prisons will send him to

10   a medical prison or a medical facility where, from everything I

11   ever learned, the care is quite good.

12             MR. COHEN:  Mr. Dennis has a history going back of

13   medical circumstances.  Obviously, the Court already knows the

14   defense's position about further incarceration.  We are

15   requesting there be no further incarceration.  There are

16   doctors he deals with now.  If the Court felt the need to

17   impose further incarceration, I know Mr. Dennis would like to

18   continue to see the doctors who know his situation.  He has

19   told me before, recently, that he needs his heart surgery.

20   Like, it's at the end.  He can't breathe.  He's having

21   significant difficulty walking.  And even though there's a

22   substantial risk from doing it, certain hospitals can handle

23   the surgery but can't handle -- the hernia, certainly can do

24   the hernia, but can't handle -- so you do the trauma but not

25   the cardiovascular.

1              And I don't believe, as your Honor knows, that there

2    is a need for further incarceration, especially considering

3    3553(a) factors.  And as the Court probably -- well, you may

4    not know, but I had a long conversation, a couple of them, with

5    prior counsel, Anthony Cecutti, who I know the Court is

6    familiar with, a very able federal trial lawyer, a criminal

7    trial lawyer.  And Mr. Cecutti told me on numerous occasions

8    that he was told by the government that they would seriously

9    consider a deferred prosecution.  Mr. Cecutti's position is

10   that he would have obtained one for Mr. Dennis, and obviously

11   that is important because at some point, were that the case,

12   there would have been no incarceration.  We wouldn't be

13   discussing further incarceration.

14             We do now have -- Mr. Dennis's career is over.

15   There's nobody here who doubts that.  He has spent significant

16   time in prison.  He has rapidly declined, and he is facing some

17   life-threating situations.

18             I didn't have the benefit of assisting him at trial,

19   but reading the trial transcript, the trial was a disaster.  He

20   had no business representing himself.  His cross-examinations

21   were pedestrian.  His legal acumen, legal arguments,

22   significantly lacking, I would say, to say the least.  And his

23   understanding of any defense theory of a case or how to weave

24   that through cross-examinations and legal arguments is simply

25   nonexistent.  And it wound up being the most uneven of fights

1   because of his decision.

2          THE COURT:  Repeatedly and despite being advised by

3   prior a judge and myself of how foolish that was, hard for me

4   to see that he didn't accept that wrong decision knowingly,

5   willfully, and intentionally.

6          MR. COHEN:  I think he would tell you right now that

7   it was the worst decision, second worst decision of his life.

8   First one being multiple electronic communications.

9          I bring that up because, as I stated and stand by it,

10  the field was reasonable, but this by no means was a slam dunk

11  trial for anybody, the defense or the prosecution.  But if

12  Mr. Dennis was representing somebody else, there would be

13  enough IAC claims here to make one's head spin.  He didn't know

14  what he was doing.  And that doesn't mean that the conditions

15  or the elements of the crimes were not satisfied; they were.

16  I'm just pointing to Mr. Dennis having been in a state of sort

17  of unknowingness for quite some time and, again I would use the

18  term, "mentally ill."

19         Why would he turn down a potentially deferred

20  prosecution?  Now, whether the government gets up here and

21  says, oh, no, that would never happen, there's no doubt -- and

22  we could have Mr. Cecutti come here under oath -- that it was

23  discussed and that it was said if you could get Mr. Dennis to

24  agree to it, bring it to us, but he couldn't get Mr. Dennis to

25  agree to it.

N2AZZDENS-DC

1          THE COURT:  I'm not sure that I'm properly able to

2    take account of those plea discussions.  They, of course, would

3    not be admissible in evidence because of the Federal Rule of

4    Evidence precluding that.  And the Federal Rule of Evidence

5    precluding introduction of settlement discussions, that exists,

6    among other reasons, because people will throw out all sorts of

7    things at a settlement discussion that may not be where they

8    would come out finally.

9          So it seems to me probably bad policy for my even to

10   take account of these alleged settlements.

11         MR. COHEN:  The analogy that I'm thinking of, your

12   Honor, is sort of letting in something for the sole purpose of

13   highlighting state of mind.

14         THE COURT:  Well, all right.  I will accept it for

15   that limited purpose.

16         MR. COHEN:  Thank you, your Honor.

17         So I guess we come down, your Honor, what is it that

18   your Honor should do?  What's sufficient but not greater than

19   necessary to serve the legitimate goals of sentencing?  You

20   know, the federal sentencing guidelines talks about promotion

21   of the idea of non-incarceratory sentences when appropriate,

22   right, and that's what defense is arguing here.

23         THE COURT:  That's what they say as they continue over

24   the years to increase the amount of prison times that they

25   recommend, but this is not germane here, but I think a fair

1    argument can be said that the federal sentencing guidelines and

2    their parallels in various states have played a role in the

3    evil of mass incarceration in this country.  So I'm not a big

4    fan of anything said in the guidelines.

5         MR. COHEN:  Hopefully, the new ones that are

6    supposedly coming out will more accurately reflect your Honor's

7    position as well as the state of intent of non-incarceratory

8    sentences.

9         You know, the federal government is asking for a

10   four-and-a-half-year sentence.  And, your Honor, I have a big

11   problem with not just the number but with the government's

12   position.  What was really difficult for me to swallow, and I

13   will watch my tongue here, but I will quote from the

14   government's submission:  "The defendant appears to have

15   various health conditions.  His medical records show that he is

16   receiving appropriate treatment and medications at MDC."

17        There's not been a case that I've had as a federal

18   defense attorney with anybody who has had a serious medical

19   condition at the MDC who has ever received appropriate medical

20   conditions.  I have had more --

21        THE COURT:  No, I come back -- I might not join in

22   your view.  I think it is clear from innumerable cases that

23   this Court has had involving health issues at the MDC that it

24   is not as well equipped as one would hope to deal with medical

25   issues.  But I also think it's secondary here, because if I do

N2AZZDENS-DC

1    sentence him to prison -- I know you hope I won't -- but if I

2    do sentence him to prison, I think the likelihood is extremely

3    high that he will be sent to a medical prison, a medical

4    facility, and most of those places have really good care.  And

5    that's been, again, the experience of this Court in numerous

6    cases where there has been such a referral.

7             MR. COHEN:  Well, I didn't cite it necessarily for

8    that reason, your Honor, but I cited it for -- it was because

9    that's part of the government's position, right?  If you have a

10   witness who tells a lie on the stand, you're permitted to

11   discount other things because something that they said was a

12   lie, and I'm saying that four-and-a-half-year recommendation,

13   and the idea that he was receiving appropriate medical

14   conditions, is so preposterous to the defense to be offensive.

15   To think that Mr. Dennis -- Judge, he had a tooth fall out of

16   his mouth with no explanation.

17             THE COURT:  I've been so impressed both by the papers

18   you presented and by your argument up to this point.  But if

19   you are saying that the Court should view the statements made

20   by the government as lies, which is what you just said, you

21   analogized it to the principle, which, by the way, is part of

22   state law but not federal law --

23             MR. COHEN:  Understood.

24             THE COURT:  -- that he lied once, you can infer that

25   he lied always, that was your analogy, and then you go on to

1    say that they're asking for a substantial sentence as the

2    spokespersons of the victims, as the spokespersons of society

3    is somehow so offensive that I should draw a negative

4    inference, I think that's not a very promising argument.

5         MR. COHEN:  To be clear, I made that in conjunction,

6    your Honor, and I said the idea that he was receiving

7    appropriate medical condition -- medical treatment at the MDC

8    is -- that's what I refer to as offensive.

9         THE COURT:  All right.  I think maybe you should move

10   on.

11        MR. COHEN:  Got it.

12        Things that were not in the sentencing memorandum,

13   your Honor, he's been told by outside doctors -- because he

14   receives a cocktail of different medications, and he even had

15   one doctor give one medication for the hernia, another doctor

16   gave something for the breathing, another one for the heart

17   condition.  And he's supposed to be checked, his blood

18   pressure, his heart rate, several times a day.  Three weeks

19   went by where he did not have his blood pressure checked even

20   once.  More than a month went by from December, late December,

21   to late January without his pulse ever being taken.

22        His medical condition, I am putting forth to the

23   Court, has worsened significantly.  And I understand the

24   Court's position that were you to continue his incarceratory

25   period that he would receive better medical care.  What I'm

N2AZZDENS-DC

1    suggesting to your Honor is as a result of the inability of the

2    BOP up to present to provide that, his medical condition has

3    grown substantially worse, and I believe that the Court could

4    permissibly consider that consequence.

5         THE COURT:  No, that's certainly within the broad

6    spectrum of things that the Court can consider, so I will take

7    that argument.

8         But I also need to make you aware that you've gone on

9    for quite some time now, and so I think you ought to bring your

10   comments to a close.

11        MR. COHEN:  Okay.  Your Honor, the rise and fall of

12   Willie Dennis is a tragedy, a tragedy by his own making.

13   That's what this is all about, right, willie Dennis' rise and

14   his much faster fall.  None of what happens to Mr. Dennis from

15   this point on will do anything to make his victims safer or do

16   anything to make Mr. Dennis more rehabilitated or will do

17   anything to further the goals of sentence.

18        The Court need not fear any more transgression from

19   Mr. Dennis.  His well-lived life, his lack of prior

20   criminality, the restrictions that undoubtedly will follow him,

21   restrictions on his electronic communications that will stay

22   with him, the monitoring of his electronic communications, his

23   immobility, and of course, your Honor -- and I know your Honor

24   credited this during the course of the trial -- but his desire

25   and his parents' need for him to be there and be a caretaker

N2AZZDENS-DC

```
1   for such, this is what Mr. Dennis will be.  Home incarceration,
2   if necessary; electronic monitoring, as necessary; whatever
3   type of restrictions one would need.  You already know our
4   request in terms of the non-incarceratory period.  If the Court
5   were so gracious to grant that, we would further ask, as you
6   probably already know, that he be allowed to live and he be
7   required, in essence, to live with his parents where he was
8   leading up to the trial.  No one here will ever hear from
9   Mr. Dennis again, and he will maintain his residence down in
10  Florida with his parents.
11          Thank you for the colloquy.
12          THE COURT:  Thank you very much.  Let me hear from the
13  government.
14          MS. KUSHNER:  Thank you, Judge.
15          What I heard today from the defendant and from his
16  counsel is, if you were to call it even acceptance of
17  responsibility, the bare minimum of that.
18          THE COURT:  You know, why should I care whether it's
19  the bare minimum or that he beats his chest and throws himself
20  down?  I've never understood why the government pays so much
21  attention to that.  In the hundreds of cases I've had, many,
22  many, many, many defendants come before this Court who have
23  pled guilty and say, Judge, you'll never see me again.  I'm a
24  changed person.  I'm so sorry.  What I did was awful, and half
25  of them are lying through their teeth, and half are telling the
```

1    truth.  But doesn't seem to me that it's my job to figure out

2    which half they fall in.

3            When I'm composing a sentence, I look first and

4    foremost at the nature of the crime, then I look at the nature

5    of the defendant, the fellow human being who I'm being asked to

6    sentence.  And then I look, as part of the nature of the crime,

7    of how much pain and suffering was imposed on the victims,

8    which in this case looms large, and then I look at the other

9    factors under Section 3553.

10            So what I took away from your excellent review and

11    what I really saw in the court was just how real the pain and

12    fear of these victims was.  It changed their lives.  And so to

13    me that's, from your standpoint, the most meaningful element in

14    favor of a substantial sentence.  Remorse, eh.

15            I don't know if the reporter will pick up "eh," but

16    she'll do her best, or he'll do his best.

17            Go ahead.

18            MS. KUSHNER:  The government, of course, agrees and

19    doesn't want to just repeat what was in the sentencing

20    submission, but like you just pointed out, I mean, the harm

21    here was the fear.  So there's been a distraction, I think,

22    today about whether he ever owned a gun or engaged in any

23    physical violence, and that just doesn't matter here in terms

24    of calculating the appropriate sentence.  The conduct here was

25    to disrupt and to cause instability amongst these victims'

N2AZZDENS-DC

| | |
|---|---|
| 1 | lives, never knowing whether or not the person, the defendant, |
| 2 | was going to show up to their home to "water their flowers" or |
| 3 | was going to show up, and in fact did show up, to the deli with |
| 4 | Ms. Bostick and said, "I'm going to handle this my way."  He |
| 5 | gave every reason to be in fear day in and day out, year after |
| 6 | year after year.  This is not -- |
| 7 | THE COURT:  I agree with that. |
| 8 | MS. KUSHNER:  And given the length of the conduct and |
| 9 | the number of messages, it's not an aberration.  This was |
| 10 | someone who was calculated.  As you know, as the doctor who |
| 11 | examined the defendant knows, this was calculated conduct that |
| 12 | was designed to upend people's lives. |
| 13 | And what the defendant is saying here today is that, |
| 14 | okay, it was a misguided way to accomplish goals, those goals |
| 15 | that he claims are about empowering women, empowering black |
| 16 | attorneys. |
| 17 | THE COURT:  No, no, no.  I really don't want to -- I |
| 18 | took what he said earlier today to be acceptance of |
| 19 | responsibility under the guidelines, little though I care for |
| 20 | the guidelines, because he recognized that what he did was |
| 21 | knowing, voluntary.  It was intended to intimidate.  He knew it |
| 22 | would intimidate, and he did it with his victims again and |
| 23 | again and again and again through hundreds, if not thousands, |
| 24 | of emails.  And his lawyer reconfirmed that.  So I don't think |
| 25 | there's a debate about whether -- or if you want to have a |

N2AZZDENS-DC

1    debate, I don't see the relevance of whether he has fully

2    accepted deep responsibility.

3            MS. KUSHNER:  And sorry, I was making a different

4    point, and I probably wasn't being clear about that.

5            THE COURT:  Okay.

6            MS. KUSHNER:  What the defense says in its submission

7    is that these messages -- I'm not talking about acceptance of

8    responsibility, but I'm talking just about the seriousness and

9    the nature and circumstances of the offense here and the

10   justification that is being provided for the offense conduct in

11   the defendant's own submission and, I believe, repeated here

12   today.

13           THE COURT:  His "noble causes."

14           MS. KUSHNER:  That there were noble causes.

15           THE COURT:  And you may recall how I reacted to that

16   just a few minutes ago, so you needn't worry about that.

17           MS. KUSHNER:  Thank you, Judge.

18           I want to just point out that the --

19           THE COURT:  Let me put my question to you, and I

20   apologize because your adversary spoke for quite a length of

21   time, and you barely had more than a few minutes to speak.  But

22   here's the way I look at it, subject to hearing from

23   Mr. Dennis, of course.

24           The crimes were of a very serious sort.  Their impact

25   on the victims was terrible, and the sheer magnitude of those

1    crimes that he committed again and again and again over many,

2    many months would normally call for a substantial prison

3    sentence and still may.

4            On the other hand, under Section 3553, I also need to

5    look at the character of the human being that I'm being asked

6    to sentence.  His character until the events leading up to this

7    initial friction with the firm and then it devolved into

8    criminal activity were quite impressive.  And if ever one

9    should receive some credit for a life well lived up to that

10    point, the day of sentence is the time to receive that.

11            There's also his health problems, though I've

12    indicated I don't think that's as significant as defense

13    counsel does, but they're not irrelevant.

14            There's a question of deterrence.  It will be

15    interesting what you have to say on this.  I think the

16    government's position, if I understand it, is not so much to

17    argue specific deterrence as general deterrence.  It seems

18    unlikely that this defendant is going to engage in the same

19    behavior again, although, ironically, defense counsel's

20    suggestion that he was under some sort of mental limitation, if

21    I were to credit that, might argue for incapacitation, another

22    factor that the Section 3553 references.

23            But I don't think it's likely he's going to do this

24    again, so general deterrence is a different kind of question.

25    The trouble with general deterrence is it's very hard to

N2AZZDENS-DC

1    measure.  In fact, criminologists on the whole have thrown up

2    their hands at trying to measure.  You know it in the extremes.

3    You know that the death penalty is more of a deterrent than

4    probation, but not in a more nuanced way.  So I still think

5    that the elephant in the room is the enormity of the pain and

6    suffering and fear inflicted on the victims.

7              But let me hear what else you have to say.

8              MS. KUSHNER:  I absolutely agree with that, Judge, I

9    do, and I do agree that general deterrence is an important

10    factor here.  I don't want to completely discount the specific

11    deterrence, and I think that may be why I was focusing on the

12    acceptance of responsibility part.  Because on January 27,

13    2023, we have the defendant's medical records.  He told the

14    doctor at MDC that the patient feels ex-partners have turned on

15    the patient, setting him up over a charge of threatening

16    behavior on the eve of a possible legal proceeding.  I assume

17    that refers to the civil lawsuit that he still has pending

18    against K&L Gates, which I believe is another potential avenue

19    to harass and harm the very same victims in this case.

20              THE COURT:  Well, he has a legal right to pursue his

21    lawsuit.

22              MS. KUSHNER:  Absolutely.  But I believe that, based

23    on his own statements, that lawsuit was another part of trying

24    to shake down the firm and to get what he wanted or believed

25    that he was entitled to, which is part of the motivation, the

1    government submits, for the yearslong harassment of all

2    different types of partners at the firm -- young, old, black,

3    white, Jewish.  And so I think there is some concern that not

4    fully appreciating what he did was wrong, that that would

5    justify a significant term of imprisonment both to ensure that

6    he is justly punished and to ensure that that punishment is a

7    deterrent going forward, it is a deterrent even against other

8    victims.

9        During the course of this case, while he was not

10   emailing in a serial fashion the victims in this case, he was

11   emailing people closely associated with K&L Gates over and over

12   and over again.  He was doing that with the Court, in fact, as

13   well.  So I think that there is need here for both specific and

14   general deterrence, and I don't want to discount that

15   completely.

16       But, of course, the government agrees with your Honor

17   that the nature and circumstances, seriousness of offense, and

18   that the harm that the victims received here is the most

19   important driving factor for a significant term of

20   imprisonment.  And I think that all blends together with the

21   history and characteristics of the defendant and who he is and

22   his selfish, compulsive, obsessive behavior.

23       So I think those very strong 3553(a) factors warrant a

24   significant term of imprisonment, as do the others, just

25   punishment, deterrence, need to protect the public and the

N2AZZDENS-DC

1      community from the defendant.  And I think incapacitation will

2      achieve that, and anything short of a serious term of

3      imprisonment will not.

4           THE COURT:  All right.  Thank you very much.  No, wait

5      a minute.  Your colleague says you forgot something.

6           MS. KUSHNER:  Very helpfully.

7           Of course, two of the three victims are here today,

8      Mr. Bicks and Mr. Cottle.  I want to make sure that if they

9      would like -- and they, of course, submitted their statements

10     along with Ms. Bostick, who I was in touch with right before

11     the sentencing and will be in touch with her right after this.

12     It is too traumatic for her to be here.  It was -- I understood

13     it was traumatic for her to be here testifying at trial, but

14     she is very well aware, very much following these proceedings,

15     but it was too traumatic for her physically to be here today.

16          THE COURT:  I understand.  But are you saying the

17     other victims want to be heard now?

18          MS. KUSHNER:  I think Mr. Bicks may want to speak to

19     the Court.

20          THE COURT:  All right.  Let's hear from them now,

21     then, before we hear from the defendant.

22          MS. KUSHNER:  I misspoke.  The victims just want to

23     rely on the statements they submitted and, of course, their

24     trial testimony.

25          THE COURT:  All right.  I mean, I would say this is

N2AZZDENS-DC

1   the unusual case where I heard at length from the victims, and

2   as I indicated earlier today, I fully credit everything they

3   said at the trial.  So I think I already know their situations.

4           MS. KUSHNER:  Yeah.  And I just wanted the Court to be

5   aware that, of course, they are here today.

6           THE COURT:  Okay.  Let me hear from the defendant.

7           MR. COHEN:  Your Honor, would you like him to stand?

8           THE COURT:  No, he can be seated.  Just bring the

9   microphone --

10          MR. COHEN:  He just didn't want to be disrespectful.

11          THE COURT:  Yes.  I keep asking my wife to stand when

12  I address her, and she says, get lost.

13          THE DEFENDANT:  Your Honor, thank you for allowing me

14  the opportunity to make this statement.

15          First, I need to apologize to the victims in this

16  case:  Ms. Bostick, Mr. Cottle, and Mr. Bicks.  I've known each

17  of them for over ten years and refer to each of them as Callie,

18  Eric, and John, and they refer to me as Willie.

19          I am sorry for what I put each of you through as a

20  result of my emails and text messages.  What began as a

21  business dispute I turned into something which resulted in you

22  being terrified of me.  It was never my intention, but it was a

23  result of my actions, and I fully accept responsibility for my

24  actions and their negative consequences which harmed each of

25  you.  Please know that I will be forever regretful and ashamed

1    of my behavior.

2           While sitting in my cell at the Metropolitan Detention

3    Center, particularly during the holiday season -- Thanksgiving,

4    Christmas Eve, Christmas, New Year's Eve, New Year's Day, MLK

5    day -- it was -- ever present in my mind were the painful

6    thoughts of where our relationships began and what do my

7    actions -- I caused them to come.

8           Callie, you were someone who I mentored when you came

9    to the firm as a summer associate and then as a junior

10   associate and later became a partner in a male-dominated

11   industry.  To now have you fear for your physical safety from

12   me is a testimony of the devastation of my actions.

13          Similarly, Eric, when you joined the New York office,

14   I was thrilled.  You were the second African-American partner

15   in the history of the firm's New York office.  I was so excited

16   about it that I tried to introduce you to many attorneys and

17   business people that I knew in the tri-state area.  It hurts me

18   now to know that my communications caused fear in you for your

19   own safety.

20          John, you and my son both attended Allen-Stevenson

21   School, obviously at different times.  But when you were

22   promoted to managing partner of the New York office and I

23   quickly pointed out that connection to you, hoping that would

24   build a bond between us, and now through my actions all that

25   has been destroyed.  Now, you and your family are fearful that

N2AZZDENS-DC

1    one day I may come to harm you.  Again, it was never my

2    intention, but it was a result of my actions.  I got carried

3    away and crossed lines I never should have crossed.  I wish I

4    had realized this sooner.

5         But one of the most fortunate things about this matter

6    is that I read all the letters submitted by my family, friends,

7    colleagues, and counsel.  And I can only ask myself, how did I

8    end up here?  I was so wrapped up in my own causes and so

9    blinded by my emotions I could not hear the reasonable voices

10   around me trying to guide me.

11        I apologize to my legal counsel that tried so hard to

12   help me, Mr. Cecutti and Mr. Commissiong, who both tried to

13   offer me expert advice, but I could not hear them at the time.

14   I will continue to pay for that error in judgment the rest of

15   my life.  It was not their inability to give good advice, it

16   was my inability to hear it.  To think that Mr. Cecutti told me

17   that the government would seriously consider a deferred

18   prosecution, but I just could not hear him at the time.  The

19   resulting consequences are far beyond what I could have

20   imagined.  I'm sorry I did not heed his counsel, and not a day

21   goes by when I'm sitting in my cell at MDC that I don't think

22   about that.

23        I want and need to apologize to the Court, your Honor,

24   and your legal and administrative team.  I came before you as a

25   man on a mission dedicated to vindicate my name through trial.

1    I came into your courtroom with all the pride of a man who had

2    been practicing criminal law for 30 years.

3        You knew the truth, however, that I was a corporate

4    lawyer with no litigation or criminal experience, and you tried

5    to help me.  During our first conference call, you stressed the

6    value add that Mr. Cecutti could bring to what I was trying to

7    accomplish, but I could not hear you, blinded by my open

8    emotions.

9        During our second call, you tried to get me to slow

10    down and consider more carefully my approach and timing for the

11    trial, offering to give me more time to prepare it, but I could

12    not hear you, blinded by my emotion.  Instead, what I did was

13    spar with you.  When others much smarter than I in federal

14    criminal court would have heeded your words and benefited from

15    doing so, I spoke when I should have listened.  I got angry and

16    dug my heels in when I should have followed your advice and the

17    wisdom.  How ignorant I was arguing unimportant points with

18    your Honor.

19        They say smart people know what they know and, most

20    importantly, know what they don't know.  By that measure, I was

21    not a smart man.  I see and hear now, your Honor, that which I

22    was blind and deaf to before.  The confluence of events in my

23    life leading up to this criminal proceeding turned my life

24    upside down.  Excuses will do no one any good.  I simply wanted

25    to say that -- to thank you to everyone for trying to help me

out.  I am truly sorry to everyone I have hurt.  I take full

responsibility for my actions.  I have no one else to blame.

The blame begins and ends with me.

Your Honor, I come to you now as an old and broken

man.  As a result of my actions, I have lost everything -- my

family, my career, my friends, and my physical health.  I look

at what life was like before and I -- and I see how my actions

did cause fear and did cause concern.  When I -- when I could

and should have drawn a line in the sand, I did not, and to

that I am deeply sorry.

At the Brooklyn prison, I have felt the fear that

Callie, Eric, and John may have felt.  I am surrounded by,

among others, significant dealers of narcotics, persons

associated with ISIS and al-Qaeda, as well as professional

hitmen.  While at the Brooklyn prison, I suffered the effects

of pepper spray and received bodily threats.  I completely

understand now the fear that John, Callie, and Eric felt for

me.  I'm feeling it every day and every night.  I would not

want to impose that on anyone.

To Callie, Eric, and John, there are no words to

explain what I did or how remorseful, regretful, and ashamed I

am of my actions.

Your Honor, I come before you as an old and broken

man, and if I am released, my primary goal is to address my own

health issues, the failing health of my parents, and repair my

1   relationship with my children.

2              As my parents sacrificed for me during most of their

3   lives, I believe it is time for me to sacrifice for them.  My

4   parents are old, 88 and 82, and elderly.  My father worked for

5   31 years as a New York sanitation worker, working behind the

6   truck all those years.  I never remember my father having

7   worked less than two jobs to put me, my sister, and my brother

8   through school.

9              He was always and remains a frugal man.  He retired as

10  a most senior person in the New York Sanitation Department

11  seniority chart.  He did this his whole life, which allowed him

12  to put food on the table and educate us and a roof over my head

13  so I could become an attorney, not a convicted criminal.  My

14  mother worked as a domestic and took care of us, something she

15  was proud of.

16             Now that my parents are older, more fragile, less

17  dependent, I feel it's time for me to sacrifice for them so

18  that they leave this world in a better place.  I am ashamed of

19  my actions because they are contrary to what they would have

20  ever done or preached in this world.  I was the first person to

21  go to college, the first person to go to law school, and now

22  they have to witness and lie through this.  As they should be

23  smiling at my accomplishments, they are mired in the sadness

24  and depression for what they have sacrificed, where I am and

25  what I have done.

1          Your Honor, I fully accept responsibility for what

2    I've done to my family.  I fully accept responsibility for the

3    wreckage that has occurred all around me.  I have lost the

4    goodwill and respect of my partners, my sons further removed

5    from me, and the opportunity for me to repair that relationship

6    has slipped through my fingers, and my parents are left alone

7    to fend for themselves.  And I am at fault for all of this.

8          I think about these things every day and accept full

9    responsibility and will for the rest of my life.  I humbly ask

10   your Honor to believe that I get it now, to believe that I'm

11   not a threat to anyone; that I am remorseful, ashamed, and

12   broken.  I am not a threat to anyone.  I will abide by every

13   condition the Court sets and follow all the requirements if the

14   Court should feel the ability to release me.

15         I can see and hear now what I could not before, your

16   Honor.  Thank you for giving me the opportunity to make this

17   statement.

18         THE COURT:  Thank you very much.

19         So as that statement illustrates and as the Court has

20   never had any doubt about, Mr. Dennis is a highly intelligent,

21   very eloquent person.

22         And no one feels greater anguish than I do at my

23   responsibility to impose a sentence reflecting all the factors

24   under Section 3553(a) because Mr. Dennis, for so much of his

25   life, was so to be admired that it is a tragedy that he engaged

N2AZZDENS-DC

in this misconduct. But I am obligated under Section 3553 to look at all the relevant factors, and as I've already indicated, the one factor that is glaring beyond all else is the degree of fear and emotional distress that he imposed day after day, message after message on the victims of his crime. And that cannot go unpunished.

At the same time, I am not convinced by the government's suggestion that he should serve four or five years, even though I totally disagree with defense counsel that that is somehow an off-the-chart suggestion. It's a suggestion that finds its base in the very crimes committed. But it has to be mitigated here by all the other factors under Section 3553(a) of which always to this Court is the nature of the human being who this Court is called upon to sentence.

So balancing all those factors, weighing them in a sense that I've considered at great length even before the excellent arguments I heard today and the lovely statement from the defendant, the sentence of the Court is the defendant is sentenced to two years, 24 months, in prison, of which, of course, he's already served some, to be followed by three years of supervised release on terms I'll go into in a moment. No fine will be imposed because this defendant is not going to be in a position to pay any meaningful fine now or in the foreseeable future notwithstanding some of the assets he has. But there is a $300 special assessment that must be paid

N2AZZDENS-DC

1    because it's mandatory.

2            In terms of supervised release or, first, the

3    mandatory conditions:  The defendant not commit any other

4    federal, state, or local crime; that the defendant not

5    unlawfully possess a controlled substance; that the defendant

6    within 15 days from his release from prison submit to one drug

7    test to be followed by two periodic drug tests thereafter as

8    determined by the probation office; and that the defendant

9    cooperate in the collection of DNA.

10            There will also be imposed the standard conditions 1

11    through 12.  They appear on the face of the judgment but also

12    will be gone over with the defendant by the probation officer

13    when he reports to begin his period of supervised release,

14    which he must do within 72 hours of his release from prison.

15            And then there are the special conditions.  The first

16    one recommended by the probation office is a mental health

17    treatment program, and I would have imposed that because, to a

18    limited extent, I agree with defense counsel's notion that

19    Mr. Dennis was out of control when he committed the crimes here

20    for emotional reasons.  But two psychiatrists have now said

21    there's nothing more seriously mentally ill about him, and

22    therefore, I don't see the reason for the mental health

23    program.  So that will not be imposed.

24            Similarly, there's a recommendation for drug testing

25    and drug treatment program for drugs and alcohol.  I've already

imposed the mandatory three tests, but I don't see any reason

for burdening this defendant with an outpatient drug and

alcohol treatment program.  He doesn't have in his history any

serious problems in that regard.

There are restrictions that must be imposed relating

to the victims.  Specifically, the defendant shall stay at

least 100 yards away from the victims in this case and any

other current or former employee of K&L Gates.

He shall stay at least 100 yards away from the home,

school, business, and place of employment of the victims and

any other current or former employees of K&L Gates.

He should stay at least 100 yards away from the Law

Offices of K&L Gates.

He shall refrain from having any communication or any

other contact, directly or through any other person, by mail,

telephone, email, voicemail, social media, or any other means

with the victims and with any other current or former employee

of K&L Gates.

He shall refrain from harassing, intimidating,

threatening or otherwise interfering with the victims and

members of the victims' households and their children.  And the

defendant shall refrain from other harassing, intimidating,

threatening, or otherwise interfering contact with any other

current or former employees of K&L Gates and the members of

their households.

1          Probation also recommends the automatic search

2     provision.  I never impose that.  I think it is close to being

3     unconstitutional.

4          And, finally, probation recommends, and I agree, with

5     respect to his use of laptops and software, and the like, that

6     he shall permit the U.S. Probation Office to install any

7     application or software that allows them to survey and/or

8     monitor all activity on any computers, automated service, or

9     connected device that he will use during the term of

10    supervision and that can access the internet.  The U.S.

11    Probation Office is authorized to install such applications or

12    software.  There are also more details about all of that which

13    were set forth in the probation report that I will impose by

14    reference.

15         So before I advise the defendant of his right of

16    appeal, is there anything else either counsel needs to raise

17    with the Court?  Anything from the government?

18         MS. KUSHNER:  No, your Honor.

19         THE COURT:  Anything from defense counsel?

20         MR. COHEN:  I don't know if your Honor has the

21    authority to do it, but Mr. Dennis wants to go ahead with the

22    surgeries that have been recommended.  And he's been seeing a

23    doctor, not in the last couple months, in Bellevue who

24    recommended it.  He would like to be able to have those

25    surgeries as soon as possible, so they asked --

N2AZZDENS-DC

1          THE COURT:  Well, I can't order that, but what I will

2     do -- first of all, I will recommend to the Bureau of Prisons

3     that he serve his time in a medical prison.  I'm specifically

4     referring to the couple of prisons that are specially designed

5     to deal with serious medical problems.  And I so recommend.

6     Can't order it, but recommend it.

7          With respect to your more particular recommendation,

8     if he's going to be shipped off quickly to a medical prison, I

9     don't see the need for it.  But sometimes those take the Bureau

10    of Prisons about 42 days as the sort of norm.  So is there's

11    something you want done during that period?

12         MR. COHEN:  Yes, that is the request, your Honor,

13    because he would like to have the -- I know you can't order

14    them.  I guess the ask is if we left him at MDC, I don't know

15    if we could do that for a certain period of time, and he could

16    tell the doctors now.  Because they keep coming to him and

17    saying, do you want it?  He wasn't sure because he didn't know

18    what would happen here, but he wants to go ahead with those

19    surgeries at Bellevue where they offered to do that.

20         THE COURT:  All right.  Well, the most I think I can

21    recommend, because I don't have the medical knowledge to deal

22    with this in greater detail, is that they give important

23    consideration to his new -- of the position that he is

24    recommending for himself in light of the sentence imposed.

25         MR. COHEN:  Does the Court have the authority, and if

N2AZZDENS-DC

 1    you do, would you, to order that he be seen at Bellevue, and I

 2    think maybe he could make that happen with the doctors?

 3          THE COURT:  I may have that power, but I'm not sure I

 4    want to yet impose it.  I want to see what they do.  So what I

 5    will do is I will give you leave, joining with the government,

 6    to call chambers a week from today when we'll have a better

 7    idea of how the MDC wants to deal with his situation between

 8    the time he is relocated to the medical prison.

 9          All right.  Mr. Dennis, you have a right to appeal the

10    sentence.

11          Do you understand that?

12          THE DEFENDANT:  Yes, your Honor.

13          THE COURT:  No, you have to say it in words.

14          THE DEFENDANT:  Yes, your Honor.

15          THE COURT:  And if you can't afford counsel for the

16    appeal, the Court will appoint one for you free of charge.

17          Do you understand that?

18          THE DEFENDANT:  I've seen an order.  I thought that

19    the order appointed Mr. Cohen, who --

20          MR. COHEN:  You may have appointed me, your Honor,

21    both for the sentencing --

22          THE COURT:  Okay.  I'm delighted.  As you, I think,

23    fully recognize, Mr. Cohen has been utterly terrific on your

24    behalf, and I'm happy to have him continue as your attorney at

25    the expense of the government -- the expense of the court, not

N2AZZDENS-DC

1    the government.

2            All right.  Anything else anyone needs to raise?

3            MS. KUSHNER:  Not from the government.

4            MR. COHEN:  Nothing from the defense.

5            THE COURT:  All right.  I have another matter right

6    now, so if you would vacate as quickly as possible.

7            (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25